UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

PATRICK GUILLORY,

                              Plaintiff,
                                                      9:13-CV-00378
v.                                                    (NAM/TWD)

CHERYL MORRIS, PAUL GREENTH, MAUREEN
BOLL, OFFICER POTTER,

                              Defendants,

_____

APPEARANCES:                              OF COUNSEL:

PATRICK GUILLORY
09-B-0714
Plaintiff *pro se*
Southport Correctional Facility
P.O. Box 2000
Pine City, New York 14871

HON. ERIC T. SCHNEIDERMAN            RICHARD LOMBARDO, ESQ.
Attorney General for the State of New York
Attorney for Defendant
The Capitol
Albany, New York 12223

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**ORDER AND REPORT-RECOMMENDATION**</u>

      Plaintiff, Patrick Guillory, an inmate presently confined in Southport Correctional Facility

("Southport"), has commenced this *pro se* action against Defendants Cheryl Morris, Paul

Guenette, incorrectly sued as Paul Greenth, Maureen Boll and Officer Potter, in their individual

and official capacities.[1]  (Dkt. Nos. 15; 56-1 at 4.)  Plaintiff has alleged that Defendants violated

his civil rights under 42 U.S.C. § 1983; the Religious Land Use and Institutionalized Person Act

of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc, *et seq.*; the N.Y. Constitution, art. 1, §§ 3 and 11; and

N.Y. Correct. Law § 610.[2]  (Dkt. No. 15.)

Defendants have moved to dismiss Plaintiff's Amended Complaint (Dkt. No. 15) for

failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  For the reasons that

follow, the Court recommends that Defendants' motion be granted in part and denied in part.

The Court has also reviewed claims asserted in the Amended Complaint that were not addressed

in Defendants' motion papers under 28 U.S.C. §§ 1915(e)(2)(B) and made recommendations

with regard to those claims.

I.      **BACKGROUND**[3]

A.      **Plaintiff's Side-Locks**

Plaintiff is Jewish and describes himself as "a right-winged Zionist who takes [his]

Jewishness seriously."  (Dkt. No. 15 at p. 1.)  On March 3, 2010, while Plaintiff was confined at

MidState Correctional Facility ("MidState"), Defendant Maureen Boll ("Boll"), Department of

_____

[1]  Defendant Rowland Potter was initially sued as "John Doe, C/O P."  (Dkt. Nos. 15 at p. 32; 56-1 at 4; 09/04/2013 Text Order .)

[2]  The Court notes that Plaintiff has filed a number of lawsuits, including five others pending in this District.  *See Guillory v. Ellis, et al.*, 9:11-CV-600 (MAD/ATB); *Guillory v. Weber, et al.*, 9:12-CV-280 (LEK/RFT); *Guillory v. Boll, et al.*, 9:12-CV-1771 (FJS/DEP); *Guillory v. Overbaugh, et al.*, 9:13-CV-1353 (MAD/RFT); and *Guillory v. Haywood, et al.*, 9:13-CV-1564 (MAD/TWD).

[3]  The background facts set forth herein, which the Court must accept as true for purposes of this motion, are taken from Plaintiff's Amended Complaint.  (Dkt. No. 15.)  *See Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994).

2

Corrections and Community Supervision ("DOCCS") Deputy Commissioner and Counsel, sent a letter memorandum advising Plaintiff he did not need a permit from her office to wear side-locks.[4]  *Id.* at ¶¶ 2, 5.

On November 18, 2012, when Plaintiff arrived at Upstate Correctional Facility ("Upstate"), he had side-locks that were nearly eleven inches long.  *Id.*  At Upstate, inmates were allowed one haircut a month.  *Id.* at ¶ 4.  Plaintiff was not allowed to have his hair cut as long as he had his side-locks.  *Id.*  When Plaintiff showed the "hair cut Officers" the Boll letter memorandum, he was told that it only applied to MidState.  *Id.*  Plaintiff thereafter sent letters to Defendants Boll, Cheryl Morris ("Morris"), Director of DOCCS Ministerial, Family, and Volunteer Services, and Paul Guenette ("Guenette"), Acting Director of  DOCCS Ministerial, Family, and Volunteer Services, among others, concerning his side-locks.  *Id.* at ¶ 5.  He told them about threats from corrections officers at Upstate regarding chopping off his side-locks and asked for a hair permit allowing him to keep his side-locks that would apply to all New York State Correctional facilities.  *Id.*

Plaintiff claims that his request was continually denied by the recipients of his letters.  *Id.*  However, he alleges in his Amended Complaint that between January 25, 2013, and February 1, 2013, he was interviewed by Sgt. Golsky regarding the threats and denial of his hair cut permit.  *Id.*  Sgt. Golsky informed Plaintiff she had been sent by her Lieutenant to address Plaintiff's repeated letters to Boll, Morris, Guenette and others.  *Id.* at ¶6.  Sgt. Golsky also told Plaintiff

---

[4]  The second page of the March 3, 2010 letter memorandum is annexed as Exhibit B to Plaintiff's Amended Complaint.  (Dkt. No. 15-1 at 2.)  The second page reads in relevant part: "Therefore you are allowed to grow your hair in side-locks, or peyos as you wish, without a permit from this office."  The Court has no knowledge regarding the content of the first page of the letter memorandum since Plaintiff elected not to include it.

that the issues were being investigated by Plaintiff's corrections counselor from DOCCS Ministerial, Family, and Volunteer Services and by Defendant Boll as a result of all of Plaintiff's letters. *Id.*

When Plaintiff was transferred from Upstate to Greene Correctional Facility ("Greene") on February 1, 2013, he still had side-locks. *Id.* at ¶ 7. On February 5, 2013, the Hon. Frederick J. Scullin, Senior District Judge, issued a decision and order in *Guillory v. Boll, et al.*, 9:12-CV-1771, directing Boll to respond to Plaintiff's complaint in that action. The lawsuit had been commenced against Boll for allegedly ordering retaliation on Plaintiff for engaging in protected conduct. *Id.* at ¶ 8; Dkt. No. 15-1 at 10.

On or about February 6, 2013, Plaintiff spoke with Rabbi Gulack at Greene and showed her Boll's March 3, 2010, letter memorandum. *Id.* at ¶ 9. The Rabbi told Plaintiff he would have no problems with the security staff at Greene regarding his side-locks because the letter applied state-wide. *Id.* However, when Plaintiff left the law library on February 9, 2013,[5] Defendant Officer Potter ("Potter") told him that he was not allowed to wear side-locks. *Id.* at ¶ 13. When Plaintiff showed Potter Boll's letter memorandum, Potter told him that Boll had revoked the letter because it only applied to MidState. *Id.*

According to Plaintiff, during the encounter, Potter referred to him as the "fucking Jew Lawyer who likes to file inmate claims."[6] *Id.* Potter issued a direct order to Plaintiff to cut off

---

[5] Given the chronological order of Plaintiff's allegations, the Court assumes that he intended to allege February 9, 2013, rather than January 9, 2013, in his Amended Complaint. (Dkt. No. 15 at ¶ 13.)

[6] Plaintiff had filed an inmate claim at Greene on February 7, 2013, claiming that all of his property and electronics were lost or stolen by Upstate employees in retaliation for all of the complaints he had filed while he was confined there. (Dkt. No. 15 at ¶ 10.) He was ordered to

his side-locks and told him he would not be allowed in the chow hall until he did.  Plaintiff had

to return to his unit and cut off his side-locks with a razor because otherwise he would have

"receive[d] a swift beat down and [would have been] sent directly to the Special Housing Unit

(SHU)."  *Id.*

Plaintiff spoke with Rabbi Gulack after he had cut off his side-locks.  She told him that

Potter was not supposed to order Plaintiff to cut them off regardless of what Boll had told him

and regardless of claims Plaintiff had filed.  *Id*. at ¶ 18.

### B.      Kosher Meals

On or about February 6, 2013, Plaintiff signed a request for Kosher meals and to

participate in special meals and events during Jewish holy days.  (Dkt. No. 15-1 at 24.)  The

request was approved by the Deputy Superintendent of Programs at Greene on or about March

20, 2013.  (Dkt. No. 15 at ¶ 9.)  The request signed by Plaintiff, referred to by him as the "Jew

Contract" (referred to herein as the "Kosher diet agreement"), provided that: "These meals are

being specifically prepared for you.  Therefore, meal attendance is expected.  If you are found not

in compliance with this consent, you may be subject to disciplinary sanctions." *Id*. at ¶ 23 and p.

24.  Plaintiff was told that the Kosher diet agreement was drafted by Defendants Morris and

Guenette, and that facility staff were told to enforce the contract as to all Jewish inmates . *Id*.

---

go to the grievance office at Greene the next day.  Plaintiff told Correction Officer Snide that he
had filed an inmate claim, not a grievance, and the grievance office at Greene had no jurisdiction
over the claim.  *Id*. at ¶ 11.  Snide suggested that Plaintiff give his bags some time to get to
Greene.  Plaintiff responded that he had a limited time to file a claim pursuant to DOCCS
directives, that he knew DOCCS directives, rules, and regulations, and did not need Snide's input
regarding the same, which "ticked [Snide] off."  *Id*.

Plaintiff was informed that Morris had previously worked at Greene and still had friends there. *Id*. Plaintiff took it as a warning against challenging the Kosher diet agreement *Id*.

On March 30, 2013, Plaintiff was ill with a cold and signed up for nurse sick call. *Id.* at ¶ 29. He was too ill to pick up his Passover meals at 4:00 pm in the Activities Building.[7] *Id*. On March 31, 2013, when Plaintiff reported to the Activities Building to pick up his Passover meals, he was told by a corrections officer that he had "violated the [the Kosher diet agreement] and was not in compliance by missing the Passover meal on March 30, 2013. [Therefore] since you cannot seem to comply with your own religious beliefs go back to your housing unit and you **may** get your food tomorrow." (emphasis in Amended Complaint) *Id*. at ¶ 30. Plaintiff was then given a direct order to report back to his housing unit without his religious food. *Id*.

Plaintiff claims that Muslims, Rastafarians, and Christians are not subject to a threat of disciplinary sanctions like those imposed on Jewish inmates, and that "special diet offenders" can miss three meals without discipline. *Id*. at ¶¶ 12, 17-18. Plaintiff was told that Defendants Morris and Guenette included the disciplinary sanction in the Kosher diet agreement because the Jewish inmates were wasting too much food by missing too many meals in the mess hall, thereby causing DOCCS to lose money. *Id*. at ¶ 35. Plaintiff disputes that rationale and claims that members of other religions are not subject to the restriction "because the Defendants focus at this time is to threaten the smallest religious group in Corrections, the Jews." *Id*. at ¶ 39.

---

[7] According to Plaintiff, breakfast, lunch and dinner were all picked up at 4:00 pm daily during Passover. (Dkt. No. 15 at ¶ 29.)

## II.     PROCEDURAL HISTORY

Plaintiff commenced this action against three named defendants and a John Doe defendant on April 4, 2013.  (Dkt. No. 1.)  On May 13, 2013, Plaintiff filed a letter motion asking that Defendant Potter be substituted for John Doe, and that the Complaint be supplemented with papers submitted with the letter motion.  (Dkt. No. 6.)  On July 8, 2013, Plaintiff filed a letter enclosing affidavits he wanted added to the Complaint.  (Dkt. No. 11.)  The Court issued a Text Order on September 4, 2013, substituting Defendant Potter for Defendant John Doe, C/O  P., and granting Plaintiff's request to supplement his original Complaint with the papers received from Plaintiff on May 13, 2013 (Dkt. No. 6) and the affidavits received on July 8, 2013.  (Dkt. No. 11.)   In the Text Order, the Court also ordered the Clerk to docket the supplemented pleading with the original Complaint as Plaintiff's Amended Complaint.  (Dkt. No. 15.)

The Hon. Norman A. Mordue, Senior District Judge, issued a Decision and Order on September 13, 2013, granting Plaintiff's application to proceed *in forma pauperis* (Dkt. No. 2); dismissing Plaintiff's access to court claim without prejudice upon initial review under 28 U.S.C. §§ 1915(e)(2) and 1915A; and directing Defendants to respond to Plaintiff's Amended Complaint with regard to Plaintiff's retaliation and religion claims as provided in the Federal Rules of Civil Procedure.  *Id.* at 8-9.

Plaintiff moved for appointment of counsel on October 25, 2013 (Dkt. No. 39), and the motion was denied without prejudice on October 31, 2014.  (Dkt. No, 43.)  On January 10, 2014, Defendants filed this Rule 12(b)(6) motion to dismiss Plaintiff's Amended Complaint in its

entirety. (Dkt. No. 56) Plaintiff thereafter filed papers in opposition on January 23, 2014. (Dkt. No. 62.)

## III.    LEGAL STANDARD GOVERNING RULE 12(b)(6) MOTIONS TO DISMISS

A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted" under Rule 12(b)(6). The motion tests the formal legal sufficiency of the complaint by determining whether it conforms to Federal Rule of Civil Procedure 8(a)(2), which requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bush v. Masiello*, 55 F.R.D. 72, 74 (S.D.N.Y. 1972). Satisfaction of the requirement that a plaintiff "show" that he or she is entitled to relief requires that the complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted).

A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim that is plausible on its face." *Id.* at 570. While Rule 8(a)(2) "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me-accusation." *Iqbal,* 556 U.S. at 678 (citation and internal quotation marks omitted). A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice. *Id.* (citation omitted)

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

In considering a Rule 12(b)(6) motion, "the court considers the complaint, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (citation and internal quotation marks omitted); *see also Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (A court may consider "any written instrument attached [to the complaint] as an exhibit or documents incorporated in it by reference."). "The mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual allegations are consistent with the allegations of the Plaintiff's complaint." *Robles v. Bleau*, No. 07-CV-0464, 2008 WL 4693153, at *6 and n.41, 2008 U.S. Dist. LEXIS 110029, at *26-27 and n.41 (N.D.N.Y. Oct. 22, 2008) (collecting cases).

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (courts remain obligated to construe *pro se* complaints liberally even

after *Twombly*).  Where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation and internal quotation marks omitted).  An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it."  *Cuoco*, 222 F.3d at 112 (citation omitted).

## IV.    ANALYSIS

The Court has construed Plaintiff's Amended Complaint to allege violations of his rights under the First and Fourteenth Amendments and RLUIPA by: (1) substantially burdening his ability to practice Judaism, his chosen faith; (2) retaliating against him for commencing a lawsuit against Boll and filing an inmate claim accusing corrections officers at Upstate of losing or stealing his property in retaliation for filing claims; and (3) violating the right of Jewish inmates to equal protection.  Plaintiff has also asserted state law claims for violation of the N.Y. Constitution and N.Y. Correct. Law § 610.[8]  (Dkt. No. 15.)

### A.    Plaintiff's Official Capacity Claims For Money Damages Against Defendants Under 42 U.S.C. § 1983

Plaintiff has asserted official capacity claims for money damages under 42 U.S.C. § 1983 against all of the Defendants.  (Dkt. No. 15 at p. 1.)  The Eleventh Amendment protects states against suits brought in federal court absent their consent or express waiver.  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 92-100 (1984).  The immunity granted the states under

---

[8]  *See Cancel v. Mazzuca*, 205 F. Supp. 2d 128, 138 n.11 (S.D.N.Y. 2002) ("It is settled law that the Federal Constitution, the New York State Constitution, and Correct. Law § 610 guarantee prisoners the right to free exercise of religion.") (citation and internal quotation marks omitted).

the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are effectively arms of the state (*Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006)), and bars all money damages claims against state officials acting in their official capacities, including the Defendants herein. *Kentucky v. Graham*, 473 U.S. 159, 167-68 (1985); *see also Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002) (an inmate plaintiff's claims for damages against individual DOCCS employees sued in their official capacities are considered claims against New York and are thus barred by the state's Eleventh Amendment immunity).

Defendants have not specifically addressed the Eleventh Amendment in their motion papers. (See Dkt. No. 56-1.) However, the District Court is empowered *sua sponte* to dismiss claims barred by the Eleventh Amendment under 28 U.S.C. § 1915(e)(2)(B). *See Saxon v. Attica Medical Dept.,* 468 F. Supp. 2d 480, 484 (W.D.N.Y. 2007) (recognizing that district courts may *sua sponte* dismiss prisoner claims barred by the Eleventh Amendment). Therefore, the Court recommends the dismissal with prejudice of Plaintiff's § 1983 claims for money damages against Defendants in their official capacity on Eleventh Amendment grounds.[9]

### B.     Retaliation Claims Against Boll and Potter

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak*, 389 F.3d 379, 380-81 (2d Cir. 2004). Central to such claims is the notion that in a prison setting,

---

[9] The Eleventh Amendment allows declaratory and prospective injunctive relief from violations of the Constitution and federal law. *See Edelman v. Jordan*, 415 U.S. 651, 677 (1974) ("federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief."); *see also Ex parte Young*, 209 U.S. 123 (1908) (Eleventh Amendment immunity does not preclude suits for injunctive and declaratory relief from continuing violations of federal law brought against state officers in their official capacities) .

corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Pidlypchak*, 389 F.3d at 381-83. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983).

As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official--even those otherwise not rising to the level of a constitutional violation--can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citations omitted), *overruled on other grounds*, *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002).

To prevail on a retaliation claim under § 1983, a plaintiff must prove that: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Pidlypchak*, 389 F.3d at 380 (citing *Dawes,* 239 F.3d at 492).

Adverse action, used in the prison context, is defined objectively as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Pidlypchak*, 389 F.3d at 381, 383 (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)). In evaluating what constitutes adverse action for purposes of a retaliation

12

claim, a court should be mindful that "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse." *Dawes*, 239 F.3d at 493.

Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). Those factors include: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Id.* (citing *Colon*, 58 F.3d at 872-73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.*

### 1. Defendant Boll

The Court finds that Plaintiff has stated a claim for retaliation against Defendant Boll. Plaintiff claims that Boll rescinded her March 3, 2010, letter memorandum in retaliation for a lawsuit he had commenced against her. According to Plaintiff, Boll rescinded her letter memorandum just a few days after Judge Scullin issued a decision and order directing Boll to respond to the complaint in an action Plaintiff had commenced against her. (Dkt. Nos. 15 at ¶ 8; 15-1 at 10.) Plaintiff's commencement of a lawsuit against Boll is clearly activity protected under the First Amendment. *See Colon*, 58 F3d at 872. Rescinding the letter memorandum stating that Plaintiff did not need permission from her office to wear side-locks, thereby arguably opening the door for Potter to force Plaintiff to cut off his side-locks, could reasonably be found to constitute adverse action. *See Pidlypchak*, 389 F.3d at 381, 383.

13

The lawsuit against Boll identified as the protected conduct was commenced on December 13, 2012. (No. 9:12-CV-1771 (FJS/DEP), Dkt. No. 1.) Judge Scullin's Decision and Order was filed on February 5, 2013. (No. 9:12-CV-1771 (FJS/DEP), Dkt. No. 7.) Boll allegedly rescinded her letter memorandum at some point between the filing of Judge Scullin's Order and February 9, 2103, when Plaintiff was ordered by Potter to cut off his side-locks. (Dkt. No. 15 at ¶ 8.) The temporal relationship between the protected conduct and the alleged adverse action suggests a plausible causal nexus for purposes of surviving Defendant's motion to dismiss Plaintiff's retaliation claim against Boll. *See Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) ("A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action.").

Therefore, the Court recommends that Defendants' motion to dismiss Plaintiff's retaliation claim against Defendant Boll be denied.

2.    Defendant Potter

The protected conduct relied upon by Plaintiff in his retaliation claim against Defendant Potter is Plaintiff's filing of an inmate claim in which he claimed that when he was transferred from Upstate to Greene, his property and electronics were either lost or stolen by Upstate corrections officers in retaliation for his many complaints.[10] (Dkt. No. 15 at ¶¶ 10-11, 13.) According to Plaintiff, at the time Potter told him to cut-off his side-locks, Potter told Plaintiff he

---

[10] Plaintiff also appears to suggest that Potter retaliated against him because of the lawsuit Plaintiff had commenced against Boll. (Dkt. Nos. 15 at ¶ 47; 62 at 62 at 6-7.) However, there are no factual allegations in the Amended Complaint or Plaintiff's opposition papers from which the Court could infer that Potter knew of the lawsuit against Boll at the time.

had "received a phone call from GCF Inmate Grievance Supervisor whom informed him that I was the 'fucking Jew lawyer who likes to file inmate claims.'" *Id*. at ¶ 13.

Plaintiff's filing of an inmate claim, which accused corrections officers of theft and resulted in his being called for an interview in the Greene Grievance Office, arguably constitutes protected conduct for purposes of stating a retaliation claim. As previously noted, forcing Plaintiff to cut off his side-locks could be found to constitute adverse action. Moreover, Plaintiff has plausibly shown a causal nexus given that he filed the inmate claim on February 7, 2013, and Potter ordered him to cut off his side-locks two days after the claim was filed and the day after Plaintiff's interview in the Grievance Office. *Id*. at ¶¶ 10-11, 13. In addition, Potter's comment about Plaintiff filing claims could be construed as revealing a retaliatory motive on his part. (Dkt. No. 15 at ¶ 13.) Therefore, the Court recommends that Defendants' motion to dismiss the retaliation claim against Defendant Potter be denied.

### C.      Free Exercise Claim Regarding Plaintiff's Side-Locks

Plaintiff's Amended Complaint, liberally construed, includes a First Amendment free exercise claim with regard to his side-locks. Defendants have not addressed the claim in their motion to dismiss, and the Court is reviewing it under 28 U.S.C. § 1915(e)(2)(B).

 "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause."[11] *Ford v. McGinnis*, 352 F. 3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). Alleged infringements of an inmate's free exercise rights are judged by whether the restriction to an

---

[11] Plaintiff has also asserted a free exercise of religion claim under N.Y. Const., art. 1, § 3. (Dkt. No. 15 at ¶ 55.)

inmate's free exercise rights is "reasonable." *Ford*, 352 F.2d 588. Prison officials may not "substantially burden an inmate's First Amendment right to religious exercise without some justification . . . ." *Salahudin v. Goord*, 467 F.3d 263, 275-76 (2d Cir. 2006).

A prison regulation that impinges on an inmate's right to freely exercise his religion is valid "if it is reasonably related to legitimate penological interests." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987). In order to state a free exercise claim, Plaintiff must allege facts showing that being forced to cut off his side-locks substantially burdened his sincerely held religious beliefs. *See Salahudin*, 467 F.3d at Id. at 274-75. Plaintiff has alleged that he is a Zionist who takes his Jewish faith seriously. (Dkt. No. 15 at p. 1.) He wore side-locks in keeping with Jewish tradition for three years, and he ate a kosher diet and celebrated Jewish holidays. *Id.* at ¶¶ 2, 5, 9. Therefore, Plaintiff's Amended Complaint has made a plausible showing that his religious beliefs are sincerely held.

A grooming policy that "'intentionally puts significant pressure on inmates . . . to abandon their religious beliefs by cutting their hair'" or withstand adverse consequences, has been found to impose a substantial burden upon a plaintiff's exercise of sincerely held beliefs. *See, e.g., Amaker v. Goord*, No. 06-CV-490A (Sr), 2010 WL 2595286, at *8-9, 201 U.S. Dist. LEXIS 62349, at *23-24 (W.D.N.Y. Mar. 25, 2010) (quoting *Warsoldier v. Woodford*, 418 F.3d 989, 996 (9th Cir. 2005)). Individualized decisions to deny an inmate the ability to engage in a religious exercise, as is alleged with regard to Defendants Boll and Potter, are analyzed under the same standard as DOCCS policies. *See Salahudin*, 467 F.3d at 274, n.4.

The factual allegations in Plaintiff's Amended Complaint regarding Boll's revocation of her letter memorandum and Potter's direct order to Plaintiff to cut off his side-locks,[12] plausibly show that a substantial burden was imposed on Plaintiff's sincerely held religious beliefs in violation of his First Amendment right to free expression. The only adverse consequence for failure to cut off his side-locks specifically articulated by Potter was that Plaintiff could not come back to the chow hall until he had done so. *Id*. at ¶ 13. However, Plaintiff has also alleged that an inmate failing to comply with a direct order from a correction officer would "receive a swift beat down and [would] be sent directly to the Special Housing Unit," from which Plaintiff had just been released. *Id*.

In light of the foregoing, therefore, the Court recommends that Defendants Boll and Potter be required to respond to Plaintiff's free expression claim with regard to his side-locks.

### D. Free Exercise Claim Regarding the Kosher Diet Agreement and Being Deprived of Passover Meals

Plaintiff has alleged that because he missed picking up his Passover meals on March 30, 2013, due to illness, when he went to pick up his Passover meals the following day, he was told that he had failed to comply with the Kosher diet agreement and would not be given his Passover meals for that day. (Dkt. No. 15 at ¶ 30.) Defendants Morris and Guenette are alleged to have been responsible for the Kosher diet agreement under which Plaintiff was denied the Passover meals. *Id*. at ¶ 23. Defendants seek dismissal of the free exercise claim regarding the Kosher diet agreement because the disciplinary sanction imposed on Plaintiff for failing to pick up his

---

[12] According to Plaintiff's Amended Complaint, after Potter had ordered him to cut off his side-locks, Rabbi Gulack told him that Potter was not supposed to order Plaintiff to cut off his side-locks regardless of what Boll had told him and regardless of Plaintiff filing inmate claims. (Dkt. No. 15 at ¶ 18.)

Passover meals was *de minimis* – Plaintiff was denied his Passover meals the following day. (Dkt. No. 56-1 at 17-18.) However, liberally construed, Plaintiff's free exercise claim does not appear to be limited to being deprived of one day of Passover meals. Rather, the allegations in the Amended Complaint suggest that Plaintiff intends to assert a free exercise claim with regard to the Kosher Diet Agreement itself. (Dkt. No. 15 at ¶¶ 32-33, 37, 55-57.) The Court will review that claim under 28 U.S.C. § 1915(e)(2)(B).

### 1.    Personal Involvement of Defendants Morris and Guenette

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*.").

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 872-

73.[13]  Plaintiff's allegation that the Kosher diet agreement was drafted by Morris and Guenette for enforcement as to all Jewish inmates is sufficient to show that they were involved in "creating [the] policy or custom under which unconstitutional practices occurred" for purposes of showing personal involvement.  *See Colon, id.*

### 2.    Denial of Passover Meals on March 31, 2013

The Second Circuit has held that "prison authorities must accommodate the right of prisoners to receive diets consistent with their religious scruples." *Kahane v. Carlson*, 527 F.2d 492, 495 (2d Cir. 1975).  This includes providing Kosher food to those of the Jewish faith. *Bass v. Coughlin*, 800 F. Supp. 1066, 1071 (N.D.N.Y. 1991), *aff'd*, 976 F.2d 98 (2d Cir. 1992) "Den[ying] prison inmates the provision of food that satisfies the dictates of their faith . . . unconstitutionally burden[s] their free exercise rights." *McEachin v. McGuinnis*, 357 F.3d 197, 203 (2d Cir. 2004).

Existing case law, however, supports the conclusion that missing one day of Passover meals, particularly when it did not occur on one of the first two days of Passover when Passover Seders are traditionally held, is not enough to substantially burden Plaintiff's exercise of his religious rights under the free exercise clause.[14]  There is substantial case law finding that denial

---

[13]    The Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), has arguably nullified some of the categories set forth in *Colon*. *See Sash v. United States*, 674 F. Supp. 2d 531, 543-44 (S.D.N.Y. 2009) (collecting cases).  However, the Second Circuit has yet to issue a decision addressing *Iqbal's* effect on the *Colon* categories, and I will assume for purposes of this motion that *Colon* remains good law. *See Hogan v. Fischer*, 738 F.3d 509, 519 n.3 (2d Cir. 2013) (affirmatively stating that the Court was expressing no view on the extent to which *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations . . .") (internal citation and quotation marks omitted).

[14]    The Court takes judicial notice of the fact that Passover in 2013 began on the evening of March 25, 2013, and ended on April 2, 2013.  Seders are traditionally held on the first and

of a religious meal on a small number of occasions is *de minimis* and does not give rise to a First Amendment claim. *See, e.g.*, *Washington v. Afify,* 968 F. Supp. 2d 532, 538-39 (W.D.N.Y. 2013) (denial of two religious breakfast meals and an evening meal unless plaintiff worked in the mess hall was insufficient to state a free exercise claim); *Wilson v. Woodbourne Correctional Facility*, No. 9:11-CV-1088 (DNH/ATB), 2012 WL 1377615, at *3, 2012 U.S. Dist. LEXIS 54989, at *8 (N.D.N.Y. Mar. 21, 2012) (the withholding of a single religious meal is at most a *de minimis* burden on a prisoner's religious expression); *Tafari v. Annetts*, No. 06 Civ. 11360 (GBD)(AJP), 2008 WL 2413995, at *16, 2008 U.S. Dist. LEXIS 45901 at *65 (S.D.N.Y. June 12, 2008) (denial of Kosher meals on a few separate occasions "did not substantially burden [Plaintiff's] religious beliefs and constituted, at most, a *de minimis* violation."), *adopting Report and Recommendation*, 2008 WL 4449372, 2008 U.S. Dist. LEXIS 77015, *aff'd*, 363 F. App'x 80 (2d Cir. ), *cert. denied* 561 U.S. 1019 (2012).

The Court concludes that in this case, denial of Passover meals on one day constituted a *de minimis* burden on Plaintiff's ability to freely practice his religion and, therefore, recommends that Plaintiff's free exercise claim against Morris and Guenette with regard to denial of Passover meals on March 31, 2013, be dismissed.

### 2. Disciplinary Sanctions for Missed Meals in the Kosher Diet Agreement

Under the terms of the Kosher diet agreement, in order for an inmate to receive a Kosher diet and special holy day meals, he must agree to attend meals, absent one of a handful of acceptable excuses, or be subject to disciplinary sanctions. (Dkt. No. 15-1 at 24.) Although

---

second nights of Passover. *See, e.g., Love v. New Jersey Dept. of Correction*, No. 10-1714 (GEB), 2011 WL 345964, at *4 and n.10, 2011 U.S. Dist. LEXIS 10102, at *14-16 and n.10 (D.N.J. Jan. 31, 2011).

Defendants may well be able establish that the imposition of disciplinary sanctions is "reasonably related to legitimate penological interests" on a well-supported summary judgment motion, requiring Jewish inmates to accept mandatory attendance at meals or face disciplinary sanctions in order to follow a Kosher diet, arguably constitutes a substantial burden on the inmates' right to religious exercise.[15]  *See Salahudin*, 467 F.3d at 275-76.  Therefore, the Court recommends that Defendants be required to respond to Plaintiff's claim that the Kosher diet agreement violates his right to the free exercise of his religious beliefs.

### E.        Equal Protection Claim Regarding the Kosher Diet Agreement

The Equal Protection Clause of the Fourteenth Amendment provides that the government shall treat all similarly situated people alike.  *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (citing *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).  To establish an equal protection violation, a plaintiff must show that the defendants applied a different standard to similarly situated individuals, *Skehan v. Village of Mamaroneck*, 465 F.3d 96, 111 (2d Cir. 2006), *overruled on other grounds, Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008), and that they were treated differently because of intentional or purposeful discrimination or intentionally treated differently than others similarly situated.  *Giano*, 54 F.3d at 1057.

Plaintiff claims that in order to receive regular Kosher meals and special holy day meals, Jewish inmates have to agree to disciplinary sanctions if they fail to attend a meal for reasons

---

[15]  *See, e.g., George v. Conway*, No. 05-CV-510A (RJA) (HKS), 2009 WL 1449046, at *10-12, 2009 U.S. Dist. LEXIS 130757, at *28-33 (W.D.N.Y. Mar. 25, 2009) (finding legitimate penological interest – waste-reduction and cost control – in mandatory attendance policy removing inmates from the cold alternative diet after more than three unexcused absences in a week on defendants' summary judgment motion), *adopting Report and Recommendation*, 2009 WL 1449046, 2009 U.S. Dist. LEXIS 43309 (W.D.N.Y. May 21, 2009).

other than those included in the Kosher diet agreement drafted by Morris and Guenette. (Dkt. Nos. 15 at ¶ 24; 15-1 at 24.) According to Plaintiff, Muslims, Rastafarians, and Christians are not subject to a threat of disciplinary sanctions if they miss religious meals. (Dkt. No 15 at ¶¶ 12, 17-18.) Exhibits to Plaintiff's Amended Complaint include a July 5, 2011, DOCCS memorandum listing procedures and items pertaining to fasting for Ramadan and six days of Shawwal that contains no provision for disciplinary sanctions for non-attendance at meals (Dkt. No. 15-1 at 25); and a June 13, 2011, DOCCS memorandum regarding working procedures for the Second Advent of the Cosmic Christ for adherents to the Rastafarian faith that also contains no disciplinary sanctions for missing the lunch, *id*. at 26-27.[16]

The Court finds that the allegations in, and exhibits to, Plaintiff's Amended Complaint are sufficient to state a claim for equal protection against Defendants Morris and Guenette. Jewish, Muslim, Rastafarian, and Christian inmates are similarly situated in that they are religious groups that have religious holy days and holidays that involve food, and in some instances follow regular dietary restrictions as a part of their religious tradition. According to the Amended Complaint, Defendants Morris and Guenette were authors of the disciplinary sanctions provision imposing sanctions solely on Jewish inmates for purely discriminatory reasons, and they directed that the policy be enforced by corrections officers. (Dkt. No 15 at ¶¶ 52-55.)

---

[16] Plaintiff has alleged in his Amended Complaint that a "Residents Encounter with Christ" was to be held for Catholic inmates on April 12-14, 2013. (Dkt. No. 15 at ¶ 34.) Plaintiff claims that Catholic inmates would not be required to sign a "Catholic contract" and would not be threatened with disciplinary sanctions if they failed to attend their religious meals. *Id*.

Therefore, the Court recommends that Defendants' motion to dismiss Plaintiff's equal protection claim against Morris and Guenette be denied.[17]

### F.    Claims Under RLUIPA

Plaintiff has asserted a RLUIPA claim in his Amended Complaint.  (Dkt. No. 15 at ¶¶ 51, 56.)  RLUIPA provides that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person –
>
>> (1) is in furtherance of a compelling governmental interest; and
>> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. ¶ 2000cc-1(a) (2012).

In *Sossamon v. Texas*, ___ U.S. ___, 131 S.Ct. 1651 (2011), the Supreme Court held that RLUIPA does not authorize claims for money damages against state officials acting in their official capacities.  After the commencement of this lawsuit, the Second Circuit, in *Washington v. Gonyea*, 731 F.3d 143, 144 (2d Cir. 2013), held that RLUIPA does not create a private right of action against state officials in their individual capacity.  Therefore, Plaintiff cannot pursue claims for money damages against Defendants in their official capacities and has no claim against Defendants in their individual capacities under RLUIPA.

Plaintiff's Amended Complaint, in conjunction with his submission in opposition to Defendants' motion, can also be construed to seek injunctive and declaratory relief under

---

[17]  Plaintiff has also asserted an equal protection claim under N.Y. Const., art I, at § 11.

RLUIPA with regard to the Kosher diet agreement. (Dkt. Nos. 15 at 30; 62 at 3-5.) Those claims are not barred against Defendants Morris and Guenette in their official capacities. *See Williams v. Leonard*, No. 9:11-CV-1158 (TJM/TWD), 2013 WL 5466191, at *6 , 2013 U.S. Dist. LEXIS142051, at *18-19 (N.D.N.Y. Sept. 30, 2013) (denying defendants' motion to dismiss inmate's RLUIPA claims for injunctive relief regarding family participation in a religious meal); *Singh v. Goord*, 520 F. Supp. 2d 487, 508 (S.D.N.Y. 2007) (allowing claim for declaratory judgment under RLUIPA to proceed to trial). Moreover, as discussed above, Plaintiff has made a plausible showing that the disciplinary sanctions imposed a substantial burden on the exercise of his religious beliefs.

Therefore, the Court recommends that all of Plaintiff's RLUIPA claims against Defendants in their individual capacity, and Plaintiff's claim for money damages against Defendants in their official capacity, be dismissed with prejudice. The Court further recommends that Defendants' motion to dismiss be denied as to Plaintiff's RLUIPA claims for injunctive and declaratory relief against Defendants Morris and Guenette in their official capacity with regard to the Kosher diet agreement.

### G. Claim Under Correct. Law § 610

Plaintiff has asserted a violation of N.Y. Correct. Law § 610 by Defendants. Correct. Law § 610 includes a declaration that inmates are "declared to be and entitled to the free exercise and enjoyment of religious profession and worship, without discrimination or preference." Correct. Law § 610(1) (McKinney's 2003). Defendants have not specifically addressed Plaintiff's claim under Correct. Law § 610 in their motion papers, (Dkt. No. 56-1), and the Court is reviewing the claim under 28 U.S.C. § 1915(e)(2)(B).

Correct. Law § 24 provides as follows:

> 1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.
>
> 2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

The statute precludes inmates from suing DOCCS employees acting within the scope of their employment in New York State courts. *See Arteaga v. State*, 532 N.Y.S.2d 57, 62 (1988). The bar also applies to pendent state law claims in federal court because "[i]n applying pendent jurisdiction, federal courts are bound to apply state substantive law to the state claim." *Baker v. Coughlin*, 77 F.3d 12, 15 (2d Cir.1996) (citations omitted). "If a state would not recognize a plaintiff's right to bring a state claim in state court, a federal court exercising pendent jurisdiction . . . must follow the state's jurisdictional determination and not allow that claim to be appended to a federal law claim in federal court." *Id.* at 15.

In 2009, the United States Supreme Court found Correct. Law § 24 unconstitutional to the extent it precludes inmates from pursuing § 1983 claims. *Haywood v. Drown*, 556 U.S.729 (2009). However, the courts in this District have held that the *Haywood* decision does not affect the question of the district court's jurisdiction to hear pendent state law claims against DOCCS employees and have continued to dismiss those claims under Correct. Law § 24. *See, e.g., Rucano v. Koenigsmann*, No. 9:12-cv-00035 (MAD/RFT), 2014 WL 1292281, at *15-16, 2014

U.S. Dist. LEXIS 44637, at *38-41 (N.D.N.Y. Mar. 31, 2014); *O'Diah v. Fischer*, No. 08-CV-941 (TJM/DRH), 2012 WL 987726, at *21, 2012 U.S. Dist. LEXIS 39232, at *60 (N.D.N.Y. Feb. 28, 2012).

Correct. Law § 24 has been found applicable to claims brought under Correct. Law § 610. *See, e.g., May v. Donneli*, No. 9:06-CV-437 (GLS/RFT), 2009 WL 3049613, at *5, 2009 U.S. Dist. LEXIS *12-14 (N.D.N.Y. Sept. 18, 2009) (claim under Correct. Law § 610 barred under Correct. Law § 24 where acts of defendant corrections officers fell within the scope of their employment). Based upon the allegations in Plaintiff's Amended Complaint, the Court concludes that the acts complained of by Plaintiff were performed by Defendants within the scope of their employment and recommends dismissal of Plaintiff's state law claims under Correct. Law § 610 for failure to state a claim with prejudice under 28 U.S.C. § 1915(e)(2)(B).

**H.    Qualified Immunity**

Defendants have moved for dismissal of Plaintiff's Amended Complaint on qualified immunity grounds in the event Plaintiff's retaliation claims against Defendants Boll and Potter and equal protection claims against Defendants Morris and Guenette are not dismissed for failure to state a claim.  (Dkt. No. 56-1 at 20-22.)  Defendants' argument for qualified immunity is limited to a recitation of the doctrine of qualified immunity and the analysis to be applied in determining whether it applies – that government officials performing discretionary functions are protected from civil liability as long as their conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known" at the time committed. *Williams v. Smith*, 781 F.2d 319, 322 (2d Cir. 1986) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982)); *see also Ehrlich v. Town of Glastonbury*, 348 F.3d 48, 54-55 (2d Cir. 2003)

(describing the two-step analysis for determining entitlement to qualified immunity as first determining whether a constitutional right has been violated and then deciding whether the right was clearly established at the time and whether it was objectively reasonable for the defendant to believe his action did not violate plaintiff's right).

Defendants' argument for qualified immunity is limited to the conclusory statement "[a]t the time of the incidents alleged in the amended complaint, it was not clearly established and a reasonable official in defendants' position could not have known that the conduct that defendants are alleged to have engaged in could constitute a constitutional violation." *Id*. at 22. Defendants have not engaged in any analysis or cited a single decision in support of their conclusion.

Moreover, generally "the defense of qualified immunity cannot support the grant of a . . . 12(b)(6) motion for failure to state a claim upon which relief can be granted*." Green v. Maraio*, 722 F.2d 1013, 1018 (2d Cir. 1983); *see also Taylor v. Vermont Dep't of Educ*., 313 F.3d 768, 793 (2d Cir. 2002) (qualified immunity "turns on factual questions that cannot be resolved at [the motion to dismiss] stage of proceedings."). The exception to the general rule that exists when the complaint itself, on its face, sets up the defense, is not present in this case. *See Roniger v. McFall*, 22 F. Supp. 2d 156, 162 (S.D.N.Y. 1998) (citing *Green*, 772 F. 2d at 1019). Therefore, even if Defendants had offered legal support for dismissal on qualified immunity grounds, the request would almost certainly have been found premature in this case.

In light of the foregoing the Court recommends that Defendants' request for dismissal of Plaintiff's Amended Complaint on qualified immunity grounds be denied without prejudice

     **ACCORDINGLY**, it is hereby

**RECOMMENDED**, that Defendants' Rule 12(b)(6) motion (Dkt. No. 56) be **GRANTED** in part and **DENIED** in part; and it is further

**RECOMMENDED**, that Defendants' motion to dismiss be **GRANTED** with respect to: (1) Plaintiff's claims under RLUIPA against Defendants in their individual capacities and (2) Plaintiff's claims under RLUIPA for money damages against Defendants in their official capacities, and that those claims be **DISMISSED** with prejudice; and it is further

**RECOMMENDED**, that Defendants' motion to dismiss be **DENIED** with respect to: (1) Plaintiff's claim for retaliation against Defendants Boll and Potter; (2) Plaintiff's claim for denial of equal protection against Defendants Morris and Guenette; (3) Plaintiff's request for declaratory and injunctive relief under § 1983 and RLUIPA against Defendants Morris and Guenette in their official capacities; and (4) Defendants' request for dismissal on qualified immunity grounds; and it is further

**RECOMMENDED**, that based upon the Court's review under 28 U.S.C. § 1915(e)(2)(B), Plaintiff's claims for money damages against Defendants in their official capacities under § 1983 and his claim under Correct. Law § 610 be **DISMISSED** with prejudice; and it is further

**RECOMMENDED**, that Defendants be required to answer Plaintiff's Amended Complaint as to all claims with respect to which their motion to dismiss is denied by the District Court, and as to those claims sustained on this Court's review under 28 U.S.C. § 1915(e)(2)(B), if accepted by the District Court; and it is

**ORDERED**, that the Clerk provide Plaintiff with copies of all unpublished decisions cited herein in accordance with *LeBron v. Sanders*, 557 F.3d 76, 79 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

Dated: May 28, 2014
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

Not Reported in F.Supp.2d, 2010 WL 2595286 (W.D.N.Y.)
**(Cite as: 2010 WL 2595286 (W.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Anthony D. AMAKER, and Ruhullah Hizbullah,
Plaintiffs,
v.
Commissioner Glenn S. GOORD, et al., Defendants.
George Fluellen, Plaintiff,
v.
Commissioner Glenn S. Goord, et al., Defendants.

No. 06–CV–490A(Sr).
March 25, 2010.

Anthony D. Amaker, Alden, NY, pro se.

Ruhullah Hizuullah, Comstock, NY, pro se.

J. Richard Benitez, NYS Attorney General's Office,
Department of Law, Rochester, NY, for Defendants.

### REPORT, RECOMMENDATION AND ORDER
H. KENNETH SCHROEDER, JR., United States
Magistrate Judge.

**\*1** This case was referred to the undersigned by
the Hon. Richard J. Arcara, pursuant to 28 U.S.C. §
636(b)(1), for all pretrial matters and to hear and re-
port upon dispositive motions. Dkt. # 177.

Currently before the Court is defendants' motion
for summary judgment (Dkt. # 181), and plaintiffs'
cross motion for summary judgment. Dkt. # 215. For
the following reasons, it is recommended that de-
fendants' motion be granted in part and plaintiffs'
motion be granted in part.

### PROCEDURAL BACKGROUND
Plaintiffs Amaker and Hizbullah signed the same
amended complaint in this action (Dkt.# 22), however
plaintiff Fluellen submitted a separate complaint
which was assigned its own civil case number.
06–CV–602 at Dkt. # 1. In each case, plaintiffs com-
plained that members of the Nation of Islam/Al–Islam
seeking to follow doctrine prohibiting the cutting of
their hair were denied their rights pursuant to the First
Amendment to the United States Constitution and the
Religious Land Use and Institutionalized Persons Act
of 2000 ("RLUIPA"), by the New York State De-
partment of Correctional Services' ("DOCS" '), policy
of refusing to permit individuals who have designated
their religion as anything other than Rastafarian to
wear dreadlocks. Dkt. # 22 & 06–CV–602 at Dkt. # 1.

Plaintiffs' motions for a preliminary injunction
were granted and the defendants were "enjoined from
(1) precluding Plaintiffs' attendance at Nation of Islam
services and classes on account of Plaintiffs' dread-
locks, and in relation thereto from (2) punishing
Plaintiffs for refusing to cut their hair or refusing to
change their religious affiliations." Dkt. # 115 &
06–CV–602 at Dkt. # 33. Given the factual and legal
similarities between the two actions, the Court con-
solidated 06–CV–602 with this action. 06–CV–602 at
Dkt. # 32.

### FACTUAL BACKGROUND
Plaintiff Anthony Amaker entered DOCS in
1989. *See* http:// nysdocslookup.docs.state.ny.us.
Plaintiff Amaker affirms that his refusal to cut his
dreadlocks is based upon a provision of the Holy
Quran, specifically, Chapter 2, verse 196, which
states, in part:

And accomplish the pilgrimage and the visit for
Allah. But if you are prevented, send whatever of-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 2595286 (W.D.N.Y.)
**(Cite as: 2010 WL 2595286 (W.D.N.Y.))**

fering is easy to obtain; and shave not your heads until the offering reaches it's destination.

Dkt. # 37, ¶ 2. Plaintiff Amaker also cites the Bible's Book of Numbers, Chapter 6, Verse 5, commonly referred to as the Nazarite Vow, which provides that

All the days of the vow of his Naziriteship [sic] no razor should pass over his head; until the days that he should be separated to (Allah) God come to the full, he should prove holy by letting the locks of the hair of his head grow.

Dkt. # 44, ¶ 2. Plaintiff Amaker has been following this doctrine as a registered member of the Nation of Islam since at least 1996. Dkt. # 44, ¶¶ 2, 10 & 14. He declares that it was not until February of 2006 that DOCS officials at Attica challenged his dreadlocks and ordered him to either change his religion to Rastafarian or cut his dreadlocks. Dkt. # 217, ¶ 2(c). Plaintiff was issued misbehavior reports, subjected to disciplinary sanctions and denied privileges, including participation in Nation of Islam services and celebrations, for refusing orders to change his religion to Rastafarian or cut his dreadlocks. Dkt. # 217(2).

**\*2** Plaintiff George Fluellen entered DOCS in 1990. *See* http:// nysdocslookup.docs.state.ny.us. In 1994, plaintiff vowed to begin his "journey to Makka to perform Hajj." Dkt. # 211, ¶ 5. "In accordance with Allah's command," plaintiff believes that "if you are impeded on this journey, offer to Allah a sacrifice and do not shave your heads until the sacrifice reaches its place." Dkt. # 211, ¶ 6. Plaintiff Fluellen declares that because his incarceration has impeded his journey, he has not cut his hair. Dkt. # 211, ¶ 8. He is a practicing Muslim, registered, for DOCS' purposes, with the Nation of Islam, and has participated in all available Nation of Islam services, Ramadans and feasts since their resumption in 1995. Dkt. # 211, ¶¶ 4 & 8. Plaintiff Fluellen declares that DOCS did not question his dreadlocks during his stay at Great Meadow from 1994–1996; Auburn form 1996–2002; Green Haven

from February through October of 2002 or at Attica from his arrival in October, 2002 until May, 2006, when Corrections Officer ("C.O."), Jaboega first ordered him to either cut his hair or change his religion, and issued a misbehavior report resulting in disciplinary sanctions when he refused. Dkt. # 211, ¶¶ 9, 15 & 28.

Plaintiff Ruhulla Hizbullah entered DOCS in 1999. *See* http:// nysdocslookup.docs.state.ny.us. Plaintiff Hizbullah affirms that he is a member of the Islamic fath, has attended Islamic services & classes all of his adult life and has worn dreadlocks "numerous times, while within Attica Prison's Islamic services and classes," before being denied because of his dreadlocks beginning in April of 2006. Dkt. # 22, ¶ 14 & Dkt. # 41, ¶ 2. Plaintiff's identification card pictures plaintiff wearing dreadlocks. Dkt. # 41, ¶ 4.

DOCS' Inmate Grooming Standards provide that initial shaves and haircuts shall be required of all newly committed male inmates unless exempted. Dkt. # 55–3, p. 2. Inmates who profess to be a Rastafarian, Taoist, Sikh, Native American, Orthodox Jew, or member of any other religious sect of a similar nature cannot be forced to comply with the initial haircut requirements. Dkt. # 55–3, p. 4. Thereafter, all inmates are permitted to grow their hair to any length desired by the inmate, but must tie long hair, which is defined as hair below shoulder length, in a ponytail. Dkt. # 55–3, pp. 3 & 5. Native Americans are exempted from this restriction during the course of scheduled and approved Native American cultural ceremonies. Dkt. # 55–3, p. 4. The only braids allowed are the corn row style and any such braids must be woven close to the scalp in straight rows from the forehead to the back of the neck, without design or symbols, and may not extend below the hairline. Dkt. # 55–3, p. 5. In addition, DOCS asserts that, as set forth in Directive # 4040, decisions of the Central Office Review Committee ("CORC"),[FN1] including decisions providing that Rastafarian inmates may wear dreadlocks, are afforded the effect of directives. Dkt. # 55–3, pp. 2–5.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 2595286 (W.D.N.Y.)
**(Cite as: 2010 WL 2595286 (W.D.N.Y.))**

<span style="padding-left:2em">FN1.</span> DOCS' grievance procedure permits an inmate to file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). An inmate may appeal an adverse decision to the prison superintendent. Thereafter, an inmate may appeal the superintendent's decision to CORC. *See Hemphill v. New York,* 380 F.3d 680, 682 (2d Cir.2004); N.Y.C.R.R. § 701.7(c)(4).

**\*3** Mark Leonard, the Director of Ministerial, Family and Volunteer Services for DOCS, is responsible for "ensuring that all religious programs are carried out in accordance with the policies and procedures adopted by DOCS and are supervised by a qualified religious leader." Dkt. # 55, ¶ 1. Director Leonard declares that DOCS accommodates religious group activities for a number of religions represented within its facilities. Dkt. # 55, ¶¶ 2–3. Upon entry into DOCS, inmates voluntarily state their religion and, if that religion is a recognized religious group, the inmate is permitted to attend that group's religious services. Dkt. # 55, ¶ 10. "If an inmate is determined to be a bona fide member of the religious group, he/she is entitled to all of the religious privileges afforded to that religious group." Dkt. # 55, ¶ 12.

Although DOCS recognizes that an inmate may practice a group religion in a way that is not recognized by the tenets of the religious group and may claim to need special accommodations in addition to those of the religious group to which he belongs, Director Leonard declares that "DOCS cannot realistically accommodate the religious practices of every inmate who claims his individualized requests for privileges are ... based on the unique way he practices a group religion." Dkt. # 55, ¶¶ 29–31. Director Leonard declares that DOCS is unable to accommodate all inmates' individualized beliefs due to (a) the difficulty in determining whether the individualized beliefs are sincere; (b) the substantial administrative burdens; and (c) security concerns. Dkt. # 55, ¶ 41.

Director Leonard notes that "[w]henever an inmate receives special privileges, DOCS needs to monitor those privileges to ensure that the correct inmate receives them and does not abuse them." Dkt. # 55, ¶ 48. Director Leonard asserts that "[m]aking inmates chose one religion helps ensure that the items and practices associated with that religion are necessary for religious purposes and not to promote illicit activities." Dkt. # 55, ¶ 58. "Without this restriction," he declares that "any inmate could wear dreadlocks ... simply by claiming that his religious beliefs required it" which "would make smuggling contraband easier and more prevalent in the correctional facilities." Dkt. # 55, ¶ 58. Director Leonard declares that "the smuggling of contraband in DOCS facilities pose[s] significant security problems and put[s] prison staff and other inmates at risk for serious bodily injury." Dkt. # 55, ¶ 60.

Director Leonard confirms that "inmates are not allowed to wear dreadlocks unless it is recognized as part of a designated religious belief" and declares that "[o]nly the Rastafarian religion has a recognized dogma regarding dreadlocks, and therefore DOCS allows only inmates of the Rastafarian faith to wear dreadlocks." Dkt. # 55, ¶¶ 63, 65. Director Leonard declares that

> The Rastafarian religious mandate and symbolism regarding dreadlocks also appears to be in stark contrast to Nation of Islam, where shaving is seen as a value of cleanliness ... Nation of Islam ... religious tenets simply do not require or dictate dreadlocks as a particular hairstyle, and are not an essential part of that faith. As a designated member of [Nation of Islam], plaintiff's decision to wear dreadlocks is a personal choice and is not mandated by his religion. Simply put, [Nation of Islam] does not have a recognized body of religious dogma regarding dreadlocks, and DOCS does not allow [Nation of Islam] or other faith group members to wear dreadlocks.

**\*4** Dkt. # 55, ¶ 66. Director Leonard further de-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 2595286 (W.D.N.Y.)
**(Cite as: 2010 WL 2595286 (W.D.N.Y.))**

clares that

> Plaintiff's claim that he has a right as a designated member of [Nation of Islam] to wear dreadlocks is clearly in conflict with DOCS' policy, rules and regulations ... and if allowed would result in a[n] increased risk in breech of security for the correctional facility, conflict with Rastafarian principles and cause potential unrest among the Rastafarian inmate population, and jeopardize the safety of the staff and other inmates.

Dkt. # 55, ¶ 68.

Lucien LeClaire, Jr., the Deputy Commissioner for Correctional Facilities (Security), for DOCS, declares that "[i]f inmates are allowed to unilaterally grow dreadlocks at will, irrespective of legitimate religious requirements, the flood gates would likely spring open and a security nightmare would most certainly ensue." Dkt. # 95, ¶ 6. Deputy Commissioner LeClaire notes that "[t]he manufacture and secreting of crude weapons by inmates in a correctional setting, more than anything else, is most responsible for the undermining of safe and secure correctional facilities." Dkt. # 95, ¶ 8. Deputy Commissioner LeClaire further notes that such crude weapons "can be rather easily hidden in an inmate's dreadlocks" and that "a metal detector scanning device would not reveal the presence of any weapons that were made entirely of plastic or other non-metallic substance such as drugs or money." Dkt. # 95, ¶ 11.

Deputy LeClaire laments that "the latitude that courts sometimes accord to prison inmates in an ostensible attempt to protect their free exercise of religion, oftentimes results, albeit unintentionally, in the undermining of the safety and security of a correctional facility." Dkt. # 95, ¶ 12. In support of this argument, Deputy LeClaire notes that following a court decision permitting inmates to designate their religion as Jewish regardless of ecclesiastical tenets, the number of inmates claiming to be Jewish and demanding the more expensive and hermetically

sealed kosher meals nearly quadrupled. Dkt. # 95, ¶¶ 14–15. Deputy LeClaire emphasizes that

> The Rastafarian faith is, upon information and belief, and after consultation with the Department's Director of Ministerial Services, the only known religion in which the dreadlock is a recognized religious tenet. As such, Department policy provides for inmates of that faith to wear dreadlocks in spite of the extraordinary difficulty this hairstyle presents to security staff as they endeavor to maintain security and control contraband in our facilities. Large dreads and the matted hair close to the scalp create a hairstyle that is extremely difficult to visually inspect and nearly impossible for inmates to run their fingers through to allow staff to insure that no contraband is contained therein, as required by Department Directive # 4910 (Control of and Search for Contraband) .... It is not merely speculation that inmates may hide contraband in their hair, it is fact.

**\*5** Dkt. # 95, ¶ 17.

Deputy Commissioner LeClaire opines that "it is more than likely that opportunistic inmates who have absolutely no sincerely held religious belief regarding dreadlocks would choose to wear them for nefarious reasons." Dkt. # 95, ¶ 18. Finally, Deputy Commissioner LeClaire reiterates that

> [I]t is understood that inmates can change their religion to Rastafarian. Upon completion of the approval process, this would result in them immediately being allowed not only to wear dreadlocks, but also practice all other tenets of that religion. But this result is clearly not what is sought in this case. What is sought in this case is the ability for inmates to pick and choose what tenet of which religion they wish to observe. This practice would throw any reasonable security control of religious practices in corrections in complete chaos and interfere with other inmates' ability to practice their religion, and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 2595286 (W.D.N.Y.)
**(Cite as: 2010 WL 2595286 (W.D.N.Y.))**

significantly elevate tensions between those inmates who are sincere adherents of a particular religion and those inmates who seek to avail themselves of the benefit of a particular accommodation for ulterior, non-religious purposes.

Dkt. # 95, ¶ 19.

### *DISCUSSION AND ANALYSIS*
**Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a pro se plaintiff." *Thomas v. Irvin,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see Bryant v. Maffucci,* 923 F.2d 979 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant,* 923

F.2d at 982. A party seeking to defeat a motion for summary judgment

must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

**\*6** *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

**Monetary Damages Under RLUIPA**

Defendants argue that plaintiffs may not obtain monetary damages on a RLUIPA claim against defendants in either their individual or official capacities, but are limited to declaratory and injunctive relief. Dkt. # 183, p. 14.

Plaintiff argues that monetary damages are appropriate. Dkt. # 216, p. 16.

*Official Capacity*

RLUIPA was enacted following the determination of the United States Supreme Court that the Religious Freedom Restoration Act ("RFRA"), exceeded Congress' remedial powers under the Fourteenth Amendment. *See Cutter v. Wilkinson,* 544 U.S. 709, 715, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). RLUIPA corrected the constitutional infirmity of RFRA by invoking federal authority under the Spending Clause to reach any program or activity that receives federal financial assistance, thereby encompassing every state prison. 42 U.S.C. § 2000cc−1(b)(1); *see Cutter,* 544 U.S. at 715–16.

In accordance with the power afforded by the Spending Clause, Congress may condition grants of federal funds to require waiver of sovereign immunity, even though Congress could not directly order such a waiver. *Van Wyhe v. Reisch,* 581 F.3d 639, 649 (8th

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 2595286 (W.D.N.Y.)
**(Cite as: 2010 WL 2595286 (W.D.N.Y.))**

Cir.2009). However, "[w]aivers of the Government's sovereign immunity, to be effective, must be unequivocally expressed." *United States v. Nordic Village,* 503 U.S. 30, 33–34, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) (internal quotation omitted). The Government's consent to be sued must be construed strictly in favor of the sovereign and not enlarged beyond what the language requires. *Id.* at 34.

RLUIPA provides that

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

(1) is in furtherance of a compelling governmental interest;

and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a). This standard is "carried over from RFRA." *Cutter,* 544 U.S. at 717; *see Hoevenaar v. Lazaroff,* 422 U.S. 366, 368 (6th Cir.2005) ("test is the same as that previously imposed under RFRA"), *cert. denied,* 549 U.S. 875, 127 S.Ct. 187, 166 L.Ed.2d 132 (2006). The statute further provides that an individual may assert a violation of these provisions "as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000cc–2(a).

Although the Court of Appeals for the Second Circuit has yet to decide the issue, numerous Courts of Appeals have determined that RLUIPA's "appropriate relief" language does not unambiguously encompass monetary damages so as to effect a waiver of sover-

eign immunity from suit for monetary claims. *See Van Wyhe,* 581 F.3d at 653;. *Nelson v. Miller,* 570 F.3d 868, 884 (7th Cir.2009); *Cardinal v. Metrish,* 563 F.3d 794, 801 (6th Cir.2009); *Sossamon v. The Lone Star State of Texas,* 560 F.3d 316, 331 (5th Cir.2009); *Madison v. Virginia,* 474 F.3d 118, 130–33 (4th Cir.2006); 441 F.3d 1022, 1025–26 (D.C.Cir.2006); *See also Pugh v. Goord,* 571 F.Supp.2d 477, 507–09 (S.D.N.Y.2008). The Court finds the analysis set forth in these cases persuasive, and therefore recommends that summary judgment be granted in favor of the defendants in their official capacities with respect to plaintiffs' RLUIPA claims for monetary damages.

*Individual Capacity*

**\*7** Legislation enacted pursuant to the Spending Clause of the United States Constitution creates a contract between the federal government and the state receiving federal funds. *Smith v. Allen,* 502 F.3d 1255, 1273 (11th Cir.2007). As a result of this construction, the remedies included within such legislation are enforceable only against the recipient of such funds. *Id.* In other words, although the Spending Clause authorizes Congress to subject the grant recipient to liability in a private cause of action as a condition of funding, such authority "cannot be used to subject individual defendants, such as state employees, to individual liability in a private cause of action." *Id.* at 1274; *see Sossamon,* 560 F.3d at 329 ("Congressional enactments pursuant to the Spending Clause do not themselves impose *direct* liability on a non-party to the contract between the state and the federal government."). As a result, the Court recommends summary judgment in favor of defendants with respect to plaintiffs' RLUIPA claims in so far as those claims are pursued against them in their individual capacities.

**Injunctive Relief Under RLUIPA**

DOCS argues that it has demonstrated a compelling state interest in enforcing its hair policy because plaintiffs' dreadlocks cannot be adequately searched without putting prison officials at unnecessary risk. Dkt. # 183, p. 9. In addition, DOCS argues that its hair

Not Reported in F.Supp.2d, 2010 WL 2595286 (W.D.N.Y.)
**(Cite as: 2010 WL 2595286 (W.D.N.Y.))**

policy serves the legitimate penological interests of maintaining order, safety and security, asserting that "DOCS' hair policy reduces the opportunity for gang membership and the smuggling of contraband, which pose significant security problems." Dkt. # 183, pp. 9–10. DOCS also argues that its hair policy is the least restrictive means of achieving DOCS' compelling interest in maintaining prison security. Dkt. # 183, p. 11. DOCS asserts that if it "had to entertain every inmate's individual requests for exceptions based upon self-created religious beliefs, the correctional system would be unable to function at all." Dkt. # 183, p. 12.

Plaintiffs argue that defendants cannot demonstrate a compelling state interest in permitting only Rastafarians to wear dreadlocks. Dkt. # 213, pp. 12–13 & Dkt. # 216, p. 5.

By enacting RLUIPA, Congress mandated "a more searching standard of review of free exercise burdens than the standard used in parallel constitutional claims: strict scrutiny instead of reasonableness." *Lovelace v. Lee,* 472 F.3d 174, 186 (4th Cir.2006) (internal quotation omitted). "In addition to prescribing strict scrutiny, Congress mandated that RLUIPA be construed 'in favor of broad protection of religious exercise.' " *Id., quoting* 42 U.S.C. § 2000cc–3(g). "Congress, in other words, 'intended to provide as much protection as possible to prisoners' religious rights' without overly encumbering prison operations." *Id., quoting Murphy v. Missouri Dep't of Corr.,* 372 F.3d 979, 987 (8th Cir.), *cert. denied,* 543 U.S. 991, 125 S.Ct. 501, 160 L.Ed.2d 378 (2004). Thus, this standard is more stringent than the four-factor, rational-relationship-to-legitimate-penological-interest standard set forth in *Turner v. Safley*[FN2] for analysis of free exercise claims pursuant to the First Amendment. *See Warsoldier v. Woodford,* 418 F.3d 989, 994 (9th Cir.2005). Lawmakers anticipated, however, "that courts entertaining complaints under § 3 would accord 'due deference to the experience and expertise of prison and jail administrators in establishing necessary

regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.' " *Cutter,* 544 U.S. at 723.

> FN2. 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

**\*8** RLUIPA's definition of "religious exercise" includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A). This expansive definition was recognized by the United States Supreme Court, which confirmed that the statute "bars inquiry into whether a particular belief or practice is 'central' to a prisoner's professed religiosity." *Cutter,* 544 U.S. at 725. As the Court of Appeals for the Second Circuit explained in the context of a constitutional claim:

> Our founding principles require that courts resist the dangerous temptation to try to judge the significance of particular devotional obligations to an observant practitioner of faith. For, "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds."

*McEachin v. McGuinnis* [sic], 357 F.3d 197, 201 (2d Cir.2004), *quoting Hernandez v. Commissioner of Internal Revenue,* 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989). In other words, "a burdened practice need not be mandated by the adherent's religion in order to sustain a prisoner's free exercise claim." *Id.* at 203, *citing Ford v. McGinnis,* 352 F.3d 582, 593 (2d Cir.2003). Thus, it is clear that under both the statutory framework of RLUIPA and constitutional case law, DOCS cannot administer the religious exercise of its inmate population based upon its assessment of the validity of the requested practice to the religious denomination professed by the inmate.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

"Although RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion, the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity." *Cutter,* 544 U.S. at 725 (internal citation omitted); *see Ford,* 352 F.3d at 593–94 (The relevant question is whether a particular activity is considered central or important to the inmate's practice of religion). The Court notes that defendants do not challenge the sincerity of plaintiffs' belief in the religious texts cited in support of their determination to wear dreadlocks for purposes of this motion. Dkt. # 183, p. 7. In any event, plaintiffs' sincerity is evidenced by their determination to suffer keeplock, SHU, and denial of participation in Nation of Islam services and Ramadan meals rather than cut their hair.

Although the statute does not define "substantial burden," courts have incorporated the definition adopted in related contexts to conclude that a substantial burden exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs. *See Lovelace,* 472 F.3d at 187; *Jolly,* 76 F.3d at 477. In *Jolly,* the Court of Appeals for the Second Circuit determined that a choice of submitting to a test for latent tuberculosis or adhering to the belief that it is a sin to take artificial substances, such as those allegedly used in the test, into the body and enduring medical keeplock, constituted a substantial burden on plaintiff's religious exercise. *Id.* at 477. In a factually similar case to the instant matter, the Court of Appeals for the Ninth Circuit held that the California Department of Corrections' grooming policy imposed a substantial burden on a Native American's religious practice because it "intentionally puts significant pressure on inmates ... to abandon their religious beliefs by cutting their hair" or withstand discipline, including keeplock and loss of recreation, telephone, commissary and other privileges. *Warsoldier,* 989 F.3d at 996. Although defendants concede, for purposes of this motion, that its policy imposes a substantial burden upon plaintiffs' ability to wear

dreadlocks, as in *Warsoldier,* this Court has little difficulty determining that forcing an individual who sincerely believes that he should wear dreadlocks as part of his religious practice to either forgo his affiliation with the Nation of Islam or face discipline constitutes a substantial burden upon that individual's religious practice. Dkt. # 183, p. 7.

**\*9** Having determined that DOCS' grooming policy imposes a substantial burden upon plaintiffs' exercise of sincerely held religious beliefs, the burden shifts to defendants to demonstrate that its policy is the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000cc–1(a). The Court readily recognizes that prison safety and security are compelling governmental interests. *See Cutter,* 544 U.S. at 725, n. 13 ("prison security is a compelling state interest"); *Pell v. Procunier,* 417 U.S. 817, 823 (1974) ("central to all other corrections goals is the institutional consideration of internal security"); *Jolly,* 76 F.3d at 477 (noting DOCS compelling state interest in protecting inmates from infectious diseases). The Court also recognizes that dreadlocks are more difficult to search than straight hair and increases the opportunity for inmates to conceal contraband. Dkt. # 95, ¶ 11.

However, DOCS' policy with respect to dreadlocks is flawed as a matter of law because it permits or prohibits dreadlocks based upon its interpretation of religious doctrine, *to wit,* its determination that Rastafarians are the only religious group required to wear dreadlocks and that the doctrine of the Nation of Islam does not mandate dreadlocks, despite statutory language and Supreme Court case law expressly prohibiting such analysis. A policy based upon such an erroneous legal foundation cannot survive strict scrutiny. Stated another way, DOCS' determination to restrict dreadlocks to individuals who profess to be Rastafarian is not the least restrictive means of managing the security risks associated with dreadlocks. Such a conclusion is reinforced by the fact that plaintiffs have been wearing dreadlocks in multiple DOCS

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 2595286 (W.D.N.Y.)
**(Cite as: 2010 WL 2595286 (W.D.N.Y.))**

facilities while participating in Nation of Islam classes and services for well over a decade. Dkt. # 22, ¶ 14; Dtk. # 41, ¶¶ 2 & 4; Dkt. # 44, ¶¶ 2, 10 & 14; Dkt. # 211, ¶¶ 4, 8–9, 15 & 28. In addition, DOCS' current policy does nothing to prevent individuals from wearing dreadlocks for "ulterior, non-religious purposes," because DOCS is willing to allow any inmate who professes to be Rastafarian to wear dreadlocks without any consideration of the sincerity of their religious beliefs. Dkt. # 95, ¶ 19. Accordingly, it is recommended that plaintiffs be granted summary judgment enjoining defendants from punishing plaintiffs for refusing to cut their hair or refusing to change their religious affiliation, and preventing defendants from precluding plaintiffs' attendance at Nation of Islam services and classes because of their dreadlocks.

**Qualified Immunity on the First Amendment Claim**

Defendants argue that they are entitled to qualified immunity because it was objectively reasonable for them to believe that they were only required to modify DOCS' haircut policy to accommodate the determination of the Court of Appeals that "a policy requiring haircuts of all male inmates upon incarceration violates the free exercise rights of Rastafarians." Dkt. # 183, p. 13.

**\*10** Plaintiffs argue that it was not reasonable for DOCS to require them to designate their religion as Rastafarian in order to wear dreadlocks because the New York Court of Appeals determined in 1986 that DOCS Directive 4914 was unconstitutional as it applied to a prisoner who refused to cut his hair upon arrival into DOCS custody and that the Court of Appeals for the Second Circuit determined in 1990 that Directive 4914 violates the Free Exercise Clause under the First Amendment in 1990. Dkt. # & Dkt. # 216, p. 6.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly es-

tablished statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* —— U.S. ——, ——, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009), *quoting Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "This inquiry turns on the objective legal reasonableness of the action taken, assessed in light of the legal rules that were clearly established at the time it was taken." *Id.* at 822. "For a right to be clearly established, it must have been recognized in a particularized rather than a general sense." *Farid v. Ellen,* 593 F.3d 233, 244 (2d Cir.2010) (internal quotation omitted). However, "the precise conduct at issue need not previously have been ruled unlawful." *Zahrey v. Coffey,* 221 F.3d 342, 357 (2d Cir.2000). "The right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

Defendants are not entitled to qualified immunity because it was clearly established prior to the time that DOCS attempted to enforce its policy restricting dreadlocks to inmates who identified themselves as Rastafarian that DOCS could not administer the religious exercise of its inmate population based upon its assessment of the validity of the requested practice to the religious denomination professed by the inmate and it was not objectively reasonable for defendants to believe that ordering members of the Nation of Islam to cut their hair or change their religion would not violate that prohibition. See *McEachin,* 357 F.3d at 203 ("a burdened practice need not be mandated by the adherent's religion in order to sustain a prisoner's free exercise claim."); *Ford,* 352 F.3d at 598 (opinion of religious authorities that a particular practice is not religiously mandated under Muslim law, without more, cannot render defendants' refusal to provide that practice to plaintiff objectively reasonable). Accordingly, it is recommended that defendants' motion for summary judgment on the ground of qualified immunity be denied.

Not Reported in F.Supp.2d, 2010 WL 2595286 (W.D.N.Y.)
**(Cite as: 2010 WL 2595286 (W.D.N.Y.))**

**Merits of the First Amendment Claim**

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford,* 352 F.3d at 588, *citing Pell v. Procunier,* 417 U.S. 817, 822 (1974). However, "[b]alanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, are the interests of prison officials charged with complex duties arising from administration of the penal system." *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.), *cert. denied,* 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990). As a result, the free exercise claims of prisoners are judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights. *Ford,* 352 F.3d at 588. Accordingly, a regulation that burdens a protected right will pass constitutional muster if it is reasonably related to legitimate penological interests. *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006), *citing O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) and *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

**\*11** It is the inmate's initial burden to demonstrate that the disputed conduct substantially burdens his sincerely held religious beliefs.[FN3] *Salahuddin,* 467 F.3d at 474–75. In assessing the sincerity of an inmate's religious beliefs, courts may not "question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *McEachin,* 357 F.3d at 201, *quoting Hernandez v. Commissioner of Internal Revenue,* 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989). Instead, courts may only consider whether a claimant sincerely holds a particular belief and whether the belief is religious in nature." *Ford,* 352 F.3d at 590; *see Jackson v. Mann,* 196 F.3d 316, 321 (2d Cir.1999) ("the question whether [plaintiff's] beliefs are entitled to Free Exercise protection turns on whether they are 'sincerely held,' not whether he is in fact a Jew under Judaic law."). For the reasons set forth with respect to plaintiffs' claim for injunctive relief under RLUIPA, plaintiffs have established that DOCS' policy regarding dreadlocks substantially burdens their sincerely held religious beliefs.

> FN3. In *Ford,* the Second Circuit noted a circuit split over whether prisoners must demonstrate that a burden on their religious exercise is substantial in order to establish a free exercise claim, but declined to resolve the issue and instead assumed the continued applicability of the substantial burden test. Recent cases suggest that the Second Circuit resolved the split in *Salahuddin v. Goord* by subscribing to the substantial factor test. *Koehl v. Greene,* No. 05–CV–582, 2008 W L 4822520, *7, n. 11 (N.D.N.Y. Oct. 31, 2008); *Livingston v. Griffin,* No. 04–CV–607, 2007 W L 1500382, at *15 (N.D.N.Y. May 21, 2007); *King v. Bennett,* No. 02–CV–349, 2007 WL 1017102, at *4 (W.D.N.Y. Mar.30, 2007).

Once a plaintiff has made this showing, the burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision under scrutiny. *Salahuddin,* 467 F.3d at 474–75. Maintaining prison safety and security by reducing the opportunity for inmates to smuggle contraband is a legitimate penological purpose. *See Benjamin,* 905 F.2d at 578 ("Preventing the smuggling of contraband, such as weapons and drugs, comports with the type of penological interests contemplated under the *Turner* ... standard.").

If such a legitimate penological interest is articulated, its reasonableness is then analyzed under the test articulated by the United States Supreme Court in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Pursuant to *Turner,*

> there must be a valid, rational connection between

Not Reported in F.Supp.2d, 2010 WL 2595286 (W.D.N.Y.)
**(Cite as: 2010 WL 2595286 (W.D.N.Y.))**

the prison regulation and the legitimate governmental interest put forward to justify it. Thus, a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational. Moreover, the governmental objective must be a legitimate and neutral one. We have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression.

*Id.* at 89 (internal quotation omitted). Then, the court must ask whether the inmate is afforded adequate alternative means for exercising the right in question. *Id.* at 90. Third, the court must examine the impact that accommodation of the asserted constitutional right will have on guards and other inmates in the prison, and on the allocation of prison resources generally. *Id.* Finally, the court may consider alternatives that fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests as evidence that the regulation does not satisfy the reasonable relationship standard. *Id.* at 91. In other words, "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* at 90.

**\*12** As previously discussed under the more stringent standard of review provided by RLUIPA, the fatal flaw of DOCS' policy is that it is not neutral—it permits or denies dreadlocks based not upon the sincerity of the inmate's belief, but upon DOCS' assessment of the validity of that religious belief. Even under a less stringent standard, however, this lack of neutrality renders the governmental objective suspect. Stated another way, there is no legitimate reason for DOCS to afford members of only one religious denomination the opportunity to adhere to a sincerely held religious belief precluding cutting of hair. Requiring inmates to affiliate with that religious denomination in order to exercise their sincere religious belief in the wearing of dreadlocks is not an adequate

alternative means for members of other denominations to exercise their religious beliefs and seems more likely to foster conflict within that religious population than permitting inmates to exercise that practice within their own denominations. In contrast, there is no suggestion within this record that plaintiffs' wearing of dreadlocks while affiliated with the Nation of Islam within multiple DOCS' facilities for more than a decade has had any impact on security within DOCS' facilities. As a result, it is recommended that plaintiffs be granted summary judgment on their free exercise claim.

### CONCLUSION

For the foregoing reasons, it is hereby recommended that:

1. defendants' motion for summary judgment be granted insofar as defendants seek to dismiss plaintiffs' claims for monetary damages under RLUIPA and otherwise be denied;

2. plaintiffs' motion for summary judgment be granted insofar as plaintiffs seek permanent injunctive relief pursuant to RLUIPA and that defendants be permanently enjoined from punishing plaintiffs for refusing to cut their hair or refusing to change their religious affiliation and from precluding plaintiffs' attendance at Nation of Islam services and classes because of their dreadlocks; and

3. plaintiffs' motion for summary judgment be granted with respect to plaintiffs' cause of action alleging a violation of their free exercise rights pursuant to the First Amendment of the United States Constitution.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

ORDERED, that this Report, Recommendation and Order be filed with the Clerk of the Court.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 2595286 (W.D.N.Y.)
**(Cite as: 2010 WL 2595286 (W.D.N.Y.))**

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson–Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

**\*13** *Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." *Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.*

The Clerk is hereby directed to send a copy of this Report, Recommendation and Order to the attorneys for the parties.

**SO ORDERED.**

W.D.N.Y.,2010.
Amaker v. Goord

Not Reported in F.Supp.2d, 2010 WL 2595286 (W.D.N.Y.)

END OF DOCUMENT



Not Reported in F.Supp.2d, 2009 WL 1449046 (W.D.N.Y.)
**(Cite as: 2009 WL 1449046 (W.D.N.Y.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Llewellyn GEORGE, Plaintiff,
v.
James T. CONWAY, et al., Defendants.

No. 05-CV-510A.
May 21, 2009.

West KeySummary**Prisons 310** 🔑157

310 Prisons
   310II Prisoners and Inmates
     310II(B) Care, Custody, Confinement, and Control
       310k157 k. Food and Drink. Most Cited Cases

**Sentencing and Punishment 350H** 🔑1540

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
     350HVII(H) Conditions of Confinement
     350Hk1540 k. Food. Most Cited Cases
    Prison officials did not subject prisoner to unconstitutional cruel and unusual punishment by refusing to remove plastic wrap from prisoner's meals in prisoner's presence, even if this practice caused the meals to be exposed to hair, dust particles from construction work and the stench of feces. Prisoner failed to make any showing that his meals had actually been contaminated or tampered with, and prisoner's grievances alleging contamination and tampering had previously been investigated and found to be meritless.

U.S.C.A. Const.Amend. 8.

Llewellyn George, Fishkill, NY, pro se.

Michael A. Siragusa, New York State Attorney General's Office, Buffalo, NY, for Defendants.

ORDER
RICHARD J. ARCARA, Chief Judge.
**\*1** The above-referenced case was referred to Magistrate Judge H. Kenneth Schroeder, Jr., pursuant to 28 U.S.C. § 636(b)(1)(B). On March 25, 2009, Magistrate Judge Schroeder filed a Report and Recommendation, recommending that plaintiff's motion for summary judgment be denied and defendants' cross-motion for summary judgment be granted in its entirety.

The Court has carefully reviewed the Report and Recommendation, the record in this case, and the pleadings and materials submitted by the parties, and no objections having been timely filed, it is hereby

ORDERED, that pursuant to 28 U.S.C. § 636(b)(1), and for the reasons set forth in Magistrate Judge Schroeder's Report and Recommendation, plaintiff's motion for summary judgment is denied and defendants' cross-motion for summary judgment is granted in its entirety.

The Clerk of Court shall take all steps necessary to close the case.

SO ORDERED.

***REPORT, RECOMMENDATION AND ORDER***
H. KENNETH SCHROEDER, JR., United States Magistrate Judge.
This case was referred to the undersigned by the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1449046 (W.D.N.Y.)
**(Cite as: 2009 WL 1449046 (W.D.N.Y.))**

Hon. Richard J. Arcara, pursuant to 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions. Dkt. # 25.

Plaintiff filed this *pro se* action on or about July 22, 2005, seeking relief pursuant to 42 U.S.C. § 1983. Dkt. # 1. Plaintiff alleges that while an inmate at the Attica Correctional Facility, his rights pursuant to the First, Eighth, and Fourteenth Amendments to the United States Constitution were violated. *Id.* Currently before the Court are plaintiff's motion for summary judgment (Dkt.# 42) and defendants' cross-motion for summary judgment (Dkt. # 60). For the following reasons, it is recommended that plaintiff's motion for summary judgment be denied and defendants' cross-motion for summary judgment be granted in its entirety.

### BACKGROUND

Plaintiff, proceeding *pro se,* commenced this action on or about July 22, 2005, against defendants James Conway, Randy James, Jeffrey Bea, Carol Edwards, Rosalind Rosolowski, Darryl Borawski, Rabbi S. Charitonow and Don Lopes alleging violations of his rights pursuant to the First, Eighth and Fourteenth Amendments to the United States Constitution while he was housed at the Attica Correctional Facility ("Attica"). On each of his two claims, plaintiff seeks $15 million in compensatory damages and $10 million in punitive damages. It bears noting that plaintiff has also filed a separate action against several of the same defendants named herein, entitled *Llewellyn George v. Glenn S. Goord, et al.,* Case No. 05-CV-788 and alleging causes of action arising out of similar facts. That case is also pending before Chief United States District Judge Richard J. Arcara and has been referred to the undersigned for the handling of all pretrial matters and to hear and report on dispositive motions. Cross-motions for summary judgment are also pending in that action and will be the subject of a separate Report, Recommendation & Order.

**\*2** In his first claim, plaintiff alleges that from April 25, 2005 to June 8, 2005, defendants Rosalind Rosolowski, Don Lopes, and Carol Edwards "deliberately deprived [him] of [his] kosher meals" in violation of his rights pursuant to the First and Fourteenth Amendments to the United States Constitution. Specifically, plaintiff alleges that defendants Rosolowski, Lopes and Edwards,

> deliberately deprived me of my kosher meals from 4-25-05 to 6-8-05 after I had missed three meals, unintentionally. I was never issued a date to report to the diet line. After the Inmate Grievance Program had agreed with my complaint and recommended that my kosher meals be reinstated on 5-4-05, I was still deprived of my kosher meals until 6-8-05.

Dkt. # 1, p. 9. In his second claim, plaintiff alleges that from June 8, 2005 to "unresolved" (no later than July 22, 2005, the date when the instant action was commenced), defendants James Conway, Randy James, Jeffrey Bea, Darryl Borawski, and Rabbi S. Charitonow violated his rights pursuant to the First, Eighth and Fourteenth Amendments to the United States Constitution. Plaintiff's second claim states,

> my kosher meals were exposed to hair, dust particles from construction work, the stench of feces because each of the above mentioned defendants denied my numerous of [sic] requests to have the plastic wrapper removed from the kosher trays in my presence, even after I had repeatedly complained that certain food items were being stolen from my kosher trays.

Dkt. # 1, p. 21.

### Kosher Meal Plan, a/k/a Cold Alternative Diet

On April 18, 2005, plaintiff signed a Cold Alternative Diet ("CAD") meal plan, or kosher meal plan whereby he agreed that he would miss no more than three meals per week. Dkt. # 61, ¶ 3; Dkt. # 67, p. 5. Thereafter, the CAD meal plan was approved on April 19, 2005 by defendant Rabbi S. Charitonow, Jewish

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1449046 (W.D.N.Y.)
**(Cite as: 2009 WL 1449046 (W.D.N.Y.))**

Chaplain, defendant Rosalind Rosolowski, Coordinating Chaplain and defendant Carol Edwards, Deputy Superintendent for Programs. Dkt. # 67, ¶ 4 and p. 5. Also on April 19, 2005, consistent with standard procedure, defendant Carol Edwards sent a copy of the CAD agreement to plaintiff through the facility mail system. Dkt. # 61, ¶ 4; Dkt. # 67, ¶ 4. At that time, sending an inmate a copy of the CAD agreement was sufficient to put the inmate on notice that the CAD meal plan had commenced. *Id.*

On April 25, 2005, plaintiff was removed from the CAD meal plan for missing too many meals. Dkt. # 61, ¶ 5. For the period April 20, 2005 to April 23, 2005, plaintiff missed eleven meals. *Id.* On April 25, 2005, defendant Don Lopes, Attica Food Service Administrator, sent plaintiff a memo advising him that he would be removed from the CAD meal plan due to missed meals. Dkt. # 61, ¶ 6; Dkt. # 76, ¶ 6 and Exhibit B. Removal from the CAD meal plan could take a couple of days before becoming effective. *Id.* On April 26, 2005, plaintiff signed the Kosher Sign-In Sheets for breakfast and lunch, however, plaintiff's name does not appear on any of the days preceding or following April 26, 2005. Dkt. # 61, ¶ 7; Dkt. # 76, ¶ 7.

### Grievance No. A-48662-05-Removal from CAD

**\*3** On April 27, 2005, plaintiff filed Grievance No. A-48662-05 alleging that he was being denied his kosher meals. Dkt. # 61, ¶ 8. Specifically, plaintiff stated:

> I did not report to the diet line, because I had been under the impression that I had to wait for some kind of notice, and did not want to be charged with being out of place. I was never advised as to when, exactly, my kosher meals would commence, not even the application I had signed for diet, kosher meals, program had given me any kind of indication.

Dkt. # 75, p. 11. On May 4, 2005, the Inmate Grievance Review Committee ("IGRC") recommended that plaintiff be placed back on the list and that plaintiff should not be removed from the diet because plaintiff was never informed when the diet would begin. Dkt. # 61, ¶ 9; Dkt. # 75, p. 12. Thereafter, on May 5, 2005, plaintiff noted on the bottom of the form setting forth the IGRC recommendation that although he agreed with the IGRC response, he wished to appeal to the Superintendent because he still had not received his kosher meals. Dkt. 61, ¶ 12; Dkt. # 75, ¶ 7 and p. 12. On May 11, 2005, plaintiff was transferred from the housing unit "A-Block" to the Special Housing Unit ("SHU") because of an incident that occurred on May 10, 2005. Dkt. # 61, ¶ 10.

On May 15, 2005, plaintiff wrote defendant Rosalind Rosolowski a letter claiming that she had removed him from the "kosher meal list ." Dkt. # 61, ¶ 11; Dkt. # 72, ¶ 6 and p. 10. In his letter, plaintiff also notes that he filed a grievance and that the IGRC recommended that his kosher meals be reinstated. *Id.* Notwithstanding the IGRC's recommendation of reinstatement, plaintiff complained that his kosher meals had not been reinstated. *Id.* Defendant Rosolowski noted on the bottom of plaintiff's letter, "I do not remove anyone from KOSHER DIETS-the kitchen keeps track on [sic] attendance + writes the decision not me-..." Dkt. # 72, p. 10 (emphasis in original).

On May 17, 2005, plaintiff wrote to defendant Lopes, the Food Service Administrator at Attica, concerning the grievance he had filed after his removal from the CAD meal plan. Dkt. # 76, ¶ 8, p. 16. As in his May 15, 2005 letter to defendant Rosolowski, plaintiff noted that the IGRC recommended that his kosher meals be reinstated. *Id.* Notwithstanding the IGRC's recommendation of reinstatement, plaintiff complained to defendant Lopes that his kosher meals had not been reinstated. *Id.* On May 23, 2005, defendant Lopes responded to plaintiff's May 17, 2005 letter stating, in part, that the Food Service Department is bound by both the directives

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1449046 (W.D.N.Y.)
**(Cite as: 2009 WL 1449046 (W.D.N.Y.))**

from Albany and the operating procedures at Attica. Dkt. # 76, ¶ 9 and p. 18. Moreover, defendant Lopes reminded plaintiff that he was removed from the kosher meal plan for missing too many meals and that the actions taken by the Food Service Department were in accordance with DOCS' directives and procedures. *Id.*

On or about May 25, 2005, defendant Superintendent Conway denied plaintiff's appeal stating,

**\*4** The issue of reinstatement to the cold alternative diet menu needs to be addressed to the chaplain's office. Notification of the original diet was forwarded to you and you were removed for missing required meals. There is now a time period to wait before being put back on the menu.

Dkt. # 61, ¶ 12; Dkt. # 75, ¶ 7 and p. 12. Because plaintiff was removed from the diet plan for missing too many meals, he had to wait thirty days before being put back on the kosher diet plan. Dkt. # 61, ¶ 13. On May 26, 2005, plaintiff appealed Superintendent Conway's decision to the Central Office Review Committee ("CORC"). Dkt. # 75, p. 14. CORC upheld Superintendent Conway's determination, stating,

Upon full hearing of the facts and circumstances in the instant case, and upon recommendation of the Division of Nutritional Services, the action requested herein is hereby accepted only to the extent that CORC upholds the determination of the Superintendent for the reasons stated. CORC notes from additional investigation that the grievant signed an agreement to participate in the Cold Alternative Diet Program on 5/31/05 and was approved on 6/06/05.

Dkt. # 75, p. 19. On May 31, 2005, plaintiff was eligible for reinstatement to the CAD meal plan and signed a new CAD agreement which was approved by Rabbi Charitonow, Rosalind Rosolowski and Carol Edwards on June 6, 2005. Dkt. # 75, ¶ 8 and p. 13.

### Grievance No. A-48969-05

On or about June 13, 2005, plaintiff sent a letter to defendant Darryl Borawski, formerly a Sergeant at Attica, complaining that he was not receiving hot water with his Kosher meals, that certain food items were missing from his tray and requesting that the corrections officers remove the plastic wrap from his tray in front of him. Dkt. # 61, ¶ 16; Dkt. # 79, ¶ 5 and p. 14. On June 15, 2005, plaintiff filed Grievance No. A-48969-05 (a letter to Theresa Dyson) stating,

I am being denied portions of my food each day, because certain food items are always missing from my kosher trays, and I am not receiving any hot water. I have addressed these issues to the Rabbi, the food administrator, the S.H.U. officers and supervisors, but nothing is being done, because of the previous grievances I had filed. Action requested my [sic] grievant, is for the S.H.U. officers to remove the plastic wrapper from the kosher trays, in the presence of the S.H.U. prisoners, see to it that the S.H.U. prisoner's [sic] are provided with hot water as they are entitled to, and that the S.H.U. prisoners be issued menus for the kosher diet.

Dkt. # 79, p. 17. At the time of the incidents alleged in the complaint, Theresa Dyson was the Inmate Grievance Program Supervisor and in a June 20, 2005 Investigative Report, she found that plaintiff produced no evidence that certain foods were missing from his trays. Dkt. # 61, ¶ 20; Dkt. # 74, p. 28. Theresa Dyson further found that hot water was distributed on a daily basis and that the plastic wrapping covering the meals will not be removed in the presence of the inmates. *Id.* Moreover, she found that there was no provision for SHU inmates to receive menus. *Id.* Finally, she concluded that there was no evidence to support plaintiff's assertion that there had been retaliation for plaintiff's prior grievances. *Id.* Theresa Dyson's ultimate conclusion was that plaintiff's grievance was without merit. *Id.* The IGRC denied plaintiff's grievance and defendant Superintendent Conway endorsed the

Not Reported in F.Supp.2d, 2009 WL 1449046 (W.D.N.Y.)
**(Cite as: 2009 WL 1449046 (W.D.N.Y.))**

unanimous response of the IGRC. Dkt. # 61, ¶ 20; Dkt. # 75, ¶ 9 and pp. 31 and 33. Thereafter, the CORC upheld the Superintendent's ruling. Dkt. # 75, p. 34.

**\*5** At the time plaintiff filed Grievance No. A-48969-05, he was housed in SHU. Dkt. # 61, ¶ 17. As noted above, all inmates housed in SHU are offered hot water on a daily basis. *Id.* Moreover, for security reasons, the plastic wrapping covering meals may not be removed in front of inmates. *Id.* All meals delivered to SHU are in a closed Styrofoam tray. *Id.* at ¶ 18. In order to preserve sanitation and to prevent contraband from being transported, before the kosher meals leave the kitchen, the entire tray is wrapped in plastic wrap. *Id.* The meals are then transported on a cart to the SHU kitchen or preparation area where a porter (designated inmate) under the supervision of a SHU officer unwraps the Styrofoam tray to inspect for contraband. *Id.* A SHU officer then delivers each meal to the inmates' cell. *Id.* For the safety and security of the inmates and staff, no contraband whatsoever may be on the SHU gallery. *Id.* Section 304.2(a) of DOCS Directive # 4933 concerns the standards of operation of the SHU and provides that "[a]ll food items will be delivered to the inmates upon receipt from the food service area, and in a manner that will ensure receipt of the food in an appropriate condition." *Id.* at ¶ 21.

### Grievance No. A-49087-05

On June 27, 2005, plaintiff sent a letter to Thomas Eagen, the former Director of the Inmate Grievance Program, alleging that his kosher meals were being deliberately mishandled, tampered with and exposed to unsanitary conditions. Dkt. # 61, ¶ 22; Dkt. # 64, ¶ 10 and pp. 47-48. By letter dated July 6, 2005, Thomas Eagen acknowledged receipt of plaintiff's June 27, 2005 letter and reminded plaintiff that pursuant to DOCS' policy, Directive # 4040, the Inmate Grievance Program "provides inmates with an orderly, fair, simple and expeditious method of resolving grievances pursuant to the Correction Law." Dkt. # 64, p. 49. Thomas Eagen further stated that Directive # 4040 "makes no provision for an inmate to refer grievances

directly to Central Office." *Id.* Plaintiff's letter was returned to him and Thomas Eagen's office did not retain a copy. *Id.* On June 30, 2005, plaintiff wrote to defendant Don Lopes alleging that his kosher meals were being tampered with and requesting that the plastic wrapper be removed from the kosher trays in the presence of the prisoners. Dkt. # 76 ¶ 11 and p. 34.

On July 12, 2005, plaintiff filed Grievance No. A-49087-05 complaining of the odors and cleanliness of the SHU and requesting that the cells be cleaned and prisoners given showers, new clothing and new bedding. Dkt. # 61, ¶ 26; Dkt. # 75, p. 53. The IGRC denied plaintiff's request stating,

> Grievant is advised he may clean his own cell be [sic] addressing this to his area Supervisor along with other issues. No evidence was presented verifying the odor complaints or other [sic]. SHU inmates not being fed [sic]. Further, each cell ventilation system should be working properly.

**\*6** Dkt. # 75, p. 50. Although the following series of events relating to Grievance No. A-49087-05 occurred after the filing of plaintiff's complaint, for purposes of completeness, this Court will describe them briefly. On or about August 9, 2005, Inmate Grievance Supervisor George Struebel made the following notation, "made rounds on 8/2 in SHU no problems noted as described in grievance." Dkt. # 75, p. 54. On or about August 11, 2005, defendant Superintendent Conway denied plaintiff's grievance stating,

> [e]very effort is made to maintain a safe and hygenic [sic] living space. Galleries and cells are cleaned. Inmates are fed three times a day and showers provided per directive. Sufficient bedding materials and clothing are also supplied. The IGP Supervisor recently made rounds in SHU and did not find the conditions existent as you describe.

Dkt. # 75, p. 51. Plaintiff appealed the Superin-

Not Reported in F.Supp.2d, 2009 WL 1449046 (W.D.N.Y.)
**(Cite as: 2009 WL 1449046 (W.D.N.Y.))**

tendent's ruling to CORC, claiming that the Superintendent's views were "deliberately biased and misleading and the I.G.P. supervisor is a fraud." Dkt. # 75, p. 51. CORC upheld the Superintendent's determination and reasoned that it had not been presented with sufficient evidence to substantiate any malfeasance by the staff. Dkt. # 75, p. 51. Moreover, CORC advised plaintiff to address his housing concerns to the area supervisor. *Id.*

### DISCUSSION AND ANALYSIS

As a threshold matter, defendants argue that all plaintiff's claims against them in their official capacity must be dismissed pursuant to the Eleventh Amendment to the United States Constitution. With respect to plaintiff's claims against defendants James Conway, Rosalind Rosolowski and Carol Edwards, defendants argue that they must be dismissed for lack of personal involvement. Defendants Rosolowski, Edwards and Lopes argue that plaintiff cannot establish that his right to free exercise of religion was violated because plaintiff was not deliberately deprived on his kosher meals from April 25, 2005 to June 8, 2005. Defendants Conway, James, Bea, Borawski and Charitonow also argue that plaintiff cannot establish that his right to free exercise of religion was violated or that his right to be free from cruel and unusual punishment was violated because plaintiff cannot establish that defendants were responsible for exposing plaintiff's kosher meals to hair, dust and the stench of feces and/or defendants tampered with his kosher meals. Similarly, defendants further argue that plaintiff's claims of being deprived of his kosher meals from April 25, 2005 to June 8, 2005 and his kosher meals being exposed to hair, dust particles and the stench of feces do not rise to the level of a violation of his rights under the Fourteenth Amendment. Lastly, defendants claim that they are entitled to qualified immunity. Because the Court agrees that defendants are entitled to judgment as a matter of law on each of plaintiff's claims, the Court need not reach the issue of whether defendants are entitled to qualified immunity. For the following reasons, it is recommended that plaintiff's

motion for summary judgment be denied and defendants' motion for summary judgment be granted.

***Summary Judgment***

**\*7** Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a *pro se* plaintiff." *Thomas v. Irvin,* 981 F.Supp. 794, 798 (W.D.N.Y.1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see Bryant v. Maffucci,* 923 F.2d 979 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant,* 923 F.2d at 982 (internal citations omitted). A party seeking to defeat a motion for summary judgment,

must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1449046 (W.D.N.Y.)
**(Cite as: 2009 WL 1449046 (W.D.N.Y.))**

Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

*Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

### Official Capacity Claims

Plaintiff commenced the instant action against James Conway, Superintendent at Attica; Randy James, former Deputy Superintendent of Security at Attica; Jeffrey Bea, a Lieutenant at Attica; Carol Edwards, former Deputy Superintendent of Programs at Attica; Rosalind Rosolowski, Coordinating Chaplain at Attica; Darryl Borawski, former Sergeant at Attica; Rabbi S. Charitonow, former Rabbi at Attica; and Don Lopes, Food Service Administrator at Attica in their personal and official capacities. Dkt. # 1. Plaintiff's claims against the above-named defendants are asserted pursuant to 42 U.S.C. § 1983. In order to state a claim pursuant to § 1983, a plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Dwares v. City of New York,* 985 F.2d 94,98 (2d Cir.1993).

The Eleventh Amendment to the United States Constitution bars federal courts from exercising subject matter jurisdiction over claims against states absent their consent to such a suit or an express statutory waiver of immunity. *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89,90-100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). It is well-settled that states are not "persons" under § 1983, and thus, Eleventh Amendment immunity is not abrogated by that statute. *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). The Eleventh Amendment bar extends to agencies and officials sued in their official capacities. *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Accordingly, plaintiff's claims

against the defendants in their official capacities are barred by the Eleventh Amendment and it is recommended that those claims be dismissed. Based on the foregoing, the balance of this Court's Report, Recommendation and Order will address plaintiff's claims against defendants in their individual capacities.

### Personal Involvement

**\*8** It is well settled that the personal involvement of defendants in an alleged constitutional deprivation is a prerequisite to an award of damages under § 1983. *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Al- Jundi v. Estate of Rockefeller,* 885 F.2d 1060,1065 (2d Cir.1989). Personal involvement may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation; (2) was informed of the violation and failed to remedy the wrong; (3) created or permitted the continuation of a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating unconstitutional acts were occurring. *Colon,* 58 F.3d at 873, *citing Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994).

### James Conway

In his second claim, plaintiff alleges that for the period June 8, 2005 to "unresolved," defendant James Conway, Superintendent at Attica, knew that plaintiff's meals were being exposed to hair and dust particles and the stench of feces. Dkt. # 1. Defendant Conway argues that he cannot be held liable simply because of his position as the Superintendent at Attica. Dkt. # 63, p. 7. Plaintiff filed two grievances, A-48969-05 (June 15, 2005) and A-49087-05 (July 12, 2005), complaining that his kosher meals were being tampered with and complaining of the odors and cleanliness of the SHU. Grievance No. A-48969-05 was fully investigated by Theresa Dyson, the Inmate Grievance Program Supervisor, and she concluded

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1449046 (W.D.N.Y.)
**(Cite as: 2009 WL 1449046 (W.D.N.Y.))**

that plaintiff's grievance was without merit. Dkt. # 61, ¶ 20; Dkt. # 74, p. 28. Thereafter, the IGRC denied plaintiff's grievance and defendant Superintendent Conway endorsed the unanimous response of the IGRC. Dkt. # 61, ¶ 20; Dkt. # 75, ¶ 9 and pp. 31 and 33. The CORC upheld the Superintendent's ruling. Dkt. # 75, p. 34.

Grievance No. A-49087-05 was also fully investigated by Theresa Dyson and the IGRC denied plaintiff's request stating,

Grievant is advised he may clean his own cell be [sic] addressing this to his area Supervisor along with other issues. No evidence was presented verifying the odor complaints or other [sic]. SHU inmates not being fed [sic]. Further, each cell ventilation system should be working properly.

Dkt. # 75, p. 50. After plaintiff filed the instant complaint, on or about August 9, 2005, Inmate Grievance Supervisor George Struebel made the following notation, "made rounds on 8/2 in SHU no problems noted as described in grievance." Dkt. # 75, p. 54. On or about August 11, 2005, defendant Superintendent Conway denied plaintiff's grievance stating, "[e]very effort is made to maintain a safe and hygenic [sic] living space. Galleries and cells are cleaned. Inmates are fed three times a day and showers provided per directive. Sufficient bedding materials and clothing are also supplied. The IGP Supervisor recently made rounds in SHU and did not find the conditions existent as you describe." Dkt. # 75, p. 51. Plaintiff appealed the Superintendent's ruling to CORC, claiming that the Superintendent's views were "deliberately biased and misleading and the I.G.P. supervisor is a fraud." Dkt. # 75, p. 51. CORC upheld the Superintendent's determination and reasoned that it had not been presented with sufficient evidence to substantiate any malfeasance by the staff. Dkt. # 75, p. 51. Moreover, CORC advised plaintiff to address his housing concerns to the area supervisor. *Id.*

**\*9** The record before this Court is simply devoid of any evidence to support a conclusion that defendant Conway: participated in any way in the alleged constitutional violation; was informed of the violation and failed to remedy the wrong; created or permitted the continuation of a policy under which unconstitutional practices occurred; was grossly negligent in supervising subordinates who committed the wrongful acts; or exhibited deliberate indifference to the rights of inmates by failing to act on information indicating unconstitutional acts were occurring. Moreover, there is no evidence that defendant Conway ever dealt directly with plaintiff or oversaw the supervision of the investigation into plaintiff's grievances. Accordingly, because defendant Conway was not personally involved in the alleged constitutional violation, it is recommended that the claim against defendant Conway be dismissed.

### Rosalind Rosolowski and Carol Edwards

In his first claim, plaintiff claims that defendants Rosolowski and Edwards, for the period April 25, 2005 to June 8, 2005, deprived plaintiff of his kosher meals. Dkt. # 1. In support of their motion for summary judgment, defendants maintain and plaintiff does not dispute that the Food Service Administrator, defendant Don Lopes, bears the sole responsibility for ensuring that inmates who are approved to receive a CAD are, in fact, provided with kosher meals. Dkt. # 63, p. 9. Notwithstanding the foregoing, defendants Rosolowski and Edwards' involvement with respect to plaintiff's participation in the CAD program was minimal at most.

On April 19, 2005, defendants Rosalind Rosolowski, Coordinating Chaplain and Carol Edwards, Deputy Superintendent for Programs approved plaintiff's CAD meal plan. Dkt. # 67, ¶ 4 and p. 5. Also on April 19, 2005, consistent with standard procedure, defendant Carol Edwards sent a copy of the CAD agreement to plaintiff through the facility mail system. Dkt. # 61, ¶ 4; Dkt. # 67, ¶ 4. On May 15, 2005,

Not Reported in F.Supp.2d, 2009 WL 1449046 (W.D.N.Y.)
**(Cite as: 2009 WL 1449046 (W.D.N.Y.))**

plaintiff wrote defendant Rosalind Rosolowski a letter claiming that she had removed him from the "kosher meal list." Dkt. # 61, ¶ 11; Dkt. # 72, ¶ 6 and p. 10. In his letter, plaintiff also noted that he filed a grievance and that the IGRC recommended that his kosher meals be reinstated. *Id.* Notwithstanding the IGRC's recommendation of reinstatement, plaintiff complained that his kosher meals had not been reinstated. *Id.* Defendant Rosolowski noted on the bottom of plaintiff's letter, "I do not remove anyone from KOSHER DIETS-the kitchen keeps track on [sic] attendance + writes the decision not me-..." Dkt. # 72, p. 10 (emphasis in original). Thus, absent any evidence that defendants Rosolowski and Edwards were involved in any way in the alleged constitutional violation; were informed of the violation and failed to remedy the wrong; created or permitted the continuation of a policy under which unconstitutional practices occurred; were grossly negligent in supervising subordinates who committed the wrongful acts; or exhibited deliberate indifference to the rights of inmates by failing to act on information indicating unconstitutional acts were occurring, it is recommended that the claims against defendants Rosalind Rosolowski and Carol Edwards be dismissed.

### First Amendment Claims

**\*10** Plaintiff alleges that defendants Rosolowski, Edwards and Lopes deliberately deprived him of his kosher meals for the period April 25, 2005 to June 8, 2005, in violation of his rights under the First Amendment to the United States Constitution. Moreover, in further violation of his rights under the First Amendment, plaintiff alleges that by reason of defendants Conway, James, Bea, Borawski and Charitonow's refusal to have the plastic wrapper removed from plaintiff's food in his presence, plaintiff's kosher meals were exposed to hair, dust particles and the stench of feces.

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause."

*Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003), citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974). However, "[b]alanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, are the interests of prison officials charged with complex duties arising from administration of the penal system." *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.), *cert. denied,* 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990). As a result, the free exercise claims of prisoners are judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights. *Ford,* 352 F.3d at 588. Accordingly, a regulation that burdens a protected right will pass constitutional muster if it is reasonably related to legitimate penological interests. *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006), *citing O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) and *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

It is the inmate's initial burden to demonstrate that the disputed conduct substantially burdens his sincerely held religious beliefs.[FN1] *Salahuddin,* 467 F.3d at 474-75. In assessing the sincerity of an inmate's religious beliefs, courts may not "question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *McEachin v. McGuinnis,* 357 F.3d 197, 201 (2d Cir.2004), *quoting Hernandez v. Commissioner of Internal Revenue,* 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989). Instead, courts may only consider whether a claimant sincerely holds a particular belief and whether the belief is religious in nature." *Ford,* 352 F.3d at 590. Once a plaintiff has made this showing, the burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision under scrutiny. *Salahuddin,* 467 F.3d at 474-75. If such a legitimate penological interest is articulated, its reasonableness is then analyzed under the test articulated by the United States Supreme Court in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1449046 (W.D.N.Y.)
**(Cite as: 2009 WL 1449046 (W.D.N.Y.))**

L.Ed.2d 64 (1987).

FN1. In *Ford v. McGinnis,* 352 F.3d 582 (2d Cir.2003), the Second Circuit noted a circuit split over whether prisoners must demonstrate that a burden on their religious exercise is substantial in order to establish a free exercise claim, but declined to resolve the issue and instead assumed the continued applicability of the substantial burden test. Recent cases suggest that the Second Circuit resolved the split in *Salahuddin v. Goord* by subscribing to the substantial factor test. *Koehl v. Greene,* No. 05-CV-582, 2008 WL 4822520, *7, n. 11 (N.D.N.Y. Oct. 31, 2008); *Livingston v. Griffin,* No. 04-CV-607, 2007 WL 1500382, at *15 (N.D.N.Y. May 21, 2007); *King v. Bennett,* No. 02-CV-349, 2007 WL 1017102, at *4 (W.D.N.Y. Mar.30, 2007).

Pursuant to *Turner,* the court must determine "whether the governmental objective underlying the regulations at issue is legitimate and neutral, and [whether] the regulations are rationally related to that objective. *Koehl v. Greene,* No. 05-CV-582, 2008 WL 4822520, *7, n. 11 (N.D.N.Y. Oct. 31, 2008), *citing Thornburgh v. Abbott,* 490 U.S. 404, 414 (1989). Then, the court must ask whether the inmate is afforded adequate alternative means for exercising the right in question. *Thornburg,* 490 U.S. at 417. Finally, the court must examine "the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison." *Id.* at 418.

### Alleged Deliberate Deprivation of Kosher Meals

**\*11** After "unintentionally missing only three meals," plaintiff claims that defendants Rosolowski, Lopes and Edwards deliberately deprived him of Kosher meals from April 25, 2005 to June 8, 2005, in violation of his rights under the First Amendment to the United States Constitution. Dkt. # 1. Defendants

argue that "as far as [they] knew, plaintiff signed and received the C.A.D. meal plan agreement, was on notice that his participation in the C.A.D. had commenced, and that plaintiff missed too many of the required meals, therefore he was removed from the C.A.D." Dkt. # 63, p. 12. Once plaintiff was removed, pursuant to Attica's operating procedures, plaintiff had to wait 30 days to be reinstated. *Id.* Thus, defendants' maintain that plaintiff was not deliberately denied kosher meals.

In a case that bears a striking factual similarity to the instant case, Senior United States District Judge John T. Curtin granted defendants' motion for summary judgment with respect to an inmate's First Amendment claim concerning his removal from the CAD program for failure to comply with DOCS mandatory meal attendance policy. *Davidson v. Zon,* 94-CV-184 (W.D.N.Y. Sept. 10, 2002). FN2 Davidson commenced his action while he was housed at Attica alleging that various DOCS personnel had violated his right to practice his religion when they refused to allow him to participate in Attica's kosher diet program unless he attended a minimum of 18 meals per week in the mess hall. Dkt. # 63, p. 35. As set forth in Judge Curtin's Decision and Order, in November 1992, the Deputy Superintendent for Program Services at Attica advised Davidson and others that DOCS was implementing a "pilot" Alternative Diet program in an effort to standardize the kosher menu and eligibility procedures statewide. *Id.* at p. 36. Under the new program, inmates participating in the Alternative Diet program were required to attend all meals in the mess hall, with no more than three unexcused absences per week. *Id.* The mandatory attendance policy was implemented as a waste-reduction and cost-control measure to monitor and manage the special ordering, storage, and handling requirements involved with providing the Alternative Diet system-wide. *Id.*

FN2. A copy of Senior United States District Judge Curtin's September 10, 2002 Decision

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1449046 (W.D.N.Y.)
(Cite as: 2009 WL 1449046 (W.D.N.Y.))

and Order in *Davidson v. Zon* is attached to Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment and in Support of their Cross-Motion for Summary Judgment. Dkt. # 63, pp. 33-53.

For a period of time while receiving the kosher diet, Davidson was housed in SHU and he received his meals in his cell. *Id.* at p. 36. After his release back into the general population, Davidson was required to receive and began receiving his meals in the mess hall. *Id.* Shortly thereafter, Davidson found that sitting on the mess hall stools for up to an hour three times a day exacerbated his chronic back condition. *Id.* So he decided to skip one meal per day and he requested a "feed in" order to have one meal per day delivered to his cell. *Id.* After receiving a warning concerning missing meals, Davidson was removed from the Alternative Diet list. *Id.* at p. 38.

Following the reasoning in *Turner* and *O'Lone,* Judge Curtin found that the mandatory attendance component of DOCS' Alternative Diet program was reasonably related to legitimate penological interests and, with respect to the second *Turner* factor, that Davidson had alternative means available to exercise his right to receive kosher food on a regular basis. *Id.* at pp. 45-46. Accordingly, Judge Curtin granted defendants' motion for summary judgment "to the extent it alleges that the removal of plaintiff from the Alternative Diet roster in October 1993 was based on an unconstitutional policy resulting in the denial of his rights under the Free Exercise Clause of the First Amendment." *Id.* at p. 47. With respect to Davidson's second claim that his free exercise rights were violated when DOCS officials refused his request to be reinstated to the C.A.D. program, Judge Curtin also granted defendants' motion for summary judgment, finding,

**\*12** DOCS' policy requires inmates who are suspended from participation in the Alternative Diet

program for failure to comply with the mandatory attendance policy to go through a reevaluation process, including approval by both the Jewish Chaplain and the Deputy Superintendent for Program Services, to substantiate the inmate's Judaic background and intent to strictly observe Jewish dietary laws. This process, as part of the overall policy already found by this court to be reasonably related to DOCS' legitimate interest in controlling its Nutritional Services budget, necessarily entails some level of institutional delay. Plaintiff has failed to allege or make a factual showing to suggest that the delay between the time his request for reinstatement was sent to the facility Chaplain on April 14, 1994, and his transfer out of Attica on May 2, 1994, constitutes anything more than typical and acceptable institutional delay which does not implicate the Free Exercise Clause.

Dkt. # 63, p. 51.

In the instant case, the record before this Court is devoid of any evidence submitted by plaintiff that any of the defendants deliberately deprived him of his kosher meals. Absent any such evidence, plaintiff's wholly unsubstantiated and conclusory allegations are insufficient to sustain his claims. Additionally, the period of delay following the IGRC's recommendation that plaintiff be reinstated to the CAD was nothing more than an institutional delay consistent with the policies and procedures in place at Attica which does not implicate the free exercise clause of the First Amendment. Accordingly, for the same reasons articulated by Judge Curtin in *Davidson v. Zon,* this Court recommends that plaintiff's motion for summary judgment on his First Amendment claim concerning a deprivation of his kosher meals be denied and defendants' motion for summary judgment on the same claim be granted.

***Tampering with and Exposure of Kosher Meals***
Plaintiff next claims that his kosher meals were exposed to hair, dust particles from construction work

Not Reported in F.Supp.2d, 2009 WL 1449046 (W.D.N.Y.)
(Cite as: 2009 WL 1449046 (W.D.N.Y.))

and the stench of feces because defendants Conway, James, Bea, Borawski and Charitonow denied his requests to have the plastic wrapper removed from his food in his presence, in violation of his First Amendment rights. Dkt. # 1. With the exception of unsubstantiated and wholly conclusory allegations, plaintiff has failed to submit any evidence to support his claim that his meals were tampered with and exposed to hair, dust and the stench of feces or to identify those individuals who tampered with or exposed his meals to such conditions.

Plaintiff filed Grievance No. A-48969-05 on June 15, 2005 alleging that his kosher meals were being tampered with and requesting that the plastic wrap be removed in front of the inmates. Specifically, plaintiff stated in Grievance No. A-48969-05 (a letter to Theresa Dyson):

I am being denied portions of my food each day, because certain food items are always missing from my kosher trays, and I am not receiving any hot water. I have addressed these issues to the Rabbi, the food administrator, the S.H.U. officers and supervisors, but nothing is being done, because of the previous grievances I had filed. Action requested my [sic] grievant, is for the S.H.U. officers to remove the plastic wrapper from the kosher trays, in the presence of the S.H.U. prisoners, see to it that the S.H.U. prisoner's [sic] are provided with hot water as they are entitled to, and that the S.H.U. prisoners be issued menus for the kosher diet.

**\*13** Dkt. # 79, p. 17. In her June 20, 2005 investigative report, Theresa Dyson, Inmate Grievance Program Supervisor, found that plaintiff produced no evidence that certain foods were missing from his trays. Dkt. # 61, ¶ 20; Dkt. # 74, p. 28. Theresa Dyson further found that hot water was distributed on a daily basis and that the plastic wrapping covering the meals could not be removed in the presence of the inmates. *Id.* Moreover, she found that there was no provision for SHU inmates to receive menus. *Id.* Finally, she

concluded that there was no evidence to support plaintiff's assertion that there had been retaliation for plaintiff's prior grievances. *Id.* Theresa Dyson's ultimate conclusion was that plaintiff's grievance was without merit. *Id.* The IGRC denied plaintiff's grievance and defendant Superintendent Conway endorsed the unanimous response of the IGRC. Dkt. # 61, ¶ 20; Dkt. # 75, ¶ 9 and pp. 31 and 33. The CORC upheld the Superintendent's ruling. Dkt. # 75, p. 34.

At the time plaintiff filed Grievance No. A-48969-05, he was housed in SHU. Dkt. # 61, ¶ 17. As noted above, all inmates housed in SHU are offered hot water on a daily basis. *Id.* Moreover, for security reasons, the plastic wrapping covering meals may not be removed in front of inmates. *Id.* All meals delivered to SHU are in a closed Styrofoam tray. *Id.* at ¶ 18. In order to preserve sanitation and to prevent contraband from being transported, before the kosher meals leave the kitchen, the entire tray is wrapped in plastic wrap. *Id.* The meals are then transported on a cart to the SHU kitchen or preparation area where a porter (designated inmate) under the supervision of a SHU officer will unwrap the Styrofoam tray to inspect for contraband. *Id.* A SHU officer then delivers each meal to the inmates' cell. *Id.* For the safety and security of the inmates and staff, no contraband whatsoever may be on the SHU gallery. *Id.* Section 304.2(a) of DOCS Directive # 4933 concerns the standards of operation of the SHU and provides that "[a]ll food items will be delivered to the inmates upon receipt from the food service area, and in a manner that will ensure receipt of the food in an appropriate condition." *Id.* at ¶ 21.

The unsubstantiated and wholly conclusory allegations submitted by plaintiff are insufficient to merit summary judgment in his favor and equally insufficient to defeat defendants' motion for summary judgment. It is undisputed that none of the defendants were personally involved in the delivery of plaintiff's meals, nor were they involved in the inspection or delivery of the meals to plaintiff's cell. Moreover,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1449046 (W.D.N.Y.)
**(Cite as: 2009 WL 1449046 (W.D.N.Y.))**

plaintiff has failed to identify any individuals who were involved in tampering with his kosher meals or who exposed his kosher meals to hair, dust and the stench of feces. Additionally, plaintiff's complaints were not ignored, rather, they were fully investigated and found to be without merit. Furthermore, following the reasoning set forth by Judge Curtin in *Davidson v. Zon,* the policy of removing the plastic wrap prior to the meal entering SHU is for legitimate penological reasons and there can be no dispute that plaintiff was receiving his kosher meals, so there was no need to have an alternative means available for plaintiff to exercise his right to receive kosher food on a regular basis. Accordingly, it is recommended that plaintiff's motion for summary judgment be denied and defendants' motion for summary judgment be granted.

### Eighth Amendment Claims

**\*14** As discussed at length above in connection with plaintiff's claims that his rights under the First Amendment were violated, plaintiff alleges that his kosher meals were exposed to hair, dust particles from construction work and the stench of feces because defendants Conway, James, Bea, Borawski, and Charitonow denied his requests to have the plastic wrap removed from his food in his presence, in violation of his rights under the Eighth Amendment. For the following reasons, it is recommended that plaintiff's motion for summary judgment be denied and defendants' motion for summary judgment be granted.

The Eighth Amendment prohibits cruel and unusual punishment that involves the unnecessary and wanton infliction of pain. *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). The Eighth Amendment to the United States Constitution imposes the duty on prison officials to provide humane conditions of confinement and officials must ensure that inmates receive adequate food, clothing, shelter and medical care. *Farmer v. Brennan,* 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In order to prevail on a claim of a violation of the Eighth Amendment, a plaintiff must satisfy both an objective

and subjective component. First, the deprivation must be, objectively, sufficiently serious, such as "a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.' " *Id.* at 834, *citing Rhodes,* 452 U.S. at 347. The second component requires that the prison official have a "sufficiently culpable state of mind." *Id.* In cases such as this, the state of mind is one of deliberate indifference to the health and safety of an inmate. *Id.*

"Although the Constitution does not require that sentenced prisoners [receive] every amenity which one might find desirable, the Eighth Amendment prohibition against cruel and unusual punishment does require that prisoners be served nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (internal citations omitted). The requirement established by the Eighth Amendment is augmented by the First Amendment which includes an inmates's clearly established right to a diet consistent with his or her religious scruples. *Koehl v. Greene,* No. 05-CV-582, 2008 WL 4822520, *6 (N.D.N.Y. Oct. 31, 2008). In a similar case, *Stokes v. Goord,* No. 03-CV-1402, 2007 WL 995624 (N.D.N.Y. Mar. 30, 2007), the plaintiff claimed that DOCS officials violated his Eighth Amendment rights when they "served him food that was ... stale, contaminated, rotten, spoiled, and re-heated." *Id.* at *4. The court granted summary judgment in favor of the defendants stating:

[A]lthough Stokes contends that defendants delivered him the food, he fails to allege that he saw any of them actually contaminate or tamper with his food. Further, Stokes filed various grievances complaining about the quality of the food, but the complaints were found to be without merit. Moreover, although Stokes makes general allegations regarding the health effects he suffered because of the alleged contaminated and inadequate food, there is nothing in his medical records to indicate that he

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1449046 (W.D.N.Y.)
(Cite as: 2009 WL 1449046 (W.D.N.Y.))

suffered any adverse health effects from the food served to him by defendants ... Thus, under the circumstances, these deprivations are not sufficiently serious to constitute cruel and unusual punishment under the Eighth Amendment.

**\*15** *Id.* at \*4-5; *see also Livingston v. Goord,* 225 F.Supp.2d 321, 332-33 (W.D.N.Y.2002) (granting summary judgment to defendants regarding plaintiff's claim that his meals were drugged because "even assuming that the food was contaminated by someone, it would ... be speculative to conclude that these defendants were the culprits simply because they delivered plaintiff's food to him."), *rev'd on other grounds, Livingston v. Piskor,* 153 Fed. Appx. 769 (2d Cir.2005).

Here, the record before this Court is devoid of any evidence to demonstrate that plaintiff's food was contaminated in any way or that it was tampered with in any way. Plaintiff filed grievances alleging that his food had been mishandled, contaminated and exposed to unsanitary conditions and each of those grievances was fully investigated and found to be without merit.

With respect to the subjective component, a prison official will not be held liable for inhumane conditions, "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The Supreme Court of the United States adopted "subjective recklessness" as is used in criminal law as the test for "deliberate indifference" under the Eighth Amendment. *Id.* at 839-40. Here, plaintiff is not alleging that he did not receive his kosher meals, to the contrary, plaintiff claims that although he received his kosher meals, those meals had been tampered with and contaminated because the defendants denied plaintiff's requests to have the plastic wrap removed in his

presence. Each of plaintiff's grievances concerning his kosher meals was fully investigated and denied as being without merit. Moreover, as discussed at length above, plaintiff's kosher meals were delivered to him consistent with the policies and procedures. Accordingly, because plaintiff can satisfy neither the objective nor the subjective component of a claim under the Eighth Amendment, it is recommended that plaintiff's motion for summary judgment be denied and defendants' motion for summary judgment be granted.

### Fourteenth Amendment Claims

To state a cognizable § 1983 due process claim, a plaintiff must demonstrate that he possessed a protected liberty or property interest and that he was deprived of that interest without due process. *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996); *Frazier v. Coughlin,* 81 F.3d 313, 316 (2d Cir.1996). Plaintiff claims that his rights under the Fourteenth Amendment were violated because he was deprived of kosher meals from April 25, 2005 to June 8, 2005 and because his kosher meals were exposed to hair, dust particles and the stench of feces. Dkt. # 1. Each of the defendants assert that plaintiff received all the process he was due. Dkt. # 63, pp. 25-28. Notwithstanding the allegations in the complaint, in his motion for summary judgment and in opposition to defendants' motion for summary judgment, plaintiff does not factually or legally distinguish between his claims under the First Amendment and those claims he purports to bring under the Fourteenth Amendment.

**\*16** An inmate's liberty interests are generally derived from two sources, the Fourteenth Amendment Due Process Clause and state statutes or regulations. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998).

With respect to interests arising directly under the Due Process Clause, the Supreme Court has narrowly circumscribed its scope to protect no more than the [sic] the most basic liberty interests in prisoners. The Due Process Clause does not protect

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1449046 (W.D.N.Y.)
**(Cite as: 2009 WL 1449046 (W.D.N.Y.))**

against every change in the conditions of confinement having a substantial adverse impact on inmates, if those changes are within the normal limits or range of custody which the conviction has authorized the State to impose. Instead, the Due Process Clause protects against restraints or conditions of confinement that exceed [ ] the sentence in ... an unexpected manner.

*Id.* (Internal quotation marks and citations omitted). In the instant case, plaintiff has failed to identify a protected liberty interest in that he has failed to show how the conditions of his confinement exceed his original sentence. Moreover, even if plaintiff could demonstrate a protected liberty interest, which he clearly cannot, plaintiff cannot demonstrate that he was deprived of anything without due process of law. As discussed above, plaintiff filed grievances claiming that he had been deprived of his kosher meals and that his kosher meals had been tampered with and contaminated. Each of those grievances was fully investigated and found to be without merit.

In order to establish the existence of a protected liberty interest under a state statute or regulation, an inmate must show that his confinement: "(1) creates an atypical and significant hardship ... in relation to the ordinary incidents of prison life, and (2) that the state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint." *Arce v. Walker,* 139 F.3d 329, 334 (2d Cir.1998) (internal quotations marks and citations omitted). Neither plaintiff's motion for summary judgment nor plaintiff's opposition to defendants' motion for summary judgment demonstrate that the alleged deprivation of his kosher meals or the alleged tampering with or contamination of his kosher meals created an atypical and significant hardship. Accordingly, because plaintiff has failed to show that he was deprived of a protected liberty interest without due process and that the alleged deprivation created an atypical and significant hardship, it is recommended that plaintiff's motion for summary

judgment be denied and defendants' motion for summary judgment be granted.

### *CONCLUSION*

Based on the foregoing, it is **RECOMMENDED** that plaintiff's motion for summary judgment (Dkt.# 42) be **DENIED** and defendants' cross-motion for summary judgment (Dkt.# 60) be **GRANTED.**

Accordingly, pursuant to 28 U.S.C. § 636(b)(1), it is hereby

ORDERED, that this Report, Recommendation and Order be filed with the Clerk of the Court.

**\*17** ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but was not presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.,* 840 F.2d 985 (1st Cir.1988).

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1449046 (W.D.N.Y.)
**(Cite as: 2009 WL 1449046 (W.D.N.Y.))**

legal authority." *Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.*

The Clerk is hereby directed to send a copy of this Order and a copy of the Report and Recommendation to counsel for the parties.

**SO ORDERED.**

W.D.N.Y.,2009.
George v. Conway
Not Reported in F.Supp.2d, 2009 WL 1449046 (W.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

C

Only the Westlaw citation is currently available.NOT FOR PUBLICATION

United States District Court,
D. New Jersey.
Kelvin Ray LOVE, Plaintiff,
v.
NEW JERSEY DEPARTMENT OF CORRECTION, et al., Defendants.

Civil Action No. 10–1714 (GEB).
Jan. 31, 2011.

West KeySummary**Constitutional Law 92** 1427

92 Constitutional Law
    92XIII Freedom of Religion and Conscience
        92XIII(B) Particular Issues and Applications
        92k1421 Prisons and Pretrial Detention
            92k1427 k. Religious Services and Ceremonies; Study and Prayer Groups. Most Cited Cases

**Prisons 310** 155

310 Prisons
    310II Prisoners and Inmates
        310II(B) Care, Custody, Confinement, and Control
        310k151 Religious Practices and Materials
            310k155 k. Services, Ceremonies, Texts, Study, and Prayer. Most Cited Cases
    Jewish prisoner who experienced a three-month lull in having his weekly prayer led by a rabbi failed to state a §

1983 claim against prison officials based on the Free Exercise Clause. Prisoner did not assert that he was denied access to religious material of his choice, or that he was prevented from ordering such material. Similarly, he did not assert that he was forced to partake in activities contrary to the Jewish faith, or prevented from engaging in activities mandated by the Jewish faith. Prisoner was provided with a substantial number of alternative means to exercise Jewish religious beliefs, and the prison's accommodation of prisoner's preferences for services corresponding exactly to his unique religious beliefs would have unduly burdened the prison's resources. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

Kelvin Ray Love, Trenton, NJ, pro se.

*OPINION*

BROWN, Chief Judge.
    **\*1** This matter comes before the Court upon a series of recent filings executed by Plaintiff, namely, his amended complaint, *see* Docket Entry No. 10, his motion to re-amend that amended complaint, *see* Docket Entry No. 13, and his motion for injunctive relief. *See* Docket Entry No. 12. Plaintiff's motion seeking injunctive relief will be denied, with prejudice. Plaintiff's motion to amend will be denied in part and granted in part. Plaintiff's claims stated in the amended complaint and his proposed re-amended complaint will be dismissed, with prejudice, short of three narrowly-tailored lines of claims. Plaintiff's *in forma pauperis* status will be revoked, and this matter will be administratively terminated subject to reopening in the event Plaintiff either shows cause for reinstatement of his *in forma pauperis* status or timely prepays the applicable filing fee.

*TABLE OF CONTENTS*

I.                Background

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

A.  Original Complaint

B.  Plaintiff's Supplement to the Complaint

C.  The Court's Prior Decision

D.  Plaintiff's Amended Complaints

    1.  Amended Complaint—First Round

        a.  Prayer in Segregated Confinement

        b.  Passover 2008 Events

        c.  Passover 2009 Events

        d.  Prayers upon Return to the General Population

        e.  Private Possession of Tallit

        f.  Passover 2010 Events

    2.  Remedies Sought in "First Round" Amended Complaint

    3.  "Second Round" of the Amended Complaint and the Motion for Preliminary Injunction

II.  Discussion

A.  Plaintiff's Right to Exercise His Religious Beliefs

    1.  Equal Protection Aspects

    2.  First Amendment Aspects

        a.  Governing Standard

        b.  Plaintiff's Facially Meritless Claims

            i.  The Nature of Plaintiff's Beliefs

            ii.  Prayers in Segregated Confinement

            iii.  Reentry into the General Population

            iv.  Around-the-clock Possession of Tallit

            v.  Passover 2009 and Second Seder of 2010

        c.  Passover 2008 and First Seder of 2010

B.  Plaintiff's Allegation Related to Law Library Access

    1.  Construction as an Access–to–the–Courts Claim

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

| | | a. | | Procedural Deficiency |
| | | b. | | Substantive Invalidity |
| | 2. | | Construction as an Application to Amend |
| | | a. | | Additional Defendants |
| | | b. | | Additional Allegations |
| | | | i. | Elaboration of the "Festive Meal" Claims |
| | | | ii. | Claims Based on Lack of Teffilin |
| C. | | Application for Injunctive Relief |
| D. | | Future Course of This Litigation |
| | 1. | | The Three Strikes Rule |
| | 2. | | Plaintiff's Statements Made in This Matter |
| | 3. | | Plaintiff's Prior Litigations |
| | | a. | | Failure–to–State–a–Claim Actions |
| | | b. | | Other Actions |
| | 4. | | Plaintiff's Pauper Status Will Be Revoked |
| III. | | Conclusion |

# I. BACKGROUND

## A. *Original Complaint*

*\*2* The Clerk received Plaintiff's original submission (executed on April 1, 2010) [FN1] on April 6, 2010. *See* Docket Entry No. 1. That submission, a diary-like compilation, included the original complaint (which consisted of twenty two pages packing, in turn, seventy two paragraphs) and fourteen pages of various exhibits. *See id.*

> FN1. Since certain Plaintiff's claims arise out of the events that, allegedly, took place on April 19, 2010, and on, this Court presumes—for the purposes of this Opinion only and without making a factual finding—that all Plaintiff's claims are timely and, hence, subject to screening on merits.

In his original complaint ("Complaint"), Plaintiff asserted that: (a) he held certain religious beliefs related or pertaining to the Jewish faith, but without clarifying the exact nature of his religious beliefs; [FN2] (b) Plaintiff made his religious perceptions known to his prison officials at a certain unspecified point in time; (c) during his confinement, Plaintiff requested Passover meals but was denied the same; and (d) Plaintiff requested to partake in certain congregational chanting of Jewish prayers but was denied the same. *See* Docket Entry No. 1. The exhibits attached to the Complaint indicated that Plaintiff had been asked by the Chaplaincy Department at his place of confinement to provide contact information of rabbis sharing Plaintiff's seemingly unique religious views so that the prison officials could attempt to accommodate his religious needs. [FN3] *See id.*

> FN2. Jewish movements, often referred to as

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

denominations or branches of traditional Judaism, differ from one another in ways that adherents to these denominations find material, that is, from the religious point of view.

**FN3.** One of the letters from the head of the Chaplaincy Department included in Plaintiff's exhibits read as follows:

> The title for religious staff is chaplains. They are require to provide or facilitate religious services, education and counseling to [the] inmates. We have chaplains that assist inmates of other faiths to practice their religion. Rabbi Spritzer has informed you verbally and in writing that he is willing to help you in practicing your faith. It should be understood that Judaism like other religions has different sects or denominations. Freedom of Religion does not permit the state, a group or an individual to impose or force someone to practice a particular religion. This freedom is afforded to both inmates and chaplains. Although the Rabbi may not be able to perform certain rites with you, he is willing to help find people from your denomination. I would suggest that you discuss your needs when you meet with him. I would encourage you to work with the Rabbi. He has expressed a willingness to assist you. We have Buddhist, Wicca, Hindus and others who do not have a chaplain or volunteers. They seek the help of the Chaplaincy Department and are provided assistance. A conversation with the Rabbi might be very beneficial.

> Docket Entry No. 1–1, at 10; *see also id.* at 6 (replicating a related letter from Rabbi Spritzer reading, *inter alia,* "It is the policy of the chaplaincy department to help any and all individuals in their religious needs. In regard to your request, we are prepared to contact a person of faith that would help you in your religious needs, and ask them to volunteer and

minister you in any way that would help you in your religious needs. Please furnish us with the name or names of individuals that we may contact on your behalf"). Plaintiff, seemingly, was unable to provide the Chaplaincy Department with the names of any rabbis practicing Judaism in the way exactly corresponding to Plaintiff's preferences for religious services.

The Complaint named, as Defendants in this matter, the DOC, Warden Michelle R. Ricci ("Warden"), Imam Suluki ("Imam," asserting that the Imam was the Head Chaplain at Plaintiff's place of confinement), Rabbi Goldenberg (asserting that the Rabbi used to be the Jewish Chaplain at Plaintiff's place of confinement), Rabbi Spritzer (asserting that the Rabbi was the currently retained Jewish Chaplain at Plaintiff's place of confinement), and "John or Jane Doe" (asserting that these "Does" were leaders of certain unspecified religious groups volunteering, *inter alia,* at Plaintiff's place of confinement). *See id.*

Plaintiff maintained that these Defendants were liable for violations of Plaintiff's civil rights because: (a) the Imam did not provide Plaintiff with Passover meals and unspecified "necessary religious elements"; (b) Rabbi Goldenberg allowed Jewish inmates in the general prison population to congregate for the purposes of group prayer, but did not allow the same to the inmates held in segregated confinement; [FN4] (c) Rabbi Goldenberg failed to properly train and supervise Does, due to which (d) Does excluded Plaintiff from chanting certain Jewish prayers and did not provide Plaintiff with "necessary means of celebrating the first Passover Seder"; (e) Rabbi Spritzer continued Rabbi Goldenberg's practices; and (f) the Warden was the supervisor of Plaintiff's place of confinement. *See* Docket Entry No. 1. The Complaint indicated that Plaintiff sought damages and injunctive relief, asserting that he was "racially discriminated" against by Defendants' position, which Plaintiff defined as a notion that "Plaintiff [was] not of Jewish race." *See id.* at 15, 21.

**FN4.** The exhibits attached to the Complaint indicated that Plaintiff's place of confinement held

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

two inmates, who identified themselves as religious Jews, in segregated confinement (one of whom, seemingly, was Plaintiff), and at least 16 inmates of the same religious identification in the general population. Therefore, the Court is not entirely clear as to Plaintiff's interest in "congregating" with another Jewish inmate in segregated confinement, since traditional Judaism places religious importance on the concept of "minyan," *i.e.,* the quorum of *ten* male Jewish adults who gather for certain religious obligations, the most common of which is public prayer. However, the Court cannot rule out the possibility that the unique religious perceptions held by Plaintiff allocated a certain importance to congregational prayer by two adult males.

### B. *Plaintiff's Supplement to the Complaint*

**\*3** On June 21, 2010, the Clerk received Plaintiff's submission titled "amended complaint," *see* Docket Entry No. 2, but—just two days later—the Clerk also received Plaintiff's "amended motion" clarifying that the "amended complaint" was intended to operate as a "supplement" to the Complaint. *See* Docket Entry No. 3. This "supplement" added another seventeen pages (comprised out of eighty-six paragraphs) to Plaintiff's Complaint, plus three pages of additional exhibits. *See* Docket Entry No. 2. However, in its substance, the "supplement" largely repeated the Complaint, although it increases the list of Defendants, and the newly added exhibits suggested that a certain piece of Plaintiff's property had been "taken" by prison officials, although the nature of that property or of that "taking" were not detailed in the supplement.[FN5] *See id.*

> FN5. Plaintiff's submissions clarified the nature of a certain property Plaintiff *wished to purchase* but not the nature of the property *taken* (which could or could not have been the property Plaintiff sought to purchase). *See* Docket Entry No. 2.

### C. *The Court's Prior Decision*

On August 10, 2010, this Court issued a memorandum opinion and order ("August Order") dismissing Plaintiff's Complaint. *See* Docket Entry No. 7. Specifically, the Court dismissed Plaintiff's claims against the DOC with prejudice, since the DOC was not a "person" within the meaning of Section 1983 action. *See id.* at 6 (citing *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 64, 70–71 and n. 10, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Grabow v. Southern State Correctional Facility,* 726 F.Supp. 537, 538–39 (D.N.J.1989)).

All other claims, stated in one hundred and fifty-eight paragraphs of the Complaint and its "supplement," were dismissed without prejudice for failure to meet Rule 8 requirements. *See id.* at 6–7. In order to provide Plaintiff with additional guidance, the Court clarified to Plaintiff why his overly-voluminous submissions (omitting, nonetheless, statements of vital facts) failed to satisfy both the requirements of Rule 8(a)(2) and the pleading standard set forth in *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). *See id.* In addition, the Court noted its concern with whether Plaintiff's claims against Does and/or the Imam, Rabbi Goldenberg, Rabbi Spritzer met the color of law requirement. *See id.* at 7–13. The August Order directed Plaintiff to file an amended complaint stating, clearly and concisely, only the facts of Plaintiff's claims. *See id.* at 16–18.

### D. *Plaintiff's Amended Complaints*

### 1. Amended Complaint—First Round

In response, Plaintiff submitted his amended complaint ("Amended Complaint") that differed substantially from the Complaint, both in terms of the substance of Plaintiff's claims and the identities of the culpable parties.[FN6] *See* Docket Entry No. 10. While being shorter than the Complaint and its "supplement," the Amended Complaint, nonetheless, presented a lengthy document (comprised of pages of a pre-printed form and hand-written pages which packed, on occasion, up to thirty-six lines of a super-small script per page), providing a rather patchy account of Plaintiff's facts. *See id.* To the degree the Court

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

can systemize these facts, Plaintiff's allegations appear to be as follows:

FN6. Among the most notable distinctions were: (a) elimination of Plaintiff's claims asserting that he was "racially discriminated" for being, seemingly, a self-defined righteous gentile rather than a born (or formally converted) Jew; and (b) elimination of all references to unspecified religious volunteering organizations. Indeed, the Amended Complaint appears to have transformed Defendant "Doe" in the Complaint from the head of an unspecified religious volunteering organization into "Doe 2," a correctional officer who allegedly mis-forwarded Plaintiff's application to a prison department not having control over the issue raised in that application. *Compare* Docket Entry No. 1 to Docket Entry No. 10.

a. *Prayer in Segregated Confinement*

**\*4** Prior to March 2008, Plaintiff was held in the general prison population and so, during that period, partook in certain group payers of a congregation consisting of the Jewish inmates held in that general population (and who were, at that time, ministered-to by Rabbi Goldenberg and/or by Rabbi Goldenberg's predecessor/colleague, who seemed to be Rabbi Lev). *See id.* at 9. However, according to the Complaint, Plaintiff was placed in segregated confinement in March 2008, where he would remain for more than two years until his reentry into the general prison population on March 15, 2010. During this time, Plaintiff alleges he: (a) experienced a three-month lull in ministered weekly prayers; that lull occurred about half-way into the period of his segregated confinement (specifically, from June 17, 2009, to September 24, 2009); FN7 and (b) did not have a rabbi present during his morning prayers until Plaintiff's reentry into the general prison population.FN8 The Complaint, therefore, asserts that Plaintiff's rights were violated during his segregated confinement by the lack of ministered morning prayer and/or by his inability to attend a congregational morning prayer rendered by the Jewish inmates confined in the general prison population. In addition, the Complaint asserts that Plaintiff's civil

rights were violated during this segregated confinement period because the sessions of ministered weekly services provided to him, which were shorter than the weekly services provided to the general prison population, were too short to satisfy the weekly prayer requirements of Plaintiff's self-proclaimed faith. *See id.* at 9–10.

FN7. Plaintiff's submissions indicate that, since Rabbi Goldenberg left his position as Jewish chaplain on June 17, 2009, *see* Docket Entry No. 1, at 16, Rabbi Spritzer was retained, as Rabbi Goldenberg's replacement, sometime after June 17, 2009, and began ministered weekly prayers with Plaintiff on the week of September 24, 2009. *See id.* at 17. In other words, it appears that Rabbi Spritzer began ministered weekly prayers with Plaintiff either right upon being retained or took either a few weeks or up to three months to establish his routine: depending on the exact date of Rabbi Spritzer's retention.

FN8. It appears that the string of Plaintiff's written administrative submissions insisting that, pursuant to Plaintiff's religious perceptions, a rabbi had to be present, daily, during Plaintiff's morning prayers (as well as Plaintiff's other disagreements with Rabbi Spritzer's mode of ministering) resulted in the Imam and Rabbi Spritzer's requests to provide the Chaplaincy Department with the contact information of those rabbis who shared Plaintiff's unique religious perceptions (in order to retain services of those rabbis and have them minister to Plaintiff), but Plaintiff, seemingly, failed to identify any such chaplain. *See* Docket Entry No. 1–1, at 6, 10.

b. *Passover 2008 Events*

At an unspecified point in time prior to April 19, 2008, Plaintiff (being already held in segregated confinement) requested to be put on the list of inmates wishing to obtain Passover "treats" FN9 that had been, allegedly, served to Jewish inmates at Plaintiff's place of confinement at the first Seder and at the second Seder of each Passover.FN10

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

*See id.* at 8. However, Plaintiff alleges that no Passover "treat" of any kind was served to him for the first Seder of 2008 and—for the second Seder of 2008—the Imam provided him only with grape juice. *See id.* In other words, the Complaint may be construed as asserting that Plaintiff was served with no Passover meals of any kind for the first and second Seders of 2008 and, perhaps, no dinner meals whatsoever, short of the grape juice brought by the Imam for the second Seder of 2008.

> FN9. Since the issue of the content of a "proper" Passover "treat" is part of Plaintiff's claims, the Court uses the word "treat" to distinguish between the specialty meals served for Passover and the routine kosher meals served to Jewish inmates.

> FN10. A Seder (meaning, in Hebrew, an "order" or "arrangement") is a Jewish religious ritual marking the Jewish holiday of Passover. The Seder ritual includes, *inter alia,* the consumption of a specific meal. Under the traditional Hebrew calendar, the first Seder is held on the evening of the 14th day of Nisan, which typically corresponds to either late March or early- to mid-April in the Gregorian calendar. *See* <<http://www.beingJewish.com/yomtov/passover/schedule1.html>>.

c. *Passover 2009 Events*

Prior to April 2009, Plaintiff (still being held in segregated confinement) again, allegedly, requested to be put on the list of Jewish inmates wishing to obtain Passover "treats." *See id.* According to the Complaint, in response to his request, Plaintiff was served with a "treat" that included: (a) a traditional Seder plate; (b) a traditional roasted shank bone; (c) a traditional hard boiled egg; (d) traditional bitter herbs; a serving of traditional "charoset" (a sweet chunky paste made of fruits and nuts); (e) a serving of traditional "karpas" (a vegetable, which usually means parsley or celery); (f) "chazeres" (traditional bitter herbs); [FN11] (g) three sheets of matzoh; (e) a container of grape juice (seemingly substituting for Passover wine); (f)

traditional salted water needed for the Seder ritual; and (g) a ritual cup. This "treat" was served to him for the first Seder of 2009 and repeated, identically, for the second Seder of 2009. *See id.* While conceding that the above-listed ingredients did, indeed, comprise the entire list of traditional items served to celebrate the ritual part of Passover Seder order, *see id.,* Plaintiff asserts that the "treats" he was served were insufficient because they did not include a "pillow" [FN12] and an unspecified "festive meal," that is, in addition to the above-listed items included in the "treat." *See id.* Plaintiff asserts that, in response to his inquiry with the Imam as to the lack of a "pillow" and a "festive meal," [FN13] the Imam responded that he served Plaintiff with "all there was." *See id.*

> FN11. While Plaintiff's Complaint made separate references to "bitter herbs" and to "chazeres," it appears that these items were the same thing.

> FN12. Beaded or embroidered pillows are a decoration sometimes utilized to elaborate Passover celebrations, in the sense that the guests, invited to attend the Seder, are also invited by the host/hostess to recline on these elaborately decorated cushions while drinking the wine and eating the matzoh, seemingly because such pillow signifies the comforts of the Passover freedom: by allowing the guests to elect whether to sit straight or lean on the pillow. *See* <<http://www.happypassover.net/4–questions.html>>.

> FN13. Plaintiff's submissions, at no point, defined the exact meaning of the phrase "festive meal," that is, as Plaintiff construes this term from the point of view of his particular religious beliefs, or even from the point of view of the traditional Judaism. Rather, Plaintiff's submissions indicate that he corresponds this phrase to his desire for "a" fancy dinner, which would include elaborate but unspecified main courses (that Plaintiff prefers to be based on meat, obviously kosher) and equally elaborate—although unspeci-

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

fied—deserts. *See e.g.,* Docket Entry No. 10, at 11.

#### d. *Prayers Upon Return to the General Population*

**\*5** According to the Complaint, Plaintiff reentered the prison's general population on March 15, 2010, but that reentry was not accompanied by Plaintiff's automatic inclusion in the list of the general population inmates cleared for entrance to the "balcony" part of Plaintiff's correctional facility, where, apparently, the Sabbath prayers and morning prayers of the Jewish inmate congregation were typically held. *See id.* at 8 (indicating that Plaintiff's name was removed from the list, seemingly due to, and during, Plaintiff's placement in segregated confinement for two years). Rather, Plaintiff had to submit a written request for such clearance, and he allegedly did so three days after his reentry into the general prison population, that is, on March 18, 2010. *See id.* However, since—according to the Complaint—Plaintiff's request for clearance was erroneously forwarded to the Custody Coordination Department rather than to the Chaplaincy Department, this mis-forwarding caused a delay in Plaintiff's clearance, necessitating his additional oral inquiries and resubmission of application forms. So Plaintiff was finally placed on the list of inmates allowed to the balcony for the purposes of Jewish congregational prayer on May 6, 2010. *See id.* at 9.

Plaintiff asserts that this seven-week delay in obtaining clearance violated his constitutional rights. *See id.*

#### e. *Private Possession of Tallit*

At the time of his reentry into the general prison population, Plaintiff requested a permission to purchase a tallit.[FN14] *See id.* at 10. Having his request granted, Plaintiff duly purchased a tallit (which, seemingly, was a tallit gadol) and has been utilizing it for his morning prayers ever since, every day of the week, *see id.,* but he had his request to keep his tallit in his personal possession (*i.e.,* in his cell, around the clock) denied; rather, his tallit has been kept in the prison's safekeeping and released to Plaintiff each morning, for the purposes of his morning prayers. *See id.*

**FN14.** Tallit is a traditional Jewish prayer shawl. There are two kinds of tallit: (a) "tallit gadol," which is a very large shawl worn during prayers (the shawl is so large because it must cover most of the wearer's body, over the clothing; therefore the average size of a tallit gadol is at least five feet by two feet, although six feet by three feet are very common); and (b) "tallit katan," which is a somewhat smaller but, nonetheless, also a sizable shawl, usually worn at all times under the clothing, as a religious undergarment (but such wearing is, typically, performed in no relation to one's prayer); both garments are decorated by fringes referred-to as "tzitzit." *See* <<http://www.bje.org.au/learning/judaism/symbols/tallit.html>>. However, the Court stresses that it does not rule out the possibility that, pursuant to Plaintiff's unique religious beliefs: (a) one might be required to wear a tallit katan in connection with one's prayers, be it, over the clothing or under; or (b) one might be required to wear a tallit gadol as a religious undergarment; or (c) there is no distinction between a tallit katan and a tallit gadol.

Plaintiff asserts that his civil rights were and are violated by having restricted access to his tallit, since, according to the Complaint, Plaintiff also prays frequently at random times during the afternoon and evening. Without unrestricted access to his tallit, Plaintiff claims that his random daily prayer sessions have been hindered.

#### f. *Passover 2010 Events*

In addition to the foregoing, Plaintiff also asserts that there was another set of events which took place upon Plaintiff's reentry into the general population. As noted *supra,* Plaintiff alleged that, on March 18, 2010, he submitted his request to be cleared for entry to the balcony (for the purposes of Jewish congregational prayers). It appears that this request was submitted in conjunction with Plaintiff's request to be cleared for attendance of the congregational celebration of the first and second Passover Seders

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
(Cite as: 2011 WL 345964 (D.N.J.))

in 2010 (which, in 2010, took place on March 29 and March 30).[FN15] The Amended Complaint asserts that, when Plaintiff learned that his request for clearance (seeking to be allowed at the locale of the Jewish daily morning prayer) was erroneously forwarded to a wrong administrative department (*i.e.* to the Custody Coordination Department rather than to the Chaplaincy Department), he realized, by March 29, 2010, or shortly prior, that he might be unable to attend the congregational Passover celebration held by the general population inmates. *See id.* at 8. Therefore, when Plaintiff met the Warden (who was making her in-person rounds around the facility) at an unspecified hour on March 29, Plaintiff related to her his concerns. In response, the Warden immediately granted limited emergent clearance for Plaintiff to attend the congregational Passover Seders. *See id.* (asserting that, right upon communicating with Plaintiff, the Warden orally directed her assistant, Christopher Holmes ("Mr.Holmes"), to ensure Plaintiff's ability to attend the Seders). Plaintiff alleges that he was, indeed, allowed to leave the area of his confinement and proceeded toward the area of first Seder celebration at 6:05 p.m. on March 29, but he maintains that no Passover meal (and, seemingly, no meal of any kind) was served to him, and that all other Jewish inmates held in the general population arrived to the celebration earlier, *i.e.,* at 4:30 p.m. and—hence—already completed the entire Passover ritual prior to Plaintiff's arrival. *See id.* at 8. Plaintiff also alleges that, upon his arrival, he saw no "signs" or even "remains" of any "festive meal" served to these inmates. *See id.* at 8–9.

> FN15. The Court presumes—for the purposes of this Opinion only and without making a factual finding—that Plaintiff also requested to be placed—and was, in fact, placed—on the list of inmates wishing to receive Passover "treats" in 2010.

**\*6** With regard to the second Seder of 2010, the Amended Complaint alleges that Plaintiff was allowed to arrive at 4:30 p.m. and fully participated in the entire Seder ritual but was left unsatisfied with the "festive meal"—seemingly provided in addition to or as part of the Passover "treat" served to him—since the meal offered consisted of a "regular 12 oz ... kosher for Passover prepackaged meal," plus matzoh (which one of the chaplains, Sister Elizabeth, was distributing to the attendees, Plaintiff included). *See id.* at 9. Asserting that he "does not consider a regular kosher for Passover vegetarian 12 oz prepackaged tray ... as a Feast," Plaintiff maintains that his civil rights were violated by this offering, since it failed to meet his definition of "festiveness." *See id.*

**2. Remedies Sought in "First Round" Amended Complaint**

Plaintiff's Amended Complaint closed with an application for monetary damages and injunctive relief in the form of an order directing Defendants to: (a) allow Plaintiff around-the-clock possession of his tallit in his cell; and (b) allow "Plaintiff to purchase kosher for Passover meats, vegetables, fruits and deserts from ... a vendor" selected by Plaintiff, *i.e.,* a meal elaborate enough to satisfy Plaintiff's opinion as the degree of "festiveness" due to him under the Constitution. *See id.* at 11.

**3. "Second Round" of the Amended Complaint and the Motion for Preliminary Injunction**

Following his submission of the Amended Complaint, Plaintiff filed a motion for preliminary injunction which, effectively, was a legal brief void of any factual statements short of Plaintiff's assertion that his reading of "Tanach"[FN16] was such that Plaintiff believed he was obligated to possess and constantly wear "a four cornered garment with fringes on the corners," which the Court reads as a reference to a tallit. Docket Entry No. 12–1, at 5. In light of the foregoing, the motion asserted that Plaintiff was suffering an irreparable injury each time he was rendering a prayer while not wearing his tallit. *See id.*

> FN16. The Court presumes that Plaintiff wished to refer to the Tanakh, *i.e.,* the compilation the content of which is easiest understood by comparison to that of the Torah. The word "Torah" can mean different things in different contexts: the term can refer, in its most limited sense, to the Five Books of Moses (Genesis, Exodus, Leviti-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

cus, Numbers and Deuteronomy) but it can also refer to the entire body of Jewish scriptures, *i.e.,* to the prescripts predominantly corresponding to the part of the Bible known as the "Old Testament" (this set of prescripts is known as the "Tanakh") together with the entire body of the Jewish Laws and Teachings. *See* <<http://www.jewfaq.org/torah.htm>>.

Plaintiff's other motion, seeking leave to re-amend his Amended Complaint, similarly asserted no facts (short of Plaintiff's belief that he was provided with insufficient access to the law library and, hence, had insufficient opportunity to elaborate on the statements he already made in: (a) the legal brief submitted as his motion for preliminary injunction: (b) in the hundred fifty eight paragraphs comprising his Complaint and "supplement" to it; and (c) in the thirteen pages of his Amended Complaint packing, on occasion, thirty six lines of super-small script per page). This motion arrived accompanied, oddly enough, by an exhibit showing that, as of April 31, 2010 (that is, during the period when Plaintiff drafted and filed his "supplement" to the Complaint, his Amended Complaint, his application for preliminary injunction and even his motion to re-amend on the grounds of having insufficient access to the law library), Plaintiff was, actually, allowed *extended* access to the law library. *See* Docket Entry No. 13–1.

## II. DISCUSSION

### A. *Plaintiff's Right to Exercise His Religious Beliefs*

### 1. Equal Protection Aspects

**\*7** "Broadly construed, Plaintiff's Amended Complaint and prior submissions contained numerous allegations that appear to assert claims under equal protection. To review, Plaintiff alleges that:

(a) congregational prayers (while Plaintiff, allegedly, was not allowed to "congregate"—either with the general population inmates or the one other segregated

Jewish inmate—during the time when Plaintiff was held in segregated confinement);

(b) Rabbi Spritzer's longer sessions of weekly (presumably Sabbath) ministering to this large group (and/or a longer Rabbi-led Sabbath prayers with this large group), that is, longer in comparison with the allegedly shorter period of Rabbi Spritzer's weekly, presumably Sabbath, personalized ministering to Plaintiff (and/or in comparison with the Rabbi-led, allegedly shorter, weekly prayer with Plaintiff, personally) while Plaintiff remained in segregated confinement; and

(c) Rabbi Spritzer's daily (presumably non-Sabbath, *i.e.,* sixday-a-week, except on Holy Days) morning prayers with this large group, while Plaintiff, allegedly, was not having a rabbi accompanying him in his individual (presumably non-Sabbath and non-Holy Days) daily morning prayers during the time when Plaintiff was held in segregated confinement.

The Court, therefore, finds it warranted to start its discussion by briefly visiting this Fourteenth Amendment issue.

The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. "This is not a command that all persons be treated alike but, rather, 'a direction that all persons similarly situated should be treated alike.' " *Artway v. Att'y Gen. State of N.J.,* 81 F.3d 1235, 1267 (3d Cir.1996) (quoting *City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)).

The level of scrutiny applied to ensure that classifications comply with this guarantee differs depending on the nature of the classification and the nature of the rights involved. Hence, classifications involving a suspect or quasi-suspect class, or actions that impact certain fundamental constitutional rights, are subject to heightened or "strict" scrutiny. *See City of Cleburne,* 473 U.S. at 439. All

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

other classifications are subject to the "rational basis" test, which requires that a classification need only be rationally related to a legitimate state interest to survive an equal protection challenge. *See F.C.C. v. Beach Communications, Inc.,* 508 U.S. 307, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) (state action that does not affect a suspect category or infringe on a fundamental constitutional right must be upheld against equal protection challenge if there is *any reasonably conceivable* facts that could provide a rational basis for the classification); *see also Chapman v. United States,* 500 U.S. 453, 465, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991).

Here, Plaintiff asserts that he was "discriminated" against, in comparison to Jewish inmates held in the general prison population, on the grounds of being held in segregated confinement. However, it is well settled that prison inmates—even those held in general prison populations—are not a suspect class. *See e.g., Nicholas v. Tucker,* 114 F.3d 17, 20 (2d Cir.1997) (inmates are not suspect class so as to require more exacting scrutiny), *cert. denied,* 523 U.S. 1126, 118 S.Ct. 1812, 140 L.Ed.2d 950 (1998); *see also Webber v. Crabtree,* 158 F.3d 460, 461 (9th Cir.1998) (same); *Hampton v. Hobbs,* 106 F.3d 1281, 1286 (6th Cir.1997) (same); *Zehner v. Trigg,* 133 F.3d 459, 463 (7th Cir.1997) (same). A *fortiori* inmates held in segregated confinement cannot qualify as a suspect class. *See, e.g., Hernandez v. Schriro,* 2008 U.S. Dist. LEXIS 34068 (D.Ariz. Apr. 14, 2008) (segregated inmates are not a suspect class); *Moore v. Burt,* 2007 U.S. Dist. LEXIS 65293 (E.D.Mich. Sept. 5, 2007) (same); *Clemmons v. Nelson,* 1999 U.S. Dist. LEXIS 5360 (D.Kan. Apr. 5, 1999) (same). Therefore, Plaintiff's equal protection claims are subject to dismissal if the Court can hypothesize a rational basis for the distinction in Plaintiff's treatment during his segregated confinement and in the treatment of inmates held in general population. *See Beach Communications,* 508 U.S. at 313; *see also Lada v. Del. County Cmty. College,* 2009 U.S. Dist. LEXIS 91634, at *18 (E.D.Pa. Sept. 30, 2009) (" 'Because this court can hypothesize a rational basis' for the challenged government action, plaintiff's equal protection claim must be dismissed") (quoting *Mercatus Group LLC v. Lake Forest Hospital,* 528 F.Supp.2d 797, 817 (N.D.Ill.2007), and citing *Sauers v. Bensalem Twp.,* 2003 U.S. Dist. LEXIS 4706, at *11–12 (E.D.Pa. Mar. 5, 2003)); *Little v. Terhune,* 200 F.Supp.2d 445, 452 (D.N.J.2002) ("A court may uphold state action creating a classification on any conceivably valid purpose, even when the court itself supplies the hypothetical basis") (citing *Tillman v. Lebanon County Corr. Facility,* 221 F.3d 410, 423 (3d Cir.2000), *Malmed v. Thornburgh,* 621 F.2d 565, 570 (3d Cir.1980), and *Officers Ass'n v. City of Newark,* 98 N.J. 212, 227, 486 A.2d 305 (1985)).

**\*8** Little imagination, if any, is required to hypothesize a rational basis for the distinction in treatment alleged by Plaintiff. The security needs of the Plaintiff's place of confinement warrant a prohibition on congregation/commingling of the inmates held in the general population with those held in segregation, just as these security needs warrant a bar on assembly of those inmates who are purposely segregated.

The same logic applies to Plaintiff's claims asserting that the period of Sabbath ministering (or Sabbath Rabbi-led group prayer) catered to the entire body of Jewish inmates held in the general population was longer than the corresponding period of ministering/rabbi-led prayer catered individually to Plaintiff:[FN17] it was rational for the prison officials to ration the time Rabbi Spritzer spent with individual segregated inmates, as well as to ration the time the correctional officers spent ensuring the Rabbi's security. Otherwise, the Rabbi's Sabbath prayer, allegedly lasting ninety minutes with the entire Jewish inmate congregation held in the general prison population, would transform into a four-and-a-half-hour series of rituals, even if the Rabbi ministered only to Plaintiff and the other Jewish inmate in segregated confinement by ninety minutes ministering session each. Since such a half-day proceeding would unduly burden the Rabbi's time and the prison's security resources, it was rational to limit the length of the Rabbi's sessions for the inmates in segregated confinement.[FN18] In the same vein, it was rational for the prison officials to accommodate the security needs associated with a daily morning ceremony catered, simulta-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

neously, to the entire body of Jewish inmates held in the general population while refusing to make markedly more burdensome security arrangements associated with having the same ceremony catered and re-catered, daily, to each individual Jewish inmate held in segregated confinement.

FN17. According to the Amended Complaint and exhibits attached to the Complaint, Plaintiff's individually-catered ministering/ rabbi-led prayer lasted about ten minutes, while the same ministering/rabbi-led prayer provided to the sixteen Jewish inmates held in the general prison population lasted about ninety minutes. Arguably, then, Plaintiff received more personal attention (approximately 10 minutes) than the general prison population did (at most 5 minutes, if the 90–minute session is evenly divided among the general population).

FN18. Since the Jewish Sabbath begins at sunset on Friday, the term "Sabbath prayer" might mean either the evening Friday prayer or the morning Saturday prayer, or both. *See* <<http://www.religionfacts.com/judaism/holidays/shabbat.htm>>. Hence, if Rabbi Spritzer were to start a four-an-a-half-hour chain of Sabbath services on Friday evening, at sunset, on such a date as July 21 (when sun sets at 8:23 p.m., *see* <<http://www.timeanddate.com/worldclock/astronomy.html?n=251 & month=7 & year =2010 & obj=sun & afl=−11 & day=1>>), then he would finish his chain of Sabbath prayers, and the accompanying security detail would complete its duties, at approximately 1 a.m.

Consequently, Plaintiff's claims based on comparison of the length of his and general population Sabbath prayers (and on comparison of Rabbi Spritzer's alleged attendance of the general population inmates' daily morning prayers but non-attendance of Plaintiff's individual morning prayers) are subject to dismissal for failure to state a claim upon which relief may be granted. *See La Reau v. MacDougall,* 473 F.2d 97 (2d Cir.1972) (dismissing, on the grounds of

security concerns, claims of a segregated prisoner asserting that he was precluded from attending the prison's chapel, which the inmates held in the general prison population were permitted to attend), *cert. denied,* 414 U.S. 878 (1973). Since the facts asserted by Plaintiff's unambiguously establish that his equal protection claims are facially without merit, and—in addition—indicate that the deficiency of this line of challenges cannot be cured by Plaintiff's another re-amendment of his pleadings, these claims will be dismissed with prejudice.

**2. First Amendment Aspects**

a. *Governing Standard*

**\*9** *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), and *Overton v. Bazzetta,* 539 U.S. 126, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003), contain the basic substantive legal standards governing this case. [The Supreme] Court recognized in *Turner* that imprisonment does not automatically deprive a prisoner of certain important constitutional protections, including those of the First Amendment. [*See Turner,*] 482 U.S. at 93; *see also O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). But[,] at the same time[,] the Constitution sometimes permits greater restriction of such rights in a prison than it would allow elsewhere. *See, e.g., Turner,* [482 U.S.] at 84–85. As *Overton* ... pointed out, courts owe "substantial deference to the professional judgment of prison administrators." 539 U.S. at 132. And *Turner* reconciled these principles by holding that restrictive prison regulations are permissible if they are " 'reasonably related' to legitimate penological interests," [*Turner,*] 482 U.S. at 87 ....

*Beard v. Banks,* 548 U.S. 521, 528, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006).

*Turner* also sets forth four factors "relevant in determining the reasonableness of the regulation at issue," *Turner,* 482 U.S. at 89, observing that courts should assess: (a) whether there is a rational connection between the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

challenged prison regulation and the legitimate governmental interest; (b) whether there are alternative means of exercising the religious rights that remain open to the plaintiff; (c) what impact will accommodation of the asserted constitutional right have on the prison officials, general prison resources and other inmates; and (d) whether there are any ready available alternatives for furthering the governmental interest. *See id.* at 89–90.

b. *Plaintiff's Facially Meritless Claims*

i. *The Nature of Plaintiff's Beliefs*

The aforesaid *Turner* analysis is, however, conducted as a second step only: such analysis is warranted if the allegations made by plaintiff show that his/her beliefs are: (a) sincerely held; and (b) of religious nature. *See DeHart,* 227 F.3d at 52.

Here, the allegations and demands for relief stated in Plaintiff's original pleading, its supplement, exhibits, re-pleading and two motions seem to differ, on occasion quite markedly, from the traditional tenets of the Jewish Laws.[FN19]

> FN19. For instance Plaintiff's current claims associated with his displeasures with the kosher fare served to him at his current prison consummated in his conclusion that he should be allowed to purchase, *inter alia,* his own selection of "kosher" fruits and vegetables. The rationale of this position is not entirely clear to the Court, since unpeeled, uncut, washed (*i.e.,* bugs- and worms-free) fruits and vegetables (as they are typically served in prisons to the inmates observing kashrut) are deemed kosher *per se. See, e.g.,* <<http://www.jewfaq.org/kashrut.htm# Fruits>>; *accord Madison v. Horn,* 1998 U.S. Dist. LEXIS 12975 at *34 (E.D.Pa. Aug. 21, 1998) (making the same observation while reciting the kosher menu items discussed in *Johnson v. Horn,* 150 F.3d 276 (3d Cir.1998)).

Fifteen years after his confinement,[FN20] Plaintiff initiated his first set of civil rights actions, one of which was *Love v. Reed,* Civil Action No. 97–0208(HLJ) (E.D.Ark.). In that action, Plaintiff was appointed counsel virtually at the outset of his proceedings and eventually prevailed, after a bench trial, causing the prison officials' appeal. On appeal, the Eighth Circuit: (a) detailed the exact remedy sought by (and granted to) Plaintiff by the Eastern District of Arkansas; and (c) provided an insight into Plaintiff's religious beliefs, stating as follows:

> FN20. Plaintiff "was convicted of the April 5, 1982[, for] capital murder of his teacher and a fellow student at the Garland County Community College. The jury rejected his plea of not guilty by reason of insanity, imposing a sentence of life without parole." *Love v. State,* 281 Ark. 379, 381, 664 S.W.2d 457 (Ark.1984). On appeal, Plaintiff raised numerous challenges to his conviction and, eventually, was re-tried, upon a finding by the Supreme Court of Arkansas that prejudicial *voir dire* statements and jury instructions required a new trial. *See id.* Plaintiff was re-convicted and re-sentenced to serve two life terms. *See* <<http://www.adc.arkansas.go v/inmate_info/search.php?dcnum=079351 & lastnam e=love & firstname=kelvin & sex=b & agetype=1>>; *see also Love v. Evans,* Civil Action No. 00–0091(JMM) (E.D.Ark.), Docket Entry No. 118, at 2.

[When Plaintiff] was incarcerated in 1982, [he] identified his religion as "Catholic." During the course of his incarceration, however, [his] religious beliefs have changed. [By 2000, when the Eighth Circuit issued its decision, Plaintiff became] a self-proclaimed adherent of [what he defines as] "Hebrew religion" although [he did] not necessarily consider himself ... Jewish—indeed, he [did] not formally ascribe to any organized religion—[rather,] he [qualified himself as] a student of the Old Testament of the Christian Bible, and [alleged that] his religious beliefs derive[d] from his own interpreta-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
(Cite as: 2011 WL 345964 (D.N.J.))

tion of [the Old Testament].... From his study of the Old Testament, [he] concluded, among other things, that it [was] wrong to leave his residence or to work on [his] Sabbath, a period which he [decided should] run from sundown on Saturday to sundown on Sunday [in contrast with the traditional Jewish Sabbath, running from sunset on Friday to sunset on Saturday. His] belief about resting on [his Sunday] Sabbath extend[ed] to a belief that he should not benefit from work others perform on [his Sunday] Sabbath. [Thus, he] believe[d] that he "[was] neither permitted to eat food prepared by others on [his Sunday] Sabbath, nor to have others serve him through their work on [his Sunday] Sabbath." To accommodate these beliefs, [Plaintiff] requested in late 1995 that the [prison] provide him with peanut butter and bread in his cell on Saturday so that he [would] prepare sandwiches to consume in his cell on [his Sunday] Sabbath.... [He stated that his] belief system [was] derived from his own study of [the Old Testament and] his understanding of the tenets of his [unique] belief-system [were constantly] evolving ... [T]he district court ... found that "while [he did] not consider himself 'Jewish,' he [did] adhere to practices and teachings which are part of the Jewish faith" [even though h]is beliefs may not fit squarely with [the traditional] Judaism, in any of its forms.

**\*10** *Id.,* Docket Entry No. 55, at 1–8 (finding no abuse of discretion in the district court's determination and observing that the service-of-peanut-butter-and-bread-on-Saturdays accommodation requested by Plaintiff posed neither a security concern nor a burden to the prison official, but merely a sanitation threat than was analogous to other practices already common to the operation of the prison where Plaintiff was held at that time); *see also id.* at 4, n. 7 (noting Plaintiff's testimony that he was eager to purchase "pre-packaged food in the commissary for consumption on [his Sunday] Sabbath [but, being] indigent, [he did] not always have money to purchase such luxuries," which Plaintiff—to stress the non-attainability of these luxuries—described stating, "it's just like rain is in the clouds").

Plaintiff's religious views continued to evolve, and by the time the Eighth Circuit affirmed the Eastern District of Arkansas' order to grant Plaintiff the requested peanut-butter-and-bread-on-Saturday accommodation, Plaintiff had already filed another civil suit making new dietary requests, *see Love v. Evans,* Civil Action No. 00–0091(JMM) (E.D.Ark.), initially seeking to be served with meals produced at a fully kosher kitchen but, during the course of that litigation, he "scaled back his initial requests" by agreeing to have the Arkansas Department of Corrections: (a) "credit [weekly, his prison account with the amount] equal to the amount spent weekly [on an inmate, so he could] purchasing Kosher food items from the commissary"; and (b) "provide him with raw, unpeeled vegetables and fruits, unpeeled boiled eggs, crackers, bread and other prepackaged food certified as Kosher." *Id.,* Docket Entry No. 118, at 2–3. The Eastern District of Arkansas granted Plaintiff the aforesaid requested relief,[FN21] issuing an order which directed the prison officials: (a) to deposit $15 per week on Plaintiff's prison account to allow him his choice of Kosher commissary food; and (b) to serve Plaintiff with "daily vitamin supplements," "a jar of peanut butter and a loaf of bread ... containing the Kosher designation, to be kept by Plaintiff in his cell and replenished on a regular basis," "[two] boiled eggs every other day, boiled in a small pot designated for Plaintiff's food preparation only," "[daily serving of] fresh fruits and vegetables [that are] washed, ... unpeeled and uncooked," and "[three] individual cartons of milk daily;" plus (c) to provide the United States District Court for the Eastern District of Arkansas with "a complete list of food items presently stocked [at the] commissary [and marked] Kosher, [all] food items available from the [prison's] vendors [that are marked] Kosher [and with the] identity of each and every entity whom the [prison] has contacted in an effort to obtain pre-packaged Kosher food, such as TV dinners, pre-packaged meats, crackers or cheeses, other foods [marked] Kosher"—for the Eastern District of Arkansas' selection of the full menu to be served to Plaintiff. *Id.,* Docket Entry No. 126; *see also* Docket Entry No. 149 (informing the prison officials that the court will appoint a court adviser who would recommend the selection of items and the composition of menu for Plaintiff, so to yield a Kosher diet sufficiently nutritious in the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

court's and the court's advisor's opinions).[FN22] However, unsatisfied with the aforesaid relief, Plaintiff re-amplified his demands for meals which, in addition to the above-listed items, would: (a) also include cereals of his choice and his preferred dried (rather than fresh) fruits; and (b) be handled not by the prison staff but directly delivered to him from a kosher kitchen facility. *See id.,* Docket Entry No. 167. In response, citing *Ochs v. Thalacker,* 90 F.3d 293, 296 (8th Cir.Iowa 1996) (urging the courts to weed out "false religious claims that are actually attempts to gain special privileges or to disrupt prison life"), the prison officials:

> **FN21.** In *Love v. Evans,* Civil Action No. 00–0091(JMM) (E.D.Ark.), Plaintiff was represented by court-appointed counsel; in addition, the Eastern District of Arkansas appointed two attorneys to represent Plaintiff on appeal. *See id.* Docket Entry No. 182.

> **FN22.** This Court stresses that the Court's summary of the decisions entered by the Eastern District of Arkansas shall not be construed as an expression this Court's approval or disapproval of a federal court's endeavor to compose an inmate's menu, to assess its nutritional value, or to appoint a court's "menu selection" advisor at defendants' cost.

**\*11** (a) asserted that Plaintiff was abusing the court's favorable determination in order to obtain items desired as a result of Plaintiff's personal dining preferences rather than mandated by his religious beliefs based on "practices and teachings which [were deemed by the Eighth Circuit to be] part of the Jewish faith [even though they did] not fit squarely with [the traditional] Judaism, in any of its forms";

(b) pointed out that accommodation of Plaintiff's preference for having food not prepared by any prison staff was, literally, unattainable unless Plaintiff were to be supplied entirely with pre-packaged kosher food, pro-

hibitively expensive in light of costing 2.8 times more than the subsistence of any other inmate;[FN23] and

> **FN23.** The prison officials' response provided an overview of Plaintiff's prior and then-existing dietary demands, stating as follows:

> > [During the initial stages of his incarceration, Plaintiff was making] such statements as "They were pissing and spitting in my food, I could smell it and taste it in the food. I could smell the spit in my coffee. They brought a cat in one time and it pissed on my mixed vegetables. I heard the cat out there and I heard them squeezing it." ... Plaintiff is now objecting to the bread being provided to him [because he] believes that the way that the bread is packaged it can become contaminated, [but] Plaintiff does not explain ... how it can become contaminated [since] the bread arrives to him in an unopened manner.... Additionally, Plaintiff has objected to the milk being provided him on the basis of spoliation [but he] does not give any explanation as to what he means by spoliation. Plaintiff is being provided single cartons of kosher milk unopened [and the] milk ... is not spoiled [in the sense that it is fresh]. Recently, ... Plaintiff refused the milk, tomatoes, squash, and pear [asserting that] they were not prepared properly.... Plaintiff has requested that a microwave be carted outside of his cell to heat [his pre-packed kosher meals].

> > *Love v. Evans,* Civil Action No. 00–0091 (E.D.Ark), Docket Entry No. 186, at 3–7.

(c) suggested Plaintiff's transfer to his current facility, in New Jersey, pursuant to the Interstate Compact, since this New Jersey facility was equipped to serve kosher needs of Jewish inmates. *See id.,* Docket Entries Nos. 168, 183.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

Plaintiff, however, vigorously resisted the transfer, asserting as follows:

[The prison officials] notified Plaintiff ... that [they] had received consent from the New Jersey Department of Correction to transfer Plaintiff to a correctional facility in New Jersey. [The prison officials] contend that the New Jersey Department of Correction provides kosher foods to Jewish inmates and would similarly provide kosher foods to [Plaintiff, but] Plaintiff objects to this transfer [because]: (a) Plaintiff is not Jewish and he will likely be treated differently by the New Jersey Department of Correction, its staff, and its Jewish inmates because he has not been recognized as having legitimately converted to that faith .... (b) There have been no assurances that the New Jersey Department of Correction will comply with the relief granted [to] Plaintiff in [the form of peanut-butter-and-bread-on-Saturday] or the permanent relief granted [in the form of kosher menu].

*Id.,* Docket Entry No. 171; *see also id.,* Docket Entry No. 172 (reciting, effectively, the same conjecture).

While noting that it had "reservations about allowing the [Arkansas Department of Corrections] to transfer [Plaintiff] some thousands miles away to a prison facility in New Jersey," the Eastern District of Arkansas also noted the high cost of serving Plaintiff with *three* pre-packed heatable meals a day, and stated:

Deciding between [the option of interstate transfer and that of three costly pre-packaged heatable meals] is not an easy task for the Court. [However,] it is inappropriate for [Plaintiff] to insist on the costly [three pre-packed heatable meals a day] arrangement[ ] to be implemented to satisfy his religious-based dietary requirements while refusing a transfer that would provide him with access to a fully kosher diet at no continuing cost to the [Department of Corrections]. To satisfy the pre-packaged food option, the [Department of Corrections] proposes to obtain pre-packaged kosher meals from My Own Meals, Inc. [which] are fully cooked[,] can be stored at room temperature ... and are packaged in plastic containers with lids. [The Department of Corrections] proposes to purchase a microwave to heat the meals for [Plaintiff] in the [prison] kitchen. [However,] to heat the meal in a microwave, the corner of the lid must be lifted up to allow steam to escape and then pushed backed down after the cooking is complete. [Plaintiff is] concern [ed] about possible contamination in the [prison's] non-kosher kitchen when the lids on the meals are removed to allow steam to escape during microwaving. [So, to ensure that the steam-releasing openings would not be contaminated by being at the prison's non-kosher kitchen, Plaintiff] sought access to a microwave to observe the meals being cooked. The My Own Meals website indicates that the meals can be heated either in a microwave, a vertical steamer, or by dropping them in boiling water. Presumably, the meals can be boiled in water in their original packaging without the necessity for venting.... Thus, in the event these pre-packaged meals are used, the [prison] is directed to heat them in boiling water and serve them to [Plaintiff] unopened. The main disadvantage to the pre-packaged meal option is the cost.... [Since] reducing the pre-packaged meal to one per day would further reduce the expense [if Plaintiff] wishes to remain [in the State of Arkansas, he should] agree to a diet consisting of cereal, powdered milk [since he refuses to accept cartons with milk out of fear of contamination] and juice for breakfast, and one pre-packaged [heated-in-boiling-water] meal per day, either for lunch or dinner. That leaves one meal missing. For that meal, [Plaintiff] can be provided with additional cereal, [powdered] milk and extra peanut butter and crackers. In addition, [he] should be provided with the dried fruit [that] he requested, at both [cold] meals [since] this diet [proposed by the Eastern District of Arkansas is such that the Eastern District of Arkansas in concerned that the diet might be] lacking in fruits and vegetables. [Plaintiff] is directed to elect between accepting an interstate transfer to a New Jersey facility, where he will be provided with a kosher diet, or accepting the less costly version of the prepackaged meal option outlined [above. He] shall advise the [Eastern District of Arkansas] of his preference.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

**\*12** *Id.,* Docket Entry No. 183.[FN24]

> **FN24.** The Court underscores that this Court's quotation of the decision entered by the Eastern District of Arkansas shall not be construed as an expression this Court's approval or disapproval of a federal court's endeavor to negotiate menu items or provide cooking instructions, etc.

In response, Plaintiff, acting through his court-appointed counsel, elected in favor of transfer to New Jersey by stating:

> Plaintiff has been provided with assurances that he will be provided a kosher diet ... without the standard pre-requisite of a certification by a rabbi in the New Jersey Department of Corrections. [The Office of] Attorney General for the State of New Jersey [also] confirmed that [P]laintiff would receive a kosher diet regardless of his classification within the Department.... The kosher food provided by the New Jersey Department is *exclusively vegetarian....* Plaintiff [was duly informed] of the above referenced terms and conditions of his receipt of a kosher diet ....

> *Id.,* Docket Entry No. 187 (emphasis supplied).

How to address the "moving target" of Plaintiff's self-proclaimed religious beliefs is a matter of some concern, granted that: (a) his dietary requests progressed from a peanutbutter-and-bread-on-Saturday accommodation to a fully-kosher diet and now yielded a new set of requirements that demands sufficiently "festive meals" consisting of multiple courses (including kosher meats, Plaintiff's own selection of fruits, vegetables and deserts) that would be served together with a pillow, for Plaintiff to lean upon during his process of meal consumption; and (b) his unique religious beliefs keep evolving in the way which this Court cannot neither establish with any degree of certainty nor predict with any reasonable approximation.

However, this Court is mindful of the Court of Appeals' guidance that "the District Court [should] not ... interject itself into [religious] doctrinal disputes[; rather,] the district court [can] properly determine only whether [the plaintiff] sincerely held his religious beliefs, not whether his beliefs are doctrinally correct or central to a particular school of [religious] teaching [with which the plaintiff elects to associate himself]." *DeHart v. Horn,* 227 F.3d 47, 50 (3d Cir.2000) (quoting the memorandum opinion registered as *DeHart v. Horn,* 127 F.3d 1094 (3d Cir.1997) (mandate published without opinion), which—in turn—relied on *Employment Division v. Smith,* 494 U.S. 872, 886–87, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)); *accord Patrick v. Le Fevre,* 745 F.2d 153, 159 (2d Cir.1984) (the sincerity and nature of the plaintiff's beliefs shall remain a question of fact even if the record indicates the plaintiff's "disdain for formal accouterments of religious worship and the propinquity of the perception [that the plaintiff's] faith [is not a religious belief but merely] a 'way of life' ").

Thus, this Court presumes—for the purposes of this Opinion only and without making a factual finding—that Plaintiff's evolving beliefs are sincerely held, they could be qualified as those of a religious nature and, correspondingly, regardless of any incongruence (or of the magnitude of such incongruence) between his perceptions and the traditional tenets of Jewish Laws, Plaintiff's claims (and his demands for relief) are rooted in religious beliefs cognizable under the First Amendment.[FN25]

> **FN25.** For instance, at this juncture, the Court cannot even guess whether Plaintiff's "own" Sabbath still falls on Sunday (and, hence, requires a Sabbath service by a rabbi ministering Sabbath on Sunday, which—at the very least-would be a violation of any traditional Jewish rabbi's religious beliefs and, hence, of that rabbi's First Amendment rights) or whether Plaintiff's Sabbath had shifted, at some point in the past, twenty-four hours forward to coincide with the traditional Jewish Sabbath (or whether Plaintiff's "own" Sabbath transgressed any other direction).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

Granted such built-in ambiguity, this Court, unlike the Eastern District of Arkansas or the Court of Appeals for the Eighth Circuit, does not find it appropriate to address whether or not Plaintiff's past (or currently existing) set(s) of religious beliefs could, moreover should, be qualified as "adhesion to practices and teachings of the Jewish faith." Rather, *since Plaintiff is seeking religious accommodations provided pursuant to the requirements of Judaism* (where these requirements coincide with the current evolutionary state of his own religion), the Court assesses Plaintiff's claims accordingly.

ii. *Prayers in Segregated Confinement*

**\*13** The first line of Plaintiff's challenges detected by this Court pertains to Plaintiff's over-two-year period spent in segregated confinement. With equal protection aspects of these challenges removed, Plaintiff's allegations can be reduced to the following claims:

(a) Plaintiff's rights were violated because—slightly more than half-way into his segregated confinement—he, allegedly, experienced a three-month lull in having his weekly (presumably traditional Sabbath) prayer led by a rabbi. Plaintiff does not assert that he was prevented, in any way, from rendering Sabbath prayers on his own or from reading Jewish religious books (or any other books), or from resting, relaxing, taking strolls or indulging in Sabbath activities other that listening to a ministered sermon and/or praying with (or under a supervision) of a rabbi.[FN26] In other words, Plaintiff's claims can be reduced to the statement that his Sabbaths were not as fulfilling as he desired, due to either: (i) the prison authorities' inability to fill the position of Rabbi Goldenberg swifter then within three months after Rabbi Goldenberg's departure; or (ii) Rabbi Spritzer's inability to begin individualized ministered sermons with segregated inmates in a speedier fashion (that is, if the Court were to generously presume that Rabbi Spritzer's services were retained markedly sooner than within three months after Rabbi Goldenberg's departure);

FN26. In traditional Judaism, Sabbath "is primarily a day of rest and spiritual enrichment." *See* <<http://www.jewfaq.org/shabbat.htm>>. Consequently, Sabbath celebration "implies ... relaxation [and/or] sharing time with loved ones [and/or] enjoying the beauty of nature [and/or] eating a leisurely meal [and/or] visiting with friends and relatives [and/or] taking a leisurely stroll [and/or] reading [and/or] listening to music [etc.]" *See* <<http://www.temple sanjose.org/JudaismInfo/time/Shabbat.htm>>.

(b) Plaintiff's rights were violated because Rabbi Spritzer, while resuming weekly services with Plaintiff within three months after Rabbi Goldenberg's departure, did not attend/ partake-in/supervise Plaintiff's individual daily prayers on non-Saturday (non-Holy Days) mornings, as a result of which Plaintiff found his daily morning prayers less satisfying that what he desired; and

(c) Plaintiff's rights were violated because Rabbi Spritzer resumed weekly services, but these resumed services were not as lengthy as Plaintiff preferred them to be.[FN27]

FN27. The Court notes, in passing, the facial anomaly of Plaintiff's claim asserting his displeasure with the "undue shortness" of the Sabbath services he was provided with, since—if such claim were to succeed—federal district courts would have to establish "minimum" lengths of religious services for each particular occasion, in each faith. Such an act of judicial activism would fly not only in the face of the Court of Appeals' guidance that "the District Court [should] not ... interject itself into [religious] doctrinal disputes," *DeHart v. Horn,* 127 F.3d 1094, but also in the face of the Establishment Clause.

Alternatively, the totality of these three claims could be construed (especially in light of Plaintiff's complaints to

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

the Chaplaincy Department expressing his dissatisfaction with Rabbi Spritzer's position that the services provided to Plaintiff were sufficient, from a religious point of view, to meet the requirements of the Jewish faith) as a single overarching claim that Plaintiff's rights were violated as a result of him not being ministered/serviced by a "rabbi" sharing, in each and every respect, Plaintiff's unique religious beliefs based on his own reading of the Old Testament, be it as to a "mandatory" minimum length of Sabbath prayer (and the day of such Sabbath), or as to a "mandatory" rabbi's presence at each daily morning prayer, or as to a "mandatory" daily rabbi's ministering without gaps (*i.e.,* either without any gap, ever, or without gaps lasting up to three months), etc.

However, regardless of how the Court construes Plaintiff's allegations, they are subject to dismissal for failure to state a claim upon which relief can be granted.

**\*14** The Free Exercise Clause guarantees substantive right but does not guarantee that all religious sects will be treated alike in all respects. *See Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). While prisoners must be given reasonable opportunity to exercise their faith, the Constitution does not require that a religious adviser be provided to cater to every sect/sub-sect in the penitentiary, nor does the Constitution require that prisoners be provided with a religious adviser of their choice or with the one belonging to their unique religious sect/sub-sect (or sharing their unique religious views). *See Blair–Bey v. Nix,* 963 F.2d 162 (8th Cir.), *rehearing en banc denied,* 1992 U.S.App. LEXIS 13457 (8th Cir.), *cert. denied,* 506 U.S. 1007, 113 S.Ct. 620, 121 L.Ed.2d 553 (1992); *see also Allen v. Toombs,* 827 F.2d 563, 569 (9th Cir.1987) (a prisoner is not entitled to have the clergyman of his choice provided for him in the prison); *Gittlemacker v. Prasse,* 428 F.2d 1, 4 (3d Cir.1970) (same); *see also Pogue v. Woodford,* 2009 U.S. Dist. LEXIS 75943 at \*8 (E.D.Cal.2009) (only when a prisoner's sole opportunity for group worship arises under the guidance of someone whose beliefs are significantly different from his own is there a possibility that the prisoner's free exercise rights are violated) (citing *SapaNajin v. Gunter,* 857 F.2d 463, 464 (8th Cir.1988).

Therefore, to the extent that Plaintiff's allegations can be construed as an overarching claim that he was not provided with a rabbi whose beliefs were identical to the entire body of Plaintiff's unique and constantly-changing religious views, they are without merit and should be dismissed accordingly. [FN28]

> FN28. If the Court were to assess this claim in light of the *Turner* factors, *see* 482 U.S. at 89, the anomaly of Plaintiff's claims becomes even more pronounced, since all Plaintiff's pleadings show that he was invariably provided with alternative means of exercising his religious rights during his segregated confinement, while the prison officials had no readily-available (or even available-at-great-cost) means to accommodate his desire for having a "rabbi" sharing his beliefs: upon the Chaplaincy Department's inquiry (and upon Rabbi Spitzer's inquiry) as to the identity/contact information of the rabbis sharing Plaintiff's unique faith, Plaintiff was, seemingly, unable to name any such rabbi. Therefore, the prison officials were, by definition, unable to retain the services of someone who did not exist.

Construed individually, Plaintiff's claims are equally without merit since Plaintiff's mere dissatisfaction with the frequency of his services (*i.e.,* that his individualized services were weekly rather than daily), or with the three-month lull in ministering, or with the length of sessions of the resumed weekly services, cannot state a cognizable First Amendment claim. *See, e.g., Adegbuji v. Green,* 280 Fed. App'x 144 (3d Cir.2008) (an inmate's right to free exercise was not violated when, after having been attending four church services and bible study classes per week, he was eventually switched to one such meeting per week, because the limitation was reasonably related to legitimate penological interest in operation of facility, and the inmate was not barred from practicing his religion but merely limited in the number of religious meeting per week that he could attend); *Weir v. Nix,* 114 F.3d 817 (8th

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

Cir.1997) (free exercise rights of an inmate were not violated by prison policies which limited the inmate's sermoned activities to three hours of congregational worship per week, conducted on Fridays instead of Sundays, the inmate's holy day); *Walker v. Mintzes,* 771 F.2d 920 (6th Cir.1985) (a temporary elimination or reduction of religious services resulting from an administrative need does not violate First Amendment rights of prisoners); *see also Hadi v. Horn,* 830 F.2d 779 (7th Cir.1987) (occasional cancellation of religious services due to scheduling conflicts did not violate rights of inmates); *accord Baranowski v. Hart,* 486 F.3d 112 (5th Cir.) (where a prisoner was denied rabbi-led services or ministering by a rabbi for two months, and then was provided with once-a-month services and services on 23 Holy Days, his rights were not violated because he retained his ability to participate in alternative means of exercising his religious beliefs—by being given access to religious materials in his cell and occasional access to the lockers containing religious materials), *cert. denied,* 552 U.S. 1062, 128 S.Ct. 707, 169 L.Ed.2d 553 (2007).

**\*15** Here, Plaintiff does not assert that he was denied access to religious material of his choice during his segregation, or that he was prevented from ordering such material from the library/outside sources. Similarly, he does not assert that he was forced to partake in activities contrary to the Jewish faith, or prevented from engaging in activities mandated by the Jewish faith (e.g., rendering three-times-a-day daily prayers, consuming kosher meals, avoiding non-kosher items, observing Sabbath requirement for a weekly day of leisure, etc.). Moreover, he concedes that, short of a three-moth lull (associated with the prison officials' need to find a "replacement rabbi" after Rabbi Goldenberg left his position as the prison's Jewish Chaplain), Plaintiff was provided with a weekly personal ministering by a Jewish rabbi.

The totality of these circumstances unambiguously indicates that: (a) Plaintiff was provided with a substantial number of alternative means to exercise Jewish religious beliefs (with, seemingly, numerous additional accommodations of his own, unique, religious beliefs, such as hav-

ing a Sabbath on Sunday); and (b) the prison's accommodation of Plaintiff's preferences for services corresponding exactly to his unique religious beliefs would unduly burden the prison's resources. *Cf. Ward v. Walsh,* 1 F.3d 873, 1993 U.S.App. LEXIS 19576, at \*8 and 16–17 (9th Cir.1993) (the prison was not obligated to obtain services of an Orthodox rabbi for an Orthodox Jewish inmate where there was "no Orthodox Jewish rabbis within a one hundred mile radius of the prison," and "[t]he district court heard testimony from an Orthodox Jewish rabbi that private prayer is a significant aspect of the practice of the Jewish religion"). Therefore, Plaintiff's dissatisfaction with the religious services fails to state a claim, *see Turner,* 482 U.S. at 89–90, and his challenges based on such dissatisfaction will be dismissed with prejudice, *see Smith v. Kyler,* 295 Fed. App'x 479 (3d Cir.2008) (affirming dismissal of an inmate's claim challenging denial of weekly group service, because the inmate's constitutional rights were not violated if he had such alternatives as maintain religious materials in his cell, seeking an exemption from the hair grooming regulations, and occasional personal meetings with a religious advisor available to him in lieu of a weekly worship service), *cert. denied,* —— U.S. ——, 129 S.Ct. 2837, 174 L.Ed.2d 561 (2009), since the facts asserted in his multiple submissions indicate that he cannot cure this deficiency by re-pleading.

### iii. *Reentry into the General Population*

Plaintiff's next line of claims could be summarized into two statements, *i.e.* upon his reentry into the general population from segregated confinement, Plaintiff was displeased with: (a) the need to obtain re-clearance to access the balcony area where Jewish inmates congregated for prayer; and (b) with the need to wait for getting such re-clearance administratively processed for the period of seven weeks (which ensued from an erroneous forwarding of Plaintiff's application for re-clearance to a wrong prison department, and Plaintiff's corresponding need to refill and resubmit the application forms).

**\*16** This line of claim is also without merit. Here, Plaintiff does not challenge a prison regulation, policy, custom or decision: he merely challenges an asserted in-

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

sufficiency of prison administrative processes that resulted in a single accident of mis-forwarding. Such allegations do not state a viable claim, since prison officials simply cannot be held liable on allegations which fail to assert that there was an affirmative policy or custom, or decision, or regulation, enforced by the defendants, the enforcement of which resulted in an alleged infringement upon the prisoner's rights.[FN29] *See, e.g., Andreola v. Wisconsin,* 211 Fed. App'x 495 (7th Cir.2006) (prison officials cannot be liable for not providing kosher meals to a prisoner unless the prisoner alleges facts showing that such denial was a result of defendants' affirmative decision, policy or custom), *rehearing denied,* 2007 U.S.App. LEXIS 5281, *cert. denied,* 552 U.S. 852, 128 S.Ct. 118, 169 L.Ed.2d 83 (2007); *Lovelace v. Lee,* 472 F.3d 174, 201 (4th Cir.2006) (holding "that negligent acts by officials causing unintended denials of religious rights do not violate the Free Exercise Clause"); *Abdulhaseeb v. Calbone,* 600 F.3d 1301, 1320–21 (10th Cir.2010) (an isolated mistake is also not an actionable basis for a Free Exercise claim); *Gallagher v. Shelton,* 587 F.3d 1063, 1070 (10th Cir.2009) (same); *accord Anspach v. City of Philadelphia,* 503 F.3d 256, 273 n. 12 (3d Cir.2007); *Boles v. Neet,* 2009 U.S. Dist. LEXIS 90019 (D.Colo. Mar. 13, 2009). Hence, these allegations will be dismissed; and-in light of the facts asserted by plaintiff indicating that prison officials' willingness to provide Plaintiff with requested re-clearance—these claims will be dismissed with prejudice.

> FN29. If the Court were to hypothesize that Plaintiff wished to challenge not the delay associated with the mis-forwarding of his application for clearance but the very requirement mandating Jewish inmates to apply for such clearance, Plaintiff's claims would also be subject to dismissal. *See Resnick v. Adams,* 348 F.3d 763 (9th Cir.2003) (dismissing prisoner's claims upon applying the *Turner* balancing test and concluding that the prison regulation requiring an application process for a prisoner to receive kosher meals was not a constitutional violation, especially since: (a) the prisoner's allegations showed the prison officials' willingness to work with him in meeting his

needs; (b) a prisoner's ability to receive a kosher diet without filing an application would have frustrated the prison's orderly administration; and (c) there was no obvious or easy alternatives to the application process).

iv. *Around-the-clock Possession of Tallit*
    Plaintiff next claims that he was denied the opportunity to keep his tallit in his cell, and that this deprivation hindered his frequent, spontaneous afternoon and evening prayer sessions.[FN30]

> FN30. Plaintiff's Amended Complaint and his proposed re-amended complaint indicate that a few tallits dispensed to other Jewish inmates (being either privately owned by inmates or the property of the institution where Plaintiff is held) are dispensed only to the Jewish inmates held in the general prison population and only during their congregational morning prayer; at all other times, tallits are in safekeeping (seemingly, in the prison's Chapel/the area dedicated to Jewish congregational services) for the reasons associated by prison officials with security concerns. *See* Docket Entry No. 10, at 9; *see also* Docket Entry No. 13–2, at 9.

Plaintiff describes his prayer tallit as a piece of fabric sizeable enough to wrap either the entire body of the worshiper or, at the very least, a substantial part of the worshiper's body (and, pursuant to traditional Judaism, it is necessarily worn being loosely wrapped over, *i.e.,* on top of, one's clothing). Thus, it is necessarily concealing—at the very least—the top of the worshiper's head, his neck and arms, and even the top of his chest and back areas. As such, it could easily serve as a cover for any contraband items or weapons that the worshiper might hold/conceal in the hands or attach to his lower-and-upperarm/head/chest/upper-back areas. Therefore, the security concerns implicated by the *Turner* considerations,[FN31] weighed against the other *Turner* considerations implicated in this issue, render the modest limitation challenged by Plaintiff valid under the First Amendment.

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

*See Rogers v. Scurr,* 676 F.2d 1211 (8th Cir.1982) (prison rule preventing inmates from wearing prayer robes outside of prayer services area does not violate First Amendment rights of prisoners since the rule is justified by prison policy of prohibiting contraband which could be easily hidden in such robes); *Butler–Bey v. Frey,* 811 F.2d 449, 1987 U.S.App. LEXIS 1960 (8th Cir.Mo.1987) (prison regulation prohibiting constant wearing of headgear did not violate the inmate's right to freedom of religion since the regulation was a reasonable security measure); *Abdullah v. Kinnison,* 769 F.2d 345 (6th Cir.1985) (prison directive restricting use of full length hooded prayer robes to institutional chapel does not violate constitutional rights of inmates, since it is justified by sound security considerations, which are normally entrusted to the discretion of prison administrators); *see also Willard v. Hobbs,* 2009 U.S. Dist. LEXIS 71244 (E.D.Ark. July 23, 2009) (finding that the prison officials clearly had a legitimate penological interest in prohibiting an inmate to wear a large altar cloth on security grounds and specifically observing that since such altar cloth were similar to a tallit in the sense that both could be used to cover the worshiper's head/shoulders and hide one's appearance/contraband).

> FN31. The Court notes that Plaintiff does not specify how he wears his tallit during prayer. Because of the inherently concealing nature of a tallit, and because of the unique and evolving nature of Plaintiff's religious beliefs, the Court cannot say that the prison's security concerns are misplaced.

**\*17** Here, Plaintiff's submissions unambiguously indicate that he was and is allowed to wear his tallit during his morning prayers (that is, while he is in the designated/supervised balcony area with other Jewish inmates attending congregational services). Plaintiff's submissions also unambiguously indicate that he was and is allowed to pray in his cell during the remainder of the day, which he admits doing at least three times a day and, seemingly, as often as he wishes. The totality of these circumstances paint a picture where Plaintiff is provided with an ample set of means to worship. Conversely, allowing Plaintiff to

have a tallit around-the-clock at his disposal, kept in his cell, would trigger grave security concerns, and—since it is excessively burdensome for the prison authorities to assign an "private" correctional officer to monitor Plaintiff's use of his tallit on a 24/7 basis, the narrowly-tailored limitation allegedly imposed upon Plaintiff facially meets the *Turner* considerations. Therefore, this line of Plaintiff's claims is meritless and will be dismissed, with prejudice since Plaintiff's claims cannot be cured by repleading.

v. *Passover 2009 and Second Seder of 2010*

The next line of Plaintiff's claims arises from the events of two Passover celebrations. The first of these celebrations entailed the first and second Seders of 2009, and the second celebration was related to the second Seder of 2010.

With regard to the former, Plaintiff concedes that he was provided with the entire set of ritual and food items, as traditional Judaism perceives these items, but he asserts that he was: (a) not furnished with a special "Passover pillow" to lean upon while consuming his meal; and (b) served with a non-extensive menu that failed to make him feel sufficiently "festive." [FN32]

> FN32. Plaintiff's voluminous submissions are are silent as to whether Plaintiff was served with a kosher dinner, in addition to the Passover "treat" he received. Although the Amended Complaint suggests that he received such a dinner for at least the second Seder of 2010, this Court presumes, out of an abundance of caution, that the first and second Seders of Passover 2009 were limited solely to the "treats" he received.

With regard to the second celebration, that is, the second Seder of 2010, Plaintiff concedes that he partook in the entirety of the traditional Seder service (which, by definition, had to incorporate a Passover "treat" necessary for the Seder order) [FN33] but remained dissatisfied with the kosher-for-Passover vegetarian pre-packed meal served to him in addition to that service, [FN34] finding that the meal he

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

received was insufficiently "festive" to meet Plaintiff's unspecified perceptions as to what should be the exact content of a Passover Seder.

FN33. In traditional Judaism, a Passover Seder is viewed as a religious ritual incorporating consumption of certain traditional food items, rather than a mere dining experience. Therefore, there is a rather strict traditional "Seder order," mandating that the ritual to begin with reading of "Kadeish" blessings and consumption of the first cup of wine, then "Ur'Chatz" (ritual washing of hands), followed by dipping a vegetable into either salt water, vinegar or "charoset," then breaking the middle layer of matzoh, followed by telling the story of Passover, then rewashing hands, reading blessings, consuming matzoh, charoset and bitter herbs, then eating the remainder of the meal served (whatever this remainder might be, but it should have at least a hard-boiled egg), after which "Tzafun" (the last morsel of food, typically matzoh) is consumed and "Bareich" (a post-meal "Grace") is read, followed by singing "Hallel" praise and closing with "Nirtzah" prayers. *See, e.g., Seder Hagadah: Domestic Service for the Eve of Passover* (Leopold Stein, transl, Adolph Moses ed.) (1907). Therefore, one's partaking in a traditional Seder necessarily implies one being served with wine/grape juice, matzoh, bitter herbs, charoset, egg, etc. Although Plaintiff's submissions did not detail the elements of the second Seder he was provided with in 2010, it appears that all traditional items necessary to conduct of such Seder were served to him, the Court presumes that a proper "treat" was served: granted that Plaintiff's claims as to that particular celebration are limited solely to the allegedly insufficient "festiveness" of the kosherfor-Passover meal provided to him rather than lack of "treat."

FN34. Plaintiff's claim is belied by the fact that the transferring court expressly advised him, prior

to his acceptance of transfer to New Jersey, of the exclusively vegetarian Kosher menu served by his current place of confinement.

Admittedly, this line of Plaintiff's claims gives the Court the most pause, since there is a qualitative difference between: (a) one's sincere beliefs in the prescripts of Torah and Talmud (or—selectively—in the Tanakh only, or only in the Old Testament part of the Bible); and (b) one's, no-matter-how-fervent, adhesion to the guidance provided in Gil Marks, *Encyclopedia of Jewish Food* (2010), or analogous culinary volumes, since the former qualify as bases for religion or, at the very least, as "a" set of religious beliefs, *see DeHart,* 227 F.3d at 52, while the latter qualify, at most, as an expression of one's gourmet preferences. *See Africa v. Commonwealth of Pennsylvania,* 662 F.2d 1025, 1030 n. 9 and 1032 (3rd Cir.1981) ("First, a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters. Second, a religion is comprehensive in nature; it consists of a belief-system as opposed to an isolated teaching. Third, a religion often can be recognized by the presence of certain formal and external signs") (quoting L. Tribe, *American Constitutional Law* 859 (1978), and *Theriault v. Carlson,* 495 F.2d 390, 395 (5th Cir.), *cert. denied,* 419 U.S. 1003, 95 S.Ct. 323, 42 L.Ed.2d 279 (1974), and citing Giannella, *Religious Liberty, Nonestablishment, and Doctrinal Development: Part I, The Religious Liberty Guarantee,* 80 Harv. L.Rev. 1381, 1417–18 (1967), and *Comment, The Religious Rights of the Incarcerated,* 125 U. Pa. L.Rev. 812, 861 n. 306 (1977), for the observations that the First Amendment does not protect "so-called religions which tend to mock established institutions and are obviously shams and absurdities and whose members are patently devoid of religious sincerity," and sincerity inquiry is "especially important in prison free exercise cases because the bleakness of institutional life may create an incentive falsely to allege religious motivation for acts" otherwise forbidden by prison authorities).

**\*18** However, out of abundance of caution and being mindful of Plaintiff's *pro se* litigant status, the Court presumes—for the purposes of this Opinion only and without

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

making a factual finding—that this line of Plaintiff's claims (alleging that the menu served to him was insufficiently extensive or elaborate) was not insincerely made.

Yet, even with such generous allowance, Plaintiff's allegations that the "treats" served to him during the first and second Seders of 2009 and the kosher-for-Passover meal served to him during the second Seder of 2010 were not elaborate or not extensive enough to meet Plaintiff's own definition of "festiveness" fail to state a claim. First, a grant of Plaintiff's request to allow him to select his own menu (in which, he pointed out, Plaintiff desired to include not only unspecified variety of his preferred fruits and vegetables, but also unspecified kosher meat dishes and unspecified deserts) would open a floodgate imposing undue administrative burdens and facially excessive costs on the prison administrators. *See Udey v. Kastner,* 805 F.2d 1218 (5th Cir.1986) (prisoner's first amendment right to be provided with diet consistent with his sincerely held religious beliefs is outweighed by state's interest in avoiding proliferation of similar claims which would probably result if plaintiff's request were granted, since the number of unusual, burdensome and costly religious dietary requests by inmates has been "grow[ing] by leaps and bounds"); *see also Williams v. Morton,* 343 F.3d 212 (3d Cir.2003) (where Muslim inmates provided with vegetarian meals asserted violation of their religious beliefs and demanded service of Halal meat dishes, the Court of Appeals agreed with the district court that the decision to provide vegetarian Halal meals, rather than Halal meals with meat, was rationally related to the legitimate penological interests in simplified food service, security, and staying within the prison's budget; the Court pointed out that a situation where a single inmate requests only a cup of soy milk to be added to food already purchased by the prison is qualitatively different from the scenario where many prisoners request Halal meals with meat); *accord Baranowski,* 486 F.3d 112 (prison officials were not required to respond to particularized dietary requests when cost prohibitive and administrative burdensome).

Second, the fact that prisoners' meals are not elaborate enough to meet the prisoners' dining preferences cannot serve as the basis for a viable claim. *See DeHart v. Horn,* 390 F.3d 262 (3d Cir.2004) (prison officials' denial of an inmate's request for a diet free of meat, dairy products and pungent vegetables, that would be consistent with his Buddhist beliefs, was reasonably related to the prison's legitimate interest in efficient food provision because such diet would require special ordering of certain foods that were costly and burdensome, and there was no obvious and easy alternative with only *de minimis* cost to prison available to meet the inmate's unique set of requests); *see also Tisdale v. Dobbs,* 807 F.2d 734 (8th Cir.1986) (First Amendment rights of Muslim prisoner were not violated where, after daily religious fast, he was provided with a "sack lunch" consisting of two bologna sandwiches, since the facts alleged did not suggest that he could not eat these sandwiches, e.g., because he was vegetarian or because bologna was made of pork which he could not eat); *see also Patel v. United States Bureau of Prisons,* 515 F.3d 807 (8th Cir.2008) (affirming dismissal of an inmate's claims since the inmate did not explain why less expensive food items prepared in accordance with the inmate's religious beliefs could not serve as a substitute for kosher meat entrees); *accord Johnson v. Horn,* 150 F.3d 276 (3d Cir.1998) (while prison officials are required to provide Jewish inmates with "a" nutritionally sufficient kosher diet, service of cold diet did not violate the inmates' rights because they were not entitled to hot kosher meals), *overruled on other grounds, DeHart v. Horn,* 227 F.3d 47; *Kretchmar v. Beard,* 241 Fed. App'x 863 (3d Cir.) (dismissing an inmate's appeal since the Third Circuit precedent made it clear that inmate's rights were not violated by fact that he was served non-rotating menu of cold food items in response to his request for Kosher diet), *cert. denied* 552 U.S. 1049, 128 S.Ct. 671, 169 L.Ed.2d 526 (2007).

**\*19** As one court observed, while dismissing claims analogous to those raised by Plaintiff,

Much of [the inmate's] objection to the diet has been advanced in general terms: kosher meals were less varied than [what he desired], had a paucity of seasonal fruits and vegetables, included wilted or even rotten

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

items on occasion, and entirely lacked certain items found on the regular menu [such as] macaroni salad or potato salad, cucumbers, peppers, or tomatoes, watermelon, cantaloupe or baked potatoes. Macaroni salad seems to be of particular significance to [the inmate, since he even submitted grievances in order] to see if macaroni salad could be added to the kosher menu for the next seasonal menu. The specific instances gleaned from his pleadings and grievances [include occurrences when he] received a warm sandwich that, [he believed] should have been "cool/crisp," along with a "green orange" and a "nasty" carrot/cabbage salad [or when] he was served salad dressing that was not kosher, [or when his] lunch ... included a salad that was "rotted and clearly smelled spoiled," [or when he had] two consecutive chicken suppers and three rice/soy bean meals in [a row, or when] he was served a "cold tray" that was warm with wilted carrot sticks, [or when] he received a turkey sandwich and rotted orange, while the [non-kosher inmates] had ... macaroni salad. [The inmate's] claim ... that the inadequacies in the kosher diet burdened his religious observance [are without merit because he] must show that defendants' conduct imposed a substantial burden on his religious practice [under a statutory test, but his] scattered and minor complaints about kosher meals [are] insufficient, as a matter of law, to show that defendants had imposed a substantial burden on his religious exercise.... The complaints summarized above reflect the inconvenience of non-preferred or occasionally unsatisfactory items in a meal. We cannot say that they constituted a substantial burden on [the inmate's] practice of maintaining a kosher diet.... As for his broader complaints about the variety, quality, and rotation of the menu, such general allegations are insufficient.

*Strope v. Cummings,* 381 Fed. App'x 878 (10th Cir.2010) (footnote 2 incorporated in the main text, citations to case law and docket entries omitted).

Here, as in *Strope,* Plaintiff's claims are based on his displeasure with the variety or extent of the menu served, not on an allegation that the menu served to him violated the requirements of his kosher diet.[FN35] To the contrary, he concedes that the items served to him were in compliance with his religious beliefs, but he alleges that the meals were such, extent-wise or taste-wise, that Plaintiff did not attain a sufficiently "festive" spirit upon consuming these meals. Therefore, he invites this Court to direct Defendants to allow Plaintiff to order, from outside suppliers, multi-course dinner menus in the variety, amount and taste that would meet Plaintiff's sense of "festiveness" of mood. The Court declines the invitation. Allowing Plaintiff such a remedy would effectively give all inmates a carte blanche to dictate prison menus, and would subject prison budgets to the dietary whims of inmates.

> FN35. The Torah directs Jews not to eat (or possess) "chametz" during all seven days of Passover. *See* Exodus 13:3. "Chametz" is "leaven," so any food that's made of grain and water that have been allowed to ferment and "rise" would be "chametz." See <<http://www.chabad.org/library/howto/wizard_cdo/aid/1755/jewish/1–What -is-Chametz.htm>>. Since introduction of "chametz" into a meal is deemed a very serious religious violation, Jews take extra protective measures on Passover to prevent any mistakes leading to such introduction; food items prepared in accordance with such extra-care requirements are qualified as "kosher-for-Passover." *See id.* Plaintiff's allegations unambiguously establish that the meals and "treats" served to him in 2009 and for the second Seder of 2010 met this stringent requirement. In the event Plaintiff's unique, self-forged version of religious beliefs required a particular sense of "cheer" or "festiveness" to be supplied by that meal, this unique requirement need not be met by the prison accommodations comparable to those provided to the larger body of inmates adhering to the traditional Jewish faith. *See Gittlemacker v. Prasse,* 428 F.2d 1 (3d Cir.1970) (prison superintendent had no affirmative duty to provide, furnish, or supply every inmate with exact religious accommodations of the inmate's choice).

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

**\*20** Since Plaintiff does not assert that his consumption of the Passover "treats" or kosher-for-Passover vegetarian tray served to him forced him into committing a prohibited religious act (or prevented him from performing a mandatory religious act), his claims are subject to dismissal. And, since the facts asserted by Plaintiff in conjunction with these claims are as extensive and detailed as they are facially meritless, these allegations will be dismissed with prejudice.

c. *Passover 2008 and First Seder of 2010*

The foregoing analysis leaves the Court only with Plaintiff's line of claims based on: (a) the first and second Seders of 2008; and (b) the first Seder of 2010.

In determining the sufficiency of a complaint, the Court must be mindful to construe the facts stated in the complaint liberally. *See Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *United States v. Day,* 969 F.2d 39, 42 (3d Cir.1992). Indeed, it is long established that a court should "accept as true all of the [factual] allegations in the complaint and reasonable inferences that can be drawn therefrom." *Morse v. Lower Merion School Dist.,* 132 F.3d 902, 906 (3d Cir.1997). However, while a court will accept well-pled allegations as true, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *See id.*

In *Phillips v. County of Allegheny,* 515 F.3d 224, 230–34 (3d Cir.2008), the Third Circuit addressed the revisions to pleading standards made by the Supreme Court in *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Specifically, the Court of Appeals observed as follows:

"While a complaint ... does not need detailed factual allegations, a plaintiff's obligation [is] to provide the 'grounds' of his 'entitle[ment] to relief" [by stating] more

than labels and conclusions, and a formulaic recitation of the elements of a cause of action ...." *Twombly,* 127 S.Ct. at 1964–65 ... Rule 8 "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Id.* at 1965 n. 3.... "[T]he threshold requirement of Rule 8(a)(2) [is] that the 'plain statement [must] possess enough heft to 'sho [w] that the pleader is entitled to relief.' " *Id.* at 1966. [Hence] "factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965 & n. 3.... [Indeed, it is not] sufficient to allege mere elements of a cause of action; instead "a complaint must allege facts suggestive of the proscribed conduct." *Id.*

*Phillips,* 515 F.3d at 230–34 (original brackets removed).

This pleading standard was further refined by the United States Supreme Court in *Ashcroft v. Iqbal,* — U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), where the Court observed:

[In any civil action, t]he pleading standard ... demands more than an unadorned ["]the-defendant-unlawfully-harmed-me["] accusation. [ *Twombly,* 550 U.S.] at 555 .... A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." [ *Id.*] at 555. Nor does a complaint suffice if it tenders "naked assertion [s]" devoid of "further factual enhancement." *Id.* at 557.... A claim has facial plausibility [only] when the plaintiff pleads factual content.... *Id.* at 556. [Moreover,] *the plausibility standard ... asks for more than a sheer possibility that a defendant has acted unlawfully. Id.* [Indeed, even w ]here a complaint pleads facts that are "merely consistent with" a defendant's liability, [the so-alleging complaint still] "stops short of [showing] plausibility of 'entitlement to relief.' " Id.* at 557 (brackets omitted). [A fortiori,] the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions [or to t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements [,*i.e.,* by] legal conclusion[s] couched as a factual allegation [e.g.,] the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

plaintiffs' assertion of an unlawful agreement [or] that [defendants] adopted a policy " 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." .... [W]e do not reject these bald allegations on the ground that they are unrealistic or nonsensical.... It is the conclusory nature of [these] allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.... [Finally,] the question [of sufficiency of] pleadings does not turn ... the discovery process. *Twombly,* 550 U.S.] at 559.... [The plaintiff] is not entitled to discovery [where the complaint alleges any of the elements] "generally," [*i.e.,* as a conclusory allegation [since] Rule 8 does not [allow] pleading the bare elements of [the] cause of action [and] affix [ing] the label "general allegation" [in hope to develop facts through discovery].

**\*21** *Iqbal,* 129 S.Ct. at 1949–54 (emphasis supplied).

The Third Circuit observed that *Iqbal* provided the "final nail-in-the-coffin" for the "no set of facts" standard set forth in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957),[FN36] which was applied to federal complaints before *Twombly. See Fowler v. UPMC Shadyside,* 578 F.3d 203 (3d Cir.2009). Since *Iqbal,* the Third Circuit has required the district courts to conduct, with regard to Rule 8 allegations, the two-part analysis:

> FN36. The *Conley* Court held that a district court was permitted to dismiss a complaint for failure to state a claim only if "it appear[ed] beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. at 45–46. Under this "no set of facts" standard, a complaint could effectively survive a motion to dismiss so long as it contained a bare recitation of the claim's legal elements.

First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. [*See Iqbal,* 129 S.Ct. at 1949–50]. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief" [in light of the definition of "plausibility" provided in *Iqbal.*] In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts. *See Phillips,* 515 F.3d at 234–35. As the Supreme Court instructed in Iqbal, "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show [n]'-'that the pleader is entitled to relief.' " *Iqbal,* [129 S.Ct. at 1949–50 (emphasis supplied) ]. This "plausibility" determination will be *"a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.*
*Fowler,* 578 F.3d at 210–11 (emphasis supplied).

Assessing Plaintiff's claims (based on the events of the first and second Seders of 2008 and the first Seder of 2010) under the aforesaid standard is not an easy task.

With regard to his 2008 Seders, Plaintiff alleges that he was not provided with a Passover "treat" for the first Seder and his Passover "treat" for the second Seder consisted of grape juice with the explanation that nothing else could have been brought for security reasons. Moreover, Plaintiff notes, without specifying the date, that he was transferred to segregated confinement sometime in March 2008, hence allowing for a possibility that such transfer took place close to—or at the very end of—March, and affected the security concerns as to the Seders of 2008, which took place on April 19th and 20th, *i.e.,* within just a few weeks after Plaintiff's transfer to segregated confinement. In other words, it appears that the "security reasons" cited to Plaintiff by the Imam were a result of the change in Plaintiff's custody status. In addition, Plaintiff's submissions (detailing each meal Plaintiff was served on all pertinent days) invite a conclusion that Plaintiff's silence as to what meals were served to him during the first and second Seders of 2008 might be indicative of the fact that Plaintiff was actually served with kosher-for-Passover meals

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

(without Passover "treats") on both those evenings, *i.e.*, that Plaintiff was provided with sufficient alternative means to celebrate Passover 2008 in light of his recently changed custody status, and no actual policy/practice/regulation or even administrative decision to actually deny him an opportunity to celebrate both Seders was entailed. However, Plaintiff's allegations might also be construed as asserting that: (a) he was transferred into segregated confinement in time for prison officials to obtain security clearance for having him served with full Passover "treat" (rather than with just grape juice only or with no "treat" at all), and—in addition—lack of such "treat" was a result of an actual policy/practice/regulation or decision by Defendants to deprive him of a meaningful way to celebrate Passover; and/or (b) Plaintiff was served with no dinner meal whatsoever during the first and second Seders (or was served with non-kosher-for-Passover meal), which left him unable to have any alternative means to celebrate Passover.

**\*22** Simply put, Plaintiff's statements seem to be at the borderline of the "plausibility/possibility" distinction detailed in *Iqbal*. However, construing Plaintiff's allegations in light most favorable to Plaintiff, the Court finds that this line of claims might be defined, at the instant juncture, as plausible under *Iqbal*. Hence, the Court finds *sua sponte* dismissal of these claims not in the interests of justice.

The Court's analysis of Plaintiff's claims associated with the first Seder of 2010 is analogous. While being: (a) mindful of the possibility that Plaintiff's individualized request to the Warden (seeking emergent temporary clearance to attend the area where the Jewish inmates were scheduled to have their congregational Passover Seder) might have taken place so late in the day that Plaintiff could not have been cleared soon enough to partake in the entirety of the Seder order; and (b) cognizant of the fact that Plaintiff's statements as to his disappointment with lack of a "festive" meal during that first Seder is likely to be indicative merely of Plaintiff's dissatisfaction with lack of variety (or insufficient, in his opinion, extensiveness) of the meal offered to him, the Court—nonetheless—finds it prudent to construe, at the instant juncture, Plaintiff's

claims based on the first Seder of 2010 as alleging that: (a) Plaintiff's request for emergent clearance to attend the congregational Seder celebration was made in time for prison officials to ensure his presence during the entirety of Seder order, and Plaintiff's late attendance was a result of an actual policy/practice/ regulation or determination made by Defendants to delay him; and/or (b) Plaintiff was served with no dinner meal whatsoever during that first Seder (or was served with nonkosher-for-Passover meal), which left him without alternative means to celebrate Passover on that particular evening. Consequently, the Court will not dismiss, at this juncture, Plaintiff's claims based on the events surrounding the first Seder of 2010.

However, granted the narrow-tailoring of the above-discussed two lines of claims, the Court: (a) stresses that these challenges as to past events not prone for repeat in the future present claims solely for damages (rather than injunctive relief); and (b) will direct termination of all Defendants in this matter except for the Imam and Christopher Holmes, since Plaintiff's allegations make it abundantly clear that all other named Defendants either had no connection with the events underlying these two narrow lines of claims or were connected to these events in such a way that these Defendants could not be liable to Plaintiff.[FN37]

> FN37. For instance, Plaintiff claims that the Warden is liable to him because she: (a) being a supervisor of prison personnel, failed to be so personally involved in the day-to-day operations of the prison facility to notice the error in forwarding of Plaintiff's application for clearance to a wrong prison department; and/or and/or (b) failed to personally ensure Plaintiff's timely arrival at the congregational Seder, despite promptly authorizing his attendance when he raised the issue to her attention. Yet, these claims are facially deficient as to the Warden, since, under *Iqbal*, claims based on sheer *respondeat superior* liability are insufficient, and the Warden's action aimed to ensure his participation in the Seders of 2010 cannot result in liability. *See,*

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
(Cite as: 2011 WL 345964 (D.N.J.))

*e.g., Cardinal v. Metrish,* 564 F.3d 794 (6th Cir.) (affirming dismissal of 1983 claim alleging violation of an inmate's First Amendment rights because evidence established that, upon learning of the inmate's situation, his warden began procedures to transfer the inmate to facility which could accommodate his needs for kosher meals and segregation, and no facts alleged by the inmate suggested that the warden was affirmatively involved in the alleged denial of kosher food), *cert. granted on other grounds,* —— U.S. ——, 130 S.Ct. 534, 175 L.Ed.2d 343 (U.S.2009) (certifying the question whether the implicated statute is exempt from the reach of the Eleventh Amendment bar so an inmate asserting overcrowding of his cell may sue a public official in his/her public officer capacity). Analogously, Plaintiff's claims against Sister Elizabeth are limited to the fact that she was supervising the congregational Seder (so to ensure orderly conduct by the inmates) and, in addition, was physically distributing Matzoh; Plaintiff, however, seeks to sue Sister Elizabeth for the content of the menu served during that Seder, even though the supervision of inmate's orderly conduct (or the mechanical act of distributing matzoh) has no connection whatsoever to making the decision as to what would or would not be served as part of the Seder menu. Hence, Plaintiff's multitude of such claims should be dismissed as to these and other Defendants, e.g., Doe who had no connection with what was or was not served during the Seders: the facts alleged must show each Defendant's *affirmative involvement* in the particular events underlying the exact Plaintiff's claims that was proceeded by the Court past the *sua sponte* dismissal stage. *See Iqbal,* 129 S.Ct. at 1948.

**B. *Plaintiff's Allegation Related to Law Library Access***

As noted in Section I(D)(3) of this Opinion, *supra,* one of Plaintiff's many filings executed in this matter is a "motion" seeking leave to re-amend his already "supplemented" and later amended Complaint. The bulk of this "motion" presents a boilerplate recital of legal standard for amendment of pleadings, and the sole vaguely asserted "fact" is limited to Plaintiff's bold conclusion that he was not provided with a sufficient access to a law library. As noted *supra,* this "motion" was accompanied by an Exhibit demonstrating that Plaintiff had ample access to the prison's law library. The Court, therefore, is left to guess whether Plaintiff intended this allegation to operate: (a) as an additional claim; or (b) as a mis-identified brief accompanying his motion to amend Plaintiff's already voluminous stack of pleadings; or (c) as both, *i.e.,* an access claim and a motion brief.

**\*23** Out of abundance of caution, the Court elects in favor of the latest construction.

**1. Construction as an Access–to–the–Courts Claim**

The constitutional right of access to the courts is an aspect of the First Amendment right to petition the government for redress of grievances. See *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). In addition, the constitutional guarantee of due process of law has, as a corollary, the requirement that prisoners be afforded access to the courts in order to challenge unlawful convictions and to seek redress for violations of their constitutional rights. *See Procunier v. Martinez,* 416 U.S. 396, 419, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), *overruled on other grounds, Thornburgh v. Abbott,* 490 U.S. 401, 413–14, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); *see also Peterkin v. Jeffes,* 855 F.2d 1021, 1036 n. 18 (3d Cir.1988) (chronicling various constitutional sources of the right of access to the courts).

Addressing the issue of inmates' right of access to the courts, the Supreme Court held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers." *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). The right of access to the courts is not, however, unlimited. "The tools [that *Bounds* ] requires to be provided are those that the inmates need in order to attack their sentences, directly or

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Lewis v. Casey,* 518 U.S. 343, 355, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (emphasis removed).

Moreover, a prisoner alleging a violation of his right of access must show that prison officials caused him past or imminent "actual injury" by hindering his efforts to pursue a viable claim or defense directly or collaterally related to his criminal prosecution or his conditions of confinement. *See Lewis,* 518 U.S. at 348–51, 354–55 (1996); *Oliver v. Fauver,* 118 F.3d 175, 177–78 (3d Cir.1997); *see also Salkeld v. Tennis,* 248 Fed. App'x 341, 342 (3d Cir.2007) (the injury requirement is not satisfied by just any type of frustrated legal claim). "He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement .... Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of [his conditions of confinement] that he was unable to file even a complaint." *Lewis,* 518 U.S. at 351.

Consequently, in *Christopher v. Harbury,* 536 U.S. 403, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), the Supreme Court set forth specific criteria that a court must consider in determining whether a plaintiff has alleged a viable claim. The Supreme Court stated that, in order to present a claim for denial of access to courts, the inmate must assert facts showing each of the following three elements: (1) a non-frivolous, underlying legal claim that the inmate was pursuing in connection with his criminal prosecution or his conditions of confinement; (2) that official acts successfully frustrated that litigation; and (3) an actual loss of claim or defense resulted from such official actions, thereby providing grounds by which the court could grant a remedy to compensate for the lost opportunity. *See id.* at 415.

**\*24** Here, Plaintiff seems to assert that, regardless of being granted extended access to the law library and filing an overly-voluminous Complaint and "supplement," plus

his extensive Amended Complaint, plus two rounds of motions, Plaintiff was nonetheless deprived of his First Amendment access rights. Plaintiff's allegations, if such were intended, are procedurally and substantively deficient.

a. *Procedural Deficiency*

Rule 20(a) (2) of the Federal Rules of Civil Procedure limits the joinder of defendants, and Rule 18(a) governs the joinder of claims. *See* Fed.R.Civ.P. 18(a), 20(a)(2). Rule 20(a)(2) provides: "Persons ... may be joined in one action as defendants if: (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." Fed.R.Civ.P. 20(a)(2)(A) and (B). Rule 18(a) provides: "A party asserting a claim ... may join, as independent or alternative claims, as many claims as it has against an opposing party." Fed.R.Civ.P. 18(a). Wright & Miller's treatise on federal civil procedure explains that, where multiple defendants are named, the analysis under Rule 20 precedes that under Rule 18:

Rule 20 deals solely with joinder of parties and becomes relevant only when there is more than one party on one or both sides of the action. It is not concerned with joinder of claims, which is governed by Rule 18. Therefore, in actions involving multiple defendants Rule 20 operates independently of Rule 18 ...

Despite the broad language of Rule 18(a), plaintiff may join multiple defendants in a single action only if plaintiff asserts at least one claim to relief against each of them that arises out of the same transaction or occurrence and presents questions of law or fact common to all ...

Charles Allen Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure Civil 3d* § 1655; *see also United States v. Mississippi,* 380 U.S. 128, 143, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965) (where county registrars

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

were alleged to be carrying on activities which were part of a series of transactions or occurrences the validity of which depended upon questions of law or fact common to all of them, joinder of registrars in one suit as defendants was proper under Rule 20(a)); *Ross v. Meagan,* 638 F.2d 646, 650 n. 5 (3d Cir.1981), *overruled on other grounds by, Neitzke v. Williams,* 490 U.S. 319, 328, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (joinder of defendants is not permitted by Rule 20 unless both commonality and same transaction requirements are satisfied). Consequently, a civil plaintiff may not name more than one defendant in his original or amended complaint unless one claim against each additional defendant is transactionally related to the claim against the first defendant and involves a common question of law or fact. *See* Fed.R.Civ.P. 20(a)(2). As the United States Court of Appeals for the Seventh Circuit recently explained, a prisoner may not join in one case all defendants against whom he may have a claim, unless the prisoner satisfies the dual requirements of Rule 20(a)(2):

**\*25** Thus multiple claims against a single party are fine, but Claim A against Defendant 1 should not be joined with unrelated Claim B against Defendant 2. Unrelated claims against different defendants belong in different suits, not only to prevent the sort of morass that [a multi]-claim, [multi]-defendant suit produced but also to ensure that prisoners pay the required filing fees—for the Prison Litigation Reform Act limits to 3 the number of frivolous suits or appeals that any prisoner may file without prepayment of the required fees. 28 U.S.C. § 1915(g) ...

A buckshot complaint that would be rejected if filed by a free person—say, a suit complaining that A defrauded the plaintiff, B defamed him, C punched him, D failed to pay a debt, and E infringed his copyright, all in different transactions—should be rejected if filed by a prisoner.

*George v. Smith,* 507 F.3d 605, 607 (7th Cir.2007).

Here, Plaintiff's access challenges have no transaction relation with his challenges based on allegedly insufficient "festiveness" of his Passover meals, or to the alleged lack of morning rabbi-led daily prayers, or to the alleged in-sufficient length of rabbi-led Sabbath prayers, or to the alleged denial of his request to keep his tallit in his cell around-the-clock, or to the alleged denial of Passover "treats" in 2008 or to the alleged inability to attend the entirety of the first Passover Seder in 2010. Moreover, in addition to lack of transactional relatedness, Plaintiff's access claims have no relation to the named Defendants, since it is self-evident that neither the Imam, nor either one of the Rabbis, nor Sister Elizabeth, nor the original Doe (*i.e.,* an alleged leader of an unidentified religious volunteer group), nor the later version of Doe (*i.e.,* a prison clerk who mis-forwarded Plaintiff's request for clearance to the balcony area) had anything to do with Plaintiff's access to the law library. Moreover, Plaintiff's allegations do not suggest that the Warden or Mr. Holmes had anything to do with the access-to-law-library matter. Hence, Plaintiff's access claims are subject to dismissal under Rules 18 and 20.

b. *Substantive Invalidity*

Moreover, even if the Court were to disregard the procedural deficiencies of Plaintiff's access claim, his allegations should be dismissed for failure to state a claim upon which relief can be granted. As noted *supra,* under the test set forth in *Christopher,* 536 U.S. 403, 122 S.Ct. 2179, 153 L.Ed.2d 413, the inmate must assert facts showing that he had a non-frivolous legal claim, which pursuit was so successfully frustrated by the acts of defendants that it resulted in the inmate's actual loss of the opportunity to obtain a remedy with regard to these particular legal claim.

Here, Plaintiff asserts that his access rights are violated because, due to his insufficient access to the law library, he has been unable to add to the voluminous submissions he already deposited on the docket. However, such allegations fail to meet the *Christopher* standard, since the claims now dismissed by the Court were not deficient because of the interference of prison officials. Rather, these claims failed because, despite Plaintiff's voluminous filings, he failed to state a plausible claim. Indeed, the Court's prior opinion *excused* Plaintiff's non-compliance with Rule 8 requirements and allowed

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

repleading, providing Plaintiff with an outline of applicable pleading standards and instructing Plaintiff to do nothing more than allege the facts known to him.

**\*26** Moreover, in the instant decision, the Court employed presumptions that all Plaintiff's claims are timely and that the facts asserted by him are grounded in Plaintiff's sincerely held religious beliefs. Hence, all dismissed claims in this action were deemed invalid not on the grounds that Plaintiff's voluminous submissions failed to cite law but because the *facts* Plaintiff asserted (which Plaintiff, by definition, could not find in any law library) could not amount to viable challenges. *See, e.g., Hoffenberg v. Grondolsky,* 2009 U.S. Dist. LEXIS 117549, at *18 (D.N.J. Dec. 17, 2009) ("Here, Plaintiff's allegations are not being dismissed on the grounds of ... Plaintiff's inability to access [certain legal] documents, [since such inability,] even if true, has nothing to do with the Court's previous—or instant—dismissal of this matter. Rather, Plaintiff's instant claims are being dismissed on the grounds of Plaintiff's own persistent refusal to submit a clear and concise complaint stating the facts [amounting to a viable allegation]. Therefore, Plaintiff failed to allege that he suffered an actual injury (within the meaning of the access-to-the-courts claim) as a result of any actions by Defendants"). Thus, Plaintiff's access claims will be dismissed, with prejudice.

**2. Construction as an Application to Amend**

Ordinarily, the plaintiff may be granted "leave [to amend,] ... when justice so requires." *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Indeed, "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Id.* at 182–83.

Here, in addition to a lengthy brief (operating, seemingly, as a legal support to Plaintiff's motion to amend, plus asserting denial of access to the law library), Plaintiff's motion also contains a proposed re-amended complaint. *See* Docket Entry No. 13–2.

a. *Additional Defendants*

The proposed "re-amended complaint" adds two more Defendants to the list of those already named in the amended complaint, specifically, two more John Does.

Referring to the first such John Doe by the pronoun "he" as well as by the pronoun "they," Plaintiff asserts that, "[o]n the night of 4/19/08 he placed a substantial burden on the exercise of my religious beliefs 'or' they subjected me to invidious discrimination 'or' they took my liberty interest without 'due' process 'or' they violated my right of free exercise." *Id.* at 5. With regard to the second additional John Doe, Plaintiff—this time utilizing only the pronoun "they"—repeats, verbatim, the very same assertion, except for substituting the date "4/19/08" with "5/3/10". *See id.* at 7. These allegations also state that the first John Doe is "[an unknown] prison chaplain or volunteer [of an unspecified organization]," while the second John Doe is "administrator [of an unspecified entity] or designee [of an unspecified person]." *Id.* at 4, 7.

**\*27** Such allegations, containing nothing but generalities, popular names of constitutional claims and recitals of elements of these claims fail to state viable allegations against these two new Does under the standard detailed in *Iqbal* and, thus, will be dismissed without further discussion.

b. *Additional Allegations*

The factual allegations contained in the proposed re-amended complaint virtually repeat (and, on numerous occasions, expressly incorporate) the allegations stated in the Amended Complaint. The only substantive distinction the Court could gather might be reduced to the two following lines of claims:

i. *Elaboration of the "Festive Meal" Claims*

According to the proposed re-amended complaint, prior to Passover of 2008, 2009 and 2010, an organization—defined by Plaintiff as "Aleph Institute or some other outside source"—"donated to the Jewish [inmate]

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

congregation [at Plaintiff's place of confinement certain unspecified] necessary food and religious ritualistic elements." Docket Entry No. 13–2, at 10. Allegedly, as a result of prison officials' utilization of these unspecified "food" and "ritualistic elements," the Jewish inmates held in the general prison population were provided with the meals which Plaintiff deemed sufficiently "festive,"[FN38] while Plaintiff (being an inmate held in segregated confinement in 2008 and in 2009 or—in 2010—being a transferee from segregated confinement who was attending 2010 Seders on emergent limited clearance directed by the Warden just hours, if not minutes, prior to the first Seder and just a day prior to the second Seder) was not provided with the same "festive" meal and was served, during the second Seder of 2010, with a prepacked ko-sher-for-Passover tray that he found insufficiently "festive."

> FN38. Since Plaintiff's Amended Complaint asserted that, upon his arrival at the location of the congregational Seder of 2010 and throughout the remainder of that Seder, Plaintiff did not see either any "signs" of any "festive meal" or even any "remains" of such "festive meal," *See* Docket Entry No. 10, at 8, the Court is not entirely clear as to how Plaintiff's statement made in the Amended Complaint could be squared with Plaintiff's assertion—made in his proposed re-amended complaint, *i.e.,* it is unclear how he can now claim that the general prison population's Jewish inmates were provided with "festive meals," unless these festive meals disappeared without a trace prior to his arrival. However, while noting this anomaly of Plaintiff's position, *see Jackson v. Broad. Music, Inc.,* 2006 U.S. Dist. LEXIS 3960, at *18 (S.D.N.Y. Jan. 31, 2006) ("the court may take judicial notice of ... 'admissions in pleadings ... filed by a party ... that contradict the party's factual assertions in a subsequent [stage]' ") (quoting *Harris v. New York State Dep't of Health,* 202 F.Supp.2d 143, 173 (S.D.N.Y.2002), and citing *Munno v. Town of Orangetown,* 391 F.Supp.2d 263, 268

(S.D.N.Y.2005)), the Court need not focus on this obvious incongruety since Plaintiff's proposed amended challenges based on "festive meal" fail to state a viable claim.

Just as Plaintiff's allegations stated in his Amended Complaint, Plaintiff's proposed addition presents a conflation of: (a) his existing free exercise challenges; and (b) an elaboration on his equal protection position. However, just as Plaintiff's equal protection challenges asserted in his Amended Complaint, the allegation in the proposed re-amended complaint fails to state a cognizable claim, since Plaintiff's status as a prisoner held in segregated confinement (or as a prisoner having status of a recent transferee attending on the basis of an emergent limited clearance) cannot qualify Plaintiff as a member of protected class. This is so because the prison authorities could reasonably:

> (a) apply different degree of scrutiny inspecting the content of items/foods dispensed to inmates in the general population and in segregated confinement (especially if such scrutiny is performed with regard to items obtained not through a regular, secure chain of prison supply but with regard to the dishes donated by a non-secure "outside source"); and

> (b) elect not to try obtaining additional charitable donations (or not to engage in costly last-minute Passover purchases) and, instead, serve a kosher-for-Passover prepacked meal to Plaintiff. *Cf. Williams,* 343 F.3d 212 (observing that legitimate penological interests include staying within the prison's budget and conservation of prison's human resources).

**\*28** Therefore, the equal protection aspects of Plaintiff's claims elaborated-upon by reference to the unspecified "food and ritualistic elements" allegedly donated by "Aleph Institute or some other outside source" are without merit, and Plaintiff's application to re-amend his pleadings by inclusion of such challenges will be denied, as futile. *See McKinney v. Passaic County Prosecutor's Office,* 2009

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

U.S. Dist. LEXIS 53216, at *13 (D.N.J. June 24, 2009) ("Since Plaintiff had [prior] opportunities to plead his claims, and yet failed to assert any facts suggesting that [these] claims are plausible, it would be futile to allow Plaintiff [another] bite of this well-chewed apple"); *see also Falchenberg v. N.Y. State Dep't of Educ.,* 338 Fed. App'x 11, 2009 U.S.App. LEXIS 12213 (2d Cir.) (plaintiff was not entitled to amend her complaint because her proposed claims were based on same allegations which court had concluded failed to state viable claim), *cert. denied,* —— U.S. ——, 130 S.Ct. 1059, 175 L.Ed.2d 927 (2010).

ii. *Claims Based on Lack of Teffilin*

In addition to elaborating on his "festive meal" challenges, Plaintiff also seeks to amend his claims with an assertion that—as a result of his placement in segregated confinement, and during the entire period of such segregation—Plaintiff was not provided with the institutionally-owned "teffilins." *See* Docket Entry No. 13–2, at 9.

Traditionally, the term "tefillin" describes a set of two small cubic leather boxes, each of which: (a) contains scrolls of parchment inscribed with verses from the Torah; and (b) has a leather strap attached.[FN39]

> FN39. Granted that Plaintiff's religious believes are self-forged on the basis of Plaintiff's own reading of the Old Testament and are, allegedly, constantly evolving, this Court has no means to determine what exactly is Plaintiff's current vision of tefillin or its use. The traditional Jewish source for the tefillin requirement ensues from Exodus 13:9 and 13:16, and Deuteronomy 6:8. Before the prayer, the "arm-tefillin" is usually placed (or "laid") on the biceps of the arm, with the strap wrapped around the arm, hand and fingers; traditionally, the strap should be long enough to allow for a knot, plus wrapping around the forearm seven times, and also to tie around the hand and fingers according to particular tradition followed. *See* Isaac Klein, *A Guide to Jewish Religious Practice* 6–9 (1979). Next, pursuant to Deuteronomy 6:5–8, the head-tefillin is tradi-

tionally placed on top of the head, aligned between the worshiper's eyes, with the strap (having two sides extending on both sides of the teffilin) tied at the back of the head and then brought in front of the shoulders; each of this two straps should, traditionally, be rather long, typically long enough the reach the worshiper's navel on the left side and his genital area on the right side. *See id.* These straps ("retzuah") are typically at least 9 millimeters wide or, preferably, 10 to 11 millimeters in width, and about 1.5 millimeter in thickness. *See* <<http://www.stam.net/tefillin_straps.aspx>%. Traditionally, the straps are made of leather and intended to be strong, resilient binds. *See id.*

Teffilin [FN40] is worn by observant Jews during morning prayers every day except on Sabbath and on Holy Days. *See Ulmann v. Anderson,* 2003 U.S. Dist. LEXIS 874, at 84 (D.N.H.2003). Plaintiff asserts that institutionally-owned teffilin sets are retained in safekeeping (seemingly, either at the prison Chapel or in the area designated for congregational Jewish services) and dispensed to the Jewish inmates held in the general population only for the purposes of congregational morning prayer conducted at that designated area. *See* Docket Entry No. 13–2, at 9.

> FN40. Used as a collective (for both arm-teffilin and headteffilin), the term "teffilin" implies a plural reference. An unspecified, to arm or to head, designation is "tefilla." *See* <<http://www.britannica.com/EBchecked/topic/1318171/tefilla>>.

In his proposed re-amended complaint, Plaintiff maintains that, upon Plaintiff's placement in segregated confinement, the Imam informed Plaintiff that: (a) the number of institutionally-owned teffilin sets was sufficient to accommodate only the needs of the Jewish inmates held in the general population; but (b) the then-serving rabbi, Rabbi Lev, had been planning to place an order for additional teffilin sets and, if such purchases were made, the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

Imam was planning to ensure that an institutionally-owned teffilin would be dispensed to Plaintiff during his segregated confinement. *See id.*

Since Plaintiff had not been allowed the use of an institutionally-owned teffilin until his reentry into the general prison population, Plaintiff seeks to re-amend his Amended Complaint by inclusion of his claims based on denial of use of such institutionally-owned teffilin during the two years Plaintiff spent in segregation. *See id.*

**\*29** The deficiencies of Plaintiff's proposed claim are quite substantial. To start, Plaintiff's claims are based on pure conjecture that the prison actually purchased additional teffilin sets and—in addition—such purchases were actually made during the time when Plaintiff was in segregated confinement. Moreover, there appear to be numerous legitimate security concerns associated with dispensing, into a prisoner's unsupervised use, such items as teffilin, since the straps attached to both teffilin—being, effectively, sets of three long, strong leather ropes—might be used as a weapon either against correctional officers or other inmates. *Cf. Campos v. Coughlin,* 854 F.Supp. 194, 214 (S.D.N.Y.1994) (quoting a prison regulation proving that "[i]It is not acceptable [for inmates even] to wear [at any time any] religious [symbols that are] affixed to ... leather, strings, or rope").

However, the Court is mindful of the distinct use of teffilin, that is, for the purposes of the traditional Judaism. In the event Plaintiff's self-forged beliefs are currently at the stage corresponding to the tenets of traditional Judaism, then Plaintiff's intended use of teffilin should be solely during the time of his morning prayers (presumably on all days except for Sabbath and Holy Days). Although Plaintiff's numerous expressions of dissatisfaction with the shortness of religious services rendered to him suggest Plaintiff partakes in a lengthy morning prayer exercise, it is also possible that Plaintiff's morning prayer would not be so long as to impose a significant burden on the prison's resources. If so, it appears that a prison officer's supervision of Plaintiff's use of teffilin during his morning prayer might be a rather minor expenditure of the prison's human resources.

Indeed, Plaintiff's allegation that the Imam indicated to him that Plaintiff would be provided with a teffilin if additional sets are, in fact, purchased [FN41] suggests that the security concerns and/or human resource burdens associated with Plaintiff use of teffilin might have been rather insignificant. Therefore, the overall reading of Plaintiff's proposed additional challenges based on the alleged denial of use of institutionally-owned teffilin appears to be at the borderline between the "possibility" and "plausibility" options of *Iqbal.* Thus, out of an abundance of caution, the Court will permit Plaintiff to re-amend his Amended Complaint with regard to his access-toteffilin claim.

>    FN41. Although Plaintiff does not appear to present a contractual claim against the Imam for his alleged promise to procure additional teffilin, to the extent that his allegations may be construed to assert such a claim, the claim would be deficient for a number of reasons, including a lack of consideration. *See Parker v. Gateway Nu–Way Found.,* 2010 U.S. Dist. LEXIS 115116, at \*16 (D.N.J. Oct. 26, 2010) (an alleged agreement between an inmate and a charitable employee permitted to operate at the prison failed for lack of consideration on the inmate's part since the promise made by the employee did not impose upon the plaintiff a duty or behavioral limitations materially different from or additional to those ensuing from normal requirements imposed on inmates by the prison life) (citing Restatement (Second) of Contracts § 73 and cmt. b(1981)).

**C.** *Application for Injunctive Relief*

As noted *supra,* among Plaintiff's recent tide of filings was his motion for preliminary injunctive relief, seeking this Court's order directing Plaintiff's around-the-clock in-cell possession of his tallit, allegedly, for his prayers at any time when Plaintiff might wish to so pray. *See* Docket entry No. 12. Defendants filed their response to said motion asserting that it is premature because: (a) Plaintiff's Amended Complaint was not screened by this Court; and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

(b) Defendants did not have an opportunity to answer Plaintiff's pleadings. [FN42] *See id.* at 15.

> FN42. Defendants cited no support for their position that Plaintiff's application is facially premature, and this Court, on its own, is not aware of any provision barring a litigant from submitting a motion for injunctive relief together with the litigant's initial pleading. Indeed, the only prematurity associated with Rule 65 this Court is aware of is a scenario where the *court* renders a premature determination on merits of the claims raised in the plaintiff's pleading. *See, e.g., Sanchez v. Esso Std. Oil Co.,* 572 F.3d 1 (1st Cir.2009).

**\*30** The standard for the issuance of a preliminary injunction is well established:

> A preliminary injunction is an "extraordinary remedy," and the party seeking it must show: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief."

*Ball v. Beard,* 2010 U.S.App. LEXIS 20792, at \*2 (3d Cir. Oct. 7, 2010) (quoting *Kos Pharms., Inc. v. Andrx Corp.,* 369 F.3d 700, 708 (3d Cir.2004)). Where the movant failed to establish one element, the court's inquiry need not continue to other elements. *See id.; see also Howard v. N.J. Div. of Youth & Family Servs.,* 2010 U.S.App. LEXIS 22354, at \*5 (3d Cir. Oct. 28, 2010) ("We cannot agree with the grant of the preliminary injunction because we cannot conclude that [plaintiff] met the first prong of the standard, namely, that he had shown 'a reasonable probability' of success in his claim").

Here, this Court already determined that Plaintiff's claims based on the limitation as to his use of the tallit (allowing the tallit to be used by Plaintiff during his morning prayers in the designated area where the Jewish inmates congregate, and having the tallit at all other times in safekeeping by the prison authorities) did not amount to a violation of Plaintiff's free exercise rights under the composite test posed by *O'Lone/Turner* and elaborated upon by their progeny. Hence, Plaintiff's tallit-based claim fails on merits. Consequently, no injunctive relief is warranted, and Plaintiff's motion seeking such relief will be denied, with prejudice.

**D. *Future Course of This Litigation***

**1. The Three Strikes Rule**

The Prison Litigation Reform Act of 1995 ("PLRA"), enacted on April 26, 1996, prohibits a prisoner from bringing a civil action *in forma pauperis* pursuant to 28 U.S.C. § 1915 "if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." 28 U.S.C. § 1915(g) (Supp. II 1996). Dismissals for frivolousness of civil actions or appeals prior to the passage of the PLRA count as "strikes" under 28 U.S.C. § 1915(g). *See Keener v. Pennsylvania Bd. of Probation & Parole,* 128 F.3d 143, 144 (3d Cir.1997). The PLRA further provides that, if a prisoner has had at least three "strikes," the prisoner may not bring another action *in forma pauperis* unless he or she is in imminent danger of serious physical injury. *See* 28 U.S.C. § 1915(g).

Here, Plaintiff's multiple rounds of pleadings unambiguously indicate that he is not in imminent danger of any physical injury.

**2. Plaintiff's Statements Made in This Matter**

**\*31** Plaintiff's Complaint (a document entirely hand-written by Plaintiff and having no pre-printed form pages incorporated), presented a seventy-two-paragraph diary-like narrative, opening, right after the statement of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

jurisdiction, with Paragraphs 2, 3 and 4 that were dedicated to listing Plaintiff's prior litigations. *See* Docket Entry No. 1, at 2–4. Specifically, Plaintiff referred to: (a) *Love v. Oglesby,* Civil Action No. 97–0221(GTE) (E.D.Ark.), stating that the Eastern District of Arkansas granted dismissal on pleadings to the defendant, but the Eighth Circuit reversed, and the matter was closed only when the Eastern District of Arkansas granted defendant's motion for summary judgment;[FN43] (b) *Love v. Andrews,* Civil Action No. 00–0125(WRW) (E.D.Ark.), stating that the action was dismissed for failure to state a claim upon which relief can be granted; and (c) *Love v. Andrews,* Civil Action No. 01–1269 (8th Cir.), stating that the Eighth Circuit reached the same determination. *See* Instant Matter, Docket Entry No. 1, at 2–4. Plaintiff's Complaint closed with the statement, "I declare under penalty of perjury that the foregoing is true and correct." *Id.* at 22.

> FN43. In that action, Plaintiff alleged that the prescribed medication dispensed to him caused him mental damage and was excessive as an eye-drop prescription. *See Love v. Oglesby,* Civil Action No. 97–0221, Docket Entry No. 2(GTE) (E.D.Ark.). The district court *sua sponte* dismissed the claims against the prescribing doctor and, on motion of two remaining nursing staff defendants, dismissed the remainder of Plaintiff's challenges for failure to state a claim. A split panel of the court of appeals affirmed the dismissal, but reversed the portion of *sua sponte* dismissal based on the allegedly excessive prescription. *See id.,* Docket Entry No. 96 (with Judge Loken dissenting as to the reversal and remand determination on the grounds that no claim of excessive prescription can amount to a viable Eighth Amendment challenge since it presents, at most, a medical malpractice state law claim). Upon remand, the excessive-prescription challenges were dismissed by the district court upon the doctor's motion for summary judgment. *See id.,* Docket Entry No. 128.

Moreover, Plaintiff's first round of amended com-

plaint, which Plaintiff later qualified as a "supplement" to his Complaint, made the same averment. *See* Docket Entry No. 3, at 2–3 and 17.

Presuming veracity of Plaintiff's statements, this Court granted Plaintiff *in forma pauperis* status to prosecute the instant matter. *See* Docket Entry No. 7.

Plaintiff's latest round of submissions, including his Amended Complaint (submitted in response to this Court's prior order dismissing the Complaint and "supplement" without prejudice) asserted, again, the very same list of Plaintiff's prior litigations and, again, made the very same averment, *see* Docket Entry No. 10, at 3–4 and 11, assuring the Court that Plaintiff's prosecution of this action *in forma pauperis* was proper.

**3. Plaintiff's Prior Litigations**

Plaintiff's averred submissions made in this matter were not reflective of the truth, be it with regard to the entire massive body of Plaintiff's prior litigations or with regard to those actions where Plaintiff's challenges were either dismissed for failure to state a claim or where frivolous appeals were taken.

a. *Failure–to–State–a–Claim Actions*

While Plaintiff correctly stated that his action in *Love v. Andrews,* Civil Action No. 00–0125(WRW) (E.D.Ark.), was dismissed for failure to state a claim, and his appeal in *Love v. Andrews,* Civil Action No. 01–1269 (8th Cir.) was dismissed for failure to allege a constitutional violation, Plaintiff omitted from his statement any mention of all his other legal actions, including his litigation in *Love v. Dawson,* 03–0169(SWW) (E.D.Ark.), even though that particular litigation was the third action within the meaning of the three-strikes rule.[FN44]

> FN44. Plaintiff's district-level and appellate-level actions in *Love v. Andrews* count as two strikes within the meaning of the three-strikes rule, since: (a) there is no bar to counting the dismissal of a case in the district court level as one strike and the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

dismissal of appeal as at the circuit level as a second strike, *see Adepegba,* 103 F.3d at 388; *Hains v. Washington,* 131 F.3d 1248, 1250 (7th Cir.1997) ("[A] complaint that is dismissed under § 1915A for failure to state a claim[ ] followed by a frivolous appeal leads to two 'strikes' under 28 U.S.C. § 1915(g)"); and (b) the Eastern District of Arkansas expressly stated that "[h]aving reviewed Plaintiff's complaint, the [district court] finds that it must be dismissed for failure to state a claim [and it also] certifies that any appeal taken from an Order and Judgment dismissing this action [would be] frivolous," *Love v. Andrews,* Civil Action No. 00–0125, Docket Entry No. 4, at 1–2(WRW) (E.D.Ark.), *see also id.* Docket Entries Nos. 6 and 7 (E.D.Ark.) ("any appeal taken from this order and the judgment entered under it would be frivolous"), and the Court of Appeals for the Eighth Circuit expressly stated that "we agree that [Plaintiff] failed to allege a constitutional violation." *Love v. Andrews,* Civil Action No. 01–1269, Docket Entry docketed on 05/22/2001, at 2 (8th Cir.).

There appears to be no doubt that Plaintiff was aware of the disposition reached in his *Dawson* action, since: (a) the action lasted half a year; (b) during the course of that litigation, Plaintiff submitted two motions, [FN45] an original complaint, an amended complaint, a second amended complaint, an "addendum" to that second amended complaint, the third amended complaint, as well as Plaintiff's opposition to defendants' motion to dismiss Plaintiff's pleadings (seeking such dismissal on the grounds of his failure to state a cognizable claim). *See id.,* Docket Entries Nos. 1–8, 10, 11 and 19.

FN45. One of Plaintiff's motions in *Love v. Dawson,* 03–0169(SWW), was his application to proceed *in forma pauperis* in that action. Chief Judge Wright denied his application observing that Plaintiff had the prison account balance of $1,008.89, the most recent deposit to his account was $2,193.20, with the average monthly balance

of $363.53, hence indicating that Plaintiff had sufficient means to pay the applicable filing fee. *See id.* Docket Entry No. 9.

**\*32** As detailed in *Jennings v. Natrona County Detention Center Medical Facility,* 175 F.3d 775, 780 (10th Cir.1999), and *Adepegba v. Hammons,* 103 F.3d 383 (5th Cir.1996), an action that is dismissed for failure to state a claim does not count as a strike if an appeal of that dismissal is pending. However, *Jennings* and *Adepegba* clearly hold that a "dismissal should not count against a litigant until he has exhausted or waived his appeals." *Jennings,* 175 F.3d at 780; *see also Adepegba,* 103 F.3d at 387 ("A dismissal should not count against a petitioner until he has exhausted or waived his appeals").

In a civil case, a party wishing to appeal an order or judgment must file a notice of appeal within thirty days after the judgment or order appealed from is entered. *See* Fed. R.App. P. 3(a)(1) and 4(a)(1)(A); *Brown v. Beard,* 371 Fed. App'x 257, 258–60 (3d Cir.2010) (applying Rule 4(a)(1)(A) to a claim under 42 U.S.C. § 1983 brought by a *pro se* prisoner). "[T]he taking of an appeal within the prescribed time is mandatory and jurisdictional." *Bowles v. Russell,* 551 U.S. 205, 209, 127 S.Ct. 2360, 168 L.Ed.2d 96 (2007) (internal citation and quotation marks omitted). Failure to file a timely notice of appeal deprives the appellate court of jurisdiction. *See id.* at 209–10. Where, as here, a party fails to file a timely notice of appeal of an order, the party effectively waives his right to appeal that order. "Even if district court dismissals do not count as strikes while appeal is available, once the time of appeal has expired, that is the end of the matter, and untimely attempts to appeal do not change the situation." *Smith v. District of Columbia,* 182 F.3d 25, 28 (D.C.Cir.1999). Since Plaintiff's time to appeal Chief Judge Wright's decision in *Love v. Dawson,* 03–0169(SWW) (E.D.Ark.), had long expired, that decision counts as the third "strike" under the three-strikes rule, barring Plaintiff from proceeding *in forma pauperis* in this matter.

b. *Other Actions*

In addition to the three above-discussed actions,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

Plaintiff initiated at least nine other district-level litigations (that is, not counting the instant matter), and at least five appellate proceedings. Two of the aforesaid ten district-level proceedings ensued from his filing of an original and successive Section 2254 petitions, *see Love v. Norris,* Civil Action No. 94–0078(SMR) (E.D.Ark.) (denying the petition), *Love v. Norris,* Civil Action No. 97–0428(JFF) (E.D.Ark.) (staying successive petition subject to the Eighth Circuit's determination); and one of his appellate matters was his application for leave to file such a successive § 2254 petition, which was denied. *See Love v. Norris,* Civil Action No. 98–8019 (8th Cir.).

The remainder of Plaintiff's litigations consisted of civil rights actions asserting, virtually without any variance, either denial of medical care to Plaintiff and/or violation of his free exercise rights and/or violation of his access-to-the-courts rights and/or violation of his equal protection rights. *See Love v. Wade,* Civil Action No. 97–0207(GH) (E.D.Ark.); *Love v. Reed,* Civil Action No. 97–0208(NHJ) (E.D.Ark.); *Love v. Oglesby,* Civil Action No. 97–0221(GTE) (E.D.Ark.); *Love v. McCown,* Civil Action No. 00–0091(JMM) (E.D.Ark.); *Love v. Wade,* Civil Action No. 01–0338(JTR) (E.D.Ark.); *Love v. Hobbs,* Civil Action No. 02–0054(JMM) (E.D.Ark.); *Love v. Huckabee,* Civil Action No. 02–0251(JMM) (E.D.Ark.); *Love v. Moka,* Civil Action No. 02–0432(GH) (E.D.Ark.); *see also Love v. Reed,* Civil Action No. 99–4139 (8th Cir.); *Love v. Oglesby,* Civil Action No. 00–3212 (8th Cir.); *Love v. Evans,* Civil Action No. 02–1155 (8th Cir.); and *In re Love,* Civil Action No. 02–3769 (8th Cir.) (seeking mandamus relief). Although it appears that Plaintiff prevailed in two of these district-level actions on bench trials (getting the peanutbutter-and-bread accommodation in one and the transfer to his current New Jersey facility in another) and settled one of the district actions asserting insufficient medical care, Plaintiff's litigation practices in all above-listed actions cause this Court substantial concern, since all these proceedings were heavily peppered with: (a) Plaintiff's systemic filings of three, four and even five rounds of amended complaints, submitted often halfway into litigation and even at the eve of trial; (b) his invariably reoccurring motions for preliminary injunctive relief and

temporary restraining orders, repeatedly filed regardless of constant denials; (c) Plaintiff's consents to have his actions adjudicated by magistrate judges, followed by his nearly immediate withdrawals of these consents; (d) his massive flocks of "declarations" and strings of "briefs," frequently "supplemented" and "re-supplemented" by additional rounds of "briefs"; (e) Plaintiff's prematurely filed motions for summary judgments, oddly followed by his motions to compel discovery; (f) his applications for "disqualifications" and "statements of necessity"; (g) his objections to recommendations of magistrate judges; (h) his premature and yet repeatedly filed demands for setting trial dates; (i) Plaintiff's habitual requests for non-prejudicial withdrawals of his actions, after months or even years of litigation, right after defendants' filings revealing core deficiencies of his position; (j) his requests for reinstatements of his actions after his applications for withdrawals were granted, etc. Moreover, the bulk of these submissions, marked by a concerning paucity of substance, presented overly-lengthy regurgitations of the very same boilerplate language that was provided to Plaintiff in the decision entered by the district/magistrate judges in his prior cases (or docketed with regard to his prior submissions).

**\*33** Being presented with the same litigation practices right at the outset of this matter, the Court notes its understanding for the rationale of Plaintiff's mechanical paraphrasing of elements of action in lieu of factual allegations: such pleading mode was permissible during the now-archived reign of *Conley v. Gibson.* However, the Court fails to see a good faith-basis for Plaintiff's post-pleading litigation strategies that produced hundreds of overly-voluminous docket entries, clogged the dockets, unduly usurped court resources and tied the efforts of defendants. Plaintiff, therefore, is expressly cautioned that this Court, while standing ready to ensure Plaintiff's due opportunity to litigate his *meritorious* claims, will not tolerate any abusive or recreational litigation practices.[FN46]

> **FN46.** A "recreational litigant" is the "one who engages in litigation as sport and files numerous [submissions] with little regard for substantive law or court rules." *Jones v. Warden of the Stat-*

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)

**(Cite as: 2011 WL 345964 (D.N.J.))**

*eville Correctional Ctr.,* 918 F.Supp. 1142, 1153 (N.D.Ill.1995) (noting that, "[w]hen confronted with [a] recreational plaintiff, courts, to protect themselves and other litigants, have enjoined the filing ... without leave of court" and citing *In re Winslow,* 17 F.3d 314 (10th Cir.1994); *In re Burnley,* 988 F.2d 1 (4th Cir.1992); and *Mayfield v. Collins,* 918 F.2d 560 (5th Cir.1990)).

**4. Plaintiff's Pauper Status Will Be Revoked**

Where the inmate's " 'Prisoner Complaint' forms misrepresented how many strike suits he had filed prior to bringing the instant action, [the inmate] should not benefit from his own misleading submissions." *Harris v. City of New York,* 607 F.3d 18, 23 (2d Cir.2010). Thus, the inmate's *in forma pauperis* may be revoked at any time if the court, either *sua sponte* or on a motion, determines that the status was improperly obtained. *See, e.g., Lewis v. Burger King,* 2010 U.S.App. LEXIS 19546 (10th Cir. Sept. 1, 2010) (a court can revoke a grant of *in forma pauperis* if it later appears that the litigant had sufficient funds at the time (s)he filed the complaint); *see also Harris,* 607 F.3d at 23 ("the three strikes rule is not an affirmative defense that must be raised in the pleadings [-] district courts may apply the three strikes rule *sua sponte"* ) (citing *Thompson v. Drug Enforcement Admin.,* 492 F.3d 428, 435–36 (D.C.Cir.2007), and *Andrews v. King,* 398 F.3d 1113, 1120 (9th Cir.2005)); *accord Treff v. Galetka,* 74 F.3d 191, 197 (10th Cir.1996) ( "Leave to proceed [*in forma pauperis* ] is a privilege, not a right[,] courts have the discretion to revoke that privilege when it no longer serves its goals") (citation omitted).

Moreover,

[n]othing in the PLRA or the caselaw ... suggests that courts have an affirmative obligation to examine actual orders of dismissal. *See Thompson,* 492 F.3d at 434–35 (accepting docket reports indicating that prior dismissals satisfied at least one of the § 1915(g) criteria for a strike); *Andrews,* 398 F.3d at 1120 ("[D]istrict court docket records may be sufficient to show that a prior dismissal ... counts as a strike"); *cf. Leonard v. Lacy,* 88

F.3d 181, 185 (2d Cir.1996) ("A docket is a court's of-ficial record of what occurs in a case"). The district court may rely on the relevant docket sheets if they indicate with sufficient clarity that the prior suits were dismissed on the grounds that they were frivolous, malicious, or failed to state a claim upon which relief may be granted. *See Andrews,* 398 F.3d at 1120.

**\*34** *Harris,* 607 F.3d at 23.

This Court, therefore, will revoke Plaintiff's *in forma pauperis* status on the basis of the information obtained as a result of the Court's own research. However, out of abundance of caution, the Court will allow Plaintiff an opportunity to show cause as to why his *in forma pauperis* status should be reinstated.[FN47] In alternative, Plaintiff will be allowed an opportunity to prepay the applicable filing fee of $350, in its entirety;[FN48] he will be provided with an extended period to make such prepayment.

> FN47. In the event Plaintiff elects to file his response to the Court's order to show cause, Plaintiff's response *must* be limited to a submission: (a) not exceeding ten pages, single sided; (b) with each page having margin no less than one inch on each side; (c) having no more than 24 lines per page (*i.e.,* double-spaced); and (d) utilizing common font, such as Arial, Courier New or Times New Roman, or hand-printed in a comparable (*i.e.,* not narrow) font style; (d) stating Plaintiff's position clearly and concisely, with concise references to exhibits/documents but without any attachment of copies of the same; and (e) with clear citation to legal sources, if Plaintiff desires to cite law, *but without any regurgitation of any boilerplate language.*

> FN48. The installment filing fee collections made thus far will be remitted to Plaintiff.

**III. CONCLUSION**

For the foregoing reasons, Plaintiff's motion seeking

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)
**(Cite as: 2011 WL 345964 (D.N.J.))**

injunctive relief will be denied. Plaintiff's motion to amend will be denied in part and granted in part. Plaintiff's claims stated in the Amended Complaint and his proposed re-amended complaint will be dismissed, with prejudice, with exception of three narrowly-tailored lines of claims, as detailed *supra.* All Plaintiff's claims dismissed by this Court *sua sponte* will remain conclusively dismissed regardless of the future course of this litigation. Plaintiff's *in forma pauperis* status will be revoked. This matter will be administratively terminated subject to reopening in the event Plaintiff either timely shows cause for reinstatement of his *in forma pauperis* status or timely prepays the filing fee. Plaintiff will be directed not to make any other forms of submissions.

An appropriate Order accompanies this Opinion.

D.N.J.,2011.
Love v. New Jersey Dept. of Correction
Not Reported in F.Supp.2d, 2011 WL 345964 (D.N.J.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2009 WL 3049613 (N.D.N.Y.)
**(Cite as: 2009 WL 3049613 (N.D.N.Y.))**

C

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Charles MAY, Plaintiff,
v.
Superintendent DONNELI; Donaldson, Grievance
Coordinator; Dep. Stern; Imam Ahmed; Officer
Matthew; Deacon Bashaw; and James Jones, Admin-
istration Sergeant, Defendants.

Civil Action No. 9:06–cv–437 (GLS/RFT).

Sept. 18, 2009.

West KeySummary**Civil Rights 78** 🔑1463

78 Civil Rights
   78III Federal Remedies in General
     78k1458 Monetary Relief in General
      78k1463 k. Mental Suffering, Emotional
Distress, Humiliation, or Embarrassment. Most Cited
Cases

    A prisoner who did not suffer a physical injury
was not entitled to compensatory damages for mental
or emotional suffering for his § 1983 claim under the
Religious Land Use and Institutionalized Persons Act
(PLRA). The prisoner's alleged loss of weight and
possible increase in blood pressure was insufficient to
constitute a physical injury under the PLRA. The
prisoner alleged that his First Amendment rights were
violated when he was denied the opportunity to eat
blessed food for seven days with his fellow Nation of
Islam members during the Holy Month of Ramadan.
Prison Litigation Reform Act of 1995, § 101(e), 42
U.S.C.A. § 1997e(e).

Charles May, Ray Brook, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the
State of New York, David L. Cochran, Assistant At-
torney General, of Counsel, Albany, NY, for the De-
fendants.

### *ORDER*

GARY L. SHARPE, District Judge.

    **\*1** The above-captioned matter comes to this
court following a Report–Recommendation by Mag-
istrate Judge Randolph F. Treece, duly filed August
25, 2009. Following ten days from the service thereof,
the Clerk has sent the file, including any and all ob-
jections filed by the parties herein.

    No objections having been filed, and the court
having reviewed the Magistrate Judge's Re-
port–Recommendation for clear error, it is hereby

    ORDERED, that the Report–Recommendation of
Magistrate Judge Randolph Treece filed August 25,
2009 is ACCEPTED in its entirety for the reasons
state therein, and it is further

    ORDERED, that the defendants' motion for par-
tial summary judgment (Docket No. 57) is
GRANTED in part and DENIED in part, and it is
further

    ORDERED, that the Clerk of the court serve a
copy of this order upon the parties in accordance with
this court's local rules.

    IT IS SO ORDERED.

### *REPORT–RECOMMENDATION AND ORDER*

RANDOLPH F. TREECE, United States Magistrate
Judge.
    *Pro se* Plaintiff Charles May brings this civil

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3049613 (N.D.N.Y.)
**(Cite as: 2009 WL 3049613 (N.D.N.Y.))**

rights action, pursuant to 42 U.S.C. § 1983, alleging that his First Amendment rights were violated when he was denied the opportunity to eat blessed food for seven days with his fellow Nation of Islam members during the Holy Month of Ramadan. Dkt. No. 51, Am. Compl. at ¶ 1. In addition, Plaintiff asserts claims under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc–1, and New York State Corrections Law § 610. Id. at ¶ 37. Defendants move for Partial Summary Judgment, to which Plaintiff filed a Response in Opposition. Dkt. Nos. 57–58. Defendants contend that Plaintiff is (1) barred from bringing an action for mental or emotional injury under 42 U.S.C. § 1983 because he failed to allege the required showing of physical injury pursuant to 42 U.S.C. § 1997e(e); and (2) estopped from bringing a pendent state law claim pursuant to N.Y. CORR. LAWW § 24. Dkt. No. 57–5, Defs.' Mem. of Law at pp. 2–4. For the reasons that follow, it is recommended that the Defendants' Motion be **GRANTED in part** and **DENIED in part**.

### I. BACKGROUND

The following material facts are not, for purposes of this Motion, in dispute. Plaintiff alleges that in August 2005, approximately one month prior to the Islamic celebration of Ramadan, he was signed up as a member of the Nation of Islam in order to allow him to participate in Ramadan related activities. Dkt. No. 58, Pl.'s 7.1 Statement at p. 2. According to Plaintiff, during the Holy Month of Ramadan, Muslims are unable to eat during mess hall hours because they are required to fast during that time; the fast is then broken at night by eating blessed food. Am. Compl. at ¶ 16.[FN1] On October 5, 2005, Plaintiff fasted and then ate blessed food with his fellow Nation of Islam members. Id. at ¶ 13. Plaintiff alleges that on October 6, 2005, he was informed by Defendant Sergeant Jones, in the presence of Defendant Corrections Officer ("C.O.") Mathew, that the administration had him listed as a Sunni Muslim and he would therefore have to eat with them until the administration straightened things out. Id. Though Plaintiff was willing to eat with the Sunni

Muslims temporarily, he alleges that when he attempted to enter the Masjid[FN2] on October 6th, he was denied access by C.O. Mathew because he was not on the list. Id. at ¶ 35. Plaintiff alleges that Defendant Sergeant Jones maliciously failed to put him on the Sunni Muslim list. Id. at ¶ 34. Ultimately, Plaintiff was unable to eat with either Muslim sect for seven days until October 13, 2005, when he was permitted to eat with the Sunni Muslims. Id. at ¶ 19. During those seven days, Plaintiff observed the fasting strictures of Ramadan, but was unable to properly break his fast, thus resulting in a seven day fast. After informing Defendant Superintendent Donneli of the matter, Plaintiff was immediately placed with the Nation of Islam on October 18, 2005. Id. at ¶ 20.

> FN1. Though Plaintiff submitted a "Material Fact" statement in accordance with N.D.N.Y.L.R. 7.1 (Dkt. No. 57), his statement is presented in an argumentative manner and does not clearly lay out all of his factual allegations. Therefore, the Court relies primarily on Plaintiff's Amended Complaint to discern his factual allegations.

> FN2. A Masjid is a Muslim place of worship, commonly referred to in English as a Mosque.

**\*2** Though Plaintiff refrained from eating for seven days, he alleges no physical injury other than that he "lost a few pounds," was feeling lightheaded because of a possible increase in blood pressure, and suffered mental and emotional distress. Dkt. No. 58, Pl.'s Resp. in Opp'n to Defs.' Mot. (hereinafter "Pl.'s Resp.") at p. 2. In fact, Plaintiff stated candidly during his deposition that he did not suffer any physical injury. Dkt. No. 57–4, David L. Cochran, Esq., Affirm., dated Oct. 15, 2008, Ex. A, Pl.'s Dep., dated Jan. 22, 2008 (hereinafter "Pl.'s Dep.") at p. 2.

Plaintiff alleges a second violation of his consti-

Not Reported in F.Supp.2d, 2009 WL 3049613 (N.D.N.Y.)
**(Cite as: 2009 WL 3049613 (N.D.N.Y.))**

tutional right to freely exercise his religion when Defendants denied him the opportunity to have family visits during the Muslim festival of Eid–Ul–Adha. Am. Compl. at ¶ 22.

As a result of the aforementioned factual allegations Plaintiff claims he suffered emotional, mental, and physical distress, and seeks both compensatory and punitive damages for his alleged injuries. *Id.* at ¶¶ 22, 25 & 26.

## II. DISCUSSION
### A. Summary Judgment Standard

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In order for an issue of material fact to exist, it must relate to a disputed matter that "might affect the outcome of the suit," and the evidence is such that a "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

On a motion for summary judgment, the moving party bears the initial burden to demonstrate that there is no genuine issue as to any material fact, and therefore, they are entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the non-moving party must go beyond the pleadings and allege specific facts that present a genuine issue for trial. FED. R. CIV. P. 56(e). To that end, the non-movant cannot rest on "mere allegations or denials." *Id.*

When evaluating a motion for summary judgment, the court will draw all inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct.

1348, 89 L.Ed.2d 538 (1986). Moreover, when a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (cited in *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995)). Nevertheless, a party's "bald assertion," unsupported by evidence, is insufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

### B. Physical Injury Requirement

**\*3** The Prison Litigation Reform Act of 1995 ("PLRA"), codified in part at 42 U.S.C. § 1997e(e), states that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." The purpose of this physical injury requirement is to discourage frivolous suits commenced by inmates. *See Cox v. Malone,* 199 F.Supp.2d 135, 139–140 (S.D.N.Y.2002) ("Section 1997e(e) [ ... ] is a *substantive* limitation on the type of actions that can be brought by prisoners. Its purpose is to weed out frivolous claims where only emotional injuries are alleged.") (emphasis in original). The Second Circuit Court of Appeals has held that the PLRA applies to alleged constitutional violations brought under 42 U.S.C. § 1983. *Thompson v. Carter,* 284 F.3d 411, 416 (2d Cir.2002).

In this case, the only physical injury that Plaintiff states he suffered was a loss of a few pounds and a possible increase in blood pressure. Pl.'s Resp. at p. 2. Furthermore, Plaintiff did not allege these injuries in his Amended Complaint, but rather, only after Defendants raised the PLRA defense in their Motion for Partial Summary Judgment. Prior to Defendants' Motion, Plaintiff stated at his deposition that he did not suffer any physical injury. Pl.'s Dep. at p. 2. Even assuming, *arguendo,* that Plaintiff had properly alleged a physical injury in his Amended Complaint, his allegations do not constitute physical injury for pur-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3049613 (N.D.N.Y.)
**(Cite as: 2009 WL 3049613 (N.D.N.Y.))**

poses of the PLRA.

Section 1997e(e) provides no definition of "physical injury." *Liner v. Goord,* 196 F.3d 132, 135 (2d Cir.1999). However, courts have held that in order to constitute a physical injury under 1997e(e), an injury must be more than *de minimis,* but need not be significant. *Id.* (citing *Siglar v. Hightower,* 112 F.3d 191, 193 (5th Cir.1997)); *Warren v. Westchester County Jail,* 106 F.Supp.2d 559, 570 (S.D.N.Y.2000) (citing *Siglar* ).

The issue is therefore whether Plaintiff's loss of a few pounds amounts to more than a *de minimis* injury for purposes of the PLRA. In short, it appears this question is answered in the negative. Loss of weight is generally not considered to be a physical injury for purposes of the PLRA, especially the loss of only a few pounds. *See Dawes v. Walker,* 1998 WL 59454, at *1 n. 1 (N.D.N.Y. Feb.9, 1998)* ("It appears unlikely that lost weight is a physical injury within the meaning of Section 1997e(e)."); *see also Porter v. Coombe,* 1999 WL 587896, at *8 (S.D.N.Y. Aug.4, 1999) (plaintiff's loss of twenty-five pounds did not constitute a physical injury); *accord Pearson v. Welborn,* 471 F.3d 732, 744 (7th Cir.2006) (plaintiff's loss of fifty pounds did not constitute a physical injury). Similarly, Plaintiff's alleged increase in blood pressure does not amount to physical injury. *See Jones v. H.H.C. Inc.,* 2003 WL 1960045, at *5 (S.D.N.Y. Apr.8, 2003); *accord Davis v. District of Columbia,* 158 F.3d 1342, 1349 (D.C.Cir.1998) (articulating that § 1997e(e) precludes reliance on somatic manifestations of emotional distress). Thus, Plaintiff has not alleged a sufficient physical injury pursuant to the PLRA.

**\*4** Although Plaintiff has not met his burden on the physical injury requirement of the PLRA, his failure to do so is not completely dispositive of his underlying constitutional claim. "The failure of prisoners to plead or establish a compensable actual injury in a § 1983 constitutional tort claim [ ... ] only pre-

cludes the recovery of compensatory damages, but does not lead to the dismissal of the underlying claim." *Dawes v. Walker,* 239 F.3d 489, 496 (2d Cir.2001). Plaintiff may still be entitled to injunctive or declaratory relief for a violation of his constitutional rights. *Thompson v. Carter,* 284 F.3d 411, 416–418 (2d Cir.2002). A plaintiff is not required to show physical injury in order to recover nominal damages, punitive damages, or declaratory relief. *Gill v. Hoadley,* 2007 WL 1341468, at *4 (N.D.N.Y. May 4, 2007). In fact, it is error for courts not to award nominal damages in § 1983 actions when a constitutional violation has been established. *See Robinson v. Cattaraugus,* 147 F.3d 153, 162 (2d Cir.1998).

In the instant case, Plaintiff has requested punitive damages. Am. Compl. at ¶ 26. Defendants do not challenge the merits of Plaintiff's underlying constitutional claim, therefore that issue is not before this Court. Due to Plaintiff's inability to demonstrate a physical injury under 1997e(e), compensatory damages for mental or emotional suffering are barred for his § 1983 claim, but it remains to be decided if Plaintiff is entitled to nominal damages, punitive damages, or declaratory relief.

### C. Plaintiff's Pendent State Law Claim

Plaintiff also brings a pendent state law claim pursuant to N.Y. CORR. LAWW § 610, which guarantees inmates "the free exercise and enjoyment of religious profession and worship" while incarcerated. Am. Compl. at ¶ 37. A federal court exercising pendent jurisdiction must apply state law. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1996). "Thus, if state law does not recognize a plaintiff's right to bring an action in state court, a federal court, exercising pendent jurisdiction, sitting as a state court, must follow the state law limitation on jurisdiction." *Livingston v. Griffin,* 2007 WL 2437433, at *2 (N.D.N.Y. Aug.22, 2007) (citing *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996)).

Defendants argue that this claim is barred by N.Y.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3049613 (N.D.N.Y.)
**(Cite as: 2009 WL 3049613 (N.D.N.Y.))**

CORR. LAWW § 24, which reads:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

**\*5** Thus, § 24 precludes "the assertion of claims against corrections officers [in their personal capacities] in any court, including the federal courts," by designating the New York State Court of Claims as the only available venue to bring a claim for damages arising out the acts committed by corrections officers within the scope of their employment. *Baker v. Coughlin,* 77 F.3d at 14–15. And, because the Court of Claims is a court of limited jurisdiction, hearing only claims against New York State and no other individual or entity, § 24 amounts to a grant of immunity for corrections officers sued in their personal capacities for claims arising out of the discharge of their duties. N.Y. CT. CLMS. LAW § 9.

After the parties submitted their respective briefs on this Motion, the Supreme Court held in *Haywood v. Drown,* ——— U.S. ———, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009) that § 24, when used to relegate to the Court of Claims civil rights actions brought pursuant to 42 U.S.C. § 1983, is inconsistent with the Supremacy Clause, U.S. Const. Art. VI, cl. 2, and therefore, unconstitutional. The *Haywood* Court held that New York State, having created courts of general

jurisdiction that routinely hear § 1983 actions against all types of state actors, "is not at liberty to shut the courthouse door to federal claims [against corrections officers] that it considers at odds with its local policy." *Id.* at 2117. The Supreme Court found such selective treatment of § 1983 claims brought against corrections officers to be "contrary to Congress' judgment that *all* persons who violate federal rights while acting under color of state law shall be held liable for damages," and therefore, in violation of the Supremacy Clause. *Id.* at 2115 (emphasis in original).

In this case, Plaintiff has brought a state law claim pursuant to N.Y. CORR. LAWW § 610. Although the *Haywood* decision found § 24 to be in violation of the Supremacy Clause, it did so only with respect to claims brought under § 1983, a federal statute. A claim brought pursuant to a state law does not implicate the Supremacy Clause, and therefore, the *Haywood* decision does not affect the question of whether this Court has proper jurisdiction to hear this pendent state law claim.

Even after *Haywood,* a New York state court (other than the Court of Claims) would not have jurisdiction to hear Plaintiff's pendent claim pursuant to § 24 because Plaintiff has alleged acts that clearly fall within the scope of the Defendants' employment duties as corrections officers. Therefore, this Court does not have jurisdiction to hear this pendent state law claim brought pursuant to N.Y. CORR. LAWW § 610, and it is recommended that such claim be **dismissed.** *Baker v. Coughlin,* 77 F.3d at 14–16; *see also, e.g., Cancel v. Mazzuca,* 205 F.Supp.2d 128, 139 (S.D.N.Y.2002) (dismissing plaintiff's pendent state law claims pursuant to § 24).

### III. CONCLUSION

For the reasons stated therein, it is hereby

**\*6 RECOMMENDED,** that the Defendants' Motion for Partial Summary Judgment (Dkt. No. 57)

Not Reported in F.Supp.2d, 2009 WL 3049613 (N.D.N.Y.)
**(Cite as: 2009 WL 3049613 (N.D.N.Y.))**

be **GRANTED in part and DENIED in part;** and it
is further

　　**ORDERED,** that the Clerk of the Court serve a
copy of this Report–Recommendation and Order upon
the parties to this action.

　　Pursuant to 28 U.S.C. § 636(b)(1), the parties
have ten (10) days within which to file written objec-
tions to the foregoing report. Such objections shall be
filed with the Clerk of the Court. *FAILURE TO
OBJECT TO THIS REPORT WITHIN TEN (10)
DAYS WILL PRECLUDE APPELLATE REVIEW.*
*Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993)
(citing *Small v. Sec'y of Health and Human Servs. .,*
892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. §
636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2009.
May v. Donneli
Not Reported in F.Supp.2d, 2009 WL 3049613
(N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 987726 (N.D.N.Y.)
**(Cite as: 2012 WL 987726 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Aror Ark O'DIAH, Plaintiff,
v.
Brian FISCHER; Michael Corcoran; Malcolm R.
Cully; Ronald W. Moscicki; Stephen Guter; C.O.
Ramsay; D. Richardson; J. Pepin; J. Hahn; Mr. & Lt.
Shaw; Scott C. Carlsen; Andrew Cuomo, Attorney
General for the State of New York; K. Thomas, Cor-
rectional Officer, Cayuga Correctional Facility; and
D. Swierk, Mail Room Clerk, Lakeview Shock In-
carceration Facility, Defendants [FN1].

> FN1. Eleven other defendants were previ-
> ously terminated or had the claims against
> them transferred to other districts. *See* Dkt.
> Nos. 51, 61.

No. 08–CV–941 (TJM/DRH).
Feb. 28, 2012.

Aror Ark O'Diah, Attica, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, Roger W. Kinsey, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for De-
fendants.

## REPORT–RECOMMENDATION AND OR-
DER[FN2]

> FN2. This matter was referred to the under-
> signed for report and recommendation pur-
> suant to 28 U.S.C. § 636(b) and
> N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

**\*1** Plaintiff pro se Aror O'Diah ("O'Diah"), an
inmate in the custody of the New York State De-
partment of Correctional and Community Supervision
("DOCCS"), brings this action pursuant to 42 U.S.C. §
1983 alleging that defendants, New York's prior At-
torney General and thirteen DOCCS officials and
employees, [FN3] violated his constitutional rights under
the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth
Amendments. Am. Compl. (Dkt. No. 55). O'Diah also
asserts claims under 42 U.S.C. §§ 1985 and 1986,
Title II of the Americans with Disabilities Act
("ADA"), 42 U.S.C. § 12101 *et seq.,* and various state
law provisions. Dkt. No. 70, ¶¶ 45–49. Presently
pending is the moving defendants' motion to dismiss
the amended complaint pursuant to Fed.R.Civ.P.
12(b)(6). Dkt. No. 66. O'Diah opposes the motion.[FN4]
Dkt. No. 70. For the following reasons it is recom-
mended that defendants' motion be granted in part and
denied in part.

> FN3. *See* note 1 *supra.*

> FN4. O'Diah's opposition includes new
> claims against new defendants. Dkt. No. 70,
> ¶¶ 5–6, 26, 31, 38. These claims and de-
> fendants are not subjects of the present mo-
> tion.

### I. Background
The facts are related herein in the light most fa-
vorable to O'Diah as the non-moving party. *See* sub-
section II(A) *infra.*

### A. June 2007
On June 5 and July 27, 2007, the Queens County
Court denied O'Diah's state court motions challenging
his conviction and sentencing. Am. Compl. ¶ 29.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 987726 (N.D.N.Y.)
**(Cite as: 2012 WL 987726 (N.D.N.Y.))**

O'Diah appealed the denials, but the appeals were not processed or docketed. *Id.* O'Diah alleges that defendant Corcoran caused he appeals not to be processed properly. *Id.*

### B. October 2007 through December 2007[FN5]

> [FN5]. O'Diah claims that in May 2007, he was infected with bacterial and in September 2007 that while he required antibiotics for the bacterial infection, he was instead diagnosed with cancer, epilepsy, and tuberculosis. Am. Comp. ¶¶ 7–8. However, O'Diah has failed to link these actions to any specific defendants. Thus, he has failed to allege that anyone was personally involved and claims related to these events should be dismissed.

On October 24, 2007, via defendants Ramsay and Corcoran, O'Diah applied for special access to use the law library for extended hours. Am. Compl. ¶ 43. The application was granted from October 24 through November 24, 2008 so that O'Diah could complete pending legal work. *Id.* ¶ 44. O'Diah was under the impression that he had the ability to terminate this authorization whenever he desired. *Id.* ¶ 45. In early November, O'Diah asked Ramsay to remove his name from the call out sheets as he no longer needed the special access to the library because his legal work was completed. *Id.* ¶ 46. Ramsay agreed to remove O'Diah's name from the list and also instructed him on how to renew the application if he required additional library time in the future. *Id.*

On November 11, 2007, O'Diah received a call to visit the library, which was confusing as O'Diah had previously had a conversation with Ramsay in which Ramsay indicated that he would remove O'Diah from the call out list. Am. Compl. ¶ 47. On November 12, O'Diah received a misbehavior report for failing to use the special access pass on November 11th. *Id.* ¶ 48. On or about November 21, 2007, Ramsay, who was allegedly coerced by Mawhir, testified that he did not remember having a conversation with O'Diah about him no longer needing to use the library pass. *Id.* ¶ 50. Ramsay, Mawhir, Corcoran and Carlsen allegedly conspired to have O'Diah found guilty of the disciplinary charge. *Id.* ¶ 51. Additionally, that day, Mawhir also conspired with other inmates to have them instigate an altercation with O'Diah so that he could be given additional disciplinary charges because O'Diah had filed grievances against Corcoran and Carlsen. *Id.* ¶ 49.

**\*2** After that date, Ramsay, Mawhir and Corcoran encouraged other inmates to instigate fights with O'Diah and pour cold water on his body and personal effects. Am. Compl. ¶ 51. Due to the tension these defendants created, O'Diah refused to go into the recreation yard for fear of his personal safety. *Id.* ¶ 53. O'Diah lodged complaints with Mawhir and Ramsay, but they were ignored and he was told that he was getting what he deserved after filing grievances against the state and its employees. *Id.* ¶ 52.

### C. March 2008

On March 7, 2008, O'Diah was denied his legal mail, even though he had received prior authorization from defendant Thomas and made subsequent arrangements with an advocate to have him pick up the documents from the prison. Am. Compl. ¶ 54. Thomas had accessed O'Diah's property that day, but influenced by Mawhir, refused to deliver the legal property to O'Diah so that he could provide it to his legal advocate. *Id.* ¶ 55. The inability of O'Diah's legal advocate to receive his legal papers represented a denial of access to the courts. *Id.* ¶ 56.

Also on March 7, Thomas issued O'Diah a false misbehavior report for O'Diah's failure to obey a direct order. Am. Compl. ¶ 57. This issuance of this charge was influenced by Mawhir and Corcoran. *Id.* On March 8, O'Diah received the misbehavior report and was sent to keeplock.[FN6] *Id.* ¶ 58. While keeplocked, O'Diah was unable to file a motion to the court in one

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 987726 (N.D.N.Y.)
**(Cite as: 2012 WL 987726 (N.D.N.Y.))**

of his federal cases in the Eastern District of New York and the case was dismissed for a failure to prosecute. *Id.*

> FN6. Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6.

On March 19, 2008, defendant Guter arrived at O'Diah's cell with new medication for him to take with which O'Diah was unfamiliar. Am. Compl. ¶ 59.[FN7] O'Diah requested the information insert for the drug, which would contain the drug's name, purpose and reported side effects, but Guter refused. *Id.* ¶ 60. O'Diah refused to take the medication, so Guter summoned Thomas and the two, at the direction of Mawhir, forced O'Diah to take the unknown medication. *Id.* ¶ 61. After taking the medication O'Diah experienced serious intestinal issues including bowel movements, stomach pain, bleeding, and inflammation of his rectum. *Id.* This occurred despite the facility's directive that inmates retained the right to refuse medication. *Id.* ¶ 62. O'Diah contends that this medication was forced upon him due to his national origin.[FN8] *Id.*

> FN7. O'Diah's amended complaint contains generalized complaints that all defendants tried to provide him with the wrong medication in May, July and September of 2007 and also took away his personal food, forcing him to eat the food from the correctional facility which irritated his stomach. Am. Compl. ¶ 28. As O'Diah failed to indicate which defendants were involved in these alleged Eighth Amendment violations, they will not be further discussed. However, as O'Diah did specify dates and defendants at a later time who allegedly violated similar rights with similar actions, those actions, and only those

actions, will be addressed.

> FN8. In O'Diah's opposition, he claims that he was targeted, kidnaped and had his constitutional rights violated because of his African origin. Dkt. No. 70, ¶¶ 34, 36.

On March 19, Guter also issued a misbehavior report against O'Diah for refusing to take the unknown medication. Am. Compl. ¶ 64. Sometime thereafter, non party Rocker conducted a disciplinary hearing and determined that O'Diah was within his rights to refuse to ingest the medication. *Id.* ¶ 65. While Rocker initially stated that he would have dismissed the charge, he ended up sentencing O'Diah to ninety days keeplock due to Corcoran's influence over him. *Id.* ¶ 66. Rocker then reversed himself and suspended O'Diah's sentence. *Id.*

### D. May–June 2008

*3 On May 9, 2008, O'Diah could not perform the work required for his work placement because the exposure to cigarette smoke, butts, and ashes aggravated his preexisting medical conditions. Am. Compl. ¶ 68.[FN9] O'Diah suffered from dizziness, headaches, shoulder and back pain, and high blood pressure. *Id.* O'Diah contends that defendants Corcoran, Carlsen, Fischer, Cuomo, and Cully were all aware of his medical conditions and disregarded them when they placed him in the work program. *Id.*

> FN9. O'Diah also contends that he was forced to work in a position exacerbating his medical conditions due to exposure to cigarettes sometime after January 26, 2007. Am. Compl. ¶ 7. Whether these refer to the same events is unclear as he did not name specific defendants, dates, or facts. Additionally, O'Diah claims that the root cause of his pre-existing medical conditions was his degenerative disc disease in his back. Dkt. No. 70, ¶ 4.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2012 WL 987726 (N.D.N.Y.)
**(Cite as: 2012 WL 987726 (N.D.N.Y.))**

On May 10, 2008, while working at his placement, O'Diah suffered from irregular and elevated blood pressure, headaches, and increased pain as a result of having to clean up the cigarettes. Am. Compl. ¶ 69. On May 17, O'Diah received emergency treatment and was informed that his blood pressure was elevated and irregular, so he was placed on a "rest" until June 6 and advised that he should be examined by the physician when he came on duty the following week. Id. ¶ 71. Medical staff attended to O'Diah daily, though he still suffered from headaches and dizziness. Id. On May 19, 2008, O'Diah experienced a severe headache and dizziness, informed the corrections officer supervising him that he was not feeling well, and requested a change in his work placement. Id. ¶ 70. He was instructed to seek a medical excuse instead. Id. While pursuing that request, O'Diah claims to have been told by someone in the front office that Cully had placed him in that position as a sanction. Id.

On May 20, 2008, O'Diah was given a choice between two work programs, though he did not prefer either position because of his health conditions. Am. Compl. ¶ 72. O'Diah chose one of the placements, and was then told by an unidentified sergeant that he was going to the other per the authorization of defendants Cully, Carlsen, Corcoran, Fischer and Cuomo. Id. Later the sergeant was questioned about denying O'Diah's choice for work programs. Id. O'Diah believes his preferences were ignored because he was oppressed. Id. The placement results in an aggravation of O'Diah's pre-existing medical conditions of severe headaches, dizziness, and depression. Id.

On June 2, 2008, O'Diah was summoned by medical and told the physician that he was unable to work around excessive amounts of cigarette smoke or cigarette butts and ashes and requested a work excuse. Am. Compl. ¶ 74. Cully allegedly told the physician that supervisors prohibited him from giving work excuses. Id. O'Diah believes that these instructions ultimately came from Fischer and Cuomo and that he

was being treated differently due to his "national origin identification." Id. That same day O'Diah returned to his work assignment where he again began cleaning up the cigarettes, butts, and ashes and began feeling dizzy and developing a headache. Id. ¶ 75. One of the corrections officers ordered O'Diah back to his cell to rest, and further advised him to file a grievance and again request a work program reassignment. Id.

**\*4** On June 3, 2008, O'Diah remained very ill, suffering from dizziness and headaches. Am. Compl. ¶ 76. He wrote a grievance, which was submitted to defendant Pepin in person and mailed to defendants Fischer, Cuomo, the Inmate Grievance Clerk and the Attorney General's Office. Id. O'Diah requested reassignment but was again ordered back to his original work placement. Id. Upon returning, Pepin observed O'Diah being unable to complete his work, so Pepin sent O'Diah to return to his dorm after visiting the infirmary. Id. ¶ 77. While walking to the infirmary, O'Diah was stopped by an unnamed sergeant who berated him and insisted that he was O'Diah's master. Id. The sergeant brought O'Diah to an empty room and left him there, unattended, for hours while O'Diah believed that he was suffering from a stroke. Id.

On June 3, 2008, defendants Richardson and Pepin, via instructions from Cully, issued O'Diah a misbehavior report for threatening them to reassign him to a different work station. Am. Compl. ¶ 78. On June 5, 2008, Richardson conducted the hearing during which O'Diah was denied due process because Richardson allegedly made statements evidencing a bias against O'Diah. Id. ¶ 78, 83 (specifically, Richardson allegedly stated that he was aware that O'Diah was a difficult inmate and continually filed grievances). O'Diah was found guilty and sentenced to thirty days segregated confinement. Id. O'Diah also contends that the sentence which Rocker had reversed, from months prior, was reinstated. Id. ¶ 83. There is no evidence as to when this was reinstated or for how long, but O'Diah repeats it throughout the course of the complaint. On the same day, O'Diah was also

Not Reported in F.Supp.2d, 2012 WL 987726 (N.D.N.Y.)
**(Cite as: 2012 WL 987726 (N.D.N.Y.))**

searched, stripped naked, and paraded around while he remained shackled. *Id* . ¶¶ 33, 79. No defendants were identified as participating in that event.

On or about June 5, 2008, an Order to Show Cause was filed by the Cayuga County Court for one of the Article 78 [FN10] cases which O'Diah had filed regarding his work placement. Am. Compl. ¶ 80. O'Diah's paperwork was searched and seized which precluded his access to the courts and denied him due process. *Id.* ¶¶ 31, 80–81.

> FN10. N.Y.C.P.L.R. art. 78 establishes the procedure for judicial review of the actions and inactions of state and local government agencies and officials.

### E. June 2008

On June 10, 2008, O'Diah was transferred to Lakeview Shock Center. Am. Compl. ¶ 84. The week before, the Cayuga County Court had issued an Order to Show Cause about O'Diah's Article 78 case regarding his work placement. *Id.* ¶ 30. The return date for the order was June 26. *Id.* Prior to his transfer, he had submitted a disbursement form for postage to be attached to his legal mail in response to the Order to Show Cause previously issued by the Cayuga County Court. *Id.* ¶ 84. Also prior to his transfer, O'Diah's cell mate had provided him with postage for his legal mail, since his prior disbursement had not been processed. *Id.* ¶ 85. O'Diah then delivered four envelopes to defendant Hahn to then give to the mail room clerk, defendant Swierk. *Id.* ¶ 86.

**\*5** On June 11, 2008, defendants Hahn, Shaw, Swierk, Moscicki, Corcoran, Carlsen, Fischer and Cuomo searched and seized the stamped envelopes. Am. Compl. ¶¶ 30, 87. Hahn then issued O'Diah a misbehavior report for receiving unauthorized postage stamps from his cell mate. *Id.* ¶ 87. O'Diah also attempted to mail these responses again, on June 26, by giving them again to Hahn, but he was unsuccessful

due to the conspiracy between Hahn, Shaw Swierk, Moscicki, Corcoran, Carlsen, Fischer and Cuomo. *Id.* ¶ 89. Since these responses were not mailed, it resulted in the dismissal of the Article 78 case because Cuomo, Fischer, Corcoran, and Carlsen moved for dismissal based on O'Diah's failure to respond. *Id.* ¶¶ 87–88, 90.

O'Diah then demanded the return of the funds he applied to be disbursed for his postage prior to his transfer. Am. Compl. ¶ 91. Moscicki and Cully denied that there was ever funds available with payment. *Id.* O'Diah filed a grievance which resulted in a disposition, on June 10, 2008, that he was owed a refund. *Id.* On June 17, 2008, Shaw and Hahn issued another false misbehavior report about O'Diah exchanging stamps with his cell mate. *Id.* ¶ 92. Both Shaw and Hahn, in conjunction with Moscicki, Corcoran, Carlsen, Fischer, Pepin, Richardson, and Cuomo engaged in a conspiracy to deny O'Diah his rights, resulting in another thirty days of segregation pursuant to the misbehavior report. *Id.* ¶ 93.

O'Diah contends that on August 8, 2008, Swierk was instructed by the above referenced defendants to charge O'Diah again with correspondence violations. Am. Compl. ¶ 94. The hearing occurred on August 13 and O'Diah was found not guilty of the charges. *Id.*

### F. Retaliatory Transfers

On May 9, 2008, Corcoran, Carlsen, Cully, Fischer, Cuomo and his subordinates, the Attorney General's office and the state all conspired to arrange for a retaliatory transfer for O'Diah to Livingston where he would be housed in keeplock for the ninety days which Rocker had previously suspended. Am. Compl. ¶ 67. After the disciplinary hearing on August 13, 2008, O'Diah was again transferred to Wyoming and the Gowanda Correctional Facilities. *Id.* ¶ 94. These facilities were further from where O'Diah's family lived, making it more difficult for them to visit him. *Id.*

Not Reported in F.Supp.2d, 2012 WL 987726 (N.D.N.Y.)
**(Cite as: 2012 WL 987726 (N.D.N.Y.))**

### G. Conspiracies

O'Diah maintains that he was kidnaped into DOCCS custody pursuant to a conspiracy between all defendants, court and law enforcement personnel, and the state. Am. Compl. ¶ 115. O'Diah had evidenced planted against him so that he would be criminally convicted and sent to prison.[FN11] *Id.* ¶ 40. Moreover, throughout the entire time O'Diah was incarcerated he was subjected to harassment. *Id.* ¶ 36.

> **FN11.** In O'Diah's opposition he specifies that he was denied multiple rights such as the right to represent himself, receive alternate counsel, testify, call key eye witnesses, and introduce key evidence. Dkt. No. 70, ¶ 39. As these are not complaints about his conditions of confinement, but rather the proceedings leading to his conviction, the proper vehicle for addressing said claims is a habeas corpus petition and not a § 1983 claim.

### II. Discussion

O'Diah contends that his First Amendment rights were violated because his access to the courts was impeded and false misbehavior reports were issued against him in retaliation. O'Diah also contends that his Eighth Amendment rights were violated when he was forced to work in a placement which exposed him to cigarettes and aggravated his prior medical condition and he was forced to take an unknown medication. O'Diah also contends that some of his disciplinary hearings did not afford due process, that he was discriminated against, and that he did not receive proper reimbursement for his stamps, all in violation of the Fourteenth Amendment. O'Diah also makes allegations that he was discriminated against based on his disability and that all defendants conspired against him. O'Diah also asserts that he was unlawfully convicted and has remained illegally detained in contravention of his constitutional rights.

**\*6** Defendants contend that O'Diah's complaint must be dismissed because it fails to meet the plausi-

bility standards. Defendants also argue that O'Diah's retaliation and conspiracy claims are meritless, he has failed sufficiently to state numerous causes of action, certain defendants were not personally involved in his constitutional violations, and defendants are entitled to qualified immunity.

### A. Legal Standard[FN12]

> **FN12.** O'Diah attached additional paperwork to his opposition. However, consideration of a motion to dismiss "is limited to the facts asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir.2007). As the documents were neither attached nor incorporated into the complaint, they have not been considered on this motion.

Rule 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, this "tenet ... is inapplicable to legal conclusions[; thus, t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555 (2007) (holding that "entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action ... [as] courts are not bound to accept as true a legal conclusion couched as a factual allegation.")).

Accordingly, to defeat a motion to dismiss, a claim must include "facial plausibility ... that allows

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 987726 (N.D.N.Y.)
**(Cite as: 2012 WL 987726 (N.D.N.Y.))**

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 556 (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]."); *see also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir.2009) (holding that, "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (citations omitted). Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 129 S.Ct. at 1950–51.

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they 'suggest At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, .. or arguments that the submissions themselves do not "suggest, ..." that we should not "excuse frivolous or vexatious filings by *pro se* litigants" ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law ...."

**\*7** *Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)).

**B. Personal Involvement**

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation;

> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).[FN13]

> FN13. Various courts in the Second Circuit have considered how, if at all, the *Iqbal* decision affected the five *Colon* factors which were traditionally used to determine personal involvement. *See McCarroll v. Fed. Bureau*

Not Reported in F.Supp.2d, 2012 WL 987726 (N.D.N.Y.)
(Cite as: 2012 WL 987726 (N.D.N.Y.))

*of Prisons,* No. 08–CV–1343 (DNH/GHL), 2010 WL 4609379, at *4 (N.D.N.Y. Sept.30, 2010) (noting that although the Second Circuit has not yet addressed *Iqbal's* impact on the five *Colon* factors, several district courts have done so); *Kleehammer v. Monore County,* 743 F.Supp.2d 175 (W.D.N.Y.2010) (holding that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster ...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that *Iqbal* eliminated *Colon's* personal involvement standard).

O'Diah continually claims that Fischer, Governor Cuomo, Corcoran, Carlsen, Cully, and Moscicki were persistently involved in his alleged constitutional violations. With the exceptions of Cully's involvement in O'Diah's alleged First and Eighth Amendment violations and Moscicki's involvement in O'Diah's alleged First Amendment violations, such contentions fail. The gravamen of O'Diah's complaints against these defendants is that they were in a position of power and, thus, always involved with anything occurring in conjunction with O'Diah's incarceration. However, attempts to establish personal involvement based upon the supervisory role these defendants occupied is inappropriate. *Wright,* 21 F.3d at 501 (holding that a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement).

Moreover, while O'Diah does not specifically articulate to whom he sent grievances and when, receiving grievances, without more, is insufficient to establish personal involvement as there exists no allegation that the proposed defendants took any action. *See Bodie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) (citations omitted) (finding personal involvement only where a supervisory official received, reviewed, and responded to a prisoner's complaint); *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) ("[I]f mere receipt of a letter or sim-

ilar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose *respondeat superior* liability.") (citations omitted). Odiah's allegations are insufficient to establish, except where otherwise noted in Section II(C)(1)-(2), (D)(1) *infra,* that these defendants were involved or aware of any alleged constitutional violations.

**\*8** Furthermore, the amended complaint does not contend that these defendants created unconstitutional policies or were grossly negligent in supervising subordinates. As such, O'Diah has failed to establish their personal involvement and defendants' motion on this ground should be granted as to these defendants.

**C. First Amendment**
**1. Retaliation**

O'Diah contends that multiple defendants retaliated against him throughout his tenure in DOCCS. To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Barclay v. New York,* 477 F.Supp.2d 546, 588 (N.D.N.Y.2007) (citations omitted).

There is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases. However, courts have found that six and eight month gaps between the protected conduct and adverse action were sufficient, while in other circum-

Not Reported in F.Supp.2d, 2012 WL 987726 (N.D.N.Y.)
**(Cite as: 2012 WL 987726 (N.D.N.Y.))**

stances three months was considered too long.

   *Burton v. Lynch,* 664 F.Supp.2d 349, 367 (S.D.N.Y.2009) (internal quotation marks and citations omitted).

   However, courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 214–15 (N.D.N.Y.2008). Therefore, conclusory allegations alone are insufficient. *Id.* at 214 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (explaining that "claim [s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.")).

   O'Diah's allegations are as follows: (1) Mawhir conspired and incited the other inmates to attack O'Diah so that he could write false misbehavior reports in retaliation for O'Diah filing grievances; (2) Mawhir and Ramsay conspired with inmates to have them throw water on O'Diah for filing grievances; (3) Pepin and Richardson issued O'Diah a false misbehavior report contending he had threatened them after O'Diah filed a grievance and sought transfer from his allegedly dangerous work placement; (4) Shaw and Hahn issued O'Diah a false misbehavior report seven days after O'Diah's grievance was resolved providing him with a refund for postage he had previously paid; and (5) Swierk issued O'Diah a false misbehavior report alleging a correspondence violation. Also, liberally construing O'Diah's complaint he has alleged that Cully refused to allow him to participate in another work program, denying any requests for work program reassignments, in retaliation for his filing of grievances.

   **\*9** O'Diah has failed to allege a plausible retaliation claim with respect to Mawhir and Ramsay. In order "[t]o show retaliation [in these circumstances, O'Diah] was required to present evidence that his

constitutionally protected conduct in filing past grievances was a substantial or motivating factor for a prison official's adverse action." *Cole v. Fischer,* 416 Fed. Appx. 111, 113 (2d Cir.2011) (citing *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). First, the allegations against these defendants are conclusory. Second, O'Diah does not allege when he filed grievances, who he filed them against or how long after the grievances were filed that the alleged retaliation occurred. Accordingly, even construing the facts in the light most favorable to O'Diah he has failed to demonstrate that filing grievances was a substantial factor in the alleged retaliation.

   Conversely, O'Diah has sufficiently alleged retaliation claims against (1) Cully for mandating that he remain in a dangerous work condition after complaining to medical staff and filing a grievance; (2) Pepin and Richardson for writing him a false misbehavior report in retaliation for complaining about his work placement in June 2008; (3) Hahn and Shaw for issuing him a false misbehavior report in retaliation for submitting a grievance and receiving a reimbursement of money; and (5) Swierk for issuing him a false misbehavior report in retaliation for submitting a grievance about reimbursement. It is undisputed that filing grievances is a constitutionally protected activity. *See e.g. Varela v. Demmon,* 491 F.Supp.2d 442, 452 (S.D.N.Y.2007) ("[T]he making of a grievance is itself the constitutionally protected speech. The subject matter of the grievance—including whether it alleges the violation of any constitutional right—is thus irrelevant.") (citations omitted).

   While "[a]ll exposure to [environmental tobacco smoke] ETS is not unconstitutional; [unwilling] ... exposure to an unreasonably high level of ETS is cognizable as a constitutional violation." *Taylor v. Conway,* No. 06–CV–1329 (SRU), 2008 WL 4371928, at *4 (D.Conn. Sept.23, 2008) (citing *Helling v. McKinney,* 509 U.S. 25, 35–36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)) (attached to Report–Recommendation as Ex. A). O'Diah authored a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 987726 (N.D.N.Y.)
**(Cite as: 2012 WL 987726 (N.D.N.Y.))**

grievance and provided it to Pepin complaining about his work placement and unconstitutional exposure to ETS just prior to receiving an allegedly false misbehavior report. O'Diah contends that Pepin and Richardson were then ordered to issue this misbehavior report at Cully's instruction, which would seem implausible except for O'Diah's earlier contentions that Cully specifically advised that O'Diah was not permitted to receive a work reassignment order from the medical staff, despite his physical ailments. O'Diah's Eighth Amendment claim regarding the ETS has been deemed sufficient to withstand the present motion. The current standing of that claim, in conjunction with the temporal proximity of the filing of the grievance with the issuance of the misbehavior report, along with the fact that the same defendant that received the grievance also authored the misbehavior report serves as a plausible set of facts to establish that the grievance was a substantial cause in Pepin taking the adverse action.

*10 Similarly, the circumstances surrounding the misbehavior report issued by Hahn and Shaw in June 2008 and Swirek seven weeks later in August 2008 also establish a plausible set of facts for believing that O'Diah's prior filed grievance was the reason for the adverse action. O'Diah filed a grievance seven days before receiving his misbehavior report from Hahn and Shaw and approximately two months before receiving his misbehavior report from Swirek. Additionally, the grievance that O'Diah filed was resolved in his favor, so O'Diah was granted a reimbursement of funds. Lastly, at the disciplinary hearing for the misbehavior report issued by Swirek, O'Diah was found not guilty of any correspondence violations. Given both the grievance and disciplinary hearings findings in O'Diah's favor and temporal proximity between the filing of the grievance, its disposition, and the subsequent filing of the misbehavior reports, dismissal is inappropriate.

Accordingly, defendants' motion on this ground should be denied on these claims.

**2. False Misbehavior Reports**

In this case, O'Diah contends that he had multiple false misbehavior reports lodged against him throughout his incarceration. An inmate has a right not to be deprived of a liberty interest without due process. However, a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)). "There must be more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988)).

In this case, O'Diah contends that he received false misbehavior reports for (1) failing to use his law library pass in November 2007; (2) failing to obey a direct order in March 2008; (3) refusing to take his medication in March 2008; (4) threatening defendants to put him in a new work placement in June 2008; and (5) correspondence violations in June and August, 2008 by Shaw and Hahn and Swierk respectfully. However, O'Diah has only alleged a retaliation claim against defendants Pepin, Richardson, Swierk, Shaw, and Hahn in conjunction with the misbehavior report issued for alleged threats and a correspondence violations, authored in June and August, 2008. As previously discussed, regarding the other five alleged false misbehavior reports, even assuming that O'Diah's grievances was the basis for his retaliation claim, he has failed to sufficiently to allege that the grievance was the motivation for the adverse action. Because O'Diah has failed to state a claim for retaliation, any allegations related to the alleged filing of false misbehavior reports is also inappropriate. However, with respect to the misbehavior report issued by Pepin, Richardson, Hahn, Swierk, and Shaw, O'Diah has sufficiently pled facts sufficient to state a plausible retaliation claim. Accordingly, defendants' motion on that ground should be denied.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 987726 (N.D.N.Y.)
**(Cite as: 2012 WL 987726 (N.D.N.Y.))**

### 3. Retaliatory Transfer

**\*11** "A prisoner has no liberty interest in remaining at a particular correctional facility, but prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights .... " *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998) (citations omitted). [FN14] In order to survive dismissal, an inmate must show "that he engaged in constitutionally protected conduct and ... that conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted). However, "conclusory or general allegations are insufficient to state a claim for conspiracy under § 1983." *Walker v. Jastremski,* 430 F.3d 560, 564 n. 5 (2d Cir.2005) (citations omitted).

> FN14. As previously stated, an inmate has no liberty interest in being housed at the facility of his or her choice. *Davis,* 160 F.3d at 920. Therefore, to the extent that O'Diah claims that his transfers took him further away from his preferred facilities which were closer to his family, such claims are not cognizable under § 1983.

Here O'Diah has failed to allege that his transfers were retaliatory in anything more than general, conclusory terms. O'Diah claims that his transfers were retaliatory but fails to identify in what constitutionally protected conduct he was engaged which provoked the retaliatory response, when that conduct occurred, and how close it was to the time of the transfers. Moreover, O'Diah has failed to present facts showing that his alleged protected conduct was known by the various supervisory defendants or that it served as a motivating factor for his transfers.

Accordingly, defendants' motion on this claim should be granted.

### 4. Access to Courts[FN15]

> FN15. O'Diah also alleges that the defendants discussed *infra* were acting under the influence of Corcoran, Carlsen and Fischer. These are all supervisory defendants for whom dismissal has been recommended *supra* for a lack of personal involvement and infra for a failure to plead conspiracies. Accordingly, the contentions regarding said defendants will not be discussed further here.

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). In order to state a claim for denial of access to the courts, including those premised on interference with legal mail, a plaintiff must allege "that a defendant caused 'actual injury,' i.e. took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.' " *Id.* (*citing Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997) (*quoting Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)). Such injury must affect "a nonfrivolous legal claim [which] had been frustrated or was being impeded due to the actions of prison officials." *Warburton v. Underwood,* 2 F.Supp.2d 306, 312 (W.D.N.Y.1998) (citations omitted); *Shine v. Hofman,* 548 F.Supp.2d 112, 117–18 (D.Vt.2008) (explaining that actual injury "is not satisfied by just any type of frustrated legal claim because the Constitution guarantees only the tools that inmates need in order to attack their sentences ... and ... challenge the conditions of their confinement.") (internal quotation marks and citations omitted). Accordingly, without identification of the underlying action which was prejudiced, actual injury, and by extension a First Amendment violation, cannot be established. *See Christopher v. Harbury,* 536 U.S. 403, 415, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002) ("[T]he underlying cause of action ... is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrat-

Not Reported in F.Supp.2d, 2012 WL 987726 (N.D.N.Y.)
**(Cite as: 2012 WL 987726 (N.D.N.Y.))**

ing the litigation.").

**\*12** O'Diah first alleges that in June 2007, Corcoran impeded his access to the courts. However, O'Diah has failed to plead with any specificity what Corcoran did to preclude his access or what hindrance resulted to O'Diah's pending legal claim. Accordingly, defendants' motion as to this claim should be granted.

O'Diah next claims that in March 2008, Thomas seized his paperwork, including his legal mail, the same day he issued a false misbehavior report and sent O'Diah to keeplock. O'Diah claims that while keeplocked, he was unable to provide his legal paperwork to his legal assistant when he arrived to pick it up at the facility and also was unable to file a response to his case in the Eastern District of New York which was allegedly dismissed for a failure to prosecute. Viewing the facts in the light most favorable to O'Diah, there is nothing to indicate that the federal case pending in the Eastern District was frivolous or meritless. Accordingly, Thomas' actions in blocking delivery of O'Diah's legal papers to be the court resulted in an actual injury as his arguably meritorious case was dismissed. Therefore, defendants' motion as to this claim on this ground should be denied.

Lastly, O'Diah contends that he provided Hahn, Shaw, Swierk and Moscicki his legal mail at various times in June of 2008, but that they intentionally failed to send the mail out. Subsequently, O'Diah's Article 78 case filed in Cayuga County was dismissed. As with the Eastern District case, nothing in the record indicates that O'Diah's court case was meritless or frivolous. Therefore, the dismissal, caused by defendants' failure to mail out O'Diah's response to the court, constituted an actual injury. Accordingly, defendants' motion as to this claim on this ground should be denied.

### D. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1884). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (citations omitted). Thus, "a prisoner may prevail only where he proves both an objective element—that the prison officials' transgression was sufficiently serious—and a subjective element—that the officials acted, or omitted to act, with a sufficiently culpable state of mind ...." *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) (internal quotation marks and citations omitted).

The objective prong can be satisfied by

conditions of confinement ... [which] in combination [constitute an Eighth Amendment violation] when each would not do so alone ... [such as] when the conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets.

**\*13** *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005) (citations omitted). However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* (citing *Wilson v. Seiter,* 501 U.S. 294, 304–05, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). The subjective prong requires "a prison official [to] have a sufficiently culpable state of mind ..., of deliberate indifference to inmate health or safety" *Farmer,* 511 U.S. at 834 (citations omitted).

Not Reported in F.Supp.2d, 2012 WL 987726 (N.D.N.Y.)
**(Cite as: 2012 WL 987726 (N.D.N.Y.))**

**1. Exposure to Environmental Tobacco Smoke ("ETS")**

While "[a]ll exposure to ETS is not unconstitutional; [unwilling] ... exposure to an unreasonably high level of ETS is cognizable as a constitutional violation." *Taylor v. Conway,* No. 06–CV–1329 (SRU), 2008 WL 4371928, at *4 (D.Conn. Sept.23, 2008) (citing *Helling v. McKinney,* 509 U.S. 25, 35–36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)) (attached to Report Recommendation as Ex. A). "Courts have held that inmates were exposed to unreasonable ETS levels when they were forced to share a cell with a heavy smoker." *Id.* (citing cases). Specifically, inmates satisfy the objective prong of the Eighth Amendment test by arguing that they are personally being exposed to unreasonably high levels of ETS which is not only actually causing inmates potential harm and a serious likelihood of injury, but is seen by society as a risk so grave that it offends standards of contemporary decency. *Helling,* 509 U.S. at 35–36. Additionally, to demonstrate the subjective standard the court must assess "the prison authorities' current attitudes and conduct," towards the environment, evaluating whether "prison authorities are ignoring the possible dangers posed by exposure to ETS." *Id.* at 36–37.

In this case, it would appear that O'Diah's employment in a work area, arguably considerably larger than a cell, would expose him to a much less concentrated amount of ETS, thus making his claim meritless. However, viewing the complaint in the light most favorable to O'Diah, he has satisfied the objective prong of the analysis. O'Diah was inundated with cigarette smoke and its byproducts from having constantly to clean cigarette butts and ashes. This led to physical ailments, such as dizziness and elevated blood pressure, which required O'Diah to be sent back from work on multiple occasions.[FN16] Accordingly, these circumstances caused O'Diah potential and actualized harm which was offensive to the risks society chooses to tolerate.

FN16. To the extent that O'Diah claims an unidentified sergeant was deliberately indifferent to his care during his escort to the infirmary in June 2008, such claims are moot as O'Diah has failed to identify or name the individual as a defendant.

Moreover, O'Diah has satisfied the subjective prong by alleging that Cully specifically precluded him from receiving a work program reassignment.[FN17] However, to the extent that O'Diah claims that Pepin also was deliberately indifferent to his needs, such claims are belied by O'Diah's own recitation of the facts. O'Diah contends that it was Pepin that excused him from his work placement and instructed him to report directly to the infirmary for medical treatment. Such actions do not state a plausible claim of indifference.

FN17. O'Diah also claims that other supervisory defendants were aware of his medical condition and had some hand in requiring him to remain in his work placement. However, these vague and conclusory allegations are insufficient to establish personal involvement, as discussed *supra.*

**\*14** Accordingly, defendants' motion on this ground should be denied as to Cully and granted as to Pepin.

**2. Other Conditions of Confinement**

O'Diah claims that Ramsay, Mawhir and Corcoran encouraged inmates to pour cold water onto O'Diah and his property. These actions led him to avoid the recreation yard. These allegations, while inappropriate, do not rise to satisfy either prong of the Eighth Amendment analysis. These alleged occurrences, which were not enumerated or described in any further detail, do not result in the deprivation of a single human need. Additionally, O'Diah's decision

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

not to engage in certain activities cannot be imputed to other defendants. Accordingly, defendants' motion should be granted as to these clams.

O'Diah also claims that an unidentified officer paraded him around the yard shackled and naked. However, O'Diah has failed to name this individual as a defendant and further discussion about the potential constitutional violations which occurred is moot. Accordingly, defendants' motion should also be granted as to this claim.

### 3. Forced Medication

O'Diah alleges that Thomas and Guter, acting at Mawhir's direction, forced O'Diah to take an unknown medication. O'Diah was not provided with the medication's identifying information, the reason for its administration, or the anticipated side effects. The Supreme Court has recognized a constitutional right not to be medicated involuntarily, allowing it in rare instances, with respect to anti-psychotic drugs "solely for trial competence purposes in certain cases." *Sell v. United States,* 539 U.S. 166, 179, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003). There is no indication in the record that the administration of the medication was for these purposes. Therefore O'Diah had a right to refuse to take such medication. After ingesting the medication, O'Diah suffered severe intestinal complications. Accordingly, such allegations suffice to satisfy the plausibility standard that O'Diah's constitutional rights were violated. Accordingly, defendants' motion on this ground should be denied.

### E. Fourteenth Amendment
### 1. Equal Protection

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) ("To prove a violation of the Equal Protection Clause ... a plaintiff

must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.").

> [T]he Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

**\*15** *Vegas v. Artus,* 610 F.Supp.2d 185, 209 (N.D.N.Y.2009) (internal quotation marks and citations omitted).

In this case, O'Diah has offered only a few statements implicating equal protection, though they fail to establish how he was treated differently than other inmates. There are no contentions, and the record does not show, that O'Diah was treated differently by staff than other inmates. All O'Diah offers are a few, vague, conclusory allegations that he was oppressed and discriminated based upon his national origin. These allegations, without more, are insufficient. *See, e.g., John Gil Const., Inc. v. Riverso,* 99 F.Supp.2d 345, 353 (S.D.N.Y.2000) ("[A]ssertions of selective enforcement and racial animus [that] are wholly conclusory and unaccompanied by any supporting factual allegations ... are insufficient to state a claim under either the Equal Protection Clause or 42 U.S.C. § 1983.") (citations omitted). Accordingly, defendants' motion should be granted on this ground.

### 2. Confiscation of Property

O'Diah makes multiple, general complaints about unlawful confiscation of his property. An inmate has a right not to be deprived of property without due process. However, federal courts do not provide redress for the deprivation of property if there is an adequate state court remedy which the plaintiff can pursue.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 987726 (N.D.N.Y.)
**(Cite as: 2012 WL 987726 (N.D.N.Y.))**

*Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). "An Article 78 proceeding permits a petitioner to submit affidavits and other written evidence, and where a material issue of fact is raised, have a trial of the disputed issue, including constitutional claims." *Locurto v. Safir,* 264 F.3d 154, 174 (2d Cir.2001) (citations omitted); *see also* N.Y. C.P.L.R. §§ 7803, 7804; *Campo v. New York City Employees' Ret. Sys.,* 843 F.2d 96, 101 (2d Cir.1988) ("Article 78 ... provides a summary proceeding which can be used to review administrative decisions."). State law also provides that "[a]ny claim for damages arising out of any act done ... within the scope of ... employment and in the discharge of the duties of any officer or employee of the department [of corrections] shall be brought and maintained in the court of claims as a claim against the state." N.Y. Corr. Law § 24(2).

In this case, O'Diah contends that there was an unconstitutional deprivation when his personal property was allegedly confiscated. Such claims fail as a matter of law for several reasons. First, the Article 78 procedure exists and affords an adequate state court remedy. Second, because O'Diah is suing for damages, he must pursue his claims here against New York State in the New York Court of Claims pursuant to Corrections Law § 24. Thus, the correct venue to litigate these claims is in state court.

Accordingly, defendants' motion should be granted as to this claim.

### 3. Disciplinary Dispositions

To the extent O'Diah contends he was denied due process during his disciplinary hearings, such contentions are meritless for multiple reasons. First, such claims run afoul of the "favorable termination" rule of *Heck v. Humphrey,* 512 U.S. 477, 487–87, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). That rule provides that if a determination favorable to the plaintiff in a § 1983 action "would necessarily imply the invalidity of his conviction or sentence," a plaintiff must prove that the conviction or sentence has been reversed on direct

appeal or declared invalid in order to recover damages under § 1983. This rule applies to challenges to procedures used in prison disciplinary proceedings. *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997). There is no evidence that O'Diah's disciplinary determinations were ever vacated. Thus, the *Heck* rule applies and any challenges to those determinations are barred.

**\*16** Additionally, as a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. *See Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life. *Id.* at 484; *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate has been disciplined with a segregated confinement alone is insufficient to establish an atypical and significant deprivation. The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" are to be considered. *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998). The Second Circuit has noted that where the period of segregated confinement exceeds thirty days, "refined fact-finding" is required to resolve defendants' claims under *Sandin. Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000).

To the extent that O'Diah claims any of his disciplinary hearings denied him due process, all of his dispositions were for thirty days. O'Diah does not complain about the conditions of his confinement while serving his sentences but only that the findings of guilt occurred. Given that no confinement exceeded thirty days, no further fact finding is required.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 987726 (N.D.N.Y.)
**(Cite as: 2012 WL 987726 (N.D.N.Y.))**

Therefore, defendants' as to these claims should be granted on these grounds.

### F. Failure to State a Claim

An action commenced pursuant to 42 U.S.C. § 1983 requires proof of the "deprivation of any right[ ], privilege[ ], or immunit[y] secured by the Constitution" or laws of the federal government. 42 U.S.C. § 1983. Thus, no action lies under § 1983 unless a plaintiff has asserted the violation of a federal right. *See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n,* 453 U.S. 1, 19, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981).

### 1. Harassment

O'Diah contends that he was constantly harassed during his incarceration at DOCCS facilities. However verbal threats and harassment, alone, are insufficient to state a constitutional claim. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1996) ("The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly dismissed."); *Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) ( "[V]erbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem does not constitute the violation of any federally protected right and therefore is not actionable under ... § 1983 .").[FN18] Accordingly, defendants' motion should be granted as to all such claims.

> FN18. To the extent that such contentions can be construed to allege that O'Diah should be compensated for defendants' failure to comply with DOCS policies and protocols for investigating grievances, such contentions are also meritless. *Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.1987) ( "State procedural requirements do not establish federal constitutional rights. At most, any violation of state procedural requirements would cre-

ate liability under state law ....").

### 2. Defective Grievance Procedures

**\*17** "Prisoners, including pretrial detainees, have a constitutional right of access to the courts ...." *Bourden v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004) (internal quotation marks omitted) (citing *Bounds v. Smith,* 430 U.S. 817, 821–22, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) (citations omitted) (holding that all prisoners have a well-established Constitutional right to "adequate, effective, and meaningful" access to courts). "[I]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim." *Shell v. Brzezniak,* 365 F.Supp.2d 362, 370 (W.D.N.Y.2005) (citations omitted). However, "[i]f prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim." *Id.* (citations omitted).

In this case, to the extent that O'Diah has proffered generalized complaints about the grievance process as a whole, such claims are insufficient to establish a constitutional violation. Accordingly, defendants' motion on this ground should be granted as to all such claims.

### G. Qualified Immunity

Defendants claim that even if O'Diah's constitutional claims are substantiated, they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov.10, 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 987726 (N.D.N.Y.)
**(Cite as: 2012 WL 987726 (N.D.N.Y.))**

actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry must be discussed with regard to O'Diah's First Amendment access to court and retaliation claims as well as his Eighth Amendment medical indifference claims. As to all other claims, the second prong of the qualified immunity analysis need not be addressed because, as discussed above, even viewing the allegations in the light most favorable to O'Diah, he has failed sufficiently to allege constitutional violations.

**\*18** There is no question that it was well settled on June 7, 2008 that the (1) First Amendment provided inmates with access to the courts and freedom from retaliation, including in the form of a false misbehavior report ( *Bounds v. Smith,* 430 U.S. 817, 824, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) ("[O]ur decisions have consistently required States to shoulder affirmative obligations to assure all prisoners meaningful access to the courts); *Davis v. Goord,* 320 F.3d 346, 352–53 (2d Cir.2003) (evaluating retaliation claim because "the filing of grievances is a constitutionally protected activity.") and (2) Eighth Amendment required that inmates are to be provided "with ... reasonable safety [as i]t is cruel and unusual punishment to hold convicted criminals in unsafe conditions," (*Helling,* 509 U .S. 33 (internal quotation marks and citations omitted)) whether that pertain to their med-

ical care or conditions of confinement. Thus, accepting all of O'Diah's allegations as true, qualified immunity cannot be granted to (1) Thomas, Hahn, Shaw, Swierk or Moscicki for interfering with O'Diah's right of accessto the courts; (2) Cully for O'Diah's dangerous exposure to ETS at his work placement; (3) Thomas, Guter or Mawhir for forcing O'Diah to take unidentified medication; (4) Pepin, Richardson, Cully, Hahn, Shaw and Swierk for retaliating against O'Diah; and (5) Pepin, Richardson, Hahn, Shaw, and Swierk for filing false misbehavior forms. However, defendants' motion should be granted in the alternative on this ground as to all other defendants for all other claims.

### H. Conspiracy[FN19]

> [FN19]. Defendants also assert that any conspiracy claims are effectively barred by the intracorporate conspiracy doctrine. However, because it is recommended herein that defendants' motion as to the conspiracy claim be granted on other grounds, the intracorporate conspiracy doctrine need not be addressed.

In order to support a claim for conspiracy pursuant to § 1985, there must be "(1) an agreement ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. County of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 468 (N.D.N.Y.2009). An agreement must be alleged with specificity as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action is insufficient. *See Iqbal v. Hasty,* 490 F.3d 143, 177 (2d Cir.2007); *see also Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir.1999). Thus, plaintiffs must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 987726 (N.D.N.Y.)
**(Cite as: 2012 WL 987726 (N.D.N.Y.))**

to achieve the unlawful end." *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted). While exact specifics are not required, "the pleadings must present facts tending to show agreement and concerted action." *Anilao v. Spota,* 774 F.Supp.2d 457, 512–13 (E.D.N.Y.2011) (citations omitted). Conclusory, vague, and general allegations are insufficient to support a conspiracy claim. *Ciambriello,* 292 F.3d at 325.

O'Diah alleges that (1) Mawhir, Ramsay, Corcoran and Carlsen all conspired to procure his conviction on disciplinary charges, incite other inmates to assault O'Diah, and issue additional misbehavior reports subsequent to the assaults; (2) Mawhir, Corcoran and Thomas all conspired before issuing the March 2008 misbehavior report; (3) Corcoran, Carlsen, Fischer, Cuomo, and Cully all conspired to put O'Diah in a work placement program which exposed him to dangerous levels of ETS despite prior knowledge of his health conditions; and (4) Shaw, Hahn, Moscicki, Corcoran, Carlsen, Fischer, Pepin, and Cuomo conspired to deny O'Diah of his rights by assisting in the conviction on disciplinary charges he received from his misbehavior report in June 2008. However, none of these alleged conspiracy claims is sufficient to withstand the current motion.

**\*19** Some of O'Diah's underlying claims of constitutional violations have survived the present motion. However, it appears that in addition to the underlying conspiracy claims, O'Diah also alleges a conspiracy between the acting defendants and all of the supervisory defendants employed by DOCCS. These claims are conclusory and fail to establish how, when or why defendants from various correctional facilities and different levels of management colluded and formed these alleged schemes. While specifics are unnecessary, O'Diah fails to provide any plausible information which would lend credence to his claims of an explicit or implicit agreement between any or all of these defendants.

Accordingly, defendants' motion as to the claims of conspiracies should be granted.

## I. ADA Claims

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of ... a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA "applies to inmates in state prisons." *Beckford v. Portuondo,* 151 F.Supp.2d 204, 220 (N.D.N.Y.2001) (citations omitted). To state a claim under the ADA, an inmate must demonstrate that

(1) he or she is a "qualified individual with a disability"; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) [the facility that] provides the service, program or activity is a public entity.

*Clarkson v. Coughlin,* 898 F.Supp. 1019, 1037 (S.D.N.Y.1995); 42 U.S.C. § 12132.

As to the first element, a person is an individual with a qualified disability if "(A) a physical or mental impairment ... substantially limits one or more of the major life activities of such individual, (B) [there is] a record of such an impairment, or (C) [the individual is] being regarded as having such an impairment." 42 U.S.C. § 12102(2)(A)-(C).

To determine if an individual meets any of the above criteria, courts apply a three part test ... First, a plaintiff must show that [he or] she suffers from a physical or mental impairment. Second, the plaintiff must establish that the activity [he or] she alleges to be impaired constitutes a "major life activity." Third, the plaintiff must show that [his or] her impairment "substantially limits" the major life activity previously identified.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 987726 (N.D.N.Y.)
(Cite as: 2012 WL 987726 (N.D.N.Y.))

*Smith v. Masterson,* 538 F.Supp.2d 653, 657 (S.D.N.Y.2008) (internal citations omitted). The Second Circuit has held that it is important to

distinguish[ ] between (I) making reasonable accommodations to assure access to an existing program and (ii) providing additional or different substantive benefits ... [since] the disability statutes do not require that substantively different services be provided to the disabled, no matter how great their need for services may be. They require only that covered entities make "reasonable accommodations" to enable "meaningful access" to such services as may be provided, whether such services are adequate or not.

**\*20** *Wright v. Giuliani,* 230 F.3d 543, 548 (2d Cir.2000) (citations omitted).

In this case, O'Diah has failed sufficiently to allege that he is suffering from any sort of impairment or disability. O'Diah makes conclusory assertions that the ADA is applicable to his case, yet fails to advance from facts detailing what impairment he suffers, how it has impacted him and prevented him from engaging in major life activities, or identifying which major life activities are affected. Additionally, O'Diah has failed to indicate which reasonable accommodations, programs, or services he was denied.

Accordingly, defendants' motion as to the ADA claims on this ground should be granted.

**J. Sections 1985 & 1986**

"Section 1985 prohibits conspiracies to interfere with civil rights." *Davila v. Secure Pharmacy Plus,* 329 F.Supp.2d 311, 316 (D.Conn.2004). To state a claim for relief under § 1985(3), a plaintiff must show:

(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and

(3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

*United Bd. of Carpenters & Joiners of Am., Local 610 v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983). Additionally, a plaintiff "must demonstrate that the defendant ... acted with class-based invidiously discriminatory animus." *Webster v. Fischer,* 694 F.Supp.2d 163, 196 (N.D.N.Y.2010) (citations omitted).

Here, O'Diah does not allege any facts giving rise to a conspiracy. First, O'Diah vaguely asserts conclusory statements relating to an alleged conspiracy among defendants. This is insufficient. *See generally Thomas v. Roach,* 165 F.3d 137, 147 (2d Cir.1999) (granting summary judgment for a § 1985(3) claim where the "assertions were conclusory and vague, and did not establish the existence of an agreement among defendants to deprive [plaintiff] of his constitutional rights."). Second, there has been alleged no facts relating to agreements, or even communications, between the defendants, the purpose of their alleged conspiracy, or an intent by defendants to deprive O'Diah of his civil rights. *See Webb v. Goord,* 340 F.3d 105, 110–11 (2d Cir.2003) ("In order to maintain an action under Section 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end.") (internal quotation marks and citations omitted); *see also Romer v. Morgenthau,* 119 F.Supp.2d 346, 364 (S.D.N.Y.2000) (explaining that a plaintiff "cannot satisfy the conspiracy prong [if] his claims are too general and conclusory to sufficiently plead the meeting of the minds requirement.") (citations omitted). Lastly, O'Diah also fails to allege or establish discriminatory animus other than conclusory allegations that he was oppressed and discriminated against because of his national origin. Such statements are wholly insufficient.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 987726 (N.D.N.Y.)
**(Cite as: 2012 WL 987726 (N.D.N.Y.))**

**\*21** Additionally, if any defendant "ha[d] knowledge that any of the wrongs ... mentioned in section 1985 ... [we]re about to be committed, and ha[d] power to prevent or aid in preventing the commission of the same, [and] neglect[ed] or refuse[d] so to do ..., [he] shall be liable to the party injured." 42 U.S.C. § 1986. However, "[a] claim under section 1986 ... lies only if there is a viable conspiracy claim under section 1985." *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 194 (2d Cir.1994). No such viable claim has been alleged here.

Accordingly, defendants' motion as to this claim should be granted.

**K. Pendent State Law Claims**

O'Diah's complaint also asserts that defendants violated various state laws, however these claims fail as a matter of law. New York Correction Law § 24 provides that

> 1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

> 2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

"Section 24 thus precludes claims against corrections officers brought against them in any court in their personal capacities arising out of the discharge of their duties." *Crump v. Ekpe,* No. 07–CV–1331, 2010 WL 502762, at \*18 (N.D.N.Y. Feb. 8, 2010) (citations omitted) (Attached to this Report–Recommendation as Ex. B). Because a federal court applying pendent jurisdiction is forced to apply state substantive law to a state claim, this would result in inmates being prohibited from advancing such pendent claims along with their federal claims in federal court. *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996).

In 2009, the United States Supreme Court held that § 24 is unconstitutional to the extent that it precludes inmates from pursuing § 1983 actions. However, at least two judges in this District have observed that because *Haywood's* focus is on concerns about civil rights claims and the Supremacy Clause, the decision does not affect the question of whether this Court has proper jurisdiction to hear a pendent state law claim.

*Tafari v. McCarthy,* 714 F.Supp.2d 317, 384 (N.D.N.Y.2010) (internal quotation marks and citations omitted). Accordingly, this district has continued to dismiss state law pendent claims against defendants acting in their personal capacities, discharging their duties, pursuant to the preclusive effects of § 24. *See e.g., Crumpe,* 2010 WL 502762, at \*18.

When determining whether actions fall within the scope of the defendants employment, courts have considered:

> **\*22** the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by any employee; the extent of the departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated.

*Degrafinreid v. Ricks,* 452 F.Supp.2d 328, 333 (S.D.N.Y.2006) (citations omitted). Thus, "an employee will be considered within the scope of his

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 987726 (N.D.N.Y.)
**(Cite as: 2012 WL 987726 (N.D.N.Y.))**

employment so long as he is discharging his duties no matter how irregularly, or with what disregard of instructions." *Id.* (citations omitted). Accordingly, even in cases where alleged excessive force was used in frisking or searching a cell, or where negligence was alleged in the provision of medical care, such actions are still defined to be within an employee's duties. *Id.* (citations omitted); *see also Crump,* 2010 WL 502762, at *18 (listing DOCCS employee duties to include "determinations to administratively confine plaintiff to SHU, to issue a misbehavior report, the conduct of the disciplinary hearing, and the determination that plaintiff was guilty of the charges alleged," and explaining that while actions "exceeding the scope of the corrections officer's authority ...." may give rise to a constitutional violation, such actions are still precluded pursuant to § 24).

With respect to the defendants, all of their purported actions fell within their assigned duties. These duties include filing and adjudicating misbehavior reports, supervising inmates at their work placements, receiving grievances and handling the mail, and providing medical care. Thus, § 24 prohibits the advancement of any pendent state law claims. While these defendants actions, or inactions, may be cited as the alleged cause of a constitutional violation, their conduct was nevertheless protected by § 24.

Accordingly, defendants' motion on this ground as to such claims should be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion to dismiss the amended complaint (Dkt. No. 66) be:

1. **DENIED** as to O'Diah's claims of:

A. Denial of access to courts against defendants Thomas, Hahn, Shaw, Swierk and Moscicki;

B. Medical indifference against defendants Cully, Thomas, Guter, and Mawhir;

C. Retaliation against defendants Pepin, Richardson, Cully, Hahn, Shaw and Swierk; and

D. Filing of false misbehavior reports against defendants Pepin, Richardson, Hahn, Shaw and Swierk; and

2. **GRANTED** as to all other claims and all other moving defendants.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**\*23** [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

N.D.N.Y.,2012.
O'Diah v. Fischer
Not Reported in F.Supp.2d, 2012 WL 987726 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Raymond ROBLES, Plaintiff,
v.
K. BLEAU, Correctional Officer, Riverview C.F.;
Peacock, Correctional Sergeant, Riverview C.F.; R.
Varkiar, Senior Counsel, Riverview C.F.; and New
York State Dep't of Corr. Servs., Defendants.

No. 9:07-CV-0464.
Oct. 22, 2008.

Raymond Robles, Cape Vincent, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the
State of New York, David L. Cochran, Esq., of
Counsel, New York, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**\*1** This *pro se* civil rights action, brought pursuant to 42 U.S.C. § 1983, was referred to the Hon. George H. Lowe, United States Magistrate Judge, for a Report-Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

The Report-Recommendation dated September 12, 2008 recommended that Defendants motion to dismiss be granted in part and denied in part. Specifically, Judge Lowe recommended that Plaintiff's Fourteenth Amendment procedural due process claim against Defendant Varkiar regarding his disciplinary hearing be dismissed if, within thirty (30) days from the filing of this Final Order, Plaintiff does not file an Amended Complaint that successfully states a Four-

teenth Amendment procedural due process claim. It was recommended that Plaintiff's remaining claims be dismissed with prejudice.

Plaintiff filed objections to the Report-Recommendation, essentially raising the same arguments presented to the Magistrate Judge.

When objections to a magistrate judge's Report-Recommendation are lodged, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

Having reviewed the record *de novo* and having considered the issues raised in the Plaintiff's objections, this Court has determined to accept and adopt the recommendation of Magistrate Judge Lowe for the reasons stated in the Report-Recommendation.

It is therefore

**ORDERED** that Defendants motion to dismiss be **GRANTED** in part and **DENIED** in part.

**IT IS SO ORDERED.**

*REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me by the Honorable Thomas J. McAvoy, Senior United States District Judge, for Report and Recommendation with regard to any dispositive mo-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

tions filed, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Generally, in his Complaint, Raymond Robles ("Plaintiff") alleges that three employees of the New York State Department of Correctional Services ("DOCS"), as well as DOCS itself, violated his rights under the Eighth and Fourteenth Amendments when they (1) required him to submit to a random urinalysis test when they knew he was taking a medication that would prevent him from providing a urine sample, and (2) charged, convicted, and punished him with eighty-seven days in a Special Housing Unit for refusing to provide a urine sample. (*See generally* Dkt. No. 1 [Plf.'s Compl.].) Currently pending before the Court is Defendants' motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 16.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND

### A. Summary of Plaintiff's Complaint

*2 As Defendants correctly observe in their Memorandum of Law, Plaintiff's Complaint-which describes the events giving rise to his claims in two brief paragraphs without identifying any role played by Defendants in those events-is hardly a model of *fair notice* under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 1, ¶¶ 6-7 [Plf.'s Compl.].) However, as explained below in Part II of this Report-Recommendation, the mandate to read the papers of *pro se* civil rights litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.FN1 Here, I find that the factual allegations contained in Plaintiff's Response Affidavit are consistent with the factual allegations of his Complaint. As a result, in construing Plaintiff's Complaint, I will consider his Response Affidavit as effectively amending the factual allegations of his Complaint.

Thus construed, Plaintiff's Complaint alleges as follows:

1. On November 6, 2006, at about 7:28 a.m., Plaintiff was directed to report to the drug testing center at Riverview C.F.; FN2

2. Upon arriving at the drug testing center, Plaintiff was informed by Correctional Officer K. Bleau ("Defendant Bleau") that he had been randomly selected to submit to urinalysis drug testing; FN3

3. Defendant Bleau asked Plaintiff if he would provide a urine sample, and Plaintiff responded yes; FN4

4. Defendant Bleau then asked Plaintiff if he was taking any medications, and Plaintiff explained that (1) yes, he was taking Flomax and Omeprazole due to a prostate condition and a stomach problem, and (2) "d[ue] to the medication [s]" and the fact that he had used the bathroom at approximately 7:10 a.m. that morning, he would need more water in order to urinate; FN5

5. As Plaintiff was explaining these facts to Defendant Bleau, Defendant Bleau became upset and walked away from Plaintiff; FN6

6. When he returned, Defendant Bleau then informed Plaintiff that, pursuant to DOCS Directive 4937, Plaintiff had three hours provide a urine sample or he would be considered to be refusing to provide the urine sample; FN7

7. Defendant Bleau then gave Plaintiff a cup of water at approximately 7:30 a.m., and a second cup of water at approximately 9:30 a.m., but did not give him a third cup of water at approximately 8:30 a.m., as required by Part D.4. of DOCS Directive 4937; FN8

8. At approximately 10:30 a.m., Plaintiff was still

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

unable to provide a urine sample; [FN9]

9. At that time, Defendant Bleau notified Correctional Sergeant Peacock ("Defendant Peacock") that Plaintiff was refusing a direct order to provide a urine sample; [FN10]

10. When Plaintiff tried to explain to Defendant Peacock that his medical condition prevented him from providing the urine sample, Defendant Peacock responded, "Shut up and put [your] hands behind [your] back"; [FN11]

**\*3** 11. Both Defendants Bleau and Peacock failed to investigate or inquire as to why Plaintiff had been prescribed Flomax and Omeprazole, or what the potential side effects of those drugs were, although that information was readily obtainable from medical staff at Riverview C.F.; [FN12]

12. Instead, Defendants Bleau and/or Peacock escorted Plaintiff to the Riverview C.F. Special Housing Unit ("S.H.U."); [FN13]

13. On November 7, 2006, at about 8:55 a.m., while Plaintiff was in S.H.U., he was served with a copy of a misbehavior report authored by Defendant Bleau, charging him with (1) failing to comply with the urinalysis testing procedure, and (2) refusing a direct order to provide a urine sample; [FN14]

14. On November 10, 2006, Senior Correctional Counselor R. Varkiar conducted Plaintiff's disciplinary hearing on the misbehavior report; [FN15]

15. At the hearing, when Plaintiff entered a plea of "Not guilty, with an explanation," Defendant Varkiar gave Plaintiff "an opportunity to explain [him] self"; [FN16]

16. Plaintiff explained that he had a medical condition that prevented him from providing a urine

sample, that he had attempted to inform Defendant Bleau of this medical condition (but Defendant Bleau walked away from Plaintiff), and that he had attempted to inform Defendant Peacock of this medical condition (but Defendant Peacock told Plaintiff to "[s]hut up"); [FN17]

17. Defendant Varkiar then made a telephone call; when he was done with the call, he told Plaintiff that (1) he had called the medical unit at Riverview C.F. to ask whether or not the medication that Plaintiff was taking would prevent him from urinating, and (2) someone in the medical unit had responded that no, the medication should not prevent Plaintiff from urinating; [FN18]

18. Plaintiff then attempted to explain to Defendant Varkiar *why* he was taking one of the medications, specifically, to remedy a prostate problem that itself interfered with his ability to urinate; [FN19]

19. However, Defendant Varkiar failed to call back the person in the medical unit at Riverview C.F. and request that he or she again answer the question he had posed before, taking into account Plaintiff's prostate condition as shown by his medical records; [FN20]

20. As a result, Defendant Varkiar found Plaintiff guilty of both disciplinary charges, and sentenced him to ninety (90) days in S.H.U ., with a corresponding loss of privileges; [FN21]

21. At the conclusion of the hearing, Plaintiff received a written copy of the hearing disposition, which stated that the evidence relied on included (1) the statements in the written misbehavior report of Defendant Bleau (which Defendant Varkiar stated were credible), and (2) Plaintiff's own hearing testimony (which Defendant Varkiar stated was not credible); [FN22]

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

22. On November 27, 2006, Plaintiff appealed his conviction to DOCS Director of Special Housing, Donald Selsky, who reversed the conviction on January 19, 2007;[FN23] and

**\*4** 23. On February 1, 2007, Plaintiff was finally released from S.H.U., after spending eighty-seven (87) days there.[FN24]

It should be noted that, in addition to asserting constitutional claims against Defendants Bleau, Peacock, and Varkiar in their individual or personal capacities, Plaintiff's Complaint asserts a constitutional claim also against DOCS itself. It should also be noted that, as relief for Defendants' actions, Plaintiff requests money damages but no injunctive relief.[FN25]

**B. Summary of Grounds in Support of Defendants' Motion**

Generally, Defendants' motion to dismiss for failure to state a claim is premised on two grounds: (1) Plaintiff's claim against DOCS is barred by the Eleventh Amendment; and (2) the allegations of Plaintiff's Complaint are too lacking in detail to give Defendants *fair notice* under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 16, Part 2, at 2-5 [Defs.' Memo. of Law].)

**II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM**

Under Fed.R.Civ.P. 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2);[FN26] or (2) a challenge to the legal cognizability of the claim.[FN27]

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2)

[emphasis added]. By requiring this "showing," Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests."[FN28] The main purpose of this rule is to "facilitate a proper decision on the merits."[FN29] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims."[FN30]

The Supreme Court has long characterized this pleading requirement under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement.[FN31] However, it is well established that even this liberal notice pleading standard "has its limits."[FN32] As a result, several Supreme Court decisions, and Second Circuit decisions, exist holding that a pleading has failed to meet this liberal notice pleading standard.[FN33]

Most notably, in the recent decision of *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. 544, ---- - ----, 127 S.Ct. 1955, 1968-69, 167 L.Ed.2d 929 (2007).[FN34] Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the Fed.R.Civ.P. 8 "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74.

**\*5** More specifically, the Court reasoned that, by requiring that a pleading "show[ ] that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2) requires that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. *Id.* at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading contain at least "some factual allegation[s]." *Id.* [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]" assuming, of course, that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id.*

As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Twombly* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Twombly* ).[FN35] The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is be assessed generously, in light of the special solicitude normally afforded *pro se* litigants).[FN36]

It should be emphasized that Fed.R.Civ.P. 8's plausibly standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [citation omitted]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Twombly*-that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley v. Gib-*

*son,* 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever.[FN37] There must still be enough fact alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor."[FN38] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*"[FN39] In other words, as stated above, while all pleadings are to be construed liberally under Fed.R.Civ.P. 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality .[FN40]

**\*6** For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.[FN41] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest."[FN42] Furthermore, when addressing a *pro se* complaint, generally a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."[FN43] Of course, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it."[FN44] In addition, granting a *pro se* plaintiff an opportunity to amend is not required where the plaintiff

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

has already been given a chance to amend his pleading.[FN45]

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit very recently observed),[FN46] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[FN47] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[FN48] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended."[FN49]

### III. ANALYSIS

### A. Whether Plaintiff's Claim Against DOCS is Barred by the Eleventh Amendment

For the reasons offered by Defendants in their Memorandum of Law, I agree with them that Plaintiff's constitutional claims against Defendant DOCS are barred by the Eleventh Amendment to the United States Constitution. (Dkt. No. 16, Part 2, at 2-3 [Defs.' Mem. of Law].) In the interest of brevity, I will not repeat the well-established points of law that they correctly cite in support of their argument. Instead, I will only add three points that Defendants do *not* make in their succinct argument: (1) where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case (or claim), and "the case [or claim] *must* be stricken from the docket";[FN50] (2) Plaintiff's civil rights claims against Defendant DOCS (an entity) are barred also by the express language of 42 U.S.C. § 1983, which confers liability upon only any *"person* who ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights,

privileges, or immunities secured by the Constitution and laws .... "[FN51]; and (3) because the defect with this claim is substantive rather than merely formal, better pleading will not cure it, and thus it should be dismissed with prejudice.[FN52]

***7** For all of these reasons, I recommend that the Court dismiss with prejudice Plaintiff's claims against Defendant DOCS.

It should be noted that, in addition to barring Plaintiff's constitutional claims against Defendant DOCS, the Eleventh Amendment would also bar any claim by Plaintiff against Defendants Bleau, Peacock and Varkiar in their official capacities.[FN53] However, because I do not even liberally construe Plaintiff's Complaint (and Response Affidavit) as asserting such claims, no need exists to recommend the dismissal of those claims. (*See generally* Dkt. No 1, 17.)

### B. Whether the Allegations of Plaintiff's Complaint Are Too Lacking in Detail to Give Defendants *Fair Notice* under Fed.R.Civ.P. 8(a)(2)

For the reasons offered by Defendants in their Memorandum of Law, I agree with them that Plaintiff's Complaint-when considered alone-is too lacking in detail to give Defendants the fair notice that is required under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 16, Part 2, at 3-5 [Defs.' Mem. of Law].) However, as explained above in Part II of this Report-Recommendation, the mandate to read the papers of *pro se* civil rights litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.[FN54] Here, when construing Plaintiff's Complaint together with his Response Affidavit, I find that Plaintiff's allegations *are* detailed enough to give Defendants the fair notice that is required under Fed.R.Civ.P. 8(a)(2). *See, supra,* Part I.A. of this Report-Recommendation.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

However, this does not end the Court's analysis of Plaintiff's Complaint because, even where a defendant has not advanced a certain argument on a motion to dismiss in a *pro se* prisoner civil rights case, a district court may (and, indeed, has a duty to) *sua sponte* address whether the pleading in such a case has successfully stated a claim upon which relief may be granted.[FN55] Here, Plaintiff's Complaint is plagued by several defects (some substantive and some formal)[FN56] that simply cannot be overlooked.

**C. Whether Plaintiff Has Stated an Actionable Claim Against Defendants Bleau, Peacock and Varkiar Arising Out of Plaintiff's Being Required to Provide a Urine Sample Given Their Knowledge of His Medications and/or Medical Condition**

Among Plaintiff's claims is a claim that "[i]t is neither lawful nor [ ] reasonable to expect an Inmate to perform a bodily function on command when you know or should know that his medical condition and prescribed treatment plan indicate that when he urinates[,] and when he [can] not[,] can be beyond his control." (Dkt. No. 17, at 5 [Plf.'s Response Affid.].) I liberally construe this claim as one of harassment or perhaps inadequate-prison-conditions under the Eighth Amendment. (To the extent that this allegation is also used to support a procedural due process claim under the Fourteenth Amendment, I address that claim below in Parts III.D. and III.E. of this Report-Recommendation.)

**\*8** The problem with Plaintiff's Eighth Amendment claim is that the rather detailed facts alleged by him in support of that claim do not suggest in any way that any of the three individual Defendants were acting with the sort of mental state that is required for them to incur liability under the Eighth Amendment, namely, *deliberate indifference*. Deliberate indifference is a state of mind akin to *criminal recklessness,* which involves *knowing* of and disregarding an excessive risk to inmate health or safety.[FN57] Here, Plaintiff himself alleges that the three individual Defendants

did not in fact *understand* that he could not urinate due to his prostate condition. Indeed, as he was trying to explain his medical condition to Defendants, (1) Defendant Bleau became angry and "walked away" from Plaintiff, (2) Defendant Peacock told Plaintiff to "[s]hut up," and (3) Defendant Varkiar failed to call back the person in the medical unit of Riverview C.F. and ask him or her to report (to Varkiar) the impact of Plaintiff's prostate condition on his ability to urinate. *See, supra,* Part I.A. of this Report-Recommendation.[FN58]

At its heart, Plaintiff's Eighth Amendment claim alleges that the three individual Defendants *should have known* that he could not urinate during the time in question due to his enlarged prostate, but that they did not know that fact because they *failed to investigate* the nature and effects of his prostate condition. In other words, his Eighth Amendment claim is one of *negligence.* Such a claim is simply not actionable under the Eighth Amendment (or any constitutional provision). As is often observed, "[D]eliberate indifference describes a state of mind more blameworthy than negligence."[FN59] Finally, because the defect with this detailed claim is substantive rather than merely formal, I find that better pleading will not cure it.[FN60]

For all of these reasons, I recommend that the Court dismiss with prejudice Plaintiff's Eighth Amendment claim.

**D. Whether Plaintiff Has Stated an Actionable Claim Against Defendants Bleau and Peacock Arising Out of His Receipt of an Erroneous or False Misbehavior Report**

It is well established that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 [2d Cir.1986] ).[FN61] Rather, the only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when there is "more,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

such as retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862; *accord, Murray v. Pataki,* 03-CV-1263, 2007 U.S. Dist. LEXIS 26959, at *26, 2007 WL 965345 (N.D.N.Y. March 5, 2007) (Treece, M.J.) [citations omitted].

Here, Plaintiff alleges no actionable conduct regarding his being issued the misbehavior report in question, such as retaliation against him for exercising a constitutional right. *See, supra,* Part I.A. of this Report-Recommendation. Moreover, because the defect with this detailed claim is substantive rather than merely formal, I find that better pleading will not cure it.[FN62]

**\*9** For these reasons, I recommend that the Court dismiss with prejudice Plaintiff's Fourteenth Amendment false-misbehavior-report claim.

**E. Whether Plaintiff Has Stated an Actionable Claim Against Defendant Varkiar Arising Out of Plaintiff's Erroneous or Unjustified Disciplinary Conviction**

"[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient .... " *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). With regard to the first question, in 1995, the Supreme Court held in *Sandin v. Connor* that liberty interests protected by the Fourteenth Amendment's Due Process Clause will not arise from the use of mandatory language of a particular state law or regulation, but "will generally be limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. 472, 483-484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

Here, Plaintiff alleges that the disciplinary hearing conducted by Defendant Varkiar resulted in a sentence of eighty-seven (87) days in the Riverview C.F. S.H.U. with a corresponding loss of privileges. *See, supra,* Part I.A. of this Report-Recommendation. Numerous district courts in this Circuit have issued well-reasoned decisions finding no atypical and significant hardship experienced by inmates who served sentences in S.H.U. of far more than the eighty-seven (87) days alleged here-even where the conditions of confinement in the S.H.U. were, to varying degrees, more restrictive than those in the prison's general population.[FN63] As a result, I find that Plaintiff has not alleged facts plausibly suggesting that he possessed, during the disciplinary hearing, a liberty interest that was protected by the Fourteenth Amendment.

However, such a finding leads only to a recommendation that this claim be dismissed *without* prejudice. This is because it is conceivable to me that Plaintiff's Complaint and Response Affidavit-which are silent with regard to the conditions of confinement he experienced in the Riverview C.F. S.H.U.-may be amended so as to allege facts plausibly suggesting that those conditions were so restrictive as to impose on Plaintiff an *atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life* (thus conferring on him a protected liberty interest under the Fourteenth Amendment).

I should also point out that, even assuming (for the sake of argument) that Plaintiff possessed a protected liberty interest with regard to his disciplinary hearing, I find that he has alleged facts plausibly suggesting that he was, in fact, given all the process that he was due under the circumstances. Specifically, Plaintiff alleges that he was given the following: (1) timely notice of the misbehavior report: (2) an "opportunity to explain [him]self" at his disciplinary hearing; (3) a written disciplinary hearing disposition; (4) a disciplinary hearing disposition that was based on at least some evidence (e.g., his own hearing testimony, which Defendant Varkiar found to be not

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

credible); and (5) an opportunity to appeal the disciplinary hearing disposition (which he did so successfully). *See, supra,* Part I.A. of this Report-Recommendation.

**\*10** Of course, the defect that Plaintiff alleges occurred at his disciplinary hearing was Defendant Varkiar's failure to use the telephone to call back the person in the medical unit at Riverview C .F. and request that he or she again answer the question of whether Plaintiff was physically unable to urinate, taking into account his prostate condition as shown by his medical records. *Id.* Generally, it is not the duty of an impartial hearing officer to conduct an investigation of the merit of the disciplinary charges against an inmate; rather, the duty of a hearing officer is merely to review the evidence presented to him at the disciplinary hearing, and in *certain circumstances* identify defense witnesses for the inmate.[FN64] Here, I find that Plaintiff has alleged no circumstances conferring on Defendant Varkiar a duty to call back the medical unit at Riverview C.F. For example, I find that Plaintiff's Complaint and Response Affidavit are devoid of any allegation that, at his disciplinary hearing, he requested and was denied an adjournment of the hearing so that, with the help of a legal assistant, he could obtain his medical records and call as a witness a member of the medical unit, in order that he himself could introduce testimony that his prostate condition prevented him from urinating during the time in question. *See, supra,* Part I.A. of this Report-Recommendation. However, again, such a finding leads only to a recommendation that this claim be dismissed *without* prejudice, because it is conceivable to me that Plaintiff's Complaint and Response Affidavit may be amended to allege facts plausibly suggesting that, at his disciplinary hearing, he made, and was denied, such a request.

For these reasons, I recommend that the Court dismiss Plaintiff's Fourteenth Amendment procedural due process claim regarding his disciplinary hearing if, within thirty (30) days from the date of the Court's

final Order on this Report-Recommendation, Plaintiff does not file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim regarding his disciplinary hearing.

Finally, two points bear mentioning. First, to the extent that Plaintiff is attempting to allege that his procedural due process rights were violated at his disciplinary hearing also because Defendant Bleau violated Part D.4. of DOCS Directive 4937 by giving Plaintiff only two cups of water during the three-hour period in question, that allegation is not actionable under the circumstances. Section 1983 provides, in pertinent part, "Every person who ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by *the Constitution and laws,* shall be liable to the party injured ...." 42 U.S.C. § 1983 [emphasis added]. The term "the Constitution and laws" refers to the United States Constitution and *federal* laws.[FN65] A violation of a state law or regulation, *in and of itself,* does not give rise to liability under 42 U.S.C. § 1983.[FN66] Furthermore, the violation of a DOCS Directive, alone, is not even a violation of New York State law or regulation; [FN67] this is because a DOCS Directive is "merely a system the [DOCS] Commissioner has established to assist him in exercising his discretion," which he retains, despite any violation of that Directive.[FN68]

**\*11** Second, in making the above recommendation (that Plaintiff be required to file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim regarding his disciplinary hearing, upon penalty of dismissal), I am in no way "issuing specific instructions [to Plaintiff] mandating the content and format of the putative amended complaint"-instructions that the Second Circuit recently found erroneous in the case of *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at \*6 (2d Cir. Aug.12, 2008). Rather, I am merely reporting my finding that Plaintiff's current

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

Fourteenth Amendment procedural due process claim regarding his disciplinary hearing fails to state a claim upon which relief might be granted, as pleaded.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 16) be **GRANTED in part** and **DENIED in part** in the following respects:

(1) Plaintiff's Fourteenth Amendment procedural due process claim against Defendant Varkiar regarding his disciplinary hearing be **DISMISSED** if, within thirty (30) days from the date of the Court's final Order on this Report-Recommendation, Plaintiff does not file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim regarding his disciplinary hearing; and

(2) The other claims asserted in Plaintiff's Complaint (as effectively amended by his Response Affidavit) be **DISMISSED** with prejudice, and without condition.

**ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on** *de novo* **review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.** [FN69]

**BE ALSO ADVISED that the failure to file**

**timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

FN30. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion), *accord, Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* 98-CV-0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

FN1. *See, infra,* note 41 of this Report-Recommendation (citing cases).

FN2. (Dkt. No. 17, at 4 [Plf.'s Response Affid.].)

FN3. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.].)

FN4. (Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 8 [Ex. 1 to Plf.'s Response Affid., attaching completed form entitled, "Request for Urinalysis Test"].)

FN5. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 8 [Ex. 1 to Plf.'s Response Affid., attaching completed form entitled, "Request for Urinalysis Test"]; Dkt. No. 17, at 14 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

FN6. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 14 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

FN7. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 10 [Ex. 3 to Plf.'s Response Affid ., attaching page from DOCS Directive 4937].)

FN8. (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 4, 5 [Plf.'s Response Affid.]; Dkt. No. 17, at 10 [Ex. 3 to Plf.'s Response Affid., attaching page from DOCS Directive 4937].)

FN9. (Dkt. No. 1, ¶¶ 6-7 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf .'s Response Affid.]; Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid., attaching Inmate Misbehavior Report].)

FN10. (Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid., attaching Inmate Misbehavior Report].)

FN11. (Dkt. No. 17, at 5 [Plf.'s Response Affid.].)

FN12. (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 4, 5 [Plf.'s Response Affid.]; Dkt. No. 17, at 9 [Ex. 2 to Plf.'s Response Affid., attaching page of his Ambulatory Health Record].)

FN13. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt.

No. 17, at 5 [Plf.'s Response Affid.].)

FN14. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid ., attaching Inmate Misbehavior Report].)

FN15. (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

FN16. (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

FN17. (*Id.*)

FN18. (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition; Dkt. No. 17, at 15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

FN19. (Dkt. No. 17, at 2-3 [Plf.'s Response Affid.]; Dkt. No. 17, at 14-15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006]; Dkt. No. 17, at 17 [Ex. 6 to Plf.'s Response Affid., attaching page of information about Flomax].)

FN20. (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 17 [Ex. 6 to Plf.'s Response Affid ., attaching page of information about Flomax].)

FN21. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

FN22. (Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition]; Dkt. No. 17, at 3 [Plf.'s Response Affid.].)

FN23. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3-4 [Plf.'s Response Affid.]; Dkt. No. 17, at 15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006]; Dkt. No. 17, at 16 [Ex. 8 to Plf.'s Response Affid., attaching Donald Selsky's Review of Superintendent's Hearing, issued on January 19, 2007].)

FN24. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 2 [Plf.'s Response Affid.].)

FN25. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.].)

FN26. *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

FN27. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5, 2004 WL 2613993 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30,

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

2002) (identifying two sorts of arguments made on a Rule 12[b] [6] motion-one aimed at the sufficiency of the pleadings under Rule 8 [a], and the other aimed at the legal sufficiency of the claims).

FN28. *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz,* 534 U .S. at 512 [citation omitted]; *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) [citation omitted].

FN29. *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

FN31. *See, e.g., Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

FN32. 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

FN33. *See, e.g., Bell Atlantic Corp. v.*

*Twombly,* 550 U.S. 544, ---- - ----, 127 S.Ct. 1955, 1964-1974, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement), *accord, Dura Pharmaceuticals,* 125 S.Ct. at 1634-1635, *Christopher v. Harbury,* 536 U.S. 403, 416-422, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002)* (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

FN34. The Court in *Twombly* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
(Cite as: 2008 WL 4693153 (N.D.N.Y.))

minimum standard of adequate pleading to govern a complaint's survival." *Twombly,* 127 S.Ct. at 1969.

FN35. *See, e.g., Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim up relief that is plausible on its face.' ") [citation omitted]; *Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at *14, 2008 WL 269100 (2d Cir. Feb. 1, 2008) (in civil rights action, stating that "*Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....' ") [internal citation omitted]; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98, n. 2 (2d Cir.2007) ("We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (in prisoner civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" ) [emphasis in original].

FN36. *See, e.g., Jacobs v. Mostow,* 281 F. App'x 85, 87 (2d Cir. March 27, 2008) (in pro se action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim up relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c][1] ); *Boykin v. KeyCorp.,* 521 F.3d 202, 215-16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently pre-

sented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

FN37. For example, in *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the prisoner "substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under Fed.R.Civ.P. 8 and *Twombly,* all that is required is a "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18 months was "endangering [his] life" and that he was "still in need of treatment for [the] disease." *Id.* at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the second

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
(Cite as: 2008 WL 4693153 (N.D.N.Y.))

element. *Id.* at 2199-2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e .g., Rose v. Alvees,* 01-CV-0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept.9, 2004); *Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan.23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99-CV-3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

FN38. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

FN39. *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

FN40. *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] *pro se* complaint ... must be held to less stringent standards than formal pleadings drafted by lawyers ....") [internal quotation

marks and citation omitted]; *McEachin v. McGinnis,* 357 F.3d 197, 200 (2d Cir.2004) ("[W]hen the plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations.") [citation omitted].

FN41. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

FN42. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

FN43. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

FN44. *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted].

FN45. *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2, n. 14 (N.D.N.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5, n. 34 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4, n. 30 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Goros v. Cent. Office Review Comm.,* 03-CV-0407, 2006 WL 2794415, at *5, n. 18 (N.D.N.Y. Sept., 26, 2006) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Williams v. Weaver,* 03-CV-0912, 2006 WL 2799417, at *4, n .16 (N.D.N.Y. Sept. 26, 2006) (Kahn, J., adopting re-

port-recommendation of Lowe, M.J.).

FN46. *See Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

FN47. *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

FN48. *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

FN49. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *Di-Projetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007)

(Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

FN50. *McGinty v. State of New York,* 251 F.3d 84, 100 (2d Cir.2001) [citation omitted]; *see also* Fed.R.Civ.P. 12(h)(3).

FN51. 42 U.S.C. § 1983 [emphasis added].

FN52. *See, supra,* note 44 of this Report-Recommendation.

FN53. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ( "[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities."); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

against the official's office.... As such, it is no different from a suit against the State itself.... We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Kentucky v. Graham,* 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity."); *see also Holloway v. Selsky,* 05-CV-0501, 2007 WL 433375, at *4 (N.D.N.Y. Feb.6, 2007) (Sharpe, J.) [citing cases].

FN54. *See, infra,* note 41 of this Report-Recommendation (citing cases).

FN55. The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ....“

FN56. As explained above in Part II of this Report-Recommendation, a dismissal for failure to state a claim may be based not only on a successful challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2),

but also on a successful challenge to the legal cognizability of the claims asserted in the pleading. *See, supra,* notes 26 and 27 of this Report-Recommendation.

FN57. *Farmer v. Brennan,* 511 U.S. 825, 827, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for "deliberate indifference" under the Eighth Amendment."); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness ....") [citation omitted]; *accord, Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *17, n. 98 (N.D.N.Y. Sept.26, 2007) (Kahn, J.), *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *15, n. 124 (N.D.N.Y. Jan.23, 2007) (Kahn, J.), *Salaam v. Adams,* 03-CV-0517, 2006 WL 2827687, at *10, n. 59 (N.D.N.Y. Sept.29, 2006) (Kahn, J.).

FN58. In addition, it is worth noting that Plaintiff's explanation to Defendant Bleau consisted of a statement that Plaintiff could not urinate because of his prostate *medication,* not because of his prostate *condition.*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

*See, supra,* Part I.A. of this Report-Recommendation. As a result, Defendant Bleau would not have become *aware* of the reason for Plaintiff's inability to urinate (which Plaintiff now alleges was his prostate *condition,* not his prostate *medication* ), even if Defendant Bleau had remained in Plaintiff's presence and listened to his explanation.

FN59. *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence."); *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Murphy v. Grabo,* 94-CV-1684, 1998 WL 166840, at *4 (N.D.N.Y. Apr.9, 1998) (Pooler, J .) ("Deliberate indifference, whether evidenced by [prison] medical staff or by [prison] officials who allegedly disregard the instructions of [prison] medical staff, requires more than negligence.... Disagreement with prescribed treatment does not rise to the level of a constitutional claim.... Additionally, negligence by physicians, even amounting to malpractice, does not become a constitutional violation merely because the plaintiff is an inmate.... Thus, claims of malpractice or disagreement with treatment are not actionable under section 1983.") [citations omitted].").

FN60. *See, supra,* note 44 of this Report-Recommendation.

FN61. *Accord, Lugo v. Van Orden,* 07-CV-0879, 2008 U.S. Dist. LEXIS 56707, at *7, 2008 WL 2884925 (N.D.N.Y. July 23, 2008) (McAvoy, J.); *Darvie v. Countryman,* 08-CV-0715, 2008 U.S. Dist. LEXIS 60931, 2008 WL 3286250 (N.D.N.Y. Aug. 7, 2008) (Sharpe, J.), *adopting* 2008 U.S. Dist. LEXIS 52797, at *18, n. 5, 2008 WL 2725071 (N.D.N.Y. July 10, 2008) (Lowe, M.J.); *Anderson v. Banks,* 06-CV-0625, 2008 U.S. Dist. LEXIS 60896, at *16-17, 2008 WL 3285917 (N.D.N.Y. May 19, 2008) (Homer, M.J.), *adopted by* 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 6, 2008) (Sharpe, J.); *Stewartson v. Almstead,* 04-CV-1097, 2008 U.S. Dist. LEXIS 22178, at *7, 2008 WL 783367 (N.D.N.Y. March 20, 2008) (McAvoy, J.); *McEachin v. Goord,* 06-CV-1192, 2008 U.S. Dist. LEXIS 27479, at *12, 2008 WL 1788440 (N.D.N.Y. Feb. 8, 2008) (Treece, M.J.), *adopted by* 2008 U.S. Dist. LEXIS 31879, 2008 WL 1788440 (N.D.N.Y. Apr. 17, 2008) (Hurd, J.); *Murray v. Pataki,* 03-CV-1263, 2007 U.S. Dist. LEXIS 26959, at *27, 2007 WL 965345 (N.D.N.Y. March 5, 2007) (Treece, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 23065, 2007 WL 956941 (N.D.N.Y. March 29, 2007) (Kahn, J.); *Madera v. Goord,* 103 F.Supp.2d 536, 542 (N.D.N.Y.2000) (Kahn, J., adopting Report-Recommendation by Di Bianco, M.J.).

FN62. *See, supra,* note 44 of this Report-Recommendation.

FN63. *See, e.g., Spence v. Senkowski,* 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr.17, 1998) (McCurn, J.) (180 days that plaintiff spent in S.H.U., where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in rela-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
(Cite as: 2008 WL 4693153 (N.D.N.Y.))

tion to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217-19 (W.D.N.Y.1998) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353-56 (W.D.N.Y.1997) (161 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96-CV-2003, 1997 WL 137448, at *4-6 (S.D.N.Y.1997) (192 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116-17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94-CV-4094, 1996 WL 487951, at *4-5 (S.D.N.Y. Aug.27, 1996) (210 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103-04 (W.D.N.Y.1995) (270 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population).

FN64. *Jackson v. Onondaga County,* 05-CV-1393, 2008 U.S. Dist. LEXIS 64930, at *40 & n. 46, 549 F. Supp. 2d 204 (N.D.N.Y. Jan. 8, 2008) [citations omitted], *adopted on* de novo *review by* 05-CV-1393, 2008 U.S. Dist. LEXIS 22175, 2008 WL 782655 (N.D.N.Y. March 20, 2008) (McAvoy, J.); *see also Martin v. Mitchell,* 92-CV-0716, 1995 U.S. Dist. LEXIS 19006, at *10-12, 1995 WL 760651 (N.D.N.Y. Nov. 24, 1995) (McAvoy, C.J.) (rejecting plaintiff's assertion that prison disciplinary hearing officer "had a duty to investigate the identity of [a correction officer identified by the plaintiff merely as] 'Budd' and call him to testify"); *Hampton v. McGinnis,* 89-CV-6344, 1992 U.S. Dist. LEXIS 15696, at *6, 1992 WL 309553 (S.D.N.Y. Oct. 15, 1992) ("[I]t was not [the disciplinary hearing officer's] duty to investigate [the prisoner's assault] claim, and plaintiff was not precluded from offering his own evidence on that subject."); *cf. Kingsley v. Bureau of Prisons,* 937 F.2d 26, 31 (2d Cir.1991) (under circumstances, a hearing officer did have a duty to identify the name of the plaintiff's desired witness because [1] the plaintiff had an "especially compelling" need for the witness, [2] the witness's identity was "readily available" to the hearing officer, [3] the plaintiff had arrived at the prison only five days earlier, [4] fulfilling the request would not have delayed the imposition of "swift discipline," and [5] "no other institutional objective was implicated").

FN65. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ("The terms of § 1983 make plain two elements that are necessary for recovery. First, the plaintiff must prove that the defendant has deprived him of a right secured by the 'Constitution and laws' *of the United States.*") (emphasis added); *Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985) ("Recovery under 42 U.S.C. § 1983 ... is premised upon a showing, first, that the defendant has denied the plaintiff a constitutional or *federal* statutory right ....") (citation omitted; emphasis added); *Fluent v. Salamanca Indian Lease Auth.,* 847 F.Supp. 1046, 1056 (W.D.N.Y.1994) ("The initial inquiry in a § 1983 action is whether the Plaintiff has been deprived of a right 'secured by the Constitution and laws' *of the United*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

*States."*) [emphasis added].

**FN66.** *See Doe v. Conn. Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim."); *Patterson,* 761 F.2d at 891 ("[A] state employee's failure to conform to state law does not in itself violate the Constitution and is not alone actionable under § 1983 ....") (citation omitted); *Murray v. Michael,* 03-CV-1434, 2005 WL 2204985, at * 10 (N.D.N.Y. Sept.7, 2005) (DiBianco, M.J.) ("[A]ny violations of state regulations governing the procedures for disciplinary hearings ... do not rise to the level of constitutional violations.") (citation omitted); *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("[V]iolations of state law procedural requirements do not alone constitute a deprivation of due process since '[f]ederal constitutional standards rather than state law define the requirements of procedural due process.' ") (citing *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 [2d Cir.1990] ).

**FN67.** *See Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) (citation omitted); *Lopez v. Reynolds,* 998 F.Supp. 252, 259 (W.D.N.Y.1997).

**FN68.** *See Farinaro v. Coughlin,* 642 F.Supp. 276, 280 (S.D.N.Y.1986).

**FN69.** *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at * 18 n. 8 (S.D.N.Y. Sept.30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; s*ee also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**


N.D.N.Y.,2008.
Robles v. Bleau
Not Reported in F.Supp.2d, 2008 WL 4693153
(N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.


Slip Copy, 2014 WL 1292281 (N.D.N.Y.)
**(Cite as: 2014 WL 1292281 (N.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Anthony RUCANO, Plaintiff,
v.
Carl J. KOENIGSMANN, et al., Defendants.

No. 9:12–cv–00035 (MAD/RFT).
Signed March 31, 2014.

Anthony Rucano, Dannemora, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of New York, Christopher W. Hall, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

**ORDER**

MAE A. D'AGOSTINO, District Judge.

**\*1** Plaintiff, an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this action pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his rights under the Eighth Amendment of the United States Constitution. *See* Dkt. No. 60. Plaintiff's claims arise out of Defendants' alleged failure to provide Plaintiff with adequate dental care.

In his second amended complaint, Plaintiff contends, among other things, that Defendant Oliveira violated his Eighth Amendment rights by refusing to provide him with three crowns, improperly performing a root planing procedure, and delaying root planing treatments. Further, Plaintiff alleges that Defendant Kullman failed to treat his cavity and also delayed root planing treatments. *Id.* Currently pending before the Court is Defendant's motion to dismiss. *See*

Dkt. No. 64.

In a March 3, 2014 Report–Recommendation and Order, Magistrate Judge Randolph F. Treece recommended that the Court (1) grant Defendants' motion to dismiss as to Plaintiff's supervisory liability claims against Defendants Bellamy, LaValley, and Fischer; (2) grant Defendants' motion to dismiss as to Plaintiff's state law negligence and medical malpractice claims; (3) deny Defendants' motion to dismiss as to Plaintiff's Eighth Amendment claims against Defendants Oliveira and Kullman; and (4) deny Defendants' motion to dismiss as to Plaintiff's supervisory liability claims against Defendant Koenigsmann. *See* Dkt. No. 75. None of the parties objected to the Report–Recommendation and Order.

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011)* (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1).

A litigant's failure to file objections to a magistrate judge's report and recommendation, even when that litigant is proceeding *pro se,* waives any challenge to the report on appeal. *See Cephas v. Nash,* 328 F.3d 98, 107 (2d Cir.2003) (holding that, "[a]s a rule, a party's failure to object to any purported error or

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1292281 (N.D.N.Y.)
**(Cite as: 2014 WL 1292281 (N.D.N.Y.))**

omission in a magistrate judge's report waives further judicial review of the point" (citation omitted)). A *pro se* litigant must be given notice of this rule; notice is sufficient if it informs the litigant that the failure to timely object will result in the waiver of further judicial review and cites pertinent statutory and civil rules authority. *See Frank v. Johnson,* 968 F.2d 298, 299 (2d Cir.1992); *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (holding that a *pro se* party's failure to object to a report and recommendation does not waive his right to appellate review unless the report explicitly states that failure to object will preclude appellate review and specifically cites 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and former 6(e) of the Federal Rules of Civil Procedure).

**\*2** Having carefully reviewed the March 3, 2014 Report–Recommendation and Order, the parties' submissions and the applicable law, the Court finds that Magistrate Judge Treece correctly recommended that the Court (1) dismiss Plaintiff's supervisory liability claims as to Defendants Bellamy, LaValley, and Fischer; (2) dismiss Plaintiff's state law negligence and medical malpractice claims as to all Defendants; and (3) deny Defendants' motion to dismiss in all other respects. *See* Dkt. No. 75. Upon review of the thorough and well-reasoned Report Recommendation and Order, the Court finds that Magistrate Judge Treece did not clearly err in any of his recommendations.

Wherefore, the Court hereby

**ORDERS** that Magistrate Judge Treece's March 3, 2014 Report–Recommendation and Order is **ADOPTED in its entirety** for the reasons set forth therein; and the Court further

**ORDERS** that Defendants' motion to dismiss (Dkt. No. 64) is **GRANTED in part** and **DENIED in part;** and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**ANTHONY RUCANO,** Plaintiff,

—v—

**CARL J. KOENIGSMANN,** *Deputy Commissioner and Chief Medical Officer,* **RITA GRINBERGS,** *Regional Health Services Administrator,* **MARY D'SILVA,** *Director of Correctional Dental Services,* **KAREN BELLAMY,** *Director of Inmate Grievance Program,* **TAMIR R. FAROOKI,** *Dental Director, Clinton Correctional Facility,* **ROGERIO A. OLIVEIRA,** *Facility Dentist; Clinton Correctional Facility,* **BRIAN FISCHER,** *Commissioner,* **THOMAS LAVALLEY,** *Superintendent; Clinton Correctional Facility,* **PAUL J. KULLMAN,** *Regional Dental Director at Clinton Correctional Facility,* Defendants.

***REPORT–RECOMMENDATION and ORDER***
RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Anthony Rucano brings this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that Defendants failed to provide adequate dental care, or created and countenanced policies and procedures that led to the inadequate provision of dental care. *See generally* Dkt. No. 60, Second Am. Compl. Now before this Court is Defendants' Motion to Dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 64. Plaintiff opposes the Motion. Dkt. No. 68. For the reasons that follow we recommend that Defendants' Motion be **GRANTED** in part and **DENIED** in part.

**I. STANDARD OF REVIEW**
On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1292281 (N.D.N.Y.)
**(Cite as: 2014 WL 1292281 (N.D.N.Y.))**

405 U.S. 319, 322 (1972). The trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scherer,* 468 U.S. 183 (1984).

**\*3** "Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at \*2 (N .D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint*' may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (quoting *Cortec Indus ., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL–CIO v. Schermerhorn,* 373 U.S. 746, 754 n. 6 (1963); *see also Arar v. Ashcroft,* 585 F.3d 559, 567 (2d Cir.2009). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal,* 556 U.S. at 697 (citing *Twombly* ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. at 678. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* In this respect, to survive dismissal, a plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Bell Atl. Corp. v. Twombly,* 440 U.S. at 555). Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v.. Iqbal,* 556 U.S. at 679–80.

**\*4** With this standard in tow, we consider the plausibility of Plaintiff's Complaint.

## II. DISCUSSION
### A. Background

The following facts are derived from Plaintiff's Second Amended Complaint. [FN1]

FN1. On June 6, 2013, this Court granted Plaintiff's Motion to Amend and directed the Clerk of the Court to file Plaintiff's Proposed Amended Pleading as his Second Amended Complaint. Dkt. No. 59. The Exhibits at-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

tached to the Proposed Amended Pleading were mistakenly not refiled by the Clerk. Nevertheless, this section includes facts derived from the Exhibits attached to Plaintiff's Proposed Amended Pleading (Dkt. No. 47–2), which are incorporated by reference as part of Plaintiff's Second Amended Complaint. *See Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007). All references to these Exhibits correspond to the Table of Contents provided by Plaintiff filed as Docket Number 47–3.

On February 5, 2011, Plaintiff entered Downstate Correctional Facility ("DCF"). Second Am. Compl. at ¶ 13. During the week of February 8, Plaintiff requested and received a visit with DCF's Dentist.[FN2] *Id.* at ¶ 14. At that appointment, Plaintiff relayed that prior to his incarceration, his personal dentist had started work on crowns [FN3] in three of his teeth by inserting temporary fillings, which were now "past due to be replaced with crowns, and [are] affecting the way I eat. I chew slowly, carefully and am constantly nervous and afraid I will lose the fillings and the teeth." *Id.* at ¶ 15. Plaintiff also informed DCF's Dentist that his periodontist had told him that he had "advanced periodontal disease that required bone grafts to prevent continuing bone loss which would eventually result in the loss of my teeth, and work was scheduled to begin once my crowns were completed." *Id.* at ¶ 16. DCF's Dentist informed Plaintiff that "it was not within [New York State Department of Corrections and Community Supervision's ("DOCCS") ] Policy to provide crowns or bone grafts." *Id.* at ¶ 17. On February 23, 2011, Plaintiff filed a grievance regarding DCF's Dentist's refusal to provide him with crowns. *Id.* at ¶ 18.

FN2. DCF's Dentist is not a Defendant in this action.

FN3. According to Plaintiff, "when a tooth receives a root canal, the inside of the tooth

down to the root is removed which weakens the structural integrity of the tooth; and the placement of a post, permanent filling and crown secures the tooths integrity to prevent it from breaking apart." Second Am. Compl. at ¶ 66.

On April 19, 2011, Plaintiff was put on the draft list to be transferred to Clinton Correctional Facility ("CCF"). *Id.* at ¶ 22. On May 17, 2011, Plaintiff received a letter from Defendant Grinbergs in response to a letter he wrote, concerning his dental issues, to Defendant Koenigsmann, Deputy Commissioner and Chief Medical Officer of DOCCS. *Id.* at ¶¶ 5 & 25. On June 13, 2011, Plaintiff wrote another letter to Defendant Grinbergs "to thank her for responding for Dr. Koenigsmann[,]" and received a response, dated June 27, informing him that "the Division of Health Services has investigated [his] concerns with the Health ervice staff at Clinton, and stated [he] was receiving treatment" and that he had been scheduled to see the Dentist. *Id.* at ¶¶ 27–29.

On September 9, 2011, Plaintiff met with Defendant Oliveira, the Dentist at CCF. Plaintiff explained to Defendant Oliveira that he had three teeth that required crowns, and stated that he was concerned he would lose his teeth if the work was not completed. Defendant Oliveira told Plaintiff that pursuant to § 7.02 of the Health Services Policy Manual ("HSPM") Plaintiff could get his own dentist to handle the crowns, but that he would not provide crowns for Plaintiff. *Id.* at ¶¶ 31–32. Plaintiff informed Defendant Oliveira that he could not afford to pay a private dentist to perform the procedure. *Id.* at ¶ 33. Defendant Oliveira's assistant, Louise Jerdo,[FN4] informed Plaintiff that if his temporary "fillings fell out they would just pull the teeth [.]" *Id.* at ¶¶ 31 & 34. On September 9, 2011, Plaintiff wrote to Defendants Grinbergs and Koenigsmann, however, neither Defendant responded. *Id.* at ¶¶ 39–40 & 42–43.

FN4. Louise Jerdo is not a Defendant in this

Slip Copy, 2014 WL 1292281 (N.D.N.Y.)
**(Cite as: 2014 WL 1292281 (N.D.N.Y.))**

action.

**\*5** On October 4, November 18, and December 23 of 2011, Defendant Oliveira conducted a systematic periodontal root planing of each of the four quadrants of Plaintiff's mouth; however, he continued to refuse to provide Plaintiff with crowns. *Id.* at ¶¶ 47, 48, & 49. After his final treatment, Plaintiff inquired about a follow up treatment, but was told by Defendant Oliveira that his treatment was complete and no other work was scheduled. *Id.* at ¶ 50.

In February and March of 2012, Plaintiff made "multiple" [FN5] requests for a dental appointment to treat tooth pain and to begin bi-annual root plaining. Eventually, an appointment was made for April 5, 2012. However, Plaintiff arrived at his appointment late and consequently was told by an unidentified guard that he would have to reschedule. *Id.* at ¶¶ 51–56. On April 23, 2012, Plaintiff requested an appointment with a doctor other than Dr. Oliveira, for root planing and pain in his tooth. *Id.* at ¶ 59. Plaintiff also filed a grievance regarding the events of April 5, stating that "[he] wrote [a] letter to Mary D'Silva (Director of Corr. Dental Services) requesting my semi-anual root planing for advanced periodontal disease and appt. for tooth pain by a dentist other th[a]n Dr. Oliveira, due to issues of retaliation and substandard treatment complained of in the past. *Need appt. ASAP.* Delay will result in unnecessary infection, pain and loss of teeth that is unnecessary and serves no penological purpose, in violation of my constitutional right to adequate medical care." *Id.* at ¶ 60 & Ex. F–3, Grievance # CL–62243–12, dated Apr. 23, 2012 (emphasis in original). On May 10, 2012, Plaintiff received a response to his grievance from the Inmate Grievance Resolution Committee ("IGRC") stating "that [Plaintiff] did have a call-out on 4/5/12 for Dental but he was late. The grievant has been rescheduled." *Id.* at Ex. F–5. I.G.R.C. Response, dated May 10, 2012.

FN5. The precise number of requests Plain-

tiff made is unclear from the Second Amended Complaint.

On May 11, Plaintiff was seen by Defendant Dr. Kullman, CCF's Regional Dental Director, who examined Plaintiff and discovered that he had a cavity which required treatment; Plaintiff also informed Defendant Kullman of his need to replace his temporary fillings with permanent crowns in three of his teeth. *Id.* at ¶¶ 63–64. A dental treatment form filled out by Dr. Kullman notes that root planing was needed, tooth # 5 required treatment for a cavity, and he would schedule another appointment for the treatment. *Id.* at ¶ 64A & Ex. G2, Dental Treatment Record, at entry dated May 11, 2012. When asked by Plaintiff to explain the function of crowns, Defendant Kullman

explained that when a tooth receives a root canal, the inside of the tooth down to the root is removed which weakens the structural integrity of the tooth; and the placement of a post, permanent filling and crown secures the tooths integrity to prevent it from breaking apart.... [and] that having the crown placed on my teeth was not necessary now, but in a few years if you are still here we will give you crowns."

**\*6** *Id.* at ¶ 66.

On June 12, 2012, Plaintiff was called to the dental clinic at CCF for an "emergency callout." Although his cavity was not treated, Defendant Oliveira took a full set of x-rays of Plaintiff's mouth. *Id.* at ¶ 68. On June 14, Plaintiff received a letter from Defendant Oliveira, stating in part, " 'Generalized Advanced Chronic Adult Periodontal disease is present' and 'Teeth # 04 and # 19 are poorly endodontic treated. These teeth need retreatment of root canals, post and core and crowns. Stainless steel crowns are not indicated for these teeth. DOCCS does not provide offenders with root canals in posterior teeth.... You can either follow Form HSPM–7.02 and bring a den-

Slip Copy, 2014 WL 1292281 (N.D.N.Y.)
**(Cite as: 2014 WL 1292281 (N.D.N.Y.))**

tist into the facility to treat them or alternatively we can extract and replace them with a partial removal denture.' " *Id.* at ¶ 69 & Ex. F6, Lt. dated June 14, 2012.

On October 26, 2012, Plaintiff saw Dr. Kullman for a second time. Notwithstanding Plaintiff's protestations that he was experiencing a problem with a tooth on the left side of his mouth, Defendant Kullman refused to look at Plaintiff's x-rays and put "another filling on top of a temporary filling in tooth # 4" located on the right side of Plaintiff's mouth. *Id.* at ¶¶ 72–75. On November 26, 2012, Plaintiff submitted a sick call request form stating:

> I have cavity on upper left side of mouth, diagnosed on May 11, 2012. I saw dentist on 10–26–12 who refused to look at full mouth x-rays until after he treated a temp filling on the right side of my mouth not causing pain. My cavity is worsening, causing daily pain and I have had no treatment in it for over 6 months

> *Id.* at ¶ 76.

On December 27, 2012 Plaintiff submitted an additional sick call request form stating that he had a "[c]avity on front left top of mouth untreated for over 6 months ... [and][a]dvanced Periodontal disease not treated with root scaling since Oct–Dec 2011. Please schedule appt." *Id.* at ¶ 77. Plaintiff also submitted a note to Defendant Farooki regarding his concerns. On December 31, Plaintiff received a memo from the Dental Department notifying him that he was on the list to be seen but that it was a " '[l]ong list, long wait.' " *Id.* at ¶ 78.

On April 9, 2013, Plaintiff submitted his Second Amended Complaint. As of that date, Plaintiff had not received crowns, treatment for his cavity, nor any additional root planing for treatment of his periodontal disease. *Id.* at ¶¶ 79–80 & p. 52, Wherefore Clause.[FN6]

FN6. Plaintiff does not explicitly claim that as of April 9, 2013 he had still not been provided with crowns to replace three temporary fillings that were installed prior to his incarceration. However, in Plaintiff's Wherefore Clause, he requests that an injunction be granted directing Defendants to provide "treatment to complete [his] partially completed crowns[.]" Second Am. Compl. at p. 52, Wherefore Clause.

**B. Eighth Amendment**

Construed liberally, Plaintiff's fifty-seven page Second Amended Complaint alleges that Defendant Oliveira (1) refused to provide him with crowns in three teeth, (2) improperly performed a root planing procedure on the lower half of his mouth, and (3) delayed root planing treatments for his advanced periodontitis. *See, e.g.,* Second Am. Compl. at ¶¶ 145–55. And, that Defendant Kullman (1) failed to treat his cavity, and (2) delayed his treatment for root planing. *See, e.g., id.* at ¶¶ 180–90E. Defendants argue that Plaintiff has failed to state a cause of action under the Eighth Amendment. *See* Dkt. No. 64–1, Defs.' Mem. of Law, at pp. 7–12.

**\*7** To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825, 834–35 (1994); *Hathaway v. Coughlin ("Hathaway I"),* 37 F.3d 63, 66 (2d Cir.1994).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1292281 (N.D.N.Y.)
**(Cite as: 2014 WL 1292281 (N.D.N.Y.))**

The seriousness element is an objective test, to determine whether the deprivation of care is sufficiently serious "entails two inquiries." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (citations omitted). First, courts must determine "whether the prisoner was actually deprived of adequate medical care." *Id* . Medical care is "adequate" where the care provided is a "reasonable" response in light of the "health risk" the inmate faces. *Id.* at pp. 279–80. The second inquiry requires a determination of "whether the inadequacy in medical care is sufficiently serious." *Id.* at p. 280. In cases where medical care is denied, courts focus on the seriousness of the underlying medical condition. *Id.* (citing *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). Some of the factors that determine whether a prisoner's medical condition is serious include: "1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, 2) whether the medical condition significantly affects daily activities, and 3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (internal quotation marks and citations omitted) (noting that an inmate is not required to show "that he or she experiences pain that is at the limit of human ability to bear, nor [does the court] require a showing that his or her condition will degenerate into a life threatening one").

Whereas, the "seriousness inquiry is narrower" in cases where "the prisoner is receiving ongoing treatment and the offending conduct is an unreasonable delay or interruption in that treatment." *Salahuddin v. Goord,* 467 F.3d at 280 (citing *Smith v. Carpenter,* 316 F.3d at 185)). In such cases, courts "focus [ ] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Id.* The question becomes whether delaying treatment subjected Plaintiff to any serious risk of harm. To that end, the Second Circuit has instructed us that "the severity of the alleged denial of medical care should be analyzed with regard to all relevant facts

and circumstances." *Smith v. Carpenter,* 316 F.3d at 187. In this regard, "the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Id.* Determining whether the inadequacy/delay presents a sufficiently serious risk "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* (citing *Helling, v. McKinney,* 509 U.S. 25, 32–33 (1993)).

**\*8** The second element, deliberate indifference, is based on a subjective standard. To establish deliberate indifference a plaintiff must demonstrate that the defendant acted with a culpable mental state, similar to criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03 (1991); *Hathaway I,* 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan,* 511 U.S. at 836. This requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citing *Farmer* ). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II"),* 99 F.3d 550, 553 (2d Cir.1996)); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citations omitted).

### 1. Plaintiff's Crowns

According to Plaintiff, Defendants' Oliveira and Kullman were aware that he required crowns in three of his teeth. Second Am. Compl. at ¶¶ 31–32, 63–64, 66, & 69. Additionally, Plaintiff has alleged that in a letter from Defendant Oliveira, and during a conver-

Slip Copy, 2014 WL 1292281 (N.D.N.Y.)
**(Cite as: 2014 WL 1292281 (N.D.N.Y.))**

sation with Defendant Kullman, these Defendants explicitly acknowledged that one possible consequence of not receiving crowns was that Plaintiff's teeth could collapse and end up needing to be removed. Nonetheless, Defendant Oliveira told Plaintiff that DOCCS' Policy did not permit him to provide Plaintiff with crowns and he could either pay to have an outside dentist perform the procedure—which he could not afford—or wait until his temporary fillings fell out, at which time he could have his teeth pulled. *See id.* at ¶¶ 32–34, 66, 69, & Ex. F6, Lt. dated June 14, 2012. Likewise, Defendant Kullman informed Plaintiff that he would install the crowns if Plaintiff was still at CCF "in a few years." *Id.* at ¶ 66. Plaintiff claims that Defendants' refusals were based on economic rather than medical reasons. *See, e.g., id.* at ¶¶ 32–36 & 42–43; Dkt. No. 68, Pl.'s Mem. in Opp'n, at pp. 5–7.

Defendants argue that Plaintiff has not alleged a sufficiently serious injury for purposes of the Eighth Amendment because he does not claim to be "suffering any substantial, chronic pain from the lack of crowns," and, that his desire for crowns is nothing more than a non-actionable dispute over the proper course of treatment. Defs.' Mem. of Law at p. 9. They point out that in his Second Amended Complaint, Plaintiff does not claim that he suffered from any pain due to the lack of crowns, rather he merely alleges that he "chews slowly, carefully and [is] constantly nervous and afraid [he] will lose the fillings in his teeth." *Id.* (quoting Second Am. Compl. at ¶ 15). However, while pain is one factor to be considered in assessing the seriousness of an underlying condition, the Second Circuit has held that "dental needs—for fillings, crowns, and the like—are serious medical needs as the law defines that term." *See Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) (quoting *Dean v. Coughlin,* 623 F.Supp. 392, 404 (S.D.N.Y .), *vacated on other grounds,* 804 F.2d 207 (2d Cir.1986)).

**\*9** While upon a fuller record it may be established that Plaintiff's condition was not sufficiently serious, at this early stage, Plaintiff's allegations that Defendants acknowledged but chose to ignore the possibility that if he did not receive crowns he would lose teeth that might otherwise be saved—for economic rather than medical reasons—is sufficient to plausibly allege that Defendants acted with deliberate indifference towards Plaintiff's sufficiently serious medical need for crowns. *See Chance v. Armstrong,* 143 F .3d at 703–04 (reversing the district court's 12(b)(6) dismissal of an inmate's claim that doctors chose to pursue a less efficacious treatment based on "ulterior" economic motives).

Therefore, we recommend that Defendant's Motion to Dismiss be **DENIED** as to Plaintiff's claims that Defendants Oliveira and Kullman refused to provide him with crowns.

### 2. Plaintiff's Cavity

Plaintiff has alleged that notwithstanding multiple requests for treatment of the cavity diagnosed by Defendant Kullman, the condition went untreated for more than ten months. Second Am. Compl. at ¶¶ 63 & 76–79. Defendants argue that Plaintiff has failed to allege that his cavity was a sufficiently serious condition for purposes of the Eighth Amendment because Plaintiff did not allege that this condition caused him substantial pain or that it affected his ability to go about his daily activities. Defs.' Mem. of Law at p. 11.

The Second Circuit has noted "that a tooth cavity is a serious medical condition, not because cavities are always painful or otherwise dangerous, but because a cavity that is not treated will probably become so." *Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003) (citing *Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) for the proposition that "a tooth cavity is a degenerative condition, and if it is left untreated indefinitely, it is likely to produce agony and to require more invasive and painful treatments, such as root canal therapy or extraction"). Moreover, although Plaintiff did not complain about his cavity on a daily basis, in November and December of 2012 he re-

Slip Copy, 2014 WL 1292281 (N.D.N.Y.)
**(Cite as: 2014 WL 1292281 (N.D.N.Y.))**

quested treatment for his cavity, noting that "[m]y cavity is worsening, causing daily pain and I have had no treatment in it for over 6 months." Second Am. Compl. at ¶¶ 76–79. Thus, it is plausible that Plaintiff's cavity was a sufficiently serious condition for purposes of the Eighth Amendment.

Moreover, Plaintiff's allegations that despite their awareness of the cavity, and his requests for treatment, Defendants continued to ignore his condition for approximately ten months, is sufficient at this early stage to plausibly allege that Defendants consciously disregarded his cavity.

For these reasons we recommend that Defendant's Motion be **DENIED** as to Plaintiff's Eighth Amendment claim regarding Defendants Kullman's and Oliveira's failure to treat his cavity.

### 3. Plaintiff's Periodontal Disease

Plaintiff has alleged that (1) Defendant Kullman's failure to schedule follow up appointments for routine root planing, despite acknowledging that Plaintiff required further treatment for his periodontal disease, Second Am. Compl. at ¶¶ 188–90; and (2) Defendant Oliveira's substandard provision of dental planing, and his failure to schedule a follow up treatment for future planing, constituted deliberate indifference toward the treatment of his condition, *id.* at ¶¶ 150–52.

**\*10** For purposes of the instant Motion, Defendants concede that periodontal disease is a serious medical condition, and we agree. *See* Defs.' Mem. of Law. at p. 9; *see also Rashid v. McGraw,* 2006 WL 1378945, *1 (S.D.N.Y. May 18, 2006)* ("Periodontitis, like gingivitis, is a serious infection of the gum area, that, if left untreated, can lead to tooth loss. As the disease progresses, gums separate from the teeth, forming pockets (spaces between the teeth and gums) that become infected. Pockets deepen as the disease progresses and more gum tissue and bone are destroyed.") (citation omitted).

To begin with, we note that performing a procedure negligently does not amount to deliberate indifference. Here, Plaintiff alleges that Defendant Oliveira failed to properly plane the roots in the bottom quadrants of his mouth, because he performed the procedure to quickly and did not draw any blood, as is typical during such a procedure. *See, e.g.,* Second Am. Compl. at ¶¶ 150–51. Even if true, such behavior does not evince a conscious disregard to a known serious risk of harm; at most, such a claim sounds in negligence or medical malpractice, neither of which is tantamount to deliberate indifference. *See Estelle v. Gamble,* 429 U.S. 97, 106 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.").

Contrariwise, Plaintiff's remaining claims against these Defendants are sufficient to state a cause of action. Dr. Oliveira provided Plaintiff with root planing between October and December of 2011. Second Am. Compl. at ¶¶ 47, 48, & 49. On May 11, 2012, Defendant Kullman noted in a medical report that further root planing was needed, but did not schedule an appointment. *Id.* at ¶¶ 64A & 71. On June 14, 2012, Defendant Oliveira sent Plaintiff a letter noting that advanced periodontal disease was present, and that two of his teeth needed root canals and crowns. *Id.* at ¶ 69 & Ex. F6, Lt. dated June 14, 2012. Nonetheless, as of the filing of Plaintiff's Second Amended Complaint, on April 9, 2013, Plaintiff had not received any additional treatment for his periodontal disease. Second Am. Compl. at ¶ 80. Defendants' failure to provide further periodontal care to Plaintiff, despite their explicit acknowledgments of his continuing need for such care, evinces a conscious disregard of Plaintiff's serious medical need.[FN7] While upon a fuller record, Defendants' contentions that Plaintiff received adequate care for his periodontal disease may be born out, at this early stage Plaintiff has sufficiently alleged an Eighth Amendment claim

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1292281 (N.D.N.Y.)
**(Cite as: 2014 WL 1292281 (N.D.N.Y.))**

for deliberate indifference.

> FN7. In addition, we note that Plaintiff alleges that Defendants' decision not to provide further treatment for his periodontitis was based on ulterior economic concerns rather than his actual dental needs. *See* Pl.'s Mem. in Opp'n at p. 12; *see also Chance v. Armstrong,* 143 F.3d at 703–04.

Therefore, we recommend that Defendants' Motion to Dismiss be **DENIED** as to Plaintiff's claims that Defendants Oliveira and Kullman were deliberately indifferent towards the care of his periodontal disease.

### C. Personal Involvement

**\*11** An individual cannot be held liable for damages under § 1983 merely because he holds a position of authority, but he can be held liable if he was personally involved in the alleged deprivation.

The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citations omitted).

Defendants claim that Plaintiff failed to allege the personal involvement of Defendants Carl J. Koenigsmann, the Deputy Commissioner and Chief Medical Officer at DOCCS, Karen Bellamy, Director of the Inmate Grievance Program at DOCCS, Brian Fischer, the Commissioner of DOCCS, and Thomas LaValley, the Superintendent at CCF. Defs.' Mem. of Law at pp. 12–15.

### 1. Defendant Koenigsmann

Plaintiff alleges that he wrote Defendant Koenigsmann three letters describing the inadequacies of his dental care. Defendant Koenigsmann referred two of those letters to Defendant Grinbergs, who replied to Plaintiff on behalf of Defendant Koenigsmann on May 17 and June 27, 2011. *See, e.g.,* Second Am. Compl. at ¶¶ 82–87. Defendant Koenigsmann did not respond to Plaintiff's third letter, dated September 9, 2011, in which Plaintiff alleged that Defendant Kullman and Oliveira refused to provide him with crowns pursuant to an unconstitutional DOCCS' Policy. *Id.* at ¶¶ 40–43 & 83–87; *see also* Dkt. No. 1–1., Compl., Ex. B13, Lt., dated Sep. 9, 2011. It was once well accepted that neither ignoring an inmate's letter nor referring his letters to a subordinate constituted personal involvement on behalf of a supervisory official. *See Thomas v. Coombe,* 1998 WL 391143, at \*6 (S.D.N.Y. July 13, 1998) (citations omitted) (ignoring letter is insufficient for personal involvement); *Silvagnoli v. Fischer,* 2010 WL 1063849, at \*8 (N.D.N.Y. Mar. 1, 2010) (citing *Smart v. Goord,* 441 F.Supp.2d 631, 642–43 (S.D.N.Y.2006) for the proposition that "[i]t is now well-settled that the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement"; & *Ortiz–Rodriguez v. N.Y. State Dep't of Corr. Servs.,* 491 F.Supp.2d 342, 347 (W.D.N.Y.2007) for the proposition that "[t]he same is true if the only involvement of the supervisory official is to refer the inmate's complaint to the appropriate staff for investigation."). However, in light of the Second Circuit's recent decision in *Grullon v. City of New Haven,* it would appear that plaintiffs within the Second Circuit are "entitled to have the court draw the reasonable inference ... that the [offi-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

cial] in fact received the Letter, read it, and became aware of the alleged conditions of which [the inmate] complained." See *Castro v. Heath,* 2013 WL 5354241, at *8 (N.D.N.Y. Sept. 23, 2013) (MAD) (quoting *Grullon v. City of New Haven,* 720 F.3d 133, 141 (2d Cir. June 19, 2013)).

**\*12** As to the first two letters, it is clear that Defendant Koenigsmann acted upon those letters by referring them to his subordinate. *See Ortiz–Rodriguez v. N.Y. State Dep't of Corr. Servs.,* 491 F.Supp.2d at 347. However, affording Plaintiff the benefit of this inference, it is possible that Plaintiff's third letter to Defendant Koenigsmann put him on notice of a continuing violation of Plaintiff's Eighth Amendment rights, and he failed to take any action to remedy the wrong. *See Colon v. Coughlin,* 58 F.3d at 873. Therefore, we recommend that Defendants' Motion be **DENIED** as to Defendant Koenigsmann.

### 2. Defendant Bellamy

Plaintiff claims that Defendant Bellamy is liable because of her supervisory role over the voting members of the Central Office Review Committee ("CORC"), an entity within DOCCS that reviewed and decided the final level of Plaintiff's grievance appeals. Second Am. Compl. at ¶¶ 127–129. Construed liberally, it appears that Plaintiff believes Defendant Bellamy failed to ensure that the voting members of CORC were properly trained to understand inmate medical issues. *See id.* at ¶¶ 127–129. Even if true, such a failure is not actionable under § 1983. *See Abdush–Shahid v. Coughlin,* 933 F.Supp. 168, 183 (N.D.N.Y.1996) (citing cases for the proposition that "supervisory officials are also generally entitled to delegate medical responsibility to facility medical staffs and are entitled to rely on the opinion of medical staff concerning the proper course of treatment."). Moreover, there is no apparent supervisory link between Defendants Kullman and Oliveira and Defendant Bellamy, therefore, Plaintiff has failed to allege her personal involvement in the alleged Eighth Amendment deprivations caused by Defendants

Kullman and Oliveira. *See Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999) (finding that in the absence of *respondeat superior,* supervisory liability is found only where some act or omission of the supervisory official is the proximate cause of the constitutional violation); *see also Russo v. City of Bridgeport,* 479 F.3d 196, 211 (2d Cir.2007) (a supervisory official may be held liable for "gross negligence in failing to supervise his subordinates who commit such wrongful acts, provided that the plaintiff can show an affirmative causal link between the supervisor's inaction and [his] injury") (quoting *Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002).

Alternatively, Plaintiff argues that Defendant Bellamy is "personally involved and appropriately named in this action for the purposes of discovery to ascertain the voting members present in deciding the Plaintiff's grievance, including determining the information requested by the voting members in any form that was gathered, acquired, used or consulted in reaching the final determination on the grievance." *Id.* at ¶ 130. Although courts within the Second Circuit have permitted a named defendant who lacked personal involvement in the underlying constitutional violation to remain a defendant solely for the purposes of discovery, such exceptions are typically granted only where the plaintiff was legitimately unable to identify the true identity of any other defendant named in the action without the benefit of first conducting some limited discovery. *See, e.g., Murphy v. Goord,* 445 F.Supp.2d 261, 266 (W.D.N.Y.2006) (citing *Covington v. Warden of C–95,* 1996 WL 75211 at *4 (E.D.N.Y.Feb.8, 1996)); *see also Reed v. Doe No. 1,* 2013 WL 5441503, at *8 fn.5 (N.D.N.Y. Sept. 27, 2013) (citing *Davis v. Kelly,* 160 F.3d 917, 921–22 (2d Cir.1998)).

**\*13** Here, Plaintiff has not named any Doe Defendants. Moreover, to the extent that Plaintiff seeks discovery of relevant information, Plaintiff has named other supervisory officials in this action which Defendants have not moved to dismiss.[FN8] *Compare*

Slip Copy, 2014 WL 1292281 (N.D.N.Y.)
**(Cite as: 2014 WL 1292281 (N.D.N.Y.))**

Second Am. Compl., *with* Defs.' Mem. of Law. Therefore, it is unnecessary to allow Plaintiff to continue his action against Defendant Bellamy in the absence of some indication that she was personally involved in the deprivations allegedly caused by Defendants Oliveira and Kullman.

FN8. By their Motion, Defendants do not seek dismissal of Defendants Grinbergs, D'Silva, nor Farooki.

Accordingly, we recommend that Defendants' Motion be **GRANTED** as to Plaintiff's claims against Defendant Bellamy.

### 3. Defendant Fischer

Plaintiff claims that Defendant Fischer is liable for actions he took (or failed to take) while acting as Commissioner of DOCCS. Specifically he alleges that Defendant Fischer (1) failed to remedy certain unconstitutional policies that he was alerted to *via* a 2009 report entitled "Healthcare in New York State Prisons, 2004–2007" written by the "Corrections Association", (2) and for his gross negligence in failing to supervise Defendant Koenigsmann. Second Am. Compl. at ¶¶ 156–68. Defendant Fischer "may be found liable for his deliberate indifference to the rights of others by his failure to act on information indicating unconstitutional acts were occurring or for his gross negligence in failing to supervise his subordinates who commit such wrongful acts, provided that the plaintiff can show an affirmative causal link between the supervisor's inaction and her injury" *Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002).

Plaintiff does not allege that Defendant Fischer was personally involved in any aspect of his dental care. Moreover, Plaintiff has not plausibly alleged that Defendant Fischer was aware that Plaintiff's constitutional rights were being violated. Plaintiff's claim that the Correction Association's report regarding healthcare provided to prisoners in New York State

between 2004 and 2007 put Defendant Fischer on notice of the care actually received by Plaintiff in 2011–2013 is patently implausible. Moreover, a review of the report offered by Plaintiff reveals that it does not directly relate to dentistry, dental care, nor the named Defendants. In fact, the word dentist does not appear at all in the report nor does the report conclude anywhere that dental care at Clinton was constitutionally inadequate. Second Am. Compl. at Ex. G11. Accordingly, it is equally implausible to suggest that Defendant Fischer's awareness of the unrelated state-wide issues presented in the report put him on notice of the potential that Plaintiff would suffer constitutional harm at the hands of Defendants Kullman and Oliveira. *See Colon v. Coughlin,* 58 F.3d at 873.

Next, Plaintiff claims that Defendant Fischer was grossly negligent in his supervision of Defendant Koenigsmann because he failed to ensure that Defendant Koenigsmann properly implemented DOCC's Quality Improvement Program and that he properly supervised Defendant D'Silva, DOCCS' Dental Director. Second Am. Compl. at ¶¶ 162–68. According to Plaintiff, it was Fischer's responsibility to ensure that Defendant Koenigsmann held Defendant D'Silva accountable for her responsibilities to (1) update HSPM § 2.01, (2) utilize the Dental Review Committee to assist in complying with policies, and to investigate health complaints, and (3) insure that Facility Dental Directors were effectively applying Dental Care Policies at CCF. *Id.* at ¶¶ 165–68.

**\*14** According to the Second Circuit:

a supervisor may be liable for failing to screen or otherwise inquire about his subordinates ... actions.... To be liable under section 1983 for his failure to inquire, he must first have been on notice that his subordinate was prone to commit some unconstitutional or unacceptable behavior. Such notice could be actual (for example, awareness of prior deprivations in a related context), or it could be constructive (for instance, notice arising from a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1292281 (N.D.N.Y.)
**(Cite as: 2014 WL 1292281 (N.D.N.Y.))**

preexisting duty)....

*Poe v. Leonard,* 282 F.3d at 141–42.

Here, Plaintiff points out several aspects which he believes could have been handled better by Defendants Koenigsmann and D'Silva, yet he fails to allege any facts from which it could plausibly be concluded that Defendant Fischer was, or should have been, aware of the allegedly deficient performance of his subordinates. "[T]he mere fact that a subordinate may have deprived an inmate of a constitutional right, without more, will not support a claim against that subordinate's supervisor." *Felix–Torres v. Graham,* 687 F.Supp.2d 38, 62 (N.D.N.Y.2009). Moreover, as mentioned above, the report Plaintiff offers is primarily focused on unrelated medical and staffing issues and does not involve dental care generally nor Defendants Koenigsmann and D'Silva. Therefore, Plaintiff has failed to plausibly allege that Defendant Fischer knew of, or should have known, that either of his subordinates required greater supervision. Consequently, Plaintiff has failed to state a plausible claim that Defendant Fischer's supervision of either Defendant was grossly negligent. *See Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) citing *Poe v. Leonard,* 282 F.3d at 140 & *Iqbal v. Hasty,* 490 F.3d 143, 166 (2d Cir.) cert. granted sub nom. Ashcroft v. Iqbal, 554 U.S. 902 (2008) for the proposition that "[t]o the extent that the complaint attempts to assert a failure-to-supervise claim, ... it lacks any hint that [defendant] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights."); *see also Poe v. Leonard,* 282 F.3d at 140 n. 14 ("We have often equated gross negligence with recklessness, and have defined it as the 'kind of conduct ... where [the] defendant has reason to know of facts creating a high degree of risk of physical harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk.' " (quoting *Bryant v. Maffucci,* 923 F.2d 979, 985 (2d Cir.1991)).

Accordingly, we recommend that Defendants' Motion be **GRANTED** as to Plaintiff's claims against Defendant Fischer.[FN9]

> FN9. In light of this recommendation, there is no need for us to address Defendants' request to dismiss, pursuant to the Eleventh Amendment, the monetary claims asserted against Defendant Fischer in his official capacity.

*4. Defendant La Valley*

Plaintiff claims that Defendant LaValley, CCF's Superintendent, is liable in his supervisory capacity for the alleged constitutional violations of Defendants Oliveira and Kullman, because (1) "despite having actual knowledge through his administrative oversight of the FHSD, through his operation and participation of the Quality Improvement Program and in the [Quality Improvement] Committee, and through his knowledge and awareness of grievances appealed through his office, had allowed and condoned the Policies and Customs which resulted in unconstitutional practices occurring." Second Am. Compl. at ¶¶ 169–79.

**\*15** Construed liberally, Plaintiff has alleged that Defendant LaValley was aware of the alleged constitutional violations which Plaintiff experienced at CCF yet took no action to remedy the situation. Plaintiff's allegations that Defendant LaValley learned of the alleged constitutional deprivations *via* his administrative oversight of the FHSD, participation in the Quality Improvement Committee, or through the grievances appealed through his office, are purely speculative and conclusory. Plaintiff failed to allege with any specificity how the alleged report generated by the FHSD, complaints received by the Quality Improvement Committee, or the grievances appealed through his office related directly to Plaintiff's allegedly deficient dental care.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1292281 (N.D.N.Y.)
**(Cite as: 2014 WL 1292281 (N.D.N.Y.))**

Moreover, although Plaintiff grieved these issues on two occasions, once while at DCF, and once while at GCF, there is nothing in the record from which it would be reasonable to infer that Defendant LaValley, the Superintendent of CCF, ever saw either grievance. *See, e.g.,* Second Am. Compl. at ¶¶ 18–21, 60 & Ex. F–3, Grievance # CL–62243–12. Plaintiff's first grievance was filed at DCF, and although he appealed the decision of the IGRC to the Superintendent, that grievance was handled by DCF's Superintendent, not Defendant LaValley the Superintendent of CCF. *See id.* at Ex. A–3, Superintendent's Response, dated Mar. 24, 2011. Moreover, while Plaintiff filed a grievance regarding his dental care while at CCF, he does not allege that he appealed the decision of the IGRC to the Superintendent. Second Am. Compl. at ¶ 60 & Ex. F–5, I.G.R.C. Response, dated May 5, 2012. Thus, Plaintiff has failed to plausibly allege that Defendant LaValley was aware of the alleged constitutional violations of which Plaintiff now complains, or that he had any reason to suspect that his subordinates would violate Plaintiff's constitutional rights. *See Pettus v. Morgenthau,* 554 F.3d at 300; *see also Poe v. Leonard,* 282 F.3d at 140 n. 14.

Therefore, we recommend that Defendants' Motion be **GRANTED** as to Plaintiff's claims against Defendant LaValley.

### D. Corrections Law § 24

In addition to his federal claims, Plaintiff also raises pendent state law negligence and medical malpractice claims against each of the named Defendants. Second Am. Compl. at ¶¶ 191–239. A federal court exercising pendent jurisdiction must apply state law. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1996). "Thus, if state law does not recognize a plaintiff's right to bring an action in state court, a federal court, exercising pendent jurisdiction, sitting as a state court, must follow the state law limitation on jurisdiction." *Livingston v. Griffin,* 2007 WL 2437433, at *2 (N.D.N.Y. Aug. 22, 2007) (citing *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996)).

New York **Corrections law § 24** precludes "the assertion of claims against corrections officers [in their personal capacities] in any court, including the federal courts," by designating the New York State Court of Claims as the only available venue to bring a claim for damages arising out the acts committed by corrections officers within the scope of their employment.[FN10] *Baker v. Coughlin,* 77 F.3d at 15. And, because the Court of Claims is a court of limited jurisdiction, hearing only claims against New York State and no other individual or entity, § 24 amounts to a grant of immunity for corrections officers sued in their personal capacities for claims arising out of the discharge of their duties. N.Y. CT. CLMS. LAW § 9.

FN10. N.Y. CORR. LAWW § 24 states that:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

**\*16** Plaintiff contends that when used to relegate to the Court of Claims civil rights actions brought pursuant to 42 U.S.C. § 1983, § 24 is inconsistent with the Supremacy Clause, U.S. Const. Art. VI, cl. 2, and therefore, pursuant to the Supreme Court's decision in *Haywood v. Drown,* 556 U.S. 729 (2009), unconstitu-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1292281 (N.D.N.Y.)
**(Cite as: 2014 WL 1292281 (N.D.N.Y.))**

tional. Pl.'s Opp'n at pp. 25–26. However, Plaintiff's reliance on *Haywood* is misplaced because claims brought pursuant to state law do not implicate the Supremacy Clause, and therefore, the *Haywood* decision does not affect the question of whether this Court has proper jurisdiction to hear pendent state law claims.[FN11] *See Rounds v. Thompson,* 2013 WL 3187074 (N.D.N.Y. June 20, 2013) (citing cases for the proposition that "courts in this District have held that the *Haywood* decision does not affect the question of the district court's jurisdiction to hear pendent state law claims against DOCCS employees and have continued to dismiss those claims under **Corrections Law § 24**."); *see also Lewis v. Turco,* 2011 WL 1044511, at *2 (W.D.N.Y. Mar. 21, 2011) ("In other words, in *Haywood,* the Supreme Court held that Correction Law section **24** was unconstitutional only insofar as it barred federal section 1983 claims in state court.").

> FN11. The *Haywood* Court held that New York State, having created courts of general jurisdiction that routinely hear § 1983 actions against all types of state actors, "is not at liberty to shut the courthouse door to federal claims [against corrections officers] that it considers at odds with its local policy." *Id.* at 2117. The Supreme Court found such selective treatment of § 1983 claims brought against corrections officers to be "contrary to Congress' judgment that *all* persons who violate federal rights while acting under color of state law shall be held liable for damages," and therefore, in violation of the Supremacy Clause. *Id.* at 2115 (emphasis in original).

Thus, pursuant to § 24, only the New York State Court of Claims has jurisdiction to hear Plaintiff's pendent state claim because Plaintiff has alleged acts that clearly fall within the scope of the Defendants' employment duties. The Second Circuit has held that § 24 bars a plaintiff from bringing state law claims against corrections employees in their individual capacities in

federal as well as state court. *Baker v. Coughlin,* 77 F.3d at 15–16. In making such ruling, the Second Circuit has stated that "[i]t is of no significance that § 24(1) refers only to actions in state courts, because a federal court acts essentially as a state court in addressing pendent state law claims." *Baker v. Coughlin,* 77 F.3d at 15. Under these circumstances, the correct jurisdiction for these types of claims rests with the New York State Court of Claims. Therefore, this Court does not have jurisdiction to hear Plaintiff's pendent state law claims and we recommended that Defendants' Motion be **GRANTED** and that Plaintiff's state law claims against all Defendants be **DISMISSED.**

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion to Dismiss (Dkt. No. 64) be **GRANTED** in part and **DENIED** in part as follows:

1) **GRANTED** as to Plaintiff's supervisory liability claims against Defendants Bellamy, LaValley, and Fischer, and these Defendants should be dismissed from this action;

2) **GRANTED** as to Plaintiff's state law negligence and medical malpractice claims against all Defendants;

3) **DENIED** as to Plaintiff's Eighth Amendment deliberate indifference claims against Defendants Oliveira and Kullman; and

4) **DENIED** as to Plaintiff's supervisory liability claims against Defendant Koenigsmann;

**\*17 ORDERED,** that the Clerk of the Court attach a copy of the Exhibits that were included in Plaintiff's Motion to Amend (Dkt. No. 47), as Document Numbers 47–3 through 47–8, to Plaintiff's Sec-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1292281 (N.D.N.Y.)
**(Cite as: 2014 WL 1292281 (N.D.N.Y.))**

ond Amended Complaint (Dkt. No. 60); and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

Date: March 3, 2014.

N.D.N.Y.,2014.
Rucano v. Koenigsmann
Slip Copy, 2014 WL 1292281 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2413995 (S.D.N.Y.)
**(Cite as: 2008 WL 2413995 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Injah TAFARI, Plaintiff,
v.
Paul W. ANNETS, et al, Defendants.

No. 06 Civ 11360(GBD)(AJP).
June 12, 2008.

**REPORT AND RECOMMENDATION**

ANDREW J. PECK, United States Magistrate Judge.

**\*1 To the Honorable George B. Daniels, United States District Judge:**

Pro se plaintiff Injah Tafari, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brought this action pursuant to 42 U.S.C. § 1983 and the First, Eighth and Fourteenth Amendments, alleging that defendants violated his right to the free exercise of religion, inflicted cruel and unusual punishment, and discriminated against him based on race. (Dkt. No. 38: 2d Am. Compl. [hereafter, "Compl."] at 1-2.) This Court previously severed and transferred Tafari's claims against DOCS defendants outside the Southern District of New York, and dismissed certain of Tafari's claims against the S.D.N.Y. defendants. *See Tafari v. Annets,* 06 Civ. 11360, 2007 WL 2994367 (S.D.N.Y. Oct. 15, 2007) (Peck, M.J.), familiarity with which is assumed. The Court denied defendants' motion to dismiss with respect to Tafari's claims relating to denial of Kosher meals in transit on January 16 and 20, 2004, June 20, 2005, July 26, 2005 and September 26, 2005, and on reconsideration, Tafari's claim against defendant Rabbi Chill over Tafari's request to be transferred to

Green Haven Correctional Facility. *Tafari v. Annets,* 2007 WL 2994367 at *18-19. (*See also* Dkt. No. 56: 10/29/07 Memo Endorsed Order, *aff'd,* 2008 WL 591804 (S.D.N.Y. Mar. 3, 2008).)

Presently before the Court is defendants' summary judgment motion. (Dkt. No. 65.) For the reasons set forth below, defendants' summary judgment motion should be GRANTED, and Tafari's complaint dismissed.

*FACTS*

Pro se plaintiff Injah Tafari is incarcerated at Clinton Correctional Facility, where he has "continuously been in keeplock or SHU [Special Housing Unit] confinement since May, 2003." (Dkt. No. 67: Defs. Rule 56.1 Stmt. ¶¶ 1, 17, 37, 38; Dkt. No. 73: Jordan Aff. ¶¶ 13, 14.) Tafari is a Rastafarian Jew,[FN1] and has been registered with the DOCS Division of Classification and Movement as Jewish since October 9, 2003, when he changed his registered religion from Rastafarian to Jewish. (Defs. Rule 56.1 Stmt. ¶¶ 2-4; Reznik Aff. Ex. B: Tafari Dep. at 7; Jordan Aff. ¶ 11; Dkt. No. 75: Leonard Aff. ¶ 8.)

> FN1. Specifically, Tafari states that he is "Jew-ish/Hebrew/Israelite/Ethiopian[Orthodox Jew-ism]," part of the "Nayabinghi House of Jah Rastafari, a Rastafarian sect of the line of Judah." (Dkt. No. 68: Reznik Aff. Ex. B: Tafari Dep. at 7; *see also* Defs. Rule 56.1 Stmt. ¶ 4.) Tafari has practiced his religion since birth. (Tafari Dep. at 7; Defs. Rule 56.1 Stmt. ¶ 4 .)

Tafari participates in a Kosher meal program and receives Kosher meals three times a day in the form of the Kosher Cold Alternative Diet ("CAD"). (Defs. Rule 56.1 Stmt. ¶¶ 5, 17, 18; Jordan Aff. ¶ 12; Leonard

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2413995 (S.D.N.Y.)
**(Cite as: 2008 WL 2413995 (S.D.N.Y.))**

Aff. ¶¶ 6, 8; Tafari Dep. at 79-80.) DOCS provides Kosher meals, mainly in the form of the CAD, to any inmate registered as Jewish who requests Kosher meals.[FN2] (Defs. Rule 56 .1 Stmt. ¶ 5; Leonard Aff. ¶ 6; Dkt. No. 71: Schattinger Aff. ¶ 5.) DOCS' Department of Nutritional Services prepares the CAD menu in coordination with DOCS' Director of Ministerial Services. (Defs. Rule 56.1 Stmt. ¶ 7; Schattinger Aff. ¶ 6.) The CAD, which is not a vegetarian diet, has been standardized since 1992. (Defs. Rule 56.1 Stmt. ¶¶ 13-14; Schattinger Aff. ¶¶ 11-12.) Most DOCS correctional facilities do not have Kosher kitchens or the ability to prepare on-site Kosher meals; Kosher food is prepared at Oneida Correctional Facility-which maintains a Kosher-compliant kitchen-and sent to individual facilities. [FN3] (Defs. Rule 56.1 Stmt. ¶¶ 6, 8-12; Schattinger Aff. ¶¶ 5-8.)

> FN2. Certain inmates at Green Haven Correctional Facility eat hot Kosher meals through the Pilot Kosher Food Program, described below.

> FN3. The individual facilities may package the Kosher food received from Oneida with other food that can be prepared in a Kosher manner at the individual facility. For example, fruits and vegetables can be prepared in a Kosher manner at individual facilities, whereas meat and dairy products, as well as juices, must be prepared in a central Kosher kitchen and shipped to the individual facilities. (Defs. Rule 56.1 Stmt. ¶¶ 9-12; Schattinger Aff. ¶ 7-8.)

**\*2** DOCS also provides inmates with an alternative vegetarian meal, which may or may not be Kosher, depending upon the particular ingredients and how it is prepared. (Defs. Rule 56.1 Stmt. ¶ 15; Schattinger Aff. ¶ 12.) DOCS does not serve a strictly Kosher vegetarian diet. (Defs. Rule 56.1 Stmt. ¶ 16; Johnston Aff. ¶ 10; Schattinger Aff. ¶ 12.)

Green Haven Correctional Facility is the only DOCS correctional facility that serves Kosher meals other than the CAD, providing a hot Kosher food menu under the auspices of the Green Haven Pilot Kosher Food Program.[FN4] (Defs. Rule 56.1 Stmt. ¶¶ 19-20; Johnston Aff. ¶ 4; Leonard Aff. ¶ 7; Schattinger Aff. ¶ 9; *see also* Dkt. No. 69: Chill Aff. ¶ 6.) The food used in the Pilot Kosher Food Program is prepared in Green Haven's Kosher kitchen according to a menu prepared by the Green Haven Food Administrator and the Green Haven Jewish Chaplain, Rabbi Chill. (Defs. Rule 56.1 Stmt. ¶¶ 23-26; Johnston Aff. ¶¶ 6-8; Chill Aff. ¶ 6-7.) "The Green Haven kosher kitchen prepares hot kosher meals from a different menu than the CAD menu" and "strives to track as closely as possible the menu offered to the general inmate population at DOCS' facilities." (Defs. Rule 56.1 Stmt. ¶ 27; Johnston Aff. ¶ 8; Schattinger Aff. ¶ 9.)

> FN4. "The Green Haven kosher meal program has been in existence since the early 1980s," and pre-existed the introduction of the CAD. (Defs. Rule 56.1 Stmt. ¶ 21; Schattinger Aff. ¶¶ 10-11.)

Jewish inmates at Green Haven who do not participate in the Pilot Kosher Food Program receive the CAD.[FN5] (Defs. Rule 56.1 Stmt. ¶ 22; Johnston Aff. ¶ 5.) Like other DOCS facilities, Green Haven offers a vegetarian alternative to the meat entrees on the general population menu, but does not offer a Kosher vegetarian alternative to the meat entrees on the Pilot Kosher Food menu or the CAD (just as other facilities do not offer a Kosher vegetarian alternative to the CAD). (Defs. Rule 56.1 Stmt. ¶¶ 15-16, 28; Johnston Aff. ¶ 9-10.)

> FN5. Currently, approximately forty-five Green Haven inmates participate in the Pilot Kosher Food Program and eight Green Haven inmates receive the CAD. (Defs. Rule

Not Reported in F.Supp.2d, 2008 WL 2413995 (S.D.N.Y.)
**(Cite as: 2008 WL 2413995 (S.D.N.Y.))**

56.1 Stmt. ¶ 29; Chill Aff. ¶ 8.)

***Tafari's Request to Transfer to Green Haven***

DOCS' Division of Classification and Movement evaluates inmates for placement in DOCS' correctional facilities and determines inmates' transfer requests to other correctional facilities. (Dkt. No. 67: Defs. Rule 56.1 Stmt. ¶¶ 31-33; Dkt. No. 73: Jordan Aff. ¶ 4.) The Division considers medical, psychiatric, programming and security needs when placing or transferring an inmate. (Defs. Rule 56.1 Stmt. ¶¶ 32, 34; Jordan Aff. ¶¶ 4, 7.) Inmates may request to transfer to another facility because they prefer to be housed in a particular geographic region, which is known as an "area of preference" transfer. (Defs. Rule 56.1 Stmt. ¶ 35; Jordan Aff. ¶ 8.) To be eligible for an area of preference transfer, a maximum security inmate must be "housed in a DOCS facility for at least one (1) year, must have been at his current facility for at least six (6) months, and must have an acceptable disciplinary record." (Defs. Rule 56.1 Stmt. ¶ 36; Jordan Aff. ¶ 9.) An inmate has an acceptable disciplinary record if he is "not currently serving a keeplock or SHU ('Special Housing Unit') sanction due to disciplinary rule infractions and has not accumulated more than 60 days in keeplock or SHU over the past year." (Defs. Rule 56.1 Stmt. ¶ 36; Jordan Aff. ¶ 9.) Tafari is currently in the SHU at Clinton Correctional Facility, has continuously been in SHU or keeplock confinement since May 2003, and is scheduled to remain in SHU until July 25, 2015. (Defs. Rule 56.1 Stmt. ¶¶ 37-38, 40; Jordan Aff. ¶¶ 13-15.)

**\*3** Tafari "made several requests to be transfer[red] to Green Haven to participate in the [Pilot] Kosher Food Program" so "that he can choose a substitute of non-meat items for the meat items offered on that menu." [FN6] (Tafari Reply Aff. ¶ 14; Defs. Rule 56.1 Stmt. ¶¶ 30, 43; Tafari Dep. at 66-67, 75, 79-80; *see also* Jordan Aff. ¶ 16; Dkt. No. 69: Chill Aff. ¶ 9.) DOCS classified Tafari's requests as area of preference transfer request because Tafari is registered as Jewish and already received Kosher meals in the form

of the CAD. (Defs. Rule 56.1 Stmt. ¶ 41; Jordan Aff. ¶ 16.) Tafari's disciplinary record-including "52 Tier II disciplinary proceedings and 53 Tier III disciplinary proceedings over his 21 years of incarceration"-precluded Tafari from eligibility for an area of preference transfer. (Defs. Rule 56.1 Stmt. ¶¶ 42, 44; Jordan Aff. ¶ 17.)

> [FN6.] Tafari believes that Green Haven offers a vegetarian alternative to their hot Kosher meals (*see* Dkt. No. 68: Reznik Aff. Ex. B: Tafari Dep. at 66-67, 79-80), and stated that he wishes to transfer to Green Haven in order to participate in the Pilot Kosher Food Program because the CAD "only provide[s] sandwi[che]s, soup and fresh vegetable[s] and fruits." (Dkt. No. 83: Tafari Reply Aff. ¶¶ 14, 21.) Tafari's opposition to defendants' summary judgment motion asserts that defendants must "amend [ ] the C.A.D. menu with replacements of meat and/or meat by-products, and/or transfer[ Tafari] to Green Haven to participate in the kosher food program." (Tafari Reply Aff. ¶ 21.)

On April 30, 2004, Tafari submitted a formal grievance regarding DOCS' denial of his April 23, 2004 transfer request to participate in Green Haven's Kosher Food Program. (Tafari Reply Aff. Ex. B at 5: 4/30/04 Grievance AUB-42241-04.) On May 14, 2004, Auburn Superintendent John Burge responded to Tafari's grievance, stating that the "Kosher Food Program in question is an Honor Program. An inmate must have at least one (1) year free of Tier Hearing convictions. [Tafari's] disciplinary record makes him ineligible." (Tafari Reply Aff. Ex. B at 7: 5/14/04 Supt. Dec.) Tafari appealed Superintendent Burge's decision stating that "[t]here is no such law indicating that a Jewish [i]nmate must be one year free of [t]ier hearing [c]onvictions in [o]rder to participate in the kosher food program at Green Haven" and that "DOCS is violating [his] [c]onstitutional [r]ights [u]nder the First and Fourthteen [sic] Amendment to

Not Reported in F.Supp.2d, 2008 WL 2413995 (S.D.N.Y.)
**(Cite as: 2008 WL 2413995 (S.D.N.Y.))**

Freedom of Religion." (Tafari Reply Aff. Ex. B at 8: Grievance AUB-42241-04 Appeal.) On July 7, 2004, the Central Office Review Committee ("CORC") upheld Superintendent Burge's decision, stating that Tafari's "religious and dietary needs are being met at his present facility. CORC advises [Tafari] to address his transfer concerns to his assigned correction counselor." (Tafari Reply Aff. Ex. B at 10: 7/7/04 CORC Dec.)

On July 10, 2004, Tafari submitted a formal grievance regarding denial of his July 6, 2004 Green Haven transfer request stating that:

[the] denial was solely based upon [r]acial discrimination .... It is well documented, that the entire Jewish [i]nmate population at Green Haven C.F. are Europeans, and all Black and Latino Jewish [i]nmates are spread[ ] out throughout the DOCS facilities subjected to the [c]old [a]lternative [m]eals 3x day, while these European(s) Jewish [i]nmate[ ]s get the full constitutional right to practice and enjoy the Jewish faith and/or [r]eligion by eating [sic] [h]ot cooked Kosher meals 3x day.

(Tafari Reply Aff. Ex. B at 11-13: 7/10/04 Grievance AUB-42810-04; *see also* Tafari Reply. Aff. Ex. B at 33-35: 7/15/04 Compl. Addendum.) On August 13, 2004, Auburn Superintendent Burge denied Tafari's grievance because Tafari's transfer request was submitted by Auburn but "denied by Classification and Movement, not the [Auburn Correctional] facility." (Tafari Reply Aff. Ex. B at 17: 8/13/04 Supt. Dec.) On September 29, 2004, CORC upheld Superintendent Burge's decision, noting that Tafari's "transfer request was denied due to his poor custodial adjustment. CORC also asserts that [Tafari's] religious needs are being accommodated at his current facility, in accordance with Department policy. Jewish inmates, regardless of race, may request and receive the cold alternative diet." (Tafari Reply Aff. Ex. B at 18: 9/29/04 CORC Dec .) [FN7]

FN7. Tafari claims that DOCS denied Tafari's transfer request to Green Haven despite twenty months free from "misbehavior reports" while at Auburn Correctional Facility, and that he was instead sent to Eastern Correctional Facility. (Reznik Aff. Ex. B: Tafari Dep. at 75.)

**\*4** On September 22, 2004, Tafari wrote Rabbi Matasar at Auburn Correctional Facility, requesting the Rabbi's help in transferring to Green Haven to participate in the Pilot Kosher Food Program. (Tafari Reply Aff. ¶ 17 & Ex. B at 19-20: 9/22/04 Letter.) Rabbi Matasar responded that "transfers are the business of the guidance unit & classification & movement in albany." (Tafari Reply Aff. ¶ 17 & Ex. B at 21: 9/24/04 Letter.)

On December 3, 2006, while housed at Five Points Correctional Facility, Tafari wrote to Senior DOCS Rabbi Arthur Morgenstern requesting help in transferring to Green Haven, copying Rabbi Chill of Green Haven and Rabbi Jacobs of Five Points. (Tafari Reply Aff. ¶ 18 & Ex. B at 22: 12/3/06 Letter.) Assistant Director of Ministerial Services Omega B. Alston responded that "a request for transfer has to be initiated by [Tafari's] Correction Counselor. The transfer request has to be for a specific program need such as for an educational, vocational or treatment program.... [DOCS'] Directive 4202, Religious Programs and Practices does not state any transfers for religious purposes." (Tafari Reply Aff. ¶ 18 & Ex. B at 23: 1/23/07 Letter.) [FN8]

FN8. Directive 4202 provides in relevant part:

**DIETARY CONSIDERATIONS.** Inmates may refrain from eating those food items served to the general population which are contrary to their religious be-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2413995 (S.D.N.Y.)
**(Cite as: 2008 WL 2413995 (S.D.N.Y.))**

liefs. A nutritionally adequate alternate diet shall be provided after validation and verification of the religious need for the alternate diet by the Ministerial Program Coordinator of the faith group or the Director of Ministerial and Family Services and the Assistant Commissioner for Health Services.

(Dkt. No. 75: Leonard Aff. Ex. A: Directive 4202 at 8.)

On December 12, 2006, Tafari submitted a formal grievance alleging that on December 3, 2006, Rabbi Jacobs told Tafari, "I have discussed the [transfer] issue with Rabbi Morgenstern, and Rabbi Chill, and we have determined that [n]iggers are not Jews, therefore, you will never be approved for the Kosher Food Program at Green Haven." (Tafari Reply Aff. ¶ 19 & Ex. B at 24: 12/12/06 Grievance FPT-16281-06.) On December 21, 2006, Five Points' Acting Superintendent found "no merit to [Tafari's] grievance" because Tafari "offered no evidence or witness testimony to substantiate [Tafari's] allegations. Rabbi Jacobs indicated he has never made any racial slurs towards" Tafari. (Tafari Reply Aff. Ex. B at 25: 12/21/06 Supt. Dec.) On January 31, 2007, CORC upheld the decision, noting that the "employee in question was interviewed by telephone and denied [Tafari's] allegations. CORC has not been presented with sufficient evidence to substantiate that [Tafari] has been the victim of harassment." (Tafari Reply Aff. Ex. B at 26: 1/31/07 CORC Dec.)

Rabbi Chill-Green Haven's Jewish Chaplain who oversees the Pilot Hot Kosher Meal Program-has no authority to grant or deny inmates' requests to transfer to Green Haven to participate in the Pilot Kosher Food Program. (Defs. Rule 56.1 Stmt. ¶ 45; Chill Aff. ¶¶ 2, 10.)

### Kosher Meals In Transit

Inmates receive bag lunches-including Kosher bag lunches for Jewish inmates-while in transit between DOCS facilities. (Dkt. No. 67: Defs. Rule 56.1 Stmt. ¶¶ 47, 49; Dkt. No. 70: Johnston Aff. ¶ 11; Dkt. No. 71: Schattinger Aff. ¶ 13.) DOCS security personnel are responsible for ordering the correct number of bag lunches for inmates who will be transported, but Jewish inmates "must specifically request a kosher bag lunch from security personnel when they are in transit, so the security personnel can order the kosher bag lunch." (Defs. Rule 56.1 Stmt. ¶¶ 48-49; Johnston Aff. ¶ 11; Schattinger Aff. ¶ 13.) DOCS prefers inmates to request a Kosher bag lunch the night before they are transported, but often inmates request Kosher bag lunches "just prior to the time that the transfer occurs." (Defs. Rule 56.1 Stmt. ¶ 50; Johnston Aff. ¶ 11.)

**\*5** A Kosher bag lunch typically consists of "a meat or cheese sandwich made with kosher meat or cheese, condiments, chips, a cookie or cake, and juice." (Defs. Rule 56.1 Stmt. ¶ 53; Johnston Aff. ¶ 12.) The food items used to make the CAD at a particular facility are also used by that facility to make Kosher bag lunches. (Defs. Rule 56.1 Stmt. ¶ 54; Johnston Aff. ¶ 12.)

Fasting is an accepted part of the Jewish religion. (Defs. Rule 56.1 Stmt. ¶ 64; Dkt. No. 69: Chill Aff. ¶ 12.) For example, Jews fast on the holidays of Yom Kippur and Tisha B'Av. (Defs. Rule 56.1 Stmt. ¶ 64; Chill Aff. ¶ 12.) When Kosher food is not available, the Jewish faith permits eating non-Kosher food in life threatening situations, or when a person's health of safety would be jeopardized by not eating at all. (Defs. Rule 56.1 Stmt. ¶ 65; Chill Aff. ¶ 12.)

### Denial of Kosher Bag Lunches on January 16 and 20, 2004

On January 16, 2004, Tafari was transported from Clinton Correctional Facility to Downstate Correctional Facility. (Dkt. No. 68: Reznik Aff. Ex. B: Tafari Dep. at 32-33.) Tafari received a Kosher breakfast, but

Not Reported in F.Supp.2d, 2008 WL 2413995 (S.D.N.Y.)
**(Cite as: 2008 WL 2413995 (S.D.N.Y.))**

Downstate officers did not provide Tafari with a Kosher lunch or Kosher dinner. (Dkt. No. 67: Defs. Rule 56.1 Stmt. ¶ 55; Tafari Dep. at 32-33; Dkt. No. 83: Tafari Reply Aff. ¶ 4.)

On January 20, 2004, Tafari was transported from Downstate to Auburn Correctional Facility. (Defs. Rule 56.1 Stmt. ¶ 56; Tafari Dep. at 39-40.) Tafari was not offered, and did not receive, a Kosher breakfast or Kosher lunch, and was instead offered regular, non-Kosher meals, which he refused to accept. (Defs. Rule 56.1 Stmt. ¶ 56; Tafari Dep. at 40-41; Tafari Reply Aff. ¶ 4.) January 20, 2004 was the Martin Luther King Holiday, and "everything [at the facility] was shut down." (Defs. Rule 56.1 Stmt. ¶ 56; Tafari Dep. at 39.)

On January 25, 2006, Tafari submitted a formal grievance regarding, *inter alia,* the denial of these Kosher bag lunches. (Tafari Reply Aff. ¶ 5.) Tafari's grievance stated that on January 16, 2004, he "requested an alternative [Kosher] meal while on the bus and was denied" and on January 20, 2004, after he boarded the bus, he "again requested that [he] be provided with the Jewish [a]lternative [m]eal, and again was denied." (Tafari Reply Aff. Ex. A at 6-7: 1/25/04 Grievance AUB-41576-04.) On appeal, on April 28, 2004, CORC stated that Tafari "must address his wishes to receive a cold alternative diet, while in transit, with staff prior to leaving the facility and not while in transit." (Tafari Reply Aff. Ex. A at 16: 4/28/04 CORC Dec.)

***Denial of Kosher Bag Lunches on June 20 and 24, 2005***

On June 20, 2005, Tafari was transported from Eastern to Downstate to Clinton Correctional Facilities and was denied a Kosher bag lunch between Downstate and Clinton when the bus stopped at Washington Correctional Facility.[FN9] (Dkt. No. 67: Defs. Rule 56.1 Stmt. ¶ 57; Tafari Dep. at 44-45; Dkt. No. 83: Tafari Reply Aff. ¶ 6 & Ex. A at 17: Grievance ECF-20896-05.) Tafari requested a kosher bag lunch,

but was offered a regular bag lunch, which he did not eat. (Defs. Rule 56.1 Stmt. ¶ 57; Tafari Dep. at 44-45.) Tafari does not allege any physical injury as a result of this incident. (Defs. Rule 56.1 Stmt. ¶ 58; Tafari Dep. at 46.)

> FN9. During Tafari's deposition, Tafari referred to Washington Correctional Facility as "Great Meadows," another DOCS facility located in the same town as Washington Correctional Facility. (Dkt. No. 68: Reznik Aff. Ex. B: Tafari Dep. at 44; *see also* DOCS Facility Listing, http:// www.docs.state.ny.us/faclist.html (last visited May 27, 2008).)

**\*6** On June 28, 2005, Tafari submitted a formal grievance stating that he "advised Downstate C.F. that [he] wanted to be provided with a Kosher meal for lunch, [but he] was told by the Downstate C.F. staff that Washington C.F. provides the lunch once [they] get there.... Once reaching Washington C.F., [he] was denied Kosher meals by Washington C.F. staff and told to eat what was in the brown bag, or don't eat at all." (Tafari Reply Aff. ¶ 7 & Ex. A at 17: Grievance ECF-20896-05.) Tafari also stated that he was denied a Kosher lunch on June 24, 2005 by Washington staff when Tafari returned to Eastern via that facility. (Tafari Reply Aff. Ex. A at 18: Grievance ECF-20896-05.)

On July 13, 2005, Washington Correctional Facility Food Administrator Mark Walker responded to Tafari's grievance, stating that he:

> had denied [Tafari's] request for a kosher transit lunch. To my knowledge we have never been asked or directed to provide such a meal in the past.... I now know that a Jewish inmate requesting a C.A.D. transit lunch, we need to provide the meal. I have requested some direction from Nutritional Services on what should be provided for this meal.... I should

Not Reported in F.Supp.2d, 2008 WL 2413995 (S.D.N.Y.)
**(Cite as: 2008 WL 2413995 (S.D.N.Y.))**

... be able to provide C .A.D. transit lunches when requested by an inmate that is eligible for the meal.

(Tafari Reply Aff. ¶ 7 & Ex. A at 20: 7/13/05 Walker Response Letter.) On July 21, 2005, Downstate Deputy Superintendent Reception/Classification Catherine Jacobsen responded to Tafari's grievance stating that Jacobsen had "followed up with [the] Washington C.F. And you should have received a kosher meal. Washington C.F. [h]as advised me that they are putting things in place to prevent this from happening again in the future." (Tafari Reply Aff. ¶ 8 & Ex. A at 21: 7/21/05 Jacobsen Response Letter.)[FN10]

> FN10. On July 8, 2005, Downstate Inmate Grievance Program ("IGP") Supervisor S. Hughes issued an investigative response to Tafari's grievance stating that "C.O. Jarvis provided the information that [Tafari] made no mention of a desire for Kosher food to her, and she was an Officer involved with preparing inmates to draft out on 6/20/05." (Dkt. No. 24: 4/4/07 Johnson Motion to Dismiss Aff. Ex. C at 8: Hughes Investigative Response.)

On July 25, 2005, Eastern's Superintendent responded to Tafari's grievance stating that an "[i]nvestigation indicates that grievant [Tafari] did not request a cold alternative meal at Downstate Correctional Facility. Grievant did request a cold alternative meal at Washington Correctional Facility; however, one was not provided." (Tafari Reply Aff. Ex. A at 23: 7/25/05 Supt. Dec.) On September 28, 2005, the CORC upheld the Superintendent's decision and

> note[d] from the facility investigation, at Downstate CF, that the Officer involved with preparing the inmates to draft out on 6/20/05 indicates the grievant made no request for a Cold Alternative Meal.... CORC also notes that the Draft Sergeant, on

6/24/05, does not recall if the grievant requested a Cold Alternative Meal, however, all requests received in a timely manner are routinely honored.

(Tafari Reply Aff. Ex. A at 24: 9/28/05 CORC Dec.) CORC also noted "that Clinton CF provides the noon meals for inmates that are changing buses at Washington CF." (Tafari Reply Aff. Ex. A at 24: 9/28/05 CORC Dec.)

### Denial of Kosher Bag Lunch on July 26, 2005

On July 26, 2005, Tafari was transferred from Downstate to Elmira Correctional Facility, and requested but was denied a Kosher bag lunch when departing Downstate. (Dkt. No. 67: Defs. Rule 56.1 Stmt. ¶ 59; Dkt. No. 68: Reznik Aff. Ex. B: Tafari Dep. at 46-47; Dkt. No. 83: Tafari Reply Aff. ¶ 9.) Tafari does not allege any physical injury as a result of being denied a Kosher bag lunch. (Defs. Rule 56.1 Stmt. ¶ 60; Tafari Dep. at 47-48.) On July 29, 2005, Tafari submitted a formal grievance stating that:

> **\*7** Sgt. McDonald told [him] that the cook said all [he] can get was 2 cheese sandwicks [sic] for [his] Kosher meal. [He] told the Sgt. that the sandwicks [sic] were not Kosher, and [the Sgt.] told [Tafari] that was all [the] Downstate CF. cook sent for [him]. [He] did not eat during the ride from Downstate CF. to Elmira CF. on July 26th, 2005.

(Tafari Reply Aff. Ex. A at 25: Grievance ECF-20967-05.) On August 4, 2005, Deputy Supt. Jacobsen responded that she "was advised that [Tafari] received two cheese sandwiches with Kosher cheese" and that "peanut butter and jelly (made with Kosher products) would be more appropriate for in transit bag lunches. We have put the new procedure into place at Downstate."[FN11] (Tafari Reply Aff. Ex. A at 26: Jacobsen Response Letter; see also Tafari Reply Aff. ¶¶ 10-11.)

> FN11. On January 3, 2008, Tafari informed

Not Reported in F.Supp.2d, 2008 WL 2413995 (S.D.N.Y.)
**(Cite as: 2008 WL 2413995 (S.D.N.Y.))**

the Court that Downstate had resolved any problems in providing Kosher transit meals in the future:

> THE COURT: ... I take it from our prior conference that the kosher meals in transit issue is largely resolved or is completely resolved going forward.

> MR. TAFARI: It's largely resolved .... Paul Annetts has already spoken with the rabbi at Downstate and they are implementing only at Downstate. All I was requesting is that because Paul Annetts is in charge of the whole transportation of DOCS, he should go to central office and stress to them that that is what it is for kosher inmates or just me ....

> ....

> THE COURT: It appears ... that there is apeanut butter and jelly sandwich that is kosher that's made available for the bag lunch. Is that correct, Mr. Tafari?

> MR. TAFARI: Yes, sir. Defendant Paul Annetts, superintendent of Downstate, had implemented at Downstate as a result of this complaint. He went to the rabbi in his facility and the rabbi said that's what they are going to get in transit. They only implemented at Downstate [but not if] I leave from any other facility.

> (Dkt. No. 81: 1/3/08 Conf. Tr. at 12-13.)

On August 24, 2005, Eastern's Superintendent responded to Tafari's grievance stating that the "[i]nvestigation indicates that grievant [Tafari] was not provided with a kosher meal while in transit status on 7/26/05. Appropriate staff have been spoken to as

to insure that grievant is provided with an appropriate meal in the future." (Dkt. No. 24: 4/4/07 Johnson Motion to Dismiss Aff. Ex. D at 2: 8/24/05 Sup. Dec.) Tafari appealed the Superintendent's decision and on October 19, 2005, CORC responded:

> CORC notes that Sgt. M ... at Downstate CF has gone on record to state that a Cold Alternative Diet lunch was secured for the grievant on [7]/26/05 even though the grievant's diet status could not be verified at that time. CORC further notes that the grievant did not eat the lunch as he did not consider the two cheese sandwiches to be kosher.

> Contrary to the grievant's assertions, CORC has not been presented with sufficient evidence to substantiate any malfeasance by the employees referenced in this complaint. CORC notes that no corrective action is deemed necessary at this time.

> (4/4/07 Johnson Motion to Dismiss Aff. Ex. D at 1: 10/19/05 CORC Dec.)

### Denial of Kosher Bag Lunch on September 26, 2005

On September 26, 2005, Tafari was transported from Downstate to Elmira Correctional Facility and was denied a Kosher bag lunch while in transit. (Dkt. No. 67: Defs. Rule 56.1 Stmt. ¶ 61; Dkt. No. 68: Reznik Aff. Ex. B: Tafari Dep. at 48-49; Dkt. No. 83: Tafari Reply Aff. ¶ 12.) On October 3, 2005, Tafari submitted a formal grievance stating that prior to boarding the bus, he "informed the two (2) officers that [he] wanted Kosher lunch on the bus [and] then informed the Draft Room Sgt. and Lt. that [he] wanted Kosher lunch on the bus. When the bus stopped at Elmira C.F., the transportation supervisor told [him] that no Kosher meal was sent for [him]." (Tafari Reply Aff. Ex. A at 28: Grievance ECF-21140-05.) Tafari alleges no physical injury as a result of being denied a Kosher bag lunch. (Defs. Rule 56.1 Stmt. ¶ 62; Tafari Dep. at 49.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2413995 (S.D.N.Y.)
(Cite as: 2008 WL 2413995 (S.D.N.Y.))

On October 12, 2005, Deputy Supt. Jacobsen responded to Tafari's grievance by apologizing that Tafari did not receive a kosher meal while in transit and "suggest[ed] in the future that [Tafari] alert security earlier regarding [Tafari's] meal requirement." (Tafari Reply Aff. ¶ 13 & Ex. A at 31: 10/12/05 Jacobsen Response Letter.) On November 10, 2005, Elmira Deputy Supt. for Administrative Services William J. Hopkins responded to Tafari' grievance by stating that Elmira administrators "have no way of verifying the accuracy of [Tafari's] complaint," but that they "have a policy that enables [them] to provide for the dietary needs of inmates in transit ...." (Tafari Reply Aff. Ex A at 32: 11/10/05 Hopkins Response Letter.) Deputy Supt. Hopkins also stated that "[i]f [Tafari's] complaint is true and [Tafari] did request the CAD meal and [was] denied it, you have our humble apologies." (*Id.*)

**\*8** On October 31, 2005, the Superintendent responded to Tafari's grievance by stating that Elmira staff "have been advised of proper procedure to provide C.A.D. to in[ ]transit inmates. Every effort will be made to insure C.A.D. is provided." (Tafari Reply Aff. Ex. A at 34: 10/31/05 Supt. Dec.) On December 7, 2005, CORC upheld the Superintendent's decision and "note[d] that Downstate CF had no record of the grievant requesting a cold alternative diet trip bag." (Tafari Reply Aff. Ex. A at 35: 12/7/05 CORC Dec.) FN12

FN12. CORC added:

> CORC advises the grievant that requests for a cold alternative diet, while on extended out-to-court status, should be submitted to the Deputy Superintendent for Programs, for approval. The grievant may have missed a cold alternative diet meal during the approval process.

> (*Id.*)

Tafari stated at his deposition that he is not seeking money damages for the five instances of denial of a Kosher meal while in transit. (Dkt. No. 68: Reznik Aff. Ex. B: Tafari Dep. at 93.)

### Procedural History

On April 5, 2007, defendants moved to dismiss on several grounds. (Dkt. No. 25: Notice of Motion.) While that motion was pending, defendants filed a letter brief requesting that "[p]laintiffs claims that accrued in correctional facilities outside of the Southern District of New York ['S.D.N.Y.'] and that involve defendants other than those residing within the Southern District should be severed and transferred to those districts." (Dkt. No. 52: Reznik 8/30/07 Ltr. at 2.)

On October 15, 2007, this Court granted defendants' request to sever and transfer Tafari's claims that " 'accrued in correctional facilities outside of the Southern District of New York ... and that involve defendants other than those residing within the Southern District ....' " FN13 *Tafari v. Annets,* 06 Civ. 11360, 2007 WL 2994367 at *1, 9-11 (S.D.N.Y. Oct. 15, 2007) (Peck, M.J.). This Court and Judge Daniels granted defendants' motion to dismiss as to all claims against Southern District defendants, *except* for Tafari's claims "relating to the denial of Kosher meals in transit on January 16 and 20, 2004, June 20, 2005, July 26, 2005, and September 26, 2005." *Tafari v. Annets,* 2007 WL 2994367 at *1, 18-19. This Court and Judge Daniels later granted Tafari's reconsideration motion and reinstated Tafari's claim against defendant Rabbi Chill for denying Tafari's request to transfer to Green Haven. FN14 (*See* Dkt. No. 56: 10/29/07 Judge Peck Order; *Tafari v. Annets,* 06 Civ. 11360, 2008 WL 591804 at *1 (S.D.N.Y. Mar. 3, 2008).) After the completion of discovery, defendants moved for summary judgment on the remaining Southern District claims. (Dkt. No. 65.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2413995 (S.D.N.Y.)
**(Cite as: 2008 WL 2413995 (S.D.N.Y.))**

**FN13.** Judge Daniels adopted this Court's Report and Recommendation on defendants' motion to dismiss, but instead of separately transferring claims to the Western and Northern Districts of New York, transferred all the non-S.D.N.Y. claims to the Northern District, leaving that District to "determine whether efficiency warrants any further severance and transfer to the Western District." *Tafari v. Annets,* 06 Civ. 11360, 2008 WL 536222 at *3 n. 2 (S.D.N.Y. Feb. 25, 2008).

**FN14.** This Court previously dismissed all claims against defendant Rabbi Chill because Tafari failed to allege any facts demonstrating that Rabbi Chill "was personally involved in denying [Tafari] his alleged constitutional rights concerning a transfer to Green Haven." *Tafari v. Annets,* 2007 WL 2994367 at *14-16.

### ANALYSIS

### I. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991).

**\*9** The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. *See, e.g., Adickes v.. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608 (1970); *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994); *Gallo v. Prudential Residential Servs., Ltd.*

*P'ship,* 22 F.3d 1219, 1223 (2d Cir.1994). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552-53.

To defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986). Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *accord, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587, 106 S.Ct. at 1356; *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000) (At summary judgment, "[t]he time has come ... 'to put up or shut up.' ") (citations omitted), *cert. denied,* 540 U.S. 811, 124 S.Ct. 53 (2003).

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. at 2513.[FN15] The Court draws all inferences in favor of the nonmoving party only after determining that such inferences are reasonable, considering all the evidence presented. *See, e.g., Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 489 (1987). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d at 37.

**FN15.** *See also, e.g., Feingold v. New York,* 366 F.3d 138, 148 (2d Cir.2004); *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d at 36;

Not Reported in F.Supp.2d, 2008 WL 2413995 (S.D.N.Y.)
**(Cite as: 2008 WL 2413995 (S.D.N.Y.))**

*Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d at 1223.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact. *See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987); *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570 (1987). To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510. While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,][f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. at 2510 (citations omitted); *see also, e.g., Knight v. U.S. Fire Ins. Co.,* 804 F.2d at 11-12.

**\*10** "The Court recognizes that it must 'must extend extra consideration' to pro se plaintiffs" and that "pro se parties are to be given special latitude on summary judgment motions." *Salahuddin v. Coughlin,* 999 F.Supp. 526, 535 (S.D.N.Y.1998) (Peck, M.J.) (citations & internal quotations omitted); *see, e.g., McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (a pro se party's pleadings should be read liberally and interpreted " 'to raise the strongest arguments that they suggest' ").[FN16] "Nevertheless, proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* 93 Civ. 5981, 1999 WL 983876 at \*3 (S.D.N.Y. Oct. 28, 1999) (citing cases).[FN17]

FN16. *See also, e.g., Ferran v. Town of Nassau,* 471 F.3d 363, 369 (2d Cir.2006); *Fuller v. Armstrong,* 204 Fed. Appx. 987,

988 (2d Cir.2006), *cert. denied,* 128 S.Ct. 209 (2007); *Gildor v. United States Postal Serv.,* 179 Fed. Appx. 756, 758 (2d Cir.2006); *Porter v. Coughlin,* 421 F.3d 141, 144 n. 2 (2d Cir.2005); *Hemphill v. New York,* 380 F.3d 680, 687 (2d Cir.2004); *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003); *Johnson v. Buffalo Police Dept.,* 46 Fed. Appx. 11, 12 (2d Cir.2002), *cert. denied,* 539 U.S. 959, 123 S.Ct. 2645 (2003).

FN17. *See also, e.g., United States v. Acomb,* No. 99-6308, 216 F .3d 1073 (table), 2000 WL 899482 at \*1 (2d Cir. June 29, 2000); *James v. Phillips,* 05 Civ. 1539, 2008 WL 1700125 at \*3 (S.D.N.Y. Apr. 9, 2008); *Thompson v. Tracy,* 00 Civ. 8360, 2008 WL 190449 at \*5 (S.D.N.Y. Jan. 17, 2008); *Bunting v. Nagy,* 452 F.Supp.2d 447, 454 (S.D.N.Y.2006); *Rodriguez v. McClenning,* 399 F.Supp.2d 228, 234 & n. 52 (S.D.N.Y.2005); *Pack v. Artuz,* 348 F.Supp.2d 63, 78 (S.D.N.Y.2004); *Rector v. Sylvania,* 285 F.Supp.2d 349, 353 (S.D.N.Y.2003); *Walker v. Vaughan,* 216 F.Supp.2d 290, 296-97 (S.D.N.Y.2002); *Hussein v. The Waldorf-Astoria,* 134 F.Supp.2d 591, 596 (S.D.N.Y.2001), *aff'd,* 31 Fed. Appx. 740 (2d Cir.2002).

**II. SUMMARY JUDGMENT SHOULD BE GRANTED TO RABBI CHILL ON TAFARI'S GREEN HAVEN TRANSFER CLAIM BECAUSE RABBI CHILL LACKED PERSONAL INVOLVEMENT**

**A. *Legal Standard***

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is aprerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2413995 (S.D.N.Y.)
**(Cite as: 2008 WL 2413995 (S.D.N.Y.))**

Cir.1994); *accord, e.g., Warheit v. City of N.Y.,* No. 06-4463, 2008 WL 904777 at *3 (2d Cir. Apr. 3, 2008); *Dyno v. Village of Johnson City,* 240 Fed. Appx. 432, 434 (2d Cir.2007), *cert. denied,* 128 S.Ct. 1874 (2008); *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006); *Gill v. Tuttle,* 93 Fed. Appx. 301, 302 (2d Cir.2004); *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 122 (2d Cir.2004); *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003), *cert. denied,* 543 U.S. 1093, 125 S.Ct. 971 (2005).[FN18]

> FN18. *See, e.g., Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999); *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Allan v. Woods,* No. 05-CV-1280, 2008 WL 724916 at *5 (N.D.N.Y. Mar. 17, 2008) ("Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability."); *Zamakshari v. Dvoskin,* 899 F.Supp. 1097, 1109 (S.D.N.Y.1995) (Sotomayor, D.J. & Peck, M.J.) ("In order to maintain a cause of action [under § 1983] against any official, a plaintiff must show that the defendant was personally involved in the alleged deprivation of his constitutional rights, since the doctrine of *respondeat superior* does not apply to § 1983 actions.").

"The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to

act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d at 873.[FN19]

> FN19. *Accord, e.g., Iqbal v. Hasty,* 490 F.3d 143, 152 (2d Cir.2007); *Ziemba v. Clark,* 167 Fed. Appx. 831, 833 (2d Cir.2006); *Samuels v. Selsky,* 166 Fed. Appx. 552, 556 (2d Cir.2006); *Patterson v. County of Oneida,* 375 F.3d 206, 229 (2d Cir.2004); *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d at 127; *Hayut v. State Univ. of N.Y.,* 352 F.3d 733, 753 (2d Cir.2003); *Hernandez v. Keane,* 341 F.3d at 145; *Wright v. Smith,* 21 F.3d at 501; *see also, e.g., Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002).

**B.** *Application of the Legal Standard*

Rabbi Chill unequivocally swore in his affidavit that he has no authority to grant or deny inmates' requests to transfer to Green Haven to participate in the Pilot Kosher Food Program. (*See* page 5 above.) Rather, inmate transfer requests are determined by DOCS' Division of Classification and Movement. (*See* page 5 above.) DOCS' responses to Tafari's grievances over the denial of his transfer request document that the decisions were made by the Division of Classification and Movement. (*See* pages 6-9 above.)

**\*11** Tafari's only allegation of Rabbi Chill's involvement is his assertion that Rabbi Jacobs told Tafari that he had consulted with Rabbis Morgenstern and Chill, "and we have determined that niggers are not Jews, therefore, you will never be approved for the Kosher Food Program at Green Haven." (*See* page 9 above.)[FN20]

> FN20. Rabbi Jacobs denied making this statement. (*See* page 9 above.)

Assuming for purposes of this motion that Rabbi Jacobs made this abhorrent statement (and even as-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2413995 (S.D.N.Y.)
**(Cite as: 2008 WL 2413995 (S.D.N.Y.))**

suming that it accurately reflected Rabbi Chill's views), it does not suffice to prove Rabbi Chill's involvement in the denial of Tafari's transfer request. Tafari has not offered any evidence that Rabbi Chill (or any other DOCS Rabbi) had the authority to approve (or reject) Tafari's transfer request to Green Haven for the Kosher Food Program. Rabbi Chill's affidavit stating that he had no authority to grant or deny inmates' transfer requests to Green Haven for the Kosher Food Program, and evidence that transfer decisions are made by DOCS' Division of Classification and Movement, stand uncontradicted. Tafari's claim that Rabbi Chill was involved in the denial of his transfer is vague and conclusory and does not allege that Rabbi Chill had any authority to approve (or reject) a transfer request. Tafari's claim against Rabbi Chill over the denial of Tafari's request to transfer to Green Haven should be denied for Rabbi Chill's lack of personal involvement. *E.g., Bratton v. Goord,* No. 02CV185, 2006 WL 5564143 at *5 (N.D .N.Y. May 23, 2006) (Summary judgment for defendants' regarding plaintiff's incarceration at a particular correctional facility where defendants' were not personally involved in decision to incarcerate or transfer plaintiff and had no authority to do so.); *see, e.g., Gaston v. Coughlin,* 249 F.3d 156, 166 (2d Cir.2001) (Affirming summary judgment for prison employees who were not assigned to the prison during the time period in which the plaintiff was allegedly exposed to inhumane conditions, since plaintiff "has not asserted any personal involvement by those defendants."); *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (Affirming summary judgment for DOCS' Commissioner for lack of personal involvement where his only role in confining plaintiff to administrative segregation was to refer plaintiff's administrative segregation hearing appeal to defendant Selsky for decision and to later inform plaintiff that defendant Selsky had rendered a decision .); *Stevens v. Goord,* 535 F.Supp.2d 373, 389 (S.D.N.Y.2008) (Summary judgment for high level prison administrator defendants who were not personally involved in decisions regarding plaintiffs medical care.); *Anderson v. Ford,* No. 06CV1968, 2007 WL 3025292 at *7 (D.Conn. Oct. 16, 2007) (Summary judgment for four wardens who were not personally involved in denying proper medical care when wardens had no "authority to order surgery or other sought-after treatment."); *Persad v. Savage,* No. 02-CV-336, 2004 WL 1570286 at *7 (W.D.N.Y. May 25, 2004) (Summary judgment for defendants where plaintiff submitted only a "conclusory allegation" that defendant violated plaintiffs' First Amendment rights in upholding a CORC decision, but defendant could not have been personally involved because she is "not a voting member of the CORC, and merely is the custodian of the records."), *report & rec. adopted,* 2004 WL 1858140 (W.D.N.Y. Aug. 19, 2004).[FN21]

> FN21. *See also, e.g., McFadden v. Goord,* No. 97-2903, 172 F.3d 38 (table), 1999 WL 65141 at *1 (2d Cir. Feb. 8, 1999) (Noting "that [plaintiff]'s complaint contains only minimal, vague, and (in places) conclusory references to (a) the culpable acts taken by all defendants other than [two] and (b) the personal involvement of [three supervisory] defendants."); *Hemmings v. Gorczyk,* 134 F.3d 104, 109 n. 4 (2d Cir.1998) (Where plaintiff's "complaint contains only minimal and vague references to the personal involvement of the various State Defendants," instructing that the "district court should require [plaintiff] to file a new amended complaint ... specifying the acts of which he complains as to each of the State Defendants. If, as to any such defendant, [plaintiff] fails to include an allegation which, if proven, would permit a reasonable trier of fact to infer that that individual was personally involved in the deliberate indifference to his medical needs, the district court may dismiss the complaint as to that individual."); *Odom v. N.Y.S. Dep't of Corr. Servs.,* No. 94-2746, 122 F.3d 1057 (table), 1995 WL 595550 at *2 (2d Cir. Sept. 22, 1995) (Plaintiff's "complaint contains

Not Reported in F.Supp.2d, 2008 WL 2413995 (S.D.N.Y.)
**(Cite as: 2008 WL 2413995 (S.D.N.Y.))**

broad and conclusory allegations that [three defendants] failed in performing their supervisory functions, but it does not include any allegation that these defendants participated directly in any constitutional violation. Accordingly, the district court properly dismissed [plaintiff]'s complaint for failure to state a claim against [those three defendants] in their individual capacities."); *Schwartz v. Dennison,* 518 F.Supp.2d 560, 573 n. 11 (S.D.N.Y.2007) ("Plaintiff's claims against [two defendants] fail for the additional reason that [plaintiff] has failed to adequately allege their personal involvement.... There are no allegations in the complaint from which it can be reasonably inferred that [the two defendants] created, or allowed to continue, a[n unconstitutional] policy."); *Perri v. Bloomberg,* No. 06-CV403, 2007 WL 2891332 at *9 (E.D.N.Y. Sept. 28, 2007) (Granting motion to dismiss for lack of personal involvement because although "[p]laintiff contends that '[a]ll of the defendants were personally involved in the violation of [his] constitutional rights on the date and time in question,' ... he alleges no facts regarding these defendants' personal involvement [and his] allegations ... are wholly conclusory."); *Barnes v. Henderson,* 490 F.Supp.2d 313, 319 (W.D.N.Y.2007) ("[P]laintiff's complaint also contains nothing more than his conclusory, barely coherent assertion that Selsky 'act[ed] in cohoot [sic] with his co-working.' ... That is simply not enough to show personal involvement on Selskys part."); *Walsh v. Goord,* No. 07-CV-0246, 2007 WL 1572146 at *5 n. 2 (W.D.N.Y. May 23, 2007) ("If plaintiff can allege in factual non-conclusory terms that other persons were personally involved in the alleged due process violation, plaintiff's amended complaint may include them as defendants."); *Scaggs v. New York Dep't of Educ.,* No. 06-CV-0799, 2007 WL 1456221 at *18 (E.D.N.Y. May 16, 2007) ("In plaintiffs' blanket allegations of supervisory liability against *all* defendants, they fail to indicate personal involvement by any of the named defendants. The complaint does not indicate the role of such defendants in failing to prevent constitutional violations.... Plaintiffs' conclusory allegations are insufficient to plead Section 1983 claims of supervisory liability as to the individually-named defendants."); *Graham v. Poole,* 476 F.Supp.2d 257, 261 (W.D.N.Y.2007) ("Plaintiff's conclusory allegation that Poole failed to provide him with adequate medical care is also insufficient to state a claim."); *Young-Flynn v. Wright,* 05 Civ. 1488, 2007 WL 241332 at *21 (S.D.N.Y. Jan. 26, 2007) ("[E]ven reading Plaintiff's allegations in the light most favorable to him, they are insufficient to show that defendants Wright, Stone and Fischer were personally involved in the alleged violations. With respect to defendant Wright, Plaintiff makes absolutely no allegations in his Amended Complaint regarding the role of this defendant in any challenged conduct. Further, although, in his additional submissions, Plaintiff calls Wright the 'ring leader' ..., Plaintiff's allegation in this regard is wholly conclusory. As such, it cannot withstand Defendants' motion to dismiss.").

**\*12** The Court should grant defendants' summary judgment motion and dismiss Tafari's claim against defendant Rabbi Chill arising from Tafari's request to be transferred to Green Haven for the Kosher Food Program.

### III. *TAFARI HAS FAILED TO ESTABLISH A CLAIM UNDER THE FIRST AMENDMENT'S FREE EXERCISE CLAUSE OR RLUIPA REGARDING HIS DENIAL OF KOSHER MEALS IN TRANSIT BETWEEN CORRECTIONAL FACIL-*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2413995 (S.D.N.Y.)
(Cite as: 2008 WL 2413995 (S.D.N.Y.))

*ITIES*[FN22]

FN22. Tafari also claims, generally, that defendants have violated Tafari's Eighth Amendment rights. (*See* Dkt. No. 83: Tafari Reply Br.) The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials and conduct that offends "evolving standards of decency." *E.g., Hudson v. McMillan,* 503 U.S. 1, 5, 8, 112 S.Ct. 995, 998, 1000 (1992); *Wilson v. Seiter,* 501 U.S. 294, 297, 308, 111 S.Ct. 2321, 2323, 2329 (1991); *Estelle v. Gamble,* 429 U.S. 97, 102, 104-05, 97 S.Ct. 285, 290, 291 (1976); *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925 (1976). To establish an Eighth Amendment violation based on a claim that a prison official has placed an inmate's health in danger, the inmate must show that the prison official acted with "deliberate indifference" to the inmate's serious medical needs. E.g., *Helling v. McKinney,* 509 U.S. 25, 32, 113 S.Ct. 2475, 2480 (1993); *Estelle v. Gamble,* 429 U.S. at 104-05, 97 S.Ct. at 291. "Ordinarily the Eighth Amendment establishes as a constitutional minimum the requirement that inmates be provided with nutritionally adequate meals; provided this threshold is met, prison officials retain considerable discretion in determining dietary constituents," subject to First Amendment freedom of religion considerations. *Johnson v. Guiffere,* No. 04-CV-57, 2007 WL 3046703 at *4 (N.D.N.Y. Oct. 17, 2007); *see also, e.g., Word v. Croce,* 169 F.Supp.2d 219, 226 (S.D.N.Y.2001). Tafari provides no evidence that DOCS officials inflicted any pain or endangered Tafari in any way, even for a moment, in denying Tafari Kosher meals on a limited number of occasions while travel-

ing between facilities. (*See* pages 10-17 above.) Tafari's Eighth Amendment claim, therefore, is nothing more than a restatement of his First Amendment claim, and will not be separately discussed.

Tafari claims that his right to free exercise of religion under the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA") [FN23] was violated when DOCS denied Tafari Kosher meals while in transit between DOCS correctional facilities on five occasions. (Tafari Reply Aff. ¶¶ 2, 4-10, 12-13; Tafari Reply Br. at 1-4.) [FN24] Defendants argue that Tafari's free exercise claims fail because defendants reasonably accommodated Tafari's religious beliefs, because the State's conduct does not " 'substantially burden ... sincerely held religious beliefs,' " and because any possible burden Tafari suffered was de minimis. (Dkt. No. 72: State Br. at 9-15.)

FN23. Tafari's complaint did not refer to RLUIPA (*see generally* Dkt. No. 38: Compl.); Tafari first raised RLUIPA claims in his opposition to defendants' summary judgment motion (*see* Dkt. No. 83: Tafari Reply Aff. ¶ 2). When reviewing a pro se complaint, the Court must use less stringent standards than if the complaint had been drafted by counsel. *See, e.g., LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir.1991); *Watson v. McGinnis,* 964 F.Supp. 127, 131 (S.D.N.Y.1997) (Kaplan, D.J. & Peck, M.J.); *see also,* cases cited at pages 21-23 above. The Court therefore will consider Tafari's free exercise claims under both the First Amendment *and* RLUIPA because of Tafari's pro se status and RLUIPA's applicability to Tafari's claims. *See, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 199 n. 2 (2d Cir.2004) (considering RLUIPA claim although not raised in complaint, because facts in complaint supported RLUIPA claim);

Not Reported in F.Supp.2d, 2008 WL 2413995 (S.D.N.Y.)
(Cite as: 2008 WL 2413995 (S.D.N.Y.))

*Smith v. Nuttal,* No. 04-CV-0200, 2007 WL 837111 at *3 & n. 5 (W.D.N.Y. Mar. 14, 2007) ("Although Plaintiff does not specifically identify RLUIPA as a legal predicate for his § 1983 claim, given Plaintiff's *pro se* status and the RLUIPA's applicability to Plaintiff's claim, the court construes the Complaint as asserting a violation of the RLUIPA"); *but see, Abdur-Raqiyb v. Erie County Medical Center,* 536 F.Supp.2d 299 (W . D.N.Y.2008) ("Finally, I note that in his papers in opposition to defendants' motions, plaintiff attempts, for the first time, to assert claims under the Religious Land Use and Institutionalized Persons Act .... Plaintiff may not, however, assert a claim for the first time in his papers opposing defendants' motion for summary judgment."); *Ochoa v. Connell,* No. 05-CV-1068, 2007 WL 3049889 at *6 n. 9 (N.D.N.Y. Oct. 18, 2007) (Plaintiff's complaint does not refer to RLUIPA, "and thus we only consider his free exercise claim under the First Amendment.").

FN24. It is undisputed that Tafari is registered with DOCS as Jewish and that he requires Kosher meals. (*See* page 2 above.) Tafari does not claim that the Kosher meal DOCS provides to Jewish inmates in transit are inadequate; rather, he claims only that he was denied Kosher meals in transit on a limited number of occasions. (*See* pages 10-17 above.)

**A.** *Legal Standard*

Courts have long understood that prisoners retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause. *See, e.g., O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 2404 (1987) ("Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion.") (citations omitted); *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804 (1974) (A "prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."); *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003); *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir.1999) ("Prisoners retain their right to religious freedom even when incarcerated."); *Jackson-Bey v. Hanslmaier,* 115 F.3d 1091, 1096 (2d Cir.1997) ("[I]nmates are not stripped of their constitutional rights simply by virtue of their imprisonment, including their right to religious freedom.") (citation omitted).[FN25]

FN25. See also, e.g., *Abdul-Matiyn v. Pataki,* No. 06-CV-1503, 2008 WL 974409 at *11 (N.D.N.Y. Apr. 8, 2008); *Withrow v. Taylor,* No. 05-CV-1129, 2007 WL 3274858 at *16 (S.D.N.Y. Nov. 5, 2007); *Mack v. Griffin,* No. 04-CV-588, 2006 WL 2792736 at *9 (N.D.N.Y. Sept. 27, 2006); *Davidson v. Murray,* No. 92-CV-0283, 2005 WL 1123756 at *3 (W.D.N.Y. May 10, 2005) ("An inmate is therefore entitled to a reasonable accommodation of his or her religious beliefs, including religious dietary practices."); *Davis v. City of New York,* 142 F.Supp.2d 461, 463 (S.D.N.Y.2001); *Higgins v. Davis,* 95 Civ. 3011, 2001 WL 262930 at *4 (S.D .N.Y. Mar. 15, 2001); *Reynolds v. Goord,* 103 F.Supp.2d 316, 335 (S.D.N.Y.2000); *Ali v. Szabo,* 81 F.Supp.2d 447, 469 (S.D.N.Y.2000) (Peck, M.J.).

Since 1975 this Circuit has consistently recognized that the free exercise of religion includes "the right of prisoners to receive diets consistent with their religious scruples." *Kahane v. Carlson,* 527 F.2d 492, 495-96 (2d Cir.1975) (denial of Kosher food to a Jewish inmate is not justified by an important or substantial governmental objective); *see, e.g., McEachin v. McGuinnis,* 357 F.3d at 203 ("[C]ourts have gen-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2413995 (S.D.N.Y.)
**(Cite as: 2008 WL 2413995 (S.D.N.Y.))**

erally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights. This principle was established in our circuit at least as early as 1975."); *Ford v. McGinnis,* 352 F.3d at 597 (Second Circuit decisions "have clearly established that a prisoner has a right to a diet consistent with his or her religious scruples."); *Jackson v. Mann,* 196 F.3d at 320; *Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir.1992) ("At least as early as 1975, it was established that prison officials must provide a prisoner a diet that is consistent with his religious scruples. *Kahane* has never been overruled and remains the law.") (citation to *Kahane* omitted); *Benjamin v. Coughlin,* 905 F.2d 571, 574, 579 (2d Cir.), *cert. denied,* 498 U.S. 951, 111 S.Ct. 372 (1990); *Moorish Science Temple of America, Inc. v. Smith,* 693 F.2d 987, 990 (2d Cir.1982) ( "[T]he denial of kosher food to a Jewish inmate is not justified by an important or substantial governmental objective.").[FN26]

> [FN26.] *See also, e.g., Abdul-Matiyn v. Pataki,* 2008 WL 974409 at *12; *Wesley v. Muhammad,* 05 Civ. 5833, 2008 WL 236974 at *1 (S.D .N.Y. Jan. 28, 2008); *Johnson v. Guiffere,* No. 04-CV-57, 2007 WL 3046703 at *4 (N.D.N.Y. Oct. 17, 2007) ("Undeniably, the reach of the First Amendment's free exercise clause extends beyond mere attendance at congregate religious services into other aspects of prison life including, pertinently, that of an inmate's diet and participation in religious meals."); *Amaker v. Goord,* 98 Civ. 3634, 2002 WL 523371 at *10 (S.D.N.Y. Mar. 29, 2002); *Ford v. McGinnis,* 00 Civ. 3437, 2000 WL 1808729 at *4 (S.D.N.Y. Dec. 11, 2000); *Majid v. Wilhelm,* 110 F.Supp.2d 251, 258 (S.D.N.Y.2000); *Wesley v. Kalos,* 97 Civ. 1598, 1997 WL 767557 at *3 (S.D.N.Y. Dec. 11, 1997); *Ross v. Coughlin,* 669 F.Supp. 1235, 1241-42 (S.D.N.Y.1987).

**\*13** " 'Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, [however,] are the interests of prison officials charged with complex duties arising from administration of the penal system.' " *Ford v. McGinnis,* 352 F.3d at 588 (quoting *Benjamin v. Coughlin,* 905 F.2d at 574); *see, e.g., O'Lone v. Estate of Shabazz,* 482 U.S. at 348-49, 107 S.Ct. at 2404; *Pell v. Procunier,* 417 U.S. at 822, 94 S.Ct. at 2804; *Jackson-Bey v. Hanslmaier,* 115 F.3d at 1096.[FN27] A prison inmate retains First Amendment rights "that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier,* 417 U.S. at 822, 94 S.Ct. at 2804; *accord, e.g., Shakur v. Selsky,* 391 F.3d 106, 113 (2d Cir.2004); *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir.1995).[FN28]

> [FN27.] *See also, e.g., Anderson v. Duke,* No. 04-CV-0030, 2008 WL 238557 at *4 (N.D.N.Y. Jan. 28, 2008) ("The task of defining the contours of [First Amendment] right[s] in a prison setting requires careful balance of the rights of prison inmates against the legitimate interest of prison officials tasked with maintaining prison security."); *Ochoa v. Connell,* 2007 WL 3049889 at *6; *Keesh v. Smith,* No. 04 CV 0779, 2006 WL 516793 at *4 (N.D.N.Y. Mar. 2, 2006); *Davidson v. Murray,* 2005 WL 1123756 at *3; *Persad v. Savage,* No. 02-CV-336, 2004 WL 1570286 at *3 (W.D.N.Y. May 25, 2004), *report & rec. adopted,* 2004 WL 1858146 (W.D.N.Y. Aug. 19, 2004); *Cole v. Artuz,* 93 Civ. 5981, 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999).

> [FN28.] *See, e.g., Kahane v. Carlson,* 527 F.2d 498; *Allan v. Woods,* No. 05-CV-1280, 2008 WL 724240 at *6-7 (N.D.N.Y. Mar. 17, 2008) (The right " 'to freely exercise a chosen religion ... is not limitless, and may be subject to restrictions relating to legitimate

Not Reported in F.Supp.2d, 2008 WL 2413995 (S.D.N.Y.)
**(Cite as: 2008 WL 2413995 (S.D.N.Y.))**

penological concerns.");  *Withrow v. Taylor,* 2007 WL 3274858 at *16; *Singh v. Goord,* 520 F.Supp.2d 487, 507 (S.D.N.Y.2007) ("Policies and practices which serve legitimate penological interests do not offend the Free Exercise clause."); *Mitchell v. Goord,* No. 06-CV-6197, 2007 WL 925540 at *2 (W.D.N.Y. Mar. 23, 2007); *Salahuddin v. Perez,* 99 Civ. 10431, 2006 WL 266574 at *7 (S.D.N.Y. Feb. 2, 2006); *Reynolds v. Goord,* 103 F.Supp.2d at 335.

The standard to determine whether a prison official's conduct violates an inmate's First Amendment free exercise rights is "one of reasonableness, taking into account whether the particular [act] affecting [the] right ... is 'reasonably related to legitimate penological interests.' " *Benjamin v. Coughlin,* 905 F.2d at 574; *accord, e.g., O'Lone v. Estate of Shabazz,* 482 U.S. at 349, 107 S.Ct. at 2404-05; *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006); *Young v. Coughlin,* 866 F.2d 567, 569 (2d Cir.), *cert. denied,* 492 U.S. 909, 109 S.Ct. 3224 (1989); *see also, e.g., Ford v. McGinnis,* 352 F.3d at 588 ("The free exercise claims of prisoners are ... judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights.") (internal quotations omitted).

In evaluating the constitutionality of a restriction [FN29] on an inmate's religious rights, four factors are considered:

> FN29. This Circuit examines individual decisions that deny or curtail inmates' religious freedom under the same four factors under which it examines official prison regulations or rules. *See, e.g., Salahuddin v. Goord,* 467 F.3d at 274 n. 4 ("An individualized decision to deny a prisoner the ability to engage in religious exercise is analyzed in the same way as a prison regulation denying such exercise."); *Ford v. McGinnis,* 352 F.3d at 595

n. 15 ("Although *Turner* and *O'Lone* concerned the reasonableness of prison regulations, we have previously suggested that the analysis is the same as to an individual decision to deny a prisoner the ability to engage in some requested religious practice."); *Allan v. Woods,* 2008 WL 724240 at *7; *Withrow v. Taylor,* 2007 WL 3274858 at *17; *Johnson v. Guiffere,* No. 04-CV-57, 2007 WL 3046703 at *5 n. 8 (N.D.N.Y. Oct. 17, 2007); *Sproul v. Goord,* No. 05-CV-0075, 2007 WL 2609787 at *11 n. 12 (N.D.N.Y. Sept. 5, 2007); *Allah v. Poole,* 506 F.Supp.2d 174, 181 n. 6 (W.D.N.Y.2007); *see also, e.g., Boles v. Neet,* 486 F.3d 1177, 1181 n. 4 (10th Cir.2007); *Street v. Maloney,* No. 92-1822, 991 F.2d 786 (table), 1993 WL 125396 at *3 (1st Cir. Apr. 23, 1993).

"1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest."

*Salahuddin v. Coughlin,* 993 F.2d 306, 308-09 (2d Cir.1993) (quoting *Benjamin v. Coughlin,* 905 F.2d at 574); *accord, e.g., Salahuddin v. Goord,* 467 F.3d at 274; *United States v. El-Hage,* 213 F.3d 74, 81 (2d Cir.), *cert. denied,* 531 U.S. 881, 121 S.Ct. 193 (2000).[FN30] "In this analysis, we give deference to defendants because 'prison administrators ... and not the courts, [are] to make the difficult judgments concerning institutional operations.' " *Graham v. Mahmood,* 2008 WL 1849167 at *12; *see also, e.g., Fromer v. Scully,* 874 F.2d 69, 73 (2d Cir.1989); *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985) (this deference, however, is "by no means unlimited"); *Byrd v. Goord,* 00 Civ. 2135, 2005 WL 2086321 at *6 (S.D.N.Y. Aug. 29, 2005) (Daniels, D.J.).

FN30. *See also, e.g., Graham v. Mahmood,* 05 Civ. 10071, 2008 WL 1849167 at *12 (S.D.N.Y. Apr. 22, 2008); *Rahman v. Goord,* No. 04-CV-6368, 2007 WL 1299408 at *5 (W.D.N.Y. May 3, 2007); *Villar v.. Thompson,* 01 Civ. 0190, 2002 WL 928849 at *1 (S.D.N.Y. May 8, 2002); *Ali v. Szabo,* 81 F.Supp.2d at 470; *Salahuddin v. Coughlin,* 999 F.Supp. 526, 535 (S.D.N.Y 1998) (Peck, M.J.).

**\*14** As in other areas of the law, a burden shifting approach applies:

The prisoner must show at the threshhold that the disputed conduct substantially burdens his sincerely held religious beliefs. The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; "the burden remains with the prisoner to 'show that these [articulated] concerns were irrational.' "

*Salahuddin v. Goord,* 467 F.3d at 274-75 (citations & fn. omitted); *accord, e.g., Johnson v. Guiffere,* 2007 WL 3046703 at *5; *Sproul v. Goord,* 2007 WL 2609787 at *11.

RLUIPA claims are similar to First Amendment free exercise claims, although RLUIPA "proceeds under a slightly different framework," protecting "inmates by providing that a government shall not 'impose a substantial burden' on the 'religious exercise' of inmates in certain institutions unless the government shows that the burden furthers a compelling governmental interest by the least restrictive means."[FN31] *Salahuddin v. Goord,* 467 F.3d at 273-74 (fn.omitted); *see also, e.g., Chavis v. Goord,* No. 00-CV-01418, 2007 WL 2903950 at *3 n. 3 (N.D.N.Y. Oct. 1, 2007); *Rahman v. Goord,* 2007 WL 1299408 at *5 (RLUIPA "imposes a more exacting

standard on prison officials" than the First Amendment does.).

FN31. RLUIPA provides in part:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, ... unless the government demonstrates that the imposition of the burden on that person-(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a)(1)-(2).

In 2004, the Second Circuit declined to consider whether a "plaintiff must demonstrate that the burden on his beliefs was 'substantial' in order to state a constitutional claim" under the Free Exercise Clause, like under RLUIRA. *McEachin v. McGuinnis,* 357 F.3d at 203.[FN32] In 2006, in *Salahuddin v. Goord,* the Second Circuit held that the First Amendment requires prisoners to "show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs," but declined to address "Salahuddin's argument that a prisoner's First Amendment free-exercise claim is not governed by the 'substantial burden' threshold requirement." 467 F.3d at 274-75 & n. 5. Some courts within this Circuit subsequently have held that a plaintiff must establish a "substantial burden" under the First Amendment as well as under RLUIPA. *See, e.g., Kole v. Lappin,* No. 07-cv-1711, 2008 WL 1777379 at *4 (D.Conn. Apr. 16, 2008); *Odom v. Dixion,* 04-CV-889, 2008 WL 466255 at *5-6 (W.D.N.Y. Feb. 15, 2008); *Singh v. Goord,* 520 F.Supp.2d at 509 n. 12; *Rahman v. Goord,* 2007 WL 1299408 at *4; *King v. Bennett,* 2007 WL 1017102 at *4; *Smith v. Nuttal,* 2007 WL 837111 at *4. Other courts have found that *Salahuddin* did not definitively resolve whether prisoners must demonstrate a "sub-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2413995 (S.D.N.Y.)
**(Cite as: 2008 WL 2413995 (S.D.N.Y.))**

stantial burden" to establish a First Amendment free exercise claim. *See, e.g., Graham v. Mahmood,* 2008 WL 1849167 at \*12 n. 23 ("[I]t is possible to argue that a substantial burden is not ... an element of a free exercise claim."); *Ochoa v. Connell,* 2007 WL 3049889 at \*6 n. 10 ("[W]e believe that it is not entirely clear in this Circuit whether a prisoner plaintiff complaining of religious infringement must, as a prerequisite to stating a *constitutional* free exercise claim, establish that the prison policy at issue 'substantially burdened' the free exercise of his religion."); *Johnson v. Guiffere,* 2007 WL 3046703 at \*5 n. 7; *Sproul v. Goord,* 2007 WL 2609787 at \*11 n. 11 (doubting "that the Second Circuit has in fact laid the matter to rest," but finding "it unnecessary to take a stance" regarding whether First Amendment free exercise claims require establishing a substantial burden.).

> FN32. A "substantial burden" is defined as a "situation where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *McEachin v. McGuinnis,* 357 F.3d at 202 n. 4 (internal quotations omitted, quoting *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996)); *see also, e.g., Allan v. Woods,* 2008 WL 724240 at \*4; *King v. Bennett,* No. 02-CV-349, 2007 WL 1017102 at \*4 (W.D.N.Y. Mar. 30, 2007).

**\*15** Given the unresolved nature of this debate, this decision applies the less burdensome standard to Tafari's First Amendment claims, to ensure that if summary judgment is granted for defendants, the Court has used a legal test that most favors Tafari.

**B.** *Application f the Legal Standard to Tafari's Claims of Denial of Kosher Meals in Transit*

**1.** *Denial of Kosher Bag Lunches on January 16 and 20, 2004*

On January 16 and 20, 2004, Downstate Correctional Facility [FN33] denied Tafari four Kosher meals over a holiday weekend when Tafari arrived and departed Downstate. (*See* page 11 above.) It is undisputed that Downstate denied Tafari these Kosher meals because Tafari failed to notify the appropriate staff members before he left the facility that he required Kosher meals while traveling between facilities.[FN34] (*See* page 11 above.)

> FN33. Downstate Correctional Facility is the only DOCS facility located in the Southern District of New York that Tafari claims denied him Kosher meals while in transit to other facilities; all other DOCS facilities named by Tafari in his complaint are located in the Northern and Western Districts of New York. *See* DOCS Facility Listing, http://www.docs.state.ny.us/faclist.html (last visited May 27, 2008). All claims not arising in the Southern District of New York were transferred to the Northern District of New York (*see* page 18 & n. 13 above), and will not be considered herein.

> FN34. Tafari's January 25, 2004 Grievance admitted that he requested a Kosher meal *after* boarding the bus on January 16 and 20. (*See* page 11 above.)

DOCS may reasonably demand that inmates traveling between facilities alert security personnel to their dietary needs *prior* to traveling, so that facility staff can prepare special meals, such as the CAD, in a timely fashion; this requirement to pre-order Kosher meals places little burden on Jewish inmates. *See, e.g., O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 2404 (1987) ("In considering the appropriate balance of [the interests of prison officials and prisoners' First Amendment rights], we have often said that evaluation of penological objectives is committed to the considered judgment of prison administrators, 'who are actually charged with and

Not Reported in F.Supp.2d, 2008 WL 2413995 (S.D.N.Y.)
(Cite as: 2008 WL 2413995 (S.D.N.Y.))

trained in the running of the particular institution under examination.' ") (quoting *Bell v. Wolfish,* 441 U.S. 520, 562, 99 S.Ct. 1861, 1886, (1979)); *Davidson v. Murray,* No. 92-CV-0283, 2005 WL 1123756 at *3 (W.D.N.Y. May 10, 2005) (an inmates's denial of Kosher meals for eight days did not implicate the Free Exercise Clause when denial was attributable to reevaluation process required by the correctional facility to which plaintiff had recently transferred); *Resnick v. Adams,* 348 F.3d 763, 768-71 (9th Cir.2003) (Federal Bureau of Prisons' requirement that inmates requesting kosher diet submit written application and obtain chaplain's approval is reasonably related to legitimate penological interest and does not violate plaintiff's Free Exercise rights.); *Stavenjord v. Corrections Corp. of America,* No. CV 05-3024, 2007 WL 215816 at *5 (D.Ariz. Jan. 26, 2007) ("The requirement that an inmate complete paperwork or meet with his chaplain in order to obtain religious items is not a substantial burden."); *see also, e.g., Cole v. Artuz,* 93 Civ. 5981, 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999) (requiring "inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services" both accommodates inmates' religious needs and prison security requirements).

Downstate staff did not violate Tafari's religious rights on January 16 and 20, 2004 when they did not provide Tafari with Kosher meals because he did not timely request Kosher meals, requesting them only when he already was on the bus.

**2. *Denial of Kosher Bag Lunches on June 20 and 24, 2005***

**\*16** *Washington* Correctional Facility denied Tafari Kosher bag lunches when Tafari arrived from Downstate Correctional Facility on June 20, and when Tafari returned to Washington Correctional Facility on route to Eastern Correctional Facility on June 24.[FN35] (*See* pages 12-14 above.) This Court has already ruled that it will not consider any claims arising from the actions of Washington Correctional Facility

staff because the facility-and hence the defendants personally involved in the claim-is not located within the Southern District of New York. (*See* DOCS Facility Listing, http://www.docs.state.ny.us/faclist.html (last visited May 27, 2008) .) The S.D.N.Y. Defendants therefore are entitled to summary judgment on the claims arising from Washington Correctional Facility's actions on June 20 and 24, 2005.

> FN35. Tafari requested a Kosher bag lunch from Downstate staff, who told Tafari that Washington staff provide Kosher bag lunches upon arrival at that facility. (*See* page 12 above.)

> Washington Correctional Facility later admitted that they had failed to properly provide a "C.A.D. transit lunch" to Tafari, and stated that they would provide Kosher bag lunches in the future. (*See* page 13 above.)

**3. *Denial of Kosher Bag Lunch on July 26, 2005***

On July 26, 2005, Tafari alleges that Downstate Correctional Facility provided Tafari with a bag lunch containing non-Kosher cheese, while DOCS maintained that the sandwiches contained Kosher cheese. (*See* pages 14-15 above.) Even if Tafari's bag lunch contained non-Kosher cheese, this single in transit meal, by itself, does not constitute a violation under the First Amendment or RLUTPA, as any violation was *de minimis. E.g., McEachin v. McGuinnis,* 357 F.3d 197, 203 n. 6 (2d Cir.2004) ("There may be inconveniences [regarding denials of religiously required food] so trivial that they are most properly ignored. In this respect, this area of the law is no different from many others in which the time-honored maxim *'de minimis non curat lex'* applies."); *see, e.g., Norwood v. Strada,* 249 Fed. Appx. 269, 272 (3d Cir.2007) (Denial of religiously certified (halal) meals during prison's emergency lock-down was "a mere *de minimis* intrusion" that failed to substantially burden

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2413995 (S.D.N.Y.)
**(Cite as: 2008 WL 2413995 (S.D.N.Y.))**

the inmate's religious beliefs.); *Rapier v. Harris,* 172 F.3d 999, 1006 n. 4 (7th Cir.1999) (Affirming summary judgment for defendants where denial of pork-free meal on three isolated occasions out of 810 meals constituted *de minimis* burden, where caused by "institutional shortage," and plaintiff "has not alleged a routine or blanket practice of denying him pork-free meals."); *Thomas v. Picio,* 04 Civ. 3174, 2008 WL 820740 at \*6 & n. 8 (S.D.N.Y. Mar. 26, 2008) (assuming that inmate plaintiff was denied Kosher meals for eight days, "such a denial is not a substantial burden" on her free exercise of religion); *Odom v. Dixion,* 04-CV-889, 2008 WL 466255 at \*11 (W.D.N.Y. Feb. 15, 2008) (DOCS' failure to provide Kosher meals on seven occasions due to "an administrative error based on Plaintiff's failure to timely advise [the facility's] food service personnel of his brief confinement on keeplock status" does not "support a § 1983 violation under either the First Amendment or RLUIPA.").[FN36] Downstate staff, therefore, did not violate Tafari's religious rights on this occasion.

> FN36. *But cf., Shakur v. Selsky,* 391 F.3d 106, 120 (2d Cir.2004) (denial of attendance at feast for major Muslim religious observance stating free exercise and RLUIPA claim); *Mitchell v. Goord,* No. 04-CV-366, 2007 WL 189087 at \*7 (N.D.N.Y. Jan. 22, 2007) ("Thus, on this record, material issues of fact remain as to whether the defendants significantly interfered with Mitchell's religious beliefs when on at least four occasions, and possibly several times a week, they failed to provide him with meals that met the requirements of a kosher diet.").

**4. Denial of Kosher Bag Lunch on September 26, 2005**

**\*17** On September 26, 2005, Tafari was denied a Kosher bag lunch when transported from Downstate to Elmira Correctional Facility. (*See* page 15 above.) Tafari claims that he informed Downstate officers that

he required a Kosher bag lunch prior to departure, although Downstate Deputy Superintendent Jacobsen later suggested that Tafari "alert security earlier regarding [Tafari's] meal requirement." (*See* pages 15-16 above.) Whether Tafari provided Downstate staff with enough lead time to prepare a Kosher transit meal or not, Downstate's failure to do so, much like their possible failure to do so on July 26, 2005, did not substantially burden Tafari's religious beliefs, and constituted, at most, a *de minimis* violation. (*See* cases cited on pages 38-39 above.)

**5. Summary: Considering All SDNY Meal Denials In Total**

Putting aside the June 20 and 24, 2005 Washington Correctional Facility incidents that are not before the Court, Tafari's claims boil down to the denial of Kosher meals in transit on four occasions over an almost two year period. Clearly, the January 16 and 20, 2004 problem arose from Tafari's failure to request Kosher meals *before* leaving the facility. The remaining denials, on July 26, 2005 and September 26, 2005, singly or collectively (and even including the other four occasions above), constitute a *de minimis,* not a substantial, interference with Tafari's free exercise of religion.

This is especially so for several additional reasons. First, the denials were not intentional or malicious, but appear to at most be the result of negligence by prison officials. *See, e.g., Hawkins v. N.Y.S. Dep't of Corr. Servs.,* No. 07-CV-0405, 2008 WL 2019655 at \*5 (N.D.N.Y. Mar. 10, 2008) ("One reason that [plaintiff's] First and Fourteenth Amendment [religious freedom] claims fail is because he has not alleged facts plausibly suggesting anything other than *negligence* by Defendants.... Negligence is not actionable under either the First or Fourteenth Amendment.") (fn. citing cases omitted); *Odom v. Dixion,* No. 04-CV-889, 2008 WL 466255 at \*11 (W.D.N.Y. Feb. 15, 2008) (Summary judgment for defendants where "Plaintiff submits nothing contradicting Defendants' assertion that Plaintiff's temporary removal

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2413995 (S.D.N.Y.)
**(Cite as: 2008 WL 2413995 (S.D.N.Y.))**

from the CAD program was nothing more than an administrative error .... It is settled that mere negligence on the part of prison officials is insufficient to establish liability under § 1983."); *Young v. Scully,* 91 Civ. 4332, 1993 WL 88144 at *7 (S.D.N.Y. Mar. 22, 1993) ("There is no evidence in the record that the alleged deprivation of Plaintiff's first amendment [religious] rights involved any degree of fault by defendants.... 'Negligence alone will not carry a § 1983 action.' "). [FN37]

> [FN37]. Moreover, it does not appear that any of the S.D.N.Y. defendants (Deputy Supts. Annetts, Jacobsen or Lurenz, and Correction Officer Kern–see *Tafari v. Annetts,* 2007 WL 2994367 at *2–*were personally responsible for Tafari not receiving the few in-transit meals. Certainly, Tafari has not alleged, much less provided any evidence in response to defendants' summary judgment motion, of these defendants' personal involvement in the denials of in-transit meals. While Annetts and Jacobsen responded to some of his grievances after the fact, that does not establish their personal involvement.

Second, as a result of Tafari's lawsuit, Downstate has implemented policies to insure that inmates in transit from Downstate are provided with Kosher meals in transit. (*See* page 15 n. 11 above.) This should alleviate the issue for Tafari for the future, further demonstrating the de minimis nature of the few prior occasions where he did not receive in transit Kosher meals.

**\*18** Finally, the Court already dismissed Tafari's request for injunctive relief against the S.D.N.Y. defendants, *see Tafari v. Annetts,* 2007 WL 2994367 at *14, and Tafari stated in his deposition that he was not seeking monetary damages on his in transit meal claims. (*See* page 17 above.) Thus, he would not be entitled to any relief even if he were to prove a constitutional violation as to the in-transit Kosher meals.

Defendants' summary judgment motion on Tafari's First Amendment and RLUIPA free exercise claims regarding denial of Kosher meals while in transit should be granted.

### CONCLUSION

For the reasons set forth above, defendants' summary judgment motion (Dkt. No. 65) should be GRANTED and Tafari's complaint dismissed.[FN38]

> [FN38]. So there is no confusion, the Court makes clear that the issue of whether the First Amendment or RLUIPA requires DOCS to make available vegetarian Kosher meals to those whose religious beliefs require such meals was not before this Court. Such a claim would be against DOCS' officials in Albany-and hence in the Northern District of New York. The Court expresses no view on the viability of such a claim.

### FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels, 500 Pearl Street, Room 630, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Daniels (with a courtesy copy to my chambers). Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2413995 (S.D.N.Y.)
**(Cite as: 2008 WL 2413995 (S.D.N.Y.))**

(2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825 (1992); *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57-59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

S.D.N.Y.,2008.
Tafari v. Annets
Not Reported in F.Supp.2d, 2008 WL 2413995 (S.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5466191 (N.D.N.Y.)
**(Cite as: 2013 WL 5466191 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Richard WILLIAMS, Plaintiff,
v.
Mark LEONARD, Imam Khalil Abdul Kabir, T. La-
valley, Joe Haskell, Defendants.

No. 9:11–CV–1158.
Sept. 30, 2013.

Richard Williams, Comstock, NY, pro se.

Cathy Y. Sheehan, New York State Attorney General,
Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. INTRODUCTION**

**\*1** This *pro se* action brought pursuant to 42
U.S.C. § 1983 was referred by this Court to the Hon.
Thérèse Wiley Dancks, United States Magistrate
Judge, for a Report and Recommendation pursuant to
28 U.S.C. § 636(b) and N.D.N.Y. Local Rule 72.3(c).
In her Report–Recommendation [dkt. # 20], Magis-
trate Judge Dancks recommends that Defendants'
motion to dismiss for failure to state a claim [dkt. # 12]
be granted in part and denied in part. Specifically, she
recommends that the retaliation claim regarding meal
prices be dismissed with leave to amend, and that the
following claims be dismissed without leave to
amend: (1) the claims for monetary damages against
Defendants in their official capacities; (2) any claim
asserted on behalf of other inmates and/or their guests;
(3) the First Amendment and Religious Land Use and
Institutionalized Persons Act ("RLUIPA") claims for

monetary damages regarding the length of Plaintiff's
pants; (4) the First Amendment, RLUIPA, and Equal
Protection Clause claims for monetary damages re-
garding Plaintiff's family's participation with him
during the Eid el-Adha holy day; and (5) any claim
asserting a generalized right to visitation. Dkt. # 20 at
32–33. In addition, Magistrate Judge Dancks recom-
mends that Defendants be directed to answer the fol-
lowing claims: (1) the First Amendment claim for
injunctive relief regarding the length of Plaintiff's
pants; (2) the RLUIPA claim for injunctive relief
regarding the length of Plaintiff's pants; (3) the First
Amendment claim for injunctive relief regarding
family participation in Eid el-Adha; (4) the RLUIPA
claim for injunctive relief regarding family participa-
tion in Eid el-Adha; (5) the equal protection claim for
injunctive relief regarding family participation in Eid
el-Adha; and (6) the equal protection claim for dam-
ages and injunctive relief regarding meal prices. *Id.* at
33. Plaintiff has filed an objection to Magistrate Judge
Dancks' report. Dkt. # 21.

**II. STANDARD OF REVIEW**

When objections to a magistrate judge's report
and recommendation are lodged, the district court
makes a "*de novo* determination of those portions of
the report or specified proposed findings or recom-
mendations to which objection is made." *See* 28
U.S.C. § 636(b); *see also United States v. Male Juve-
nile,* 121 F.3d 34, 38 (2d Cir.1997) (The Court must
make a *de novo* determination to the extent that a party
makes specific objections to a magistrate's findings.).
"[E]ven a *pro se* party's objections to a Report and
Recommendation must be specific and clearly aimed
at particular findings in the magistrate's proposal, such
that no party be allowed a second bite at the apple by
simply relitigating a prior argument." *Machicote v.
Ercole,* no 06 Civ. 13320(DAB)(JCF), 2011 WL
3809920, at \* 2 (S.D.N.Y., Aug. 25, 2011) (citations
omitted) (interior quotation marks omitted); *DiPilato*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5466191 (N.D.N.Y.)
**(Cite as: 2013 WL 5466191 (N.D.N.Y.))**

*v. 7–Eleven, Inc.,* 662 F.Supp.2d 333, 340 (S.D.N.Y.2009) (same).

**\*2** General or conclusory objections, or objections which merely recite the same arguments presented to the magistrate judge, are reviewed for clear error. *Farid v. Bouey,* 554 F.Supp.2d 301, 306 n. 2 (N.D.N.Y.2008); see *Frankel v. N.Y.C.,* Nos. 06 Civ. 5450(LTS)(DFE), 07 Civ. 3436(LTS)(DFE), 2009 WL 465645 at \*2 (S.D.N.Y. Feb. 25, 2009). After reviewing the report and recommendation, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b).

**III. DISCUSSION**

**a. Plaintiff's Objections to the Report–Recommendation**

Plaintiff's sole objection to Magistrate Judge Dancks' Report–Recommendation is with respect to the application of qualified immunity. *See generally* dkt. # 21. Specifically, Plaintiff objects to the recommendation that the First Amendment and RLUIPA claims for monetary damages concerning Plaintiff's request to wear his pants above his ankles, and Plaintiff's First Amendment, RLUIPA, and Equal Protection Clause claims for monetary damages concerning his family's participation in the Eid–Adha holy day at the correctional facility, be dismissed on account of qualified immunity. Dkt. # 20 at 17–18, 24–27. Plaintiff contends that in determining "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted ...," *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (internal quotation marks omitted),[FN1] Magistrate Judge Dancks framed the federally protected rights at issue too narrowly. Dkt. # 21 at 2–3.

FN1. This is the second prong of the two prong qualified immunity test. The first prong requires the court to consider "whether the facts, viewed in the light most favorable to the plaintiff, establish a constitutional violation...." Dkt. # 20 at 15 (citing *Sira v. Morton,* 380 F.3d 57, 68–69 (2d Cir.2004)). Magistrate Judge Dancks concluded that this first prong was satisfied on all five claims at issue in this objection. See Dkt. # 20 at 15–16, 18, 23–26.

**1. Plaintiff's Request to Wear his Pants Above his Ankles**

Plaintiff asserts that his religious beliefs require him to wear his pants rolled above his ankles at all times, but alleges that Defendants initially refused to allow this practice at all, and then, sometime in 2009, allowed the practice but only while engaged in religious observations. It also appears that sometime in 2010, Defendants allowed Plaintiff to wear his pants at ankle length at all times, purportedly because of advice given by a nondefendant imam and the Office of Ministerial Services.

There is no dispute that Magistrate Judge Dancks correctly determined that Plaintiff pleaded legally plausible First Amendment and RLUIPA claims related to pants length, see dkt. # 20 pp. 14–15, 18, and set forth the proper standard for determining whether Defendants should be granted qualified immunity. *See id.* at pp. 15–17.

As to the application of qualified immunity, Magistrate Judge Dancks concluded:

[T]he right at question here is the right for Muslim inmates to wear their pants above their ankles at all times. The decisional law of the Supreme Court and the Second Circuit does not support the existence of the right in question. At the time of the Defendants' actions there were no cases dealing substantively

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5466191 (N.D.N.Y.)
**(Cite as: 2013 WL 5466191 (N.D.N.Y.))**

with the issue of the length of Muslim inmates' pants. Under preexisting law a reasonable Defendant would not have understood that his or her acts were unlawful. Further, it was objectively reasonable for Defendants at the time of the challenged action to believe their acts were lawful. Defendants conferred with the Great Meadows Imam and outside Imams regarding the policy and apparently received their support. Thus, it would not be clear to a reasonable officer that his conduct was unlawful at the time.

**\*3** *Id.* at 17.

Magistrate Judge Dancks recommended that "the Court find that Defendants are entitled to qualified immunity from the First Amendment [and RLUIPA claims] against them for civil damages regarding the length of Plaintiff's pants and dismiss that claim accordingly. Because better pleading would not cure this defect, I recommend that the Court dismiss the claim without leave to amend." *Id.* pp. 17–18. Plaintiff argues that Magistrate Judge Dancks framed the right at issue too narrowly, and, therefore, the Court should reject the recommendation.

Before addressing whether the right in issue was too narrowly framed, it is imperative to recognize that Magistrate Judge Dancks found two bases to apply qualified immunity–1) that the right in issue was not recognized by the Second Circuit or the Supreme Court; and 2) that the facts presented to Defendants would have not lead reasonable officers to believe their conduct was unlawful in the situation they confronted. The second of these alone is a proper and sufficient basis for the grant of qualified immunity, but the facts alleged in the Complaint are unclear as to when Defendants were advised that the practice of at-ankle-length pants outside of religious observations and above-ankle-length pants during religious observations was in keeping with Plaintiff's religious beliefs. Moreover, the allegations in the Complaint indicate that before Defendants were purportedly ad-

vised of the propriety of the at-ankle-length/above-anklelength protocol, they were advised by an iman that Muslims who practiced Islam should be allowed to wear their pants above the ankle at all times. See dkt. # 20, p. 6. Thus, due to the conflicting factual issues regarding the propriety of different pant lengths for Muslim inmates, qualified immunity cannot be granted on this issue at this time.

Turning to whether the right in issue was clearly established, Magistrate Judge Dancks correctly indicates that "courts must avoid 'framing the constitutional right at too broad a level of generality .' " Dtk. # 20 at 16 (citing *Redd v. Wright,* 597 F.3d 532, 536 (2d Cir.2010)). However, while *Redd* requires that the constitutional issue be framed with "reasonable specificity," *Redd,* 597 F.3d at 536, the right must not be framed too narrowly. "Describing the right at issue overly broadly eviscerates the protections of qualified immunity; describing it too narrowly negates the possibility of redress." *Nagle v. Marron,* 663 F.3d 100, 114 (2d Cir.2011).

In order to prevent the margin of immunity from overshadowing our interests in recovery ... the right in question must not be restricted to the factual circumstances under which it has been established. Thus, the Supreme Court has declined to say that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful," and has, instead, chosen a standard that excludes such immunity if "in the light of pre-existing law the unlawfulness [is] apparent." *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 129 (2d Cir.2004) (quoting *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)); *see also Zagaja v. Village of Freeport,* No. 10–cv–3660 (JFB) (WDW), 2013 WL 2405440, at \*15 (E.D.N.Y. June 3, 2013) (same).

**\*4** It is well established in the Second Circuit that "prison officials may not substantially burden inmates'

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5466191 (N.D.N.Y.)
**(Cite as: 2013 WL 5466191 (N.D.N.Y.))**

right to religious exercise without some justification...." *Salahuddin v. Goord,* 467 F.3d 263, 275–76 (2d Cir.2006); *see also Redd,* 597 F.3d at 537. Magistrate Judge Dancks correctly indicates that "the facts viewed in the light most favorable to Plaintiff establish a constitutional violation" as to the pants length issue, dkt. # 20 at 16, and that "Defendants ... have not identified [at this stage of the litigation] any legitimate penological reason for their refusal to allow Plaintiff to wear his pants at the length mandated by his religion." *Id.* at 15. Absent a legitimate penological interest for the belowankles requirement (which, on this Rule 12(b) (6) motion, the Court must assume did not exist), Defendants could have reasonably anticipated before that their refusals to allow Plaintiff to wear his pants above his ankles at all times substantially burdened his right to religious exercise without justification. *See Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996) (A prisoner's sincerely held religious belief is "substantially burdened" "where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs."). Thus, in light of pre-existing law, see e.g. *Salahuddin,* 467 F.3d at 275–76, the unlawfulness of the conduct would be apparent. This is so even though there are no cases from the Second Circuit or Supreme Court that specifically address whether a Muslim inmate may wear his pants at a particular length. Accordingly, qualified immunity on this claim must be denied at this time.

Because rights under RLUIPA are addressed substantially the same as rights under the First Amendment, the same conclusion is reached as to the RLUIPA claim based upon pants length. *See* RLUIPA, 42 U.S.C. § 2000cc–1(a) ("No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.").

To be clear, the Court is not saying that Defendants may not be entitled to qualified immunity on these claims, but only that, at this stage of the litigation, existing factual questions impacting the pants length rule prohibits the application of this immunity. *See McKenna v. Wright,* 386 F.3d 432, 436 (2d. Cir.2004); [FN2] *Walker v. Mendoza,* No. 00–CV–93(JG), 2000 WL 915070, at *7 (E.D.N.Y. June 27, 2000) ("[I]t is generally premature to address the defense of qualified immunity in a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6).") (citing *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir.1983)).

> FN2. The Second Circuit noted in *McKenna,*
>
> a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route. Not only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. Thus, the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense.
>
> 386 F.3d at 436 (citations and internal quotation marks omitted).

### 2. Plaintiff's Request for Family Participation in Eid El–Adha

**\*5** Plaintiff alleges that his religious beliefs require him to observe the Eid el-Adha holy day with his family but has been denied the ability to do so. Plaintiff also alleges that Native American inmates are

Slip Copy, 2013 WL 5466191 (N.D.N.Y.)
**(Cite as: 2013 WL 5466191 (N.D.N.Y.))**

allowed to participate with family members during nine religious holy days whereas Muslims are limited to one holy day that is not Eid el-Adha. Dkt. # 20 at 19. Plaintiff argues that Magistrate Judge Dancks framed the right at issue too narrowly when applying qualified immunity to Plaintiff's First Amendment, RLUIPA, and Equal Protection Clause claims for monetary damages resulting from Defendants' actions in prohibiting Plaintiff's family from participating during Eid el-Adha.[FN3]

> **FN3.** With respect to the First Amendment claim for damages, Magistrate Judge Dancks concluded that Defendants were entitled to qualified immunity because " 'there was no clearly established decisional law of the Supreme Court or of the Second Circuit that ... allowed family visitation during the Eid prayer festival.' " Dkt. # 20 at 24 (quoting dkt. # 12–1 at 10). Similarly, with respect to the RLUIPA claim for damages, Magistrate Judge Dancks concluded that Defendants were entitled to qualified immunity because "[t]here is no authority from the Second Circuit or the Supreme Court supporting the right of Muslim inmates to have family present at all religious events." *Id.* at 25. With respect to the Equal Protection Clause claims, Magistrate Judge Dancks concluded that "[f]or the reasons discussed above regarding the First Amendment and RLUIPA, Defendants are entitled to qualified immunity from Plaintiff's equal protection claim for damages regarding family participation in Eid el-Adha." Dkt. # 20 at 26–27.

On the First Amendment claim, Magistrate Judge Dancks correctly observed that "[t]he face of the complaint pleads facts plausibly suggesting that Defendants substantially burdened Plaintiff's sincere religious belief that family participation is required at Eid elAdha ...," and that Defendants have failed to identify a legitimate penological interest justifying

this policy. Dkt. # 20 at 23. However, for the reasons discussed above with regard to the application of qualified immunity on the pants length claim, the Court cannot conclude at this stage of the litigation that Defendants are entitled to qualified immunity. The absence in the record of a legitimate penological interest justifying the exclusion of family members from this particular religious holiday-but not others-creates a question of fact preventing the application of immunity on this claim at this time.

With respect to the RLUIPA claim, Magistrate Judge Dancks correctly concluded:

> Plaintiff has alleged facts plausibly suggesting that Defendants have placed a substantial burden on his religious exercise. Moreover, Defendants have not, at this point in the litigation, demonstrated what governmental interest supports the policy regarding family participation in Eid el-Adha. Defendants have thus failed to establish that the burden on Plaintiff was in furtherance of a compelling government interest or that it was the least restrictive means of furthering this compelling government interest. Therefore, Plaintiff has alleged facts plausibly suggesting that Defendants violated his rights under RLUIPA.

> Dkt. # 20 at 25.

For the same reasons as discussed above, it is premature to award Defendants qualified immunity on this claim.

On the Equal Protection Clause claim, Magistrate Judge Dancks correctly concluded that the Equal Protection Clause " 'bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5466191 (N.D.N.Y.)
**(Cite as: 2013 WL 5466191 (N.D.N.Y.))**

faith intent to injure a person.' " Dkt. # 20 at 26 (quoting *Bizzarro v. Miranda,* 394 F.3d 82, 86 (2d Cir.2005) (internal quotation marks omitted); *see also LeClair v. Saunders,* 627 F.2d 606, 609–10 (2d Cir.1980) (same). On the present record, it is unclear the basis for the alleged disparate treatment between Islamic prisoners and those of other religious faiths as to the number of holy days that family members may participate with a prisoner. Assuming that a disparity exists on the basis of an impermissible consideration, as the Court must at this stage of the litigation, reasonable officers could anticipate that their actions violated Plaintiff's Equal Protection Clause rights even without a case precisely on point. *See .e.g. Bizzarro,* 394 F.3d at 86. Thus, qualified immunity on this claim must be denied as premature.

### b. Remainder of the Report–Recommendation

**\*6** With respect to all other findings in Magistrate Dancks' Report–Recommendation, neither party has lodged any objections and the time for doing so has expired. After examining the record, this Court has determined that the Report–Recommendation is not subject to attack for plain error or manifest injustice on any of these recommendations. findings. Therefore, the Court adopts these portions of the Report–Recommendation.

## IV. CONCLUSION

For the reasons discussed above, the Court adopts Magistrate Judge Dancks' Report–Recommendation [dkt. # 20] in part. The Court **GRANTS** Defendants' motion to dismiss [dkt. # 12] with respect to: (1) the retaliation claim regarding meal prices; (2) the claims for damages against Defendants in their official capacities; (3) any claim asserted on behalf of other inmates and/or their guests; and (4) any claim asserting a generalized right to visitation. The (1) retaliation claim regarding meal prices is **DISMISSED with leave to amend,** and the (2) claims for damages against Defendants in their official capacities; (3) claims asserted on behalf of other inmates and/or their guests; and (4) any claim asserting a generalized right

to visitation are **DISMISSED without leave to amend.**

The Court **DENIES** Defendants' motion to dismiss [dkt. # 12] with respect to (1) the First Amendment claim for injunctive relief regarding the length of Plaintiff's pants; (2) the RLUIPA claim for injunctive relief regarding the length of Plaintiff's pants; (3) the First Amendment claim for injunctive relief regarding family participation in Eid el-Adha; (4) the RLUIPA claim for injunctive relief regarding family participation in Eid el-Adha; (5) the Equal Protection Clause claim for injunctive relief regarding family participation in Eid elAdha; (6) the Equal Protection Clause claim for damages and injunctive relief regarding meal prices; (7) the First Amendment and RLUIPA claims for damages regarding the length that Plaintiff may wear his pants while in general population; and (8) the First Amendment, RLUIPA, and Equal Protection Clause claims for damages regarding family participation in the Eid el-Adha observation at the correctional facility.

**Defendants are ordered to answer each of the remaining claims within thirty (30) days from the date of this Decision and Order.**

**IT IS SO ORDERED.**

N.D.N.Y.,2013.
Williams v. Leonard
Slip Copy, 2013 WL 5466191 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2012 WL 1377615 (N.D.N.Y.)
**(Cite as: 2012 WL 1377615 (N.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Booker WILSON, Plaintiff,
v.
WOODBOURNE CORRECTIONAL FACILITY;
Donald Depolo, Defendants.

No. 9:11–CV–1088 (DNH/ATB).
March 21, 2012.

Booker Wilson, pro se.

James J. Seaman, Asst. Attorney General for Defendants.

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In this civil rights complaint, plaintiff alleges that defendant Depolo violated plaintiff's First Amendment right to practice his religion and subjected him to excessive force in violation of the Eighth Amendment. (Compl.; Dkt. No. 1). Plaintiff claims that defendant Depolo engaged in this conduct because he does not like Muslims. Plaintiff seeks compensation for pain and suffering. (Compl.¶ 8).

Presently before the court is defendant Depolo's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 14). Plaintiff has responded in opposition to the motion. (Dkt. No. 17). For the following reasons, this court agrees with defendant and will recommend dismissal of the complaint in its entirety with prejudice.

> FN1. Defendant Depolo is the only remaining defendant. The complaint was dismissed as against Woodbourne Correctional Facility by Judge Hurd's Order, dated November 15, 2011. (Dkt. No. 5).

### DISCUSSION

**I. Facts**

In the complaint, plaintiff alleged that defendant Corrections Officer Depolo "misuse[d] his power" when he withheld plaintiff's Ramadan meal for one and one half hours. Plaintiff states that he had been fasting due to the Ramadan Holiday, and the meal that would have broken the fast was delayed from 8:17 p.m. until 9:45 p.m. (Compl.¶ 6). In his response to defendant's motion to dismiss, plaintiff states that this incident occurred on August 2, 2011. FN2

> FN2. Defendant pointed out in his memorandum of law that the complaint did not specify a particular date for the alleged conduct. (Dkt. No. 14–1 at 3; CM/ECFassigned pages).

Plaintiff also claims in the complaint that defendant Depolo threw away all plaintiff's "good stuff," including a pair of "medical boots" that were purchased for plaintiff by the State after an operation on plaintiff's feet. FN3 Plaintiff alleges that defendant Depolo put handcuffs on plaintiff too tightly when taking him to shower and to recreation. (*Id.*) Plaintiff claims that defendant always gave him "hate looks," made a "gun sign" with his hands, and called plaintiff a "terrorist" because he is Muslim. Plaintiff states that the 23 days he spent in the "Box" was "hell," and that he did not enjoy his Ramadan at all because of defendant's conduct. (*Id.*)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1377615 (N.D.N.Y.)
**(Cite as: 2012 WL 1377615 (N.D.N.Y.))**

FN3. In plaintiff's response to the motion to dismiss, he alleges that on August 26, 2011, when plaintiff was being moved to another housing area, defendant Depolo forced plaintiff to wear boots that were not his. (Dkt. No. 17 at 4). In his response, plaintiff further states that when he asked about his medical boots, defendant Depolo stated that he did not "know where they were." (*Id.*) From this statement, plaintiff assumed that defendant Depolo threw away plaintiff's boots "to be evil." (*Id.* at 5).

After the complaint was filed, plaintiff sent a letter to the court stating that Woodbourne Correctional Facility ("Woodbourne") returned his property on September 29, 2011. (Dkt. No. 4). Plaintiff states that he did get his medical boots back, but some of his unspecified "stuff" was "still missing." (*Id.*) Plaintiff's response to defendant's motion is unclear. Part of the document is typewritten, and part of the document is written in plaintiff's handwriting, but many of the facts in the typewritten portion are duplicative of the handwritten facts.[FN4] In the response, plaintiff clarifies that the date defendant allegedly delayed plaintiff's Ramadan meal was August 2, 2011, and the date that plaintiff was denied his medical boots appears to have been August 26, 2011.[FN5] (Dkt. No. 17 at 3, 4).[FN6] Plaintiff states that defendant Depolo abused his authority, violated the " 'officer & employee manual and (74 of the public health law.) Unlawful exaction of Domination)." (Dkt. No. 17 at 1).

FN4. The court notes that in the typewritten portion of the plaintiff's response, he mentions that when he was arguing with defendant Depolo about the medical boots, the defendant stated that "he didn't care about all of that this is punishment from Ramadan and snitching on him to the Sgt. which is really his buddy." (Dkt. No. 17 at 2). This is the first, and only time, that plaintiff mentions

anything that approaches a claim of retaliation for "snitching." There is absolutely no basis for this claim, and neither the complaint, nor any of plaintiff's handwritten documents mention this. Such a conclusory allegation of "retaliation," to the extent that plaintiff would have wished to add it to his complaint would be dismissed on the pleadings. *Gill v. Pidlypchak,* 389 F.3d 378, 380 (2d Cir.2004) (citation omitted). Claims of retaliation are "easily fabricated" and thus, plaintiff must set forth non-conclusory allegations. *Id.* (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002)). Additionally, any claim of retaliation is further weakened by the fact that plaintiff's boots were returned to him three days later on September 29, 2011. (Dkt. No. 4).

FN5. Plaintiff alleges that defendant Depolo made plaintiff wear other boots. (Dkt. No. 17 at 5).

FN6. The court will refer to the pages of documents as assigned by the court's electronic filing system CM/ECF.

## II. *Motion to Dismiss*

**\*2** To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.,* 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant " 'fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1377615 (N.D.N.Y.)
**(Cite as: 2012 WL 1377615 (N.D.N.Y.))**

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its particular obligation to treat *pro se* pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment).

### III. *Religion*

The First Amendment guarantees the right to the free exercise of religion. *Cutter v. Wilkinson,* 544 U.S. 709, 719 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). This right "is not absolute or unbridled, and is subject to valid penological concerns, including those relating to institutional security." *Johnson v. Guiffere,* 04–CV–57, 2007 WL 3046703, at *4, 2007 U.S. Dist. LEXIS 77239 (N.D.N.Y. Oct. 17, 2007). The Free Exercise Clause extends "beyond mere attendance at congregate religious services into other aspects of prison life including, pertinently, that of an inmate's diet...." *Id.* The Second Circuit has held

that it is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples...." *Ford,* 352 F.3d at 597 (citations omitted). Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith ... unconstitutionally burden[s] their free exercise rights." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004).

**\*3** The withholding of a single meal, however, is at most, a *de minimis* burden on plaintiff's religious expression. *See, e.g., Evans v. Albany Cty. Corr. Fac.,* No. 05–CV1400, 2009 WL 1401645, at *8 (N.D.N.Y. May 14, 2009) (receipt of "wrong meals" approximately 18 out of 354 times is *de minimis* and not actionable under First Amendment); *Ward v. Goord,* No. 9:06–CV–1429, 2009 WL 102928, at *9 (N.D.N.Y. Jan. 13, 2009) ("The failure to provide a single meal is insufficient to allege a constitutional violation."); *Odom v. Dixion,* No. 04–CV–0889, 2008 WL 466255, at *11 (W.D.N.Y. Feb. 15, 2008) (failure to provide inmate kosher meals on 7 out of 33 occasions not sufficient under First Amendment or RLUIPA [FN7]); *Thomas v. Picio,* No. 04–CV–3174, 2008 WL 820740, at *6 & n. 8 (S.D.N.Y. Mar. 26, 2008) (assuming inmate plaintiff was denied three or four Kosher meals for one or two consecutive days, "such a denial is not a substantial burden" on her free exercise of religion). *See also Norwood v. Strada,* 249 F. App'x 269, 272 & n. 1 (3d Cir.2007) (denial of religiously certified "halal" meals on seven out of seven occasions, during prison's two-and-one half-day emergency lock-down, was "a mere de minimis intrusion" that failed to substantially burden the inmate's religious beliefs). *Cf. Ford v. McGinnis,* 352 F.3d 582, 594 n. 12 (2d Cir.2003) (whether an inmate's religious beliefs were burdened by a prisonss refusal to serve a meal for the Eid ul Fitr feast was a question of fact, but noting that the "feast is sufficiently unique in its importance within Islam to distinguish the present case from those in which the mere inability to provide a small number of meals commensurate with a prisonss religious dietary restrictions was found to be a *de minimis*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

burden").

FN7. The Religious Land Use and Institutionalized Persons Act ("RLUIPA") also protects inmates' religious rights. RLUIPA prohibits the government from imposing a substantial burden on a prisoner's religious exercise unless the burden is the least restrictive means of furthering a compelling governmental interest. *See* 42 U.S.C. § 2000cc-l(a). For a burden to be substantial, a plaintiff must demonstrate that the government's action pressures him to commit an act forbidden by his religion or prevents him from engaging in conduct or having a religious experience mandated by his faith. In addition, this interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine. *Pugh v. Goord,* 571 F.Supp.2d 477, 504–05 (S.D.N.Y.2008); *Graham v. Mahmood,* No. 05–10071, 2008 WL 1849167, at * 14 (S.D.N .Y. Apr. 22, 2008). In this case, plaintiff never mentions RLUIPA, but to the extent that the court could interpret such a claim, it would also be subject to dismissal. Delaying plaintiff's meal for one and one half hours is, at worst, an inconvenience, not a substantial burden.

In this case, plaintiff claims that defendant Depolo does not like Muslims, and as a result, one[FN8] of plaintiff's Ramadan meals was *delayed* for approximately one and one half hours. Plaintiff claims that he was scheduled to break his fast by eating at 8:17 p.m., but did not eat until 9:45 p.m. This delay is a *de minimis* burden on plaintiff, and he states no constitutional or statutory violation as a result. Thus, plaintiff's First Amendment Freedom of Religion claim may be dismissed.

FN8. Although the typewritten portion of

plaintiff's response states that he was "denied" his meal on "two different occasions" (Dkt. No. 17 at 1—typewritten portion of plaintiff's response), there is no indication from plaintiff's complaint or any other handwritten document that plaintiff was "denied" any meals. It is clear that the Ramadan meal was merely delayed (Dkt. No. 1 at ¶ 6; Dkt. No. 17 at 3—handwritten portion of plaintiff's response), and there is no indication when, if ever, another meal was denied. In any event, even assuming that one meal was delayed and another was denied, the deprivation does not rise to the level of a constitutional violation.

## IV. *Tight Handcuffs*

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian,* 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v.. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

**\*4** In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be " 'inconsistent with the contemporary standards of decency.' " " *Whitely v. Albers,* 475 U.S. at 327 (citation omitted); *Hudson,* 503 U.S. at 9. However, "the malicious use of force to cause harm constitute [s][an] Eighth Amendment violation per se" regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1377615 (N.D.N.Y.)
**(Cite as: 2012 WL 1377615 (N.D.N.Y.))**

physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

Plaintiff alleges that defendant Depolo placed handcuffs on plaintiff too tightly when escorting plaintiff to recreation or to the shower. The court need not reach the subjective element of the standard for excessive force. Plaintiff's allegation, without more, that defendant Depolo put handcuffs on too tightly is clearly *de minimis,* and is certainly not "repugnant to the conscience of mankind." Although overly tight handcuffing may constitute excessive force,[FN9] in order to rise to the constitutional level, it must cause some injury beyond temporary discomfort. *See Schy v.. Vermont,* 2 F. App 'x 101, 101–102 (2d Cir.2001) (painful handcuffing for two hours does not violate the Constitution); *Lynch ex rel. Lynch v. City of Mt. Vernon,* 567 F.Supp.2d 459, 468 (S.D.N.Y.2008) (citing cases); *Wang v. Vahldieck,* No. 09–CV–3783, 2012 WL 92423, at *7 (E.D.N.Y. Jan. 9, 2012) (dis-

missing excessive force claim where there was no physical injury associated with the tight handcuffs); *Cunningham v. McCluskey,* No. 05 Civ. 10169, 2011 WL 2791336, at *7 (S.D.N.Y. June 22, 2011) (tight handcuffing was not excessive force where plaintiff suffered no physical injury as a result). Plaintiff in this case does not allege any injury that occurred as a result of these "real tight" handcuffs. (Compl.¶ 6). These allegations do not even approach stating a claim for excessive force, and any such claim may be dismissed.

> FN9. Courts have considered the following factors in making the determination of whether a "tight handcuff" claim rises to the level of excessive force. *See Ahmad v. Port Authority of New York and New Jersey,* No. 09–CV–3134, 2011 WL 7080691, at *7 (E.D.N.Y. Dec. 7, 2011). Courts consider whether the handcuffs were unreasonably tight; the defendants ignored the individual's pleas regarding the tightness of the cuffs; and the degree of injury to the wrist. *Id.* (citations omitted). Plaintiff in this case never claims that he requested defendant to loosen the cuffs, and there is no injury asserted.

**V. *Verbal Harassment***

**\*5** Verbal abuse and harassment, whether threatening, vulgar, or racial in nature, does not, by itself, rise to the level of a constitutional violation. *See, e.g., Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996). In this case, plaintiff alleges that defendant gave him "hate looks" and made a "gun sign." According to plaintiff, he looks like Osama Bin Laden, but he has never had any trouble until being incarcerated at Woodbourne. Even if the defendant did give plaintiff "hate looks" or made a threatening "gun sign," plaintiff alleges no injury as a result, and that form of harassment does not state a constitutional claim. Plaintiff's allegations of verbal harassment may be dismissed.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1377615 (N.D.N.Y.)
**(Cite as: 2012 WL 1377615 (N.D.N.Y.))**

**VI. Property**

The deprivation of property, whether intentional or unintentional is not actionable under section 1983 as long as the state provides an adequate post-deprivation procedure. *Hudson v. Palmer,* 468 U .S. 517, 533 (1984). New York provides an adequate post-deprivation remedy in the Court of Claims with respect to property claims by prison inmates. *See Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); *Love v. Coughlin,* 714 F.2d 207, 209 (2d Cir.1983); *see also* N.Y. Ct. Cl. Act § 10(6) (McKinney 1998).

Plaintiff claimed that defendant Depolo "threw away" plaintiff's good stuff, including his medical boots.[FN10] However, in a letter dated October 3, 2011, plaintiff stated that his property (including the medical boots) was returned to him, although some was still missing. (Dkt. No. 4). Clearly, based on plaintiff's own letter, defendant Depolo did not "throw away" plaintiff's medical boots, and plaintiff has not articulated what "stuff" was still missing from his property. However, even if some of plaintiff's property were not returned to him, he would have an adequate post-deprivation remedy in the Court of Claims, and any remaining property claims may be dismissed.

FN10. Plaintiff also refers to this claim as "medical negligence" although he does not allege that he suffered any harm as a result of wearing different boots. Because plaintiff's boots were returned to him, and it does not appear as though defendant Depolo was even involved in the deprivation, the court will not address the issue of medical care.

**VII. State Law Violations**

A violation of state law, even assuming that one existed, does not necessarily rise to the level of a constitutional violation. *See, e.g., Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (state law violation does not necessarily rise to the level of a constitutional violation); *Young v. County of Fulton,* 160 F.3d 899, 902 (2d Cir.1998) (violation of state law is not the

"benchmark" for determining whether a constitutional violation has occurred).

In plaintiff's response to defendant's motion to dismiss, he alleges that the defendant violated the "officer and employee manual" and section 74 of the Public Health Law. (Dkt. No. 17 at 1). It is unclear to which "manual" plaintiff is referring, and there is no section 74 of the New York Public Health Law. Even assuming that the court could decipher plaintiff's allegation, at best, he is claiming that the defendant violated state law without any further explanation. This claim may also be dismissed for failure to state a constitutional claim.

**VIII. Opportunity to Amend**

**\*6** The court should not dismiss a *pro se* action without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim may be asserted. *Parrino v. Sun Gard Availability Services, L.P.,* No. CV 11–3315, 2012 WL 826946, at \*4 (E.D.N.Y. Feb. 16, 2012) (citing *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir.1999)). In this case, even under a liberal reading of the complaint, there is no way that plaintiff could state a claim regarding his medical boots or any of his other property items, because it is clear by plaintiff's own admission, that his boots were returned to him, and defendant Depolo had nothing to do with the deprivation.[FN11] Plaintiff's claim of verbal harassment also fails to state a claim, and there is no way a claim could be stated based on the facts that plaintiff alleges. Plaintiff's claim that a religious meal was delayed for one and one half hours may not be the basis for a constitutional claim, regardless of amendment. Plaintiff has not stated any injury as the result of his "real tight" handcuffs, and his claim that defendant violated state law will not rise to the level of a constitutional violation. Thus, this court will recommend dismissal without giving plaintiff the opportunity to amend his complaint.

FN11. The court also notes that plaintiff's

Not Reported in F.Supp.2d, 2012 WL 1377615 (N.D.N.Y.)
**(Cite as: 2012 WL 1377615 (N.D.N.Y.))**

response to the defendant's motion to dismiss, dated March 1, 2012 contains some misleading statements. Plaintiff continued to state that defendant threw plaintiff's boots away and adds that he did this to "be evil." (Dkt. No. 17 at 5). However, plaintiff's letter, dated October 3, 2011 states that Woodbourne returned his property to him, including his medical boots. Thus, it is unclear why plaintiff would still be claiming on March 1, 2012 that defendant threw away plaintiff's boots to be "evil" when plaintiff was well aware by that time, that defendant did not throw away plaintiff's property.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendant's motion to dismiss this action pursuant to Fed.R.Civ.P. 12(b)(6) (Dkt. No. 14) be **GRANTED,** and the complaint **DISMISSED IN ITS ENTIRETY WITH PREJUDICE.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

N.D.N.Y.,2012.
Wilson v. Woodbourne Correctional Facility
Not Reported in F.Supp.2d, 2012 WL 1377615 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.